UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LANCE SHOCKLEY,                          )
                                         )
                 Petitioner,             )
                                         )
        v.                               )          Case No. 4:19-cv-02520-SRC
                                         )
TRAVIS CREWS,                            )
                                         )
                 Respondent.             )

**<u>Memorandum and Order</u>**

# Table of Contents

I.    Introduction .................................................................................................... 1

II.   Background ..................................................................................................... 1

III.  Standard of review ......................................................................................... 3

IV.   Motion for a *Rhines* stay ............................................................................. 4

      A.    Overview ........................................................................................... 4

      B.    Standards for *Rhines* stays ............................................................. 6

      C.    Discussion of motion for a *Rhines* stay ......................................... 7

            1.    Procedural default under Rule 29.15(b) exhausts Shockley's claims ........ 7

            2.    Rule-91 relief is not available to Shockley ............................... 11

            3.    Shockley has intentionally delayed this proceeding ..................... 13

V.    Discovery motion .......................................................................................... 14

      A.    Overview ......................................................................................... 14

      B.    AEDPA and standards for a discovery motion .................................... 14

      C.    Discussion of discovery motion ........................................................ 17

            1.    Discovery requests for raised claims ........................................ 17

            2.    Discovery requests under § 2254(e)(2) and *Shinn* ................... 20

            3.    Discovery requests contrary to § 2254(e)(2) and *Shinn* ........... 22

            4.    Discovery request under *Bracy* .............................................. 24

            5.    Discovery requests without briefing ......................................... 25

VI.   Habeas corpus petition .................................................................................. 25

      A.    The evidence against Shockley ......................................................... 26

      B.    Claims adjudicated on the merits in state court ................................. 29

            1.    Ineffective-assistance claims adjudicated on the merits in state court ........... 30

                  a.    *Strickland v. Washington* .......................................... 30

                        i.     *Strickland*'s performance and prejudice prongs .............. 31

                        ii.    The ABA's guidelines do not set the standard for effective assistance ........... 34

                        iii.   *Strickland* and § 2254(d) ..................................... 38

                  b.    Claim 1 ................................................................... 39

                        i.     Jury selection ........................................... 40

                        ii.    Motion for a new trial ................................... 44

|   |   | c. | Claim 5 ........................................................................ | 47 |
|   |   | d. | Claim 7 ........................................................................ | 49 |
|   |   | e. | Claim 9(a) ................................................................... | 49 |
|   |   | f. | Claim 10 ...................................................................... | 51 |
|   |   | g. | Claim 12 ...................................................................... | 54 |
|   |   | h. | Claim 14 ...................................................................... | 55 |
|   |   | i. | Claim 15(a) ................................................................. | 57 |
|   |   | j. | Claim 17 ...................................................................... | 59 |
|   |   | k. | Claim 20 ...................................................................... | 62 |
|   |   | l. | Claim 23 ...................................................................... | 64 |
|   |   | m. | Claim 24 ...................................................................... | 68 |
|   | 2. | Other claims adjudicated on the merits in state court ............................. | 69 |
|   |   | a. | Claim 3 ........................................................................ | 69 |
|   |   | b. | Claim 4 ........................................................................ | 74 |
|   |   | c. | Claim 16 ...................................................................... | 78 |
|   |   | d. | Claim 18(a) ................................................................. | 79 |
|   |   | e. | Claim 19 ...................................................................... | 81 |
|   |   | f. | Claim 25 ...................................................................... | 82 |
|   |   |   | i. Allegations regarding files on Sergeant Graham's computers ........................................................ | 84 |
|   |   |   | ii. Allegations regarding Sheriff Greg Melton ..................... | 91 |
|   |   |   | iii. Allegations of a criminal conspiracy ............................... | 96 |
|   |   |   | iv. Allegations of suppression of evidence .......................... | 99 |
|   |   |   | v. The Missouri Supreme Court's findings ........................ | 106 |
|   |   | g. | Claim 28 ...................................................................... | 111 |
| C. | Procedurally defaulted claims ................................................................ | | | 118 |
|   | 1. | Procedurally defaulted ineffective-assistance claims ............................. | | 120 |
|   |   | a. | Claim 6 ........................................................................ | 123 |
|   |   | b. | Claim 8 ........................................................................ | 125 |
|   |   | c. | Claim 9(b) ................................................................... | 127 |
|   |   | d. | Claim 11 ...................................................................... | 128 |
|   |   | e. | Claim 13 ...................................................................... | 129 |
|   |   | f. | Claim 15(b) ................................................................. | 135 |

g.      Claim 18(b) ............................................................... 136

h.      Claim 22 ................................................................... 138

i.      Claim 26 ................................................................... 143

2.      Other procedurally defaulted claims ...................................... 146

a.      Claim 2 ..................................................................... 146

b.      Claim 21 ................................................................... 148

i.      The factual and legal availability of a ballistics-evidence
        claim during state-court review ..................................... 150

ii.     The competence of counsel in choosing not to raise a
        ballistics-evidence claim ................................................. 154

iii.    The miscarriage-of-justice exception to the bar on
        procedurally defaulted claims ......................................... 156

c.      Claim 27 ................................................................... 157

VII.    Law-and-justice standard ....................................................... 158

VIII.   Certificate of appealability .................................................... 160

IX.     Conclusion ............................................................................ 161

iv

## I.      Introduction

A jury found that Lance Shockley murdered Missouri Highway Patrol Sergeant Carl

DeWayne Graham, Jr., and a Missouri judge sentenced him to death for his crime.  In the nearly

19 years since the murder, Shockley has presented his case to Missouri courts on four occasions.

After the Missouri Supreme Court twice affirmed his conviction and death sentence, Shockley

now petitions this Court for a writ of habeas corpus on 28 grounds.  The Court finds Shockley's

arguments lack merit and denies his Petition.

## II.     Background

The Missouri Supreme Court described the pertinent facts as follows:

> On November 26, 2004, [Shockley] was involved in a motor vehicle
> accident resulting in the death of his passenger.  Over the next several months,
> [Sergeant Graham] conducted the investigation of the accident, which criminally
> implicated [Shockley].

> On March 20, 2005, at approximately 12:20 p.m., [Shockley] borrowed
> his grandmother's red Pontiac Grand Am (hereinafter, "the red car"), which had a
> bright yellow sticker on the trunk near the driver's side.  Between 1:45 p.m. and
> 4:15 p.m. that afternoon, various witnesses noticed a red car with a bright yellow
> sticker affixed to the driver's side of the trunk parked on the wrong side of the
> road a few hundred feet from [Sergeant Graham's] residence.

> At 4:03 p.m. that day, [Sergeant Graham] returned home, backed his
> patrol car into his driveway, and radioed dispatch he was ending his shift.  As
> [Sergeant Graham] exited his vehicle, he was shot from behind with a high-
> powered rifle that penetrated his Kevlar vest.  The bullet severed [Sergeant
> Graham's] spinal cord at the neck, immediately paralyzing him.  [Sergeant
> Graham] fell backward and suffered fractures to his skull and ribs upon impact
> with the pavement.  The killer then approached [Sergeant Graham], who was still
> alive, and shot him twice more with a shotgun into his face and shoulder.  The
> recovered rifle bullet was deformed, but ballistics experts determined it belonged
> to the .22 to .24 caliber class of ammunition that would fit a .243 caliber rifle.
> Investigators later learned that, around 7 p.m. on the evening of [Sergeant
> Graham's] murder, [Shockley's] wife gave [Shockley's] uncle a box of .243
> caliber bullets and stated, "[Shockley] said you'd know what to do with them."

> [Shockley] returned the red car to his grandmother between 4:15 p.m. and
> 4:30 p.m. that same day.  Investigators calculated it took approximately eighteen

minutes to drive from [Shockley's] grandmother's house to the location where the red car with the yellow sticker had been parked near [Sergeant Graham's] home.

Two highway patrol investigators interviewed [Shockley] at his residence that evening. [Shockley] immediately denied killing [Sergeant Graham] and stated he spent all day working around his house with his neighbor, Sylvan Duncan (hereinafter, "Sylvan"). The next day, [Shockley] again met with investigators and elaborated on the alibi. [Shockley] claimed he was visiting relatives, including his grandmother, and he watched from his living room as Sylvan pushed brush. [Shockley] stated he knew [Sergeant Graham] was investigating him for the fatal accident and, without prompting, declared he did not know where [Sergeant Graham] lived.

Later that day, [Shockley] visited his grandmother and instructed her to tell the police he had been home all day the day [Sergeant Graham] was shot. When his grandmother told [Shockley] she would not lie for him, he put his finger over her mouth and said, "I was home all day."

Police arrested [Shockley] on March 23, 2005, for leaving the scene of the car accident that resulted in his passenger's death. The state subsequently charged [Shockley] with leaving the scene of a motor vehicle accident, first-degree murder for [Sergeant Graham's] death, and armed criminal action. The state proceeded to trial only on the first-degree murder charge and sought the death penalty. [Shockley] was represented initially by several public defenders, including Thomas Marshall (hereinafter, "Marshall" and, collectively, "the first trial team"). [Shockley] later obtained private counsel and was represented at trial by Brad Kessler (hereinafter, "Kessler"), David Bruns (hereinafter, "Bruns"), and Mollyanne Henshaw (hereinafter, "Henshaw" and collectively, "trial counsel").

The state theorized [Shockley] killed [Sergeant Graham] to stop the fatal car accident investigation. [Shockley's] defense was it was ridiculous for him to believe, simply by killing [Sergeant Graham], law enforcement would halt its investigation into the accident. Trial counsel also argued the police improperly directed all their investigative attention toward him rather than pursuing other possible perpetrators.

After a five-day guilt phase proceeding, the jury found [Shockley] guilty of first-degree murder. During the penalty phase, the state submitted four statutory aggravators pursuant to 565.032.2: (1) [Sergeant Graham] was a "peace officer" and the "murder was committed because of the exercise of his official duty;" (2) [Shockley] was depraved of mind when he killed [Sergeant Graham] and, "as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman;" (3) [Sergeant Graham] was murdered "for the purpose of avoiding . . . or preventing a lawful arrest;" and (4) [Sergeant Graham] was a "potential witness in [a] past or pending investigation . . . and was killed as a result of his status as a . . . potential witness."

> The jury found the first, third, and fourth statutory aggravators were proven beyond a reasonable doubt. The jury did not find unanimously the circumstances in mitigation outweighed those in aggravation. However, the jury was unable to agree which punishment to recommend. After overruling [Shockley's] motion for new trial, the circuit court imposed a death sentence pursuant to section 565.034.4.

*Shockley v. State* (*Shockley II*), 579 S.W.3d 881, 890–92 (Mo. 2019). Shockley appealed his conviction to the Missouri Supreme Court, which affirmed. *State v. Shockley* (*Shockley I*), 410 S.W.3d 179 (Mo. 2013). Shockley then filed a postconviction-relief motion under Missouri Supreme Court Rule 29.15, which the motion court denied after an evidentiary hearing. Docs. 33-107, 33-108. He appealed that decision, and the Missouri Supreme Court again affirmed. *Shockley II*, 579 S.W.3d at 921. Shockley now seeks a writ of habeas corpus in this Court pursuant to 28 U.S.C. § 2254.

## III.   Standard of review

The Antiterrorism and Effective Death Penalty Act, known as AEDPA, and related caselaw establish a complex, multilayered set of standards for adjudicating Shockley's claims. Given the complexity of those standards—and the voluminous briefing the Court must analyze under those standards (about 1,000 pages of briefing and over 15,000 pages of exhibits)—an extended preliminary explanation of the relevant standards would not effectively frame the Court's analysis. Therefore, the Court divides its analysis into six sections, stating the applicable standards at the beginning of each: (1) motion for a *Rhines* stay, (2) discovery motion, (3) ineffective-assistance claims adjudicated on the merits in state court, (4) other claims adjudicated on the merits in state court, (5) procedurally defaulted ineffective-assistance claims, and (6) other procedurally defaulted claims. And for the sake of clarity, instead of addressing the

claims in the order in which Shockley presented them, the Court groups the claims into these six

sections.

IV.    **Motion for a *Rhines* stay**

      A.    **Overview**

      In response to the Court's order for supplemental briefing regarding *Shinn v. Ramirez*,

142 S. Ct. 1718 (2022), Doc. 61, Shockley moved to stay this case so he could pursue state-court

remedies on claims 6, 13, 21, 22, and 26, citing *Rhines v. Weber*, 544 U.S. 269 (2005).  Doc. 64

at pp. 4–8.  Though a state prisoner seeking a writ of habeas corpus in federal court generally

must first exhaust available state-court remedies, *see* 28 U.S.C. § 2254(b), the Supreme Court

held in *Rhines* that, where a petitioner includes both exhausted and unexhausted claims in his

complaint and the petitioner can show that a stay would not frustrate the objectives of AEDPA,

courts must grant a petitioner's request for a stay.  544 U.S. at 278; *see also infra* Section IV.B.

(discussing the test for when a stay would frustrate the objectives of AEDPA).

      In each claim Shockley moves to stay, he presents a claim under *Martinez v. Ryan*, 566

U.S. 1 (2012), that is, an ineffective-assistance-of-trial-counsel claim attached to an ineffective-

assistance-of-postconviction-counsel claim.  *See* Doc. 48 at pp. 161–237, 305–25; 382–443;

502–11.  In Missouri courts, "[a] person convicted of a felony after trial claiming . . . ineffective

assistance of trial and appellate counsel . . . may seek relief in the sentencing court pursuant to

the provisions of this Rule 29.15."  Mo. Sup. Ct. R. 29.15(a).  On direct appeal, the Missouri

Supreme Court affirmed the trial court's judgment against Shockley on August 13, 2013.  *See*

*Shockley I*, 410 S.W.3d at 225.  "If an appeal of the judgment or sentence sought to be vacated,

set aside or corrected is taken, the motion shall be filed within 90 days after the date the mandate

of the appellate court issues affirming such judgment or sentence."  Mo. Sup. Ct. R. 29.15(b).

Shockley timely sought Rule 29.15 review of numerous claims. *Shockley II*, 579 S.W.3d at 892. Yet, nearly nine years later, on June 9, 2022, Shockley requested a *Rhines* stay as to claims 6, 13, 21, 22, and 26. *See* Doc. 64. So, the time has long since passed for Shockley to meet Missouri's ninety-day deadline to seek review pursuant to Rule 29.15 of these newly minted claims.

Shockley now seeks to return to state court and litigate his claims under Missouri Supreme Court Rule 91. Doc. 64 at p. 1. Rule 91 states that "[a]ny person restrained of liberty within [Missouri] may petition for a writ of habeas corpus to inquire into the cause of such restraint." Mo. Sup. Ct. R. 91(b). In 1952, Missouri adopted Rule 27.26, modeled after the federal "single, unitary, post-conviction remedy" established by 28 U.S.C. § 2255. *Wiglesworth v. Wyrick*, 531 S.W.2d 713, 717 n.3, 719 (Mo. 1976). That rule was "intended to provide the excusive procedure which shall be followed when a prisoner in custody seeks relief on the basis of [various kinds of claims, including claims of constitutional violations]." *Id.* at 715 (quoting Mo. Sup. Ct. R. 27.26 as it existed in 1976). "Rule 27.26 . . . was a procedural substitute for a state habeas proceeding." *Duvall v. Purkett*, 15 F.3d 745, 747 n.2 (8th Cir. 1994). Rule 29.15 has since replaced Rule 27.26 as the procedure for convicted felons to litigate constitutional claims. *Burns v. Gammon*, 173 F.3d 1089, 1091 (8th Cir. 1999) (describing Rule 29.15 as the "successor rule" to Rule 27.26).

Shockley does not provide any meaningful argument for his contention that some of his claims remain unexhausted or give any substantive discussion of the relevant caselaw. *See* Doc. 64. After reviewing the relevant caselaw, the Court finds that Shockley has exhausted his claims and that a stay at this late stage of the proceedings would frustrate the objectives of AEDPA. *See infra* Section IV.C. Therefore, the Court does denies Shockley's request for a *Rhines* stay.

B.      **Standards for** *Rhines* **stay**

Shockley alleges that he has filed a "mixed" petition and the Court should therefore grant

a stay.  Doc. 64.  The Court finds that, even if the petition were mixed, other considerations

make Shockley ineligible for a stay.  The Court discusses the relevant standard for whether to

stay a mixed petition below.  Faced with the question of how to address a mixed petition—a

petition containing both exhausted and unexhausted claims—the Supreme Court found that

"[a]ny solution to this problem must . . . be compatible with AEDPA's purposes."  *Rhines*, 544

U.S. at 271, 276.  To resolve this question, the Supreme Court established the following

standard:

> [I]t likely would be an abuse of discretion for a district court to deny a stay and to
> dismiss a mixed petition if the petitioner had good cause for failing to exhaust, his
> unexhausted claims are potentially meritorious, and there is no indication that the
> petitioner engaged in intentionally dilatory litigation tactics.   In such
> circumstances, the district court should stay, rather than dismiss, the mixed
> petition.

*Id.* at 278.

"An applicant [for federal habeas relief] shall not be deemed to have exhausted the

remedies available in the courts of the State . . . if he has the right under the law of the State to

raise, by any available procedure, the question presented."  28 U.S.C. § 2254(c).  "Although this

language could be read to effectively foreclose habeas review by requiring a state prisoner to

invoke *any possible* avenue of state court review, [the Supreme Court has] never interpreted the

exhaustion requirement in such a restrictive fashion."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 844

(1999) (citation omitted) (emphasis in original).  Exhaustion requires only that state courts have

"a *fair* opportunity to act on [the petitioner's] claims."  *Id.* (citation omitted) (emphasis in

original).  "State petitioners must give the state one full opportunity to resolve any constitutional

issues by invoking one complete round of the State's established appellate review process."  *Id.*

at 845.  "A state prisoner is not required to pursue 'extraordinary' remedies outside of the

standard review process . . . ."  *Welch v. Lund*, 616 F.3d 756, 758 (8th Cir. 2010) (citations

omitted).  And, "if state-court remedies are no longer available because the prisoner failed to

comply with the deadline for seeking state-court review or for taking an appeal, those remedies

are technically exhausted."  *Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (citation omitted).

    **C.**    **Discussion of motion for a *Rhines* stay**

The Court cannot grant Shockley a *Rhines* stay for the following reasons, which the

Court discusses below:  (1) in Missouri, direct appellate review and postconviction review under

Rule 29.15 provide the established procedure for Shockley to raise his claims, making them

sufficient to exhaust these claims; (2) even if the possibility of review under Rule 91 could keep

a claim from becoming exhausted, Rule 91 does not provide Shockley another opportunity to

litigate his case in Missouri; and (3) a court should only stay a case with unexhausted claims

where the petitioner has not intentionally delayed the proceedings, but Shockley has intentionally

delayed this Court's proceedings.  Therefore, Shockley is ineligible for a *Rhines* stay.

    **1.**    **Procedural default under Rule 29.15(b) exhausts Shockley's claims**

Shockley cannot seek any further postconviction review in Missouri.  Rule 29.15

provides the procedure for petitioners convicted of a felony after trial to present constitutional

claims, especially claims of ineffective assistance.  Mo. Sup. Ct. R. 29.15(a).  Because Shockley

appealed his conviction, *see Shockley I*, 410 S.W.3d at 179, he had 90 days from the final

decision on that appeal to file any claim for postconviction relief, Mo. Sup. Ct. R. 29.15(b).  This

deadline passed nearly a decade ago, *see Shockley I*, 410 S.W.3d at 179 (entered August 13,

2013), and it procedurally bars Shockley from any further Rule-29.15 relief.

Shockley claims that he can still receive state habeas review under Missouri Supreme Court Rule 91.  Doc. 64 at p. 1 (citing *State ex rel. Johnson v. Blair*, 628 S.W.3d 375, 381 (Mo. 2021) (holding that "[t]here is no absolute procedural bar to . . . seeking habeas relief" under Rule 91 (alteration in original) (quoting *State ex rel. Nixon v. Jaynes*, 63 S.W.3d 210, 217 (Mo. 2001) (rev.ed on other grounds))).  *But see Johnson*, 628 S.W.3d at 381 ("But the opportunities for [habeas] relief are extremely limited.  A strong presumption exists . . . against claims that already have once been litigated." (citation omitted)).  The Court concludes that Shockley's procedural default under Rule 29.15 exhausts his claims regardless of Missouri's Rule 91 procedure.  Four reasons support this conclusion.

First, Rule 29.15 postconviction review provides the established means for a petitioner in Shockley's position to raise ineffective-assistance claims.  "Rule 29.15 . . . post-conviction motions for relief 'are designed to provide a single unitary, post-conviction remedy, to be used in place of other remedies, including the writ of habeas corpus.'"  *State ex rel. Laughlin v. Bowersox*, 318 S.W.3d 695, 701 (Mo. 2010) (quoting *Nixon*, 63 S.W.3d at 214); *see also State ex rel. Zinna v. Steele*, 301 S.W.3d 510, 516 (Mo. 2010) (same).  While this principle does not mean that review under to Rule 29.15 entirely replaces habeas review pursuant to Rule 91, *see Laughlin*, 318 S.W.3d at 701–02, it does establish Rule 29.15 as *the* appropriate procedure for petitioners like Shockley to present their constitutional claims, *see* Mo. Sup. Ct. R. 29.15(a).

To exhaust a claim, "[s]tate petitioners must give the state one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan*, 526 U.S. at 845.  If a procedure is part of the "normal, simple, established . . . appellate review process," the petitioner must exhaust that remedy.  *Id.* at 845.  While terms like "normal" and "established" are not self-defining, the Missouri Supreme Court's

repeated finding that Rule 29.15 provides "a single unitary post-conviction remedy, to be use in place of other remedies," *see, e.g., Laughlin*, 318 S.W.3d at 701 (citation omitted), makes clear that Rule 29.15 provides Missouri's "established appellate review process" for convicted felons with constitutional claims, *O'Sullivan*, 526 U.S. at 845; *see also* Mo. Sup. Ct. R. 29.15(a).  The deadline for Shockley to raise claims according to Missouri's established appellate review process has now passed, making those claims exhausted.  *See Woodford*, 548 U.S. at 93 (citation omitted).

Second, Rule 91 provides only an extraordinary remedy.  "A state prisoner is not required to pursue 'extraordinary' remedies outside the standard review process" to exhaust his claims. *Welch v. Lund*, 616 F.3d 756, 758 (8th Cir. 2010) (citations omitted); *see also Grass v. Reitz*, 643 F.3d 579, 585 n.3 (8th Cir. 2011) (finding that the Missouri Supreme Court's declaration that a procedure "is an extraordinary remedy that is not part of the standard review process" makes that procedure unnecessary for purposes of exhausting a claim (citation omitted)).  The Missouri Supreme Court has held that "[t]he relief available under a writ of habeas corpus has traditionally been very limited, and courts are not required to issue this extraordinary writ where other remedies are adequate and available."  *Clay v. Dormire*, 37 S.W.3d 214, 217 (Mo. 2000).  Where a petitioner fails to raise a claim in postconviction review, the petitioner generally cannot raise those claims in a Missouri habeas petition.  *Id.*  Therefore, a state habeas petition pursuant to Rule 91 is an extraordinary remedy, not part of the established procedure for Missouri petitioners; Shockley does not need to pursue the extraordinary Rule 91 state habeas review to exhaust his claims.

Third, procedural default exhausts a claim: "[s]tate prisoners, however, often fail to raise their federal claims in compliance with state procedures, or even raise those claims in state court

9

at all.  If a state court would dismiss these claims for their procedural failures, such claims are technically exhausted . . . ."  *Shinn*, 142 S. Ct. at 1732.  If a petitioner fails to present his claims pursuant to Rule 29.15, the petitioner procedurally defaults those claims.  *Moore-El v. Luebbers*, 446 F.3d 890, 898 (8th Cir. 2006).  Thus—setting aside the nuances of the general standard established by *O'Sullivan*—failure to raise a claim under Rule 29.15 procedurally defaults that claim, and procedural default exhausts a claim.  Ergo, Shockley has defaulted the claims he chose not to raise in his Rule-29.15 review.

Fourth, accepting Shockley's argument would lead to precisely the absurd result that the *O'Sullivan* Court sought to avoid.  The Supreme Court reasoned that, if it required petitioners to "invoke *any possible* avenue of state court review," this rule would "effectively foreclose [federal] habeas review."  *O'Sullivan*, 526 U.S. at 844 (emphasis in original).  Therefore, the Supreme Court does not require a state petitioner to invoke every possible remedy before deeming his claims exhausted.  *Id.*  The Missouri Supreme Court has found that "there is no absolute bar to seeking habeas relief.  Successive habeas corpus petitioner are, as such, not barred."  *Johnson*, 628 S.W.3d at 381 (citation omitted) (cleaned up).  According to Shockley, this means he can pursue further avenues of review in state court and, therefore, his unraised claims remain unexhausted.  Doc. 64 at p. 1.  By this logic, a petitioner can always file for habeas relief in Missouri, and a petitioner can never fully exhaust the established appellate process, "effectively foreclose[ing] [federal] habeas review."  *O'Sullivan*, 526 U.S. at 844.  The fact that Shockley's Rule-91 theory leads to precisely the absurd result the Supreme Court designed its exhaustion standards to avoid highlights the error in Shockley's argument:  Rule 91 provides extraordinary relief, not the established procedure to for petitioners to litigate their

constitutional claims.  For these reasons, the Court finds that Shockley does not need to seek relief under Rule 91 to exhaust his claims.  Rather, Shockley has exhausted his claims.

### 2.    Rule-91 relief is not available to Shockley

Even if Shockley were required to pursue every possible state remedy to exhaust his claims, Rule 91 does not provide an available remedy.  Although Missouri prisoners can, in exceptional circumstances, receive habeas review under Rule 91 for procedurally defaulted claims, Shockley fails to mention any of the applicable caselaw, and he certainly fails to present a persuasive argument that he falls into one of these exceptions.  Under Missouri law the following narrow exceptions exist for a prisoner to obtain habeas review under Rule 91 of procedurally defaulted claims:

> [S]ubsequent habeas relief is not barred when the petitioner can demonstrate:  (1) a claim of actual innocence or (2) a jurisdictional defect or (3)(a) that the procedural defect was caused by something external to the defense—that is, a cause for which the defense is not responsible—and (b) prejudice resulted from the underlying error that worked to the petitioner's actual and substantial disadvantage.

*State ex rel. Laughlin v. Bowersox*, 318 S.W.3d 695, 701 (Mo. 2010) (emphasis omitted) (quoting *State ex rel. Zinna v. Steele*, 301 S.W.3d 510, 516–17 (Mo. 2010)).

Shockley never argues actual innocence and never alleges any jurisdictional defect.  *See* Docs. 48, 56, 64.  Shockley likewise fails to show that something external to the defense caused the procedural defect.  The absence of an allegation of a jurisdictional defect being self-evident, the Court turns to the actual-innocence and then the external-to-the-defense prongs.  As noted below in Section VI.A., Shockley states he has always maintained his innocence.  But Shockley never argues actual innocence; that is to say, in his hundreds of pages of briefing and motions in this Court, at no time does Shockley argue that he did not murder Sergeant Graham.  *See* Docs. 48, 56.  When addressing an analogous actual-innocence exception to procedural default in the

federal context, Shockley states that "[t]he exception requires a habeas petitioner to present new evidence that affirmatively demonstrates he is innocent," and then sidesteps the issue, arguing only that—*but for* the allegedly unreliable evidence used against him—the jury could not have convicted him of murder.  Doc. 56 at pp. 174–75.  Because Shockley fails to squarely address the actual-innocence exception to the federal bar on procedurally defaulted claims, the Court cannot find that Shockley would succeed under the actual-innocence exception to the Missouri bar on procedurally defaulted claims.  *See infra* Section VI.A. (discussing in detail the standards for actual-innocence and Shockley's failure to attempt to meet those standards).

Although he does attempt to demonstrate cause and prejudice under federal standards by alleging that postconviction counsel acted incompetently in each of the relevant claims, Shockley does not cite any case holding that postconviction-counsel incompetence is "something external to the defense" under Missouri's procedural rules.  *See* Doc. 48; *see also State ex rel. Clemons v. Larkins*, 475 S.W.3d 60, 76 (Mo. 2015) (explaining that the something-external-to-the-defense standard requires a petitioner to show that "[t]he fatual or legal basis for a claim must not have been reasonably available to counsel or some interference by state officials must have made compliance impracticable") (citing *State ex rel. Woodworth v. Denney*, 396 S.W.3d 330, 337 (Mo. 2013); *Gehrke v. State*, 280 S.W.3d 54, 59 (Mo. 2009) ("If a claim could have been raised in a . . . Rule 29.15 motion but was not raised, the [petitioner] waives that claim and cannot raise the claim in a subsequent petition for habeas corpus.").  Further, as explained below, the Court concludes that postconviction counsel did not act incompetently and that Shockley did not suffer prejudice from any alleged ineffective assistance.  *See infra* Sections VI.C.1.a.–i.  In sum, Shockley fails to show that he could receive another layer of review in the Missouri-court system and fails to show that he requires another layer of review to exhaust his claims.  Because

12

Shockley has exhausted his claims, he fails to meet the requirements for a stay under *Rhines*.
544 U.S. at 278.

### 3.       Shockley has intentionally delayed this proceeding

What's more, even if the Amended Petition contained unexhausted claims, "if a petitioner
engages in abusive litigation tactics or intentional delay, the district court should not grant him a
stay at all." *Rhines*, 544 U.S. at 277–78; *see also Shinn*, 142 S. Ct. at 1739 ("[A] federal habeas
court may never 'needlessly prolong' a habeas case . . . ." (citation omitted)).  Shockley only
requested a *Rhines* stay nearly three years after filing this case—and only after *Shinn* made clear
that he could not support the allegedly unexhausted claims with evidence.  Docs. 1, 64.  The
Court accordingly views with a healthy dose of skepticism Shockley's belated, post-*Shinn*
assertion of having unexhausted claims.

That said, if he truly believed he had further state remedies but nonetheless filed this
federal petition, Shockley should have brought the lack-of-exhaustion issue to this Court's
attention immediately.  Typically, a federal court cannot review an unexhausted claim. *Wade v.
Mayo*, 334 U.S. 672, 679 (1948).  Moreover, if Shockley thought, before filing, that he still had
available state remedies, he could have waited, free of statute-of-limitations concerns, to file this
habeas case until after the appropriate court had adjudicated his claims. *See generally*, 28 U.S.C.
§ 2244(d)(2) ("The time during which a properly filed application for State post-conviction or
other collateral review with respect to the pertinent judgement or claim is pending shall not be
counted toward any period of limitations [for federal habeas petitions].").  In either case,
Shockley's tactics amount to intentional delay.

If Shockley genuinely believed that his Petition or Amended Petition contained
unexhausted claims, he would have moved for a stay at the earliest possible moment.  Instead,
only after the Supreme Court handed down *Shinn*—which foreclosed an evidentiary hearing and

precluded the Court from otherwise considering evidence beyond the state-court record on his

ineffective-assistance-of-post-conviction-counsel claim—did Shockley pivot to a new, and

unsupported, argument for a stay. Because Shockley intentionally delayed filing a motion for a

stay, and because the Court concludes his motion lacks merit, *Rhines* does not entitle Shockley to

a stay, and the Court denies his motion. Doc. 64.

## V.      Discovery motion

### A.      Overview

In keeping with AEDPA's overarching design, federal law sets a high bar for a habeas

petitioner to be entitled to discovery. First, 28 U.S.C. § 2254(d) bars petitioners from developing

and presenting evidence outside the state court record to relitigate the state court's decision.

Second, 28 U.S.C. § 2254(e)(2) bars petitioners who have failed to develop the state court record

from developing and presenting additional evidence, unless they meet certain stringent

requirements. Finally, any evidentiary development must still comply with the Federal Rules of

Evidence. The Court explains each of these in detail below. Therefore, to introduce any new

evidence for the Court to consider, Shockley must first run AEDPA's gauntlet.

### B.      AEDPA and standards for a discovery motion

In 28 U.S.C. § 2254(d), Congress enacted the following bar on federal habeas relief:

(d)  An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted with respect to any
claim that was adjudicated on the merits in State court proceedings unless the
adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the
> Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

14

So, if a claim "was adjudicated on the merits in State court proceedings," a petitioner must overcome § 2254(d)'s bar on relief.  And that petitioner cannot use evidence from outside the state-court record to overcome this bar.  *Cullen v. Pinholster*, 563 U.S. 170, 181–83 (2011) ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. . . .  It would be strange to ask a federal court to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court."); *Shoop v. Twyford*, 142 S. Ct. 2037, 2043–44 (2022) ("Review of factual determinations under § 2254(d)(2) is expressly limited to 'the evidence presented in the State court proceeding.'").  Further, when § 2254(d) renders evidence outside the state-court record irrelevant, it also makes that evidence inadmissible.  *Shoop*, 142 S. Ct. at 2044 (stating that "AEDPA . . . restricts the ability of a federal habeas court to develop and consider new evidence, limiting review" under § 2254(d)(1) and (d)(2) to the state-court record (citing *Pinholster*, 563 U.S. at 181)).

Even if the state court did not adjudicate a claim on the merits, AEDPA limits a petitioner's ability to introduce evidence outside the state-court record:

(2)  If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A)  the claim relies on—

(i)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii)  a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B)  the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

15

28 U.S.C. § 2254(e)(2).

According to the opening clause of § 2254(e)(2), these strict limits apply to cases where the petitioner "failed to develop the factual basis of a claim."  Here, "fail[] to develop" means a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 431 (2000).  So whether § 2254(e)(2) applies to a petitioner does not depend on "whether the facts [that the petitioner now wants to introduce] could have been discovered but instead [on] whether the [petitioner] was diligent in his efforts [to discover and present those facts in state court]."  *Marcyniuk v. Payne*, 39 F.4th 988, 999 (8th Cir. 2022) (quoting *Williams v. Taylor*, 529 U.S. at 435).  Recently, the Supreme Court established that "under § 2254(e)(2), a [petitioner] is 'at fault' even when state postconviction counsel is negligent.  In such a case, a federal court may order an evidentiary hearing or otherwise expand the state-court record only if the [petitioner] can satisfy § 2254(e)(2)'s stringent requirements." *Shinn*, 142 S. Ct. at 1735.

A petitioner who "fails to demonstrate either that the requirements of § 2254(e)(2) do not apply to him [because he diligently attempted to develop the factual record] or that he can satisfy those requirements . . . is not entitled to discovery."  *Marcyniuk*, 39 F.4th at 1000.  But overcoming the bar of § 2254(e)(2) is a necessary—not sufficient—condition for petitioner to add further evidence.  And even where § 2254(e)(2) does not bar the introduction of further evidence, other rules may bar additional evidence, such as § 2254(d)'s bar on using evidence outside the state-court record to review state-court adjudications of the merits.  *Pinholster*, 563 U.S. at 181–85.

### C.    Discussion of discovery motion

In January 2022, Shockley filed his motion for discovery, requesting expansion on claims 24 and 25, which he presented in state court, and claims 6, 13, 21, 22, 26, and 27, which he did not present in state court.  Doc. 57.  The parties fully briefed this motion and then submitted additional briefing after the Supreme Court's *Shinn* decision.  Docs. 57–59, 64–65.  The Court addresses first, the claims Shockley presented in state court; second, the claims Shockley did not present, but that Shockley claims meet § 2254(e)(2)'s high bar; third, claims Shockley did not present in state court, and which Shockley does not argue meet § 2254(e)(2)'s high bar; fourth, claim 27, which makes no concrete allegations, but which Shockley says meets the discovery standard of *Bracy v. Gramley*, 520 U.S. 899 (1997); and, fifth, claims that Shockley mentions without properly discussing in his discovery motion.  As explained below, having analyzed each of Shockley's arguments, the Court concludes that on the facts and under the law, Shockley's motion for discovery fails.

### 1.    Discovery requests for raised claims

Shockley already presented, and attempted to develop, the factual records for claims 24 and 25 in state court.  Doc. 20-52 at pp. 65–66; Doc. 48-3 at pp. 129–32.  Therefore, Missouri's courts have "adjudicated [these claims] on the merits," and § 2254(d) applies, requiring Shockley to show that the Missouri Supreme Court contradicted Supreme Court precedent, unreasonably applied that precedent, or unreasonably determined the facts.  *See* § 2254(d).  Of course, no *new* evidence could possibly render the Missouri Supreme Court's decision retroactively unreasonable, *Pinholster*, 563 U.S. at 182–83, and so cannot possibly be relevant to whether Shockley can overcome § 2254(d)'s bar on relief.  *Id.*  Granting discovery on claims 24 and 25, then, would "needlessly prolong" this case, contravening the Supreme Court's instructions. *Shoop*, 142 S. Ct. at 2044 (quoting *Shinn*, 142 S. Ct. at 1739).

In defense of his request for discovery, Shockley says that he did not raise these claims in state court, so *Pinholster* does not apply.  Doc. 59 at pp. 7–8.  Yet, Shockley did raise claim 24 in state court, Doc. 48 at p. 458 (As Shockley alleges in is Amended Petition, "The Supreme Court of Missouri addressed this claim as '*Point V. Failure to call a ballistics expert.*'"), as well as claim 25, *id.* at p. 501 ("[T]he Missouri Supreme Court's decision denying *Brady* relief was contrary to clearly established federal law . . . .").  Shockley makes some vague remarks suggesting that the Missouri Supreme Court might not have adjudicated some aspect of these claims.  *See, e.g.*, *id.* at 458 ("This aspect of the claim was raised during post-conviction proceed[ings]"); *id.* at 470 ("To the extent the Missouri courts ruled on the merits of Shockley's *Brady* claim . . . .").  He does not explain, however, what he means by these remarks.  A brief comparison of claims 24 and 25 of Shockley's Amended Petition with points V and XVII of the Missouri Supreme Court ruling reveals that Shockley raised these claims in state court. *Compare* Doc. 48 at pp. 455–68, *with Shockley II*, 579 S.W.3d at 906–08; *compare* Doc. 48 at pp. 468–501, *with Shockley II*, 579 S.W.3d at 920–21.  Shockley's arguments here rest on a misrepresentation of the record, and to the contrary, Shockley did raise claims 24 and 25 in state court.  This argument therefore fails.

Shockley also argues that, under *Pinholster*, a court may allow a petitioner to gather and present additional evidence before it determines whether § 2254(d) bars relief.  Doc. 59 at p. 66 (citing *Pinholster*, 563 U.S. at 203 n.20).  The footnote Shockley cites explains that the Supreme Court was "barred from considering the evidence *Pinholster* submitted" from outside the state-court record in deciding whether his claims satisfied § 2254(d).  *Pinholster*, 563 U.S. at 203 n.20. The footnote also states that "we need not decide . . . whether a district court may ever choose to hold an evidentiary hearing before it determines that § 2254(d) has been satisfied."  *Id.*

The Court disagrees with Shockley's reading of *Pinholster*. *Shoop* clarifies any ambiguity in *Pinholster* regarding whether a court can allow a petitioner to add to the state-court record before overcoming § 2254(d). *Shoop* cited *Pinholster*'s holding that review under § 2254(d)(1) is limited to the state-court record as a restriction on "the ability of a federal habeas court to develop and consider new evidence." *Shoop*, 142 S. Ct. at 2043–44. The *Shoop* Court concluded that "[a] court . . . must, consistent with AEDPA, determine at the outset whether the new evidence sought could be lawfully considered," and held that the district court erred by giving the petitioner an opportunity to develop the record without "determin[ing] how, in light of the limitations on its review described above, newly developed evidence could aid [the petitioner's] cause." *Id.* at 2044–45. The Court will not repeat the error identified in *Shoop*.

Finally, Shockley argues that *Pinholster* does not bar him from developing the record, because "Shockley can show that he was diligent in his attempt to develop the *Brady* issue in state court." Doc. 59 at p. 64 (referring to claim 25). Shockley quotes a passage from another *Pinholster* footnote: "§ 2254(e)(2) should be interpreted in a way that does not preclude a state prisoner, who was diligent in state habeas court and who can satisfy § 2254(d), from receiving an evidentiary hearing." *Id.* (quoting *Pinholster*, 563 U.S. at 1400 n.5). According to this footnote, a petitioner who can succeed under § 2254(d)—for example, by showing that the state court applied a standard that contradicts a rule set by the Supreme Court—and who can satisfy § 2254(e)(2)'s restrictions could possibly add to the evidence in the state-court record. But *Pinholster* and *Shoop* make clear that a court cannot allow a petitioner to develop the record without first determining "whether the new evidence sought could be lawfully considered"—and a court cannot lawfully consider evidence outside the state-court record in deciding whether § 2254(d) bars relief. *Shoop*, 142 S. Ct. at 2044. So, a court can only "grant an evidentiary

hearing or 'otherwise consider new evidence' under § 2254(e)(2)," for a claim adjudicated on the merits in state court if it first decides that the petitioner satisfies § 2254(d). *Id.* (quoting *Shinn*, 142 S. Ct. at 1739). As discussed in Sections V.B.1.m. (claim 24) and V.B.2.f. (claim 25), § 2254(d) bars relief on claims 24 and 25, so the Court cannot allow Shockley to expand the record for these claims.

### 2.    Discovery requests under § 2254(e)(2) and *Shinn*

Although Shockley did not raise and develop the factual basis for claims 21 and 22 in state court, he gives three reasons why he thinks he can overcome § 2254(e)(2)'s restrictions on further discovery. Doc. 64 at p. 6. First, he argues that *Martinez* allows him to satisfy § 2254(e)(2). *Id.* Second, he argues that "the evidence supporting the claim did not previously exist," so he satisfies § 2254(e)(2)(A)(ii). *Id.* Third, he opines that "a miscarriage of justice would occur if this Court were to not grant further evidentiary development." *Id.* Each of these arguments fail.

First, although Shockley argues he can satisfy or bypass § 2254(e)(2) by demonstrating ineffective assistance of postconviction counsel, *Shinn* conclusively rejected this theory. Section 2254(e)(2) does not bar a petitioner from developing the record where the petitioner is not "at fault" for the lack of factual development. *Shinn*, 142 S. Ct. at 1734. In his briefing filed before the Supreme Court decided *Shinn*, Shockley argued that "*deficient* representation of post-conviction counsel is not imputed to the petitioner," pursuant to *Martinez*. Doc. 59 at p. 51; *see also infra* Section VI.C.1. (detailing the caselaw surrounding *Martinez*). Then the Supreme Court decided *Shinn*, holding that "under § 2254(e)(2), a prisoner is 'at fault' even when state postconviction counsel is negligent. In such a case, a federal court may order an evidentiary hearing or otherwise expand the state-court record only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements." *Shinn*, 142 S. Ct. at 1735. So, *Shinn* undermines Shockley's appeal to

*Martinez*.  Shockley cannot demonstrate that he satisfies § 2254(e)(2) by showing ineffective assistance of postconviction counsel.  Thus, Shockley's first argument for overcoming § 2254(e)(2)'s bar on discovery fails.

Second, Shockley says that he could not have previously discovered—because it did not exist—the evidence that he now asks the Court to consider.  Doc. 64 at p. 6.  Additionally, he argues that no reasonable jurist would find him guilty in light of this new evidence.  *Id.* According to this argument, Shockley satisfies § 2254(e)(2) by showing that his claim relies on "a factual predicate that could not have been previously discovered through the exercise of due diligence" and that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  § 2254(e)(2).

Shockley, however, cannot satisfy either of these elements.  Elsewhere, when presenting his ineffective-assistance claim, Shockley argues at length that his postconviction counsel could have discovered this allegedly new evidence through the exercise of due diligence.  *See* Doc. 48 at p. 394 ("What is critical, however, is that the questioning of such evidence was taking place before, at the time, and after Shockley's trial."); *id.* at p. 396 ("This information would have been available to Shockley's trial lawyers to challenge the reliability of such evidence.").  And as the Court discusses in its analysis of Shockley's cause-and-prejudice argument for claim 21 below, Shockley has persuaded the Court that his postconviction counsel could have discovered this evidence through the exercise of due diligence.  *See infra* Section VI.C.2.b.  Therefore, Shockley fails to satisfy § 2254(e)(2)(A).

Even if Shockley could satisfy § 2254(e)(2)(A) by showing that he could not have previously discovered the evidence that he hopes the Court will consider in deciding claims 21

21

and 22, Shockley would still need to satisfy § 2254(e)(2)(B).  This would require him to show by

clear and convincing evidence that, in light of the allegedly new evidence, "no reasonable

factfinder would have found the applicant guilty of the underlying offense."  § 2254(e)(2)(B).

Shockley says that the allegedly new evidence undermines the reliability of the ballistics

evidence used at trial, and if his trial counsel or the trial court had excluded the allegedly

unreliably ballistics evidence, the jury could not have convicted him.  Doc. 64 at p. 6.  But,

because of the strength of the cumulative case against Shockley, *see infra* Section VI.A., a

reasonable factfinder could have found him guilty in the absence of the ballistics evidence he

now seeks to dispute.  Therefore, even if Shockley could satisfy § 2254(e)(2)(A), he could not

satisfy § 2254(e)(2)(B).

Third, Shockley argues that "a miscarriage of justice would occur if this Court were to

not grant further development."  Doc. 64 at p. 6.  However, Shockley does not cite any case

holding that a petitioner can bypass § 2254(e)(2)'s restriction on developing the record by

arguing that a miscarriage of justice would occur in the absence of further discovery.  *See* Doc.

64.  Presumably, Shockley is drawing from his discussion of the miscarriage-of-justice exception

to the rule barring procedurally defaulted claims.  *See* Doc. 56 at p. 174 (presenting Shockley's

discussion of the miscarriage-of-justice exception).  But even if this exception applied in the

context of § 2254(e)(2), this exception does not apply to Shockley, as the Court discusses in

Sections VI.C.1.h. and VI.C.2.b.  Therefore, Shockley's three arguments for further discovery

for claims 21 and 22 each fail.

### 3.     Discovery requests contrary to § 2254(e)(2) and *Shinn*

Shockley requests discovery on claims 6, 13, and 26, which he did not present in state

court and does not argue meet § 2254(e)(2)'s high bar.  Doc. 57.  Each of these presents a

*Martinez* claim—in other words, a procedurally defaulted ineffective-assistance-of-trial-counsel

22

claim that Shockley hopes to revive with a showing of postconviction-counsel incompetence. *See Shinn*, 142 S. Ct. at 1733; *see also* Mo. Sup. Ct. R. 29.15(b).  In support of his motion for discovery, Shockley cites, among other cases, *Sasser v. Hobbs*, which reversed a district court's denial of an evidentiary hearing on several *Martinez* claims and concluded that "the district court is authorized under 28 U.S.C. § 2254(e)(2) and required under *Trevino* to 'hold an evidentiary hearing on the claim[s].'"  735 F.3d 833, 853 (8th Cir. 2013) (alteration in original) (citation omitted).

Since Shockley filed his discovery motion, the Supreme Court rejected the reasoning in *Sasser* and that case's interpretation of *Trevino*.  *Shinn*, 142 S. Ct. at 1734.  Instead, the Supreme Court held "that, under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel."  *Id.*  The Court reasoned that, because no Sixth-Amendment right to postconviction counsel exists, "state postconviction counsel's ineffective assistance in developing the state-court record is attributed to the prisoner."  *Id.*  Thus, "under § 2254(e)(2), a prisoner is 'at fault' even when state postconviction counsel is negligent."  *Id.* at 1735.  "In such a case, a federal court may order an evidentiary hearing or otherwise expand the state-court record only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements."  *Id.*

In his supplemental brief, Shockley all but concedes that *Shinn* forecloses expansion of the state-court record in this case.  *See* Doc. 64.  Although he says that claims 21 and 22 can meet § 2254(e)(2)'s standards for discovery, he remains conspicuously silent on how this standard should apply to his other attempts to expand the evidentiary record.  *Id.*  Instead of arguing that he can satisfy these requirements, Shockley condemns § 2254(e)(2) and *Shinn*'s interpretation of that statute as unconstitutional and otherwise unlawful as applied to him and the

facts of his case.  Doc. 64 at pp. 8–10.  Shockley cites no authority supporting his challenge to

the Supreme Court's decision.  *See* Doc. 64.  Essentially, Shockley urges the Court to ignore

controlling caselaw.  *Id.* at p. 8.  But the Court "must follow Supreme Court precedent which

directly applies to a case before [it]."  *Hennepin Cnty. v. Fed. Nat. Mortg. Ass'n*, 742 F.3d 818,

823 (8th Cir. 2014).  And Shockley admits that *Shinn* applies here.  Doc. 64 at p. 8.  Thus, the

Court denies Shockley's request for discovery on claims 6, 13, and 26 and rejects Shockley's

broader arguments that *Shinn* and § 2254(e)(2) should not govern this case.

### 4.    Discovery request under *Bracy*

Shockley requests discovery on claim 27—which voices Shockley's suspicion that

prosecutors violated *Brady v. Maryland,* 373 U.S. 83 (1963)—without any concrete factual

allegations.  Doc. 48 at pp. 511–19.  Shockley argues that because he can demonstrate "good

cause" for further discovery, he can proceed under *Bracy v. Gramley*.  Doc. 57 at p. 60.  *Bracy*

concerns Habeas Rule 6(a), which says that a party is entitled to discovery if he can show good

cause for further discovery.  520 U.S. at 901.  Shockley does not supply any argument or cite any

authority supporting the notion that the Habeas Rules allow a petitioner to circumvent

§ 2254(e)(2)'s limits on discovery and record expansion.  *See* Docs. 57, 59.  Indeed, the Eighth

Circuit has rejected such attempts to escape AEDPA's requirements, concluding that "the

conditions prescribed by § 2254(e)(2) must still be met" when a petitioner attempts to expand the

record under the Habeas Rules.  *Mark v. Ault*, 498 F.3d 775, 788 (8th Cir. 2007) (citations

omitted) (discussing the relationship between § 2254(e)(2) and discovery under Habeas Rule 7's

provision for record expansion); *cf. Shoop*, 142 S. Ct. at 2044–45 ("[P]etitioner[s] cannot use

[the All Writs] Act to circumvent statutory requirements or otherwise binding procedural rules."

(citation omitted)).  Shockley does not argue that he can meet § 2254(e)(2)'s standard for

discovery.  Doc. 57 at pp. 56–61.  Thus, the Court denies Shockley's request for discovery on this vacuous claim.

### 5.    Discovery requests without briefing

In his discovery briefing, Shockley seeks discovery on a number of claims, but he does not submit related briefing on, claims 8, 9, and 11.  More specifically, Shockley "reiterates his request for this Court to grant discovery as requested in the initial motion, [and] grant a hearing on Claims 6, 13*, 8*, *9*, *11*, 21, 22, 24, 25, and 26 of his amended petition."  Doc. 59 at p. 1 (emphasis added); *see also id.* at p. 2 (citing Doc. 48) ("Mr. Shockley previously sought a hearing on claims 6, 13, 8, 9, 11, 21, 22, 24, 25, and 26 in his amended petition for writ of habeas corpus.").  Shockley's briefing on his discovery requests discusses most of these claims.  *See* Doc. 57 (seeking discovery on claims 6, 13, 21, 22, 24, 25, 26, and 27); Doc. 59 (arguing for discovery on claims 6, 13, 21, 22, 24, 25, 26, and 27); Doc. 64 (arguing for discovery on claims 6, 13, 21, 22, and 26, but not 24, 25, or 27).  However, Shockley's briefing does not request an evidentiary hearing on claims "8, 9, [and] 11."  Doc. 59 at p. 1.  At the end of his Amended Petition, Shockley makes a general request for "discovery and a hearing on claims brought pursuant to *Martinez v. Ryan*."  Doc. 48 at p. 530.  While Shockley raises claims 8, 9, and 11 under *Martinez*, *id.* at pp. 248–69, 283–91, *Martinez* does not provide an exception to § 2254(e)(2)'s limits on discovery, *see supra* Section IV.C.2–3.  Shockley does not explain how he can overcome this problem, nor does the Court see any argument he could provide.  Therefore, the Court denies Shockley's request for discovery on claims 8, 9, and 11.

## VI.   Habeas corpus petition

Having resolved Shockley's ancillary motions, the Court now turns to the merits of Shockley's Amended Petition.

A.      **The evidence against Shockley**

Shockley contends that "[t]he State's weak circumstantial case was not enough to convict" him.  Doc. 48 at p. 25.  This notion stands in the background of the prejudice analysis of Shockley's many *Strickland* claims, so, in Shockley's view, each of his counsel's alleged failures played a key role in Shockley's conviction.  *See, e.g.*, *id.* at 250 (claiming that a witness's testimony was "essential" to the prosecution's case and that counsel failed to address the testimony appropriately).

The Missouri Supreme Court rejected Shockley's characterization of the evidence:

> Here, the circumstantial evidence was strong.  Knowing that Sergeant Graham was investigating his involvement in the accident that killed Mr. Bayless, for several months Mr. Shockley concocted a series of lies to conceal the fact that it was he who drove the truck into the ditch.  He also encouraged others to lie for him about his participation in the accident, including putting his finger over his grandmother's mouth when she said she would not lie for him.  Once Mr. Shockley learned that Sergeant Graham had verified his involvement, he obtained Sergeant Graham's home address.  The day of Sergeant Graham's murder, Mr. Shockley borrowed his grandmother's car, and witnesses testified to seeing the car near Sergeant Graham's house during the estimated time of the murder.  Mr. Shockley returned the car to his grandmother within thirty minutes of the shooting.  The bullet that penetrated Sergeant Graham's Kevlar vest belonged to the .22 to .24 caliber class of ammunition.  Although never found in his possession, Mr. Shockley was known to own a .243 rifle, and investigators discovered a single empty slot in Mr. Shockley's gun cabinet.  On the night of the murder, Mrs. Shockley took a box of .243 ammunition to Mr. Shockley's uncle and stated that "Lance said you'd know what to do with them."  After learning that Mr. Shockley previously had fired his .243 rifle on his uncle's property, investigators searched the grounds and discovered a .243 shell casing.  The investigators also recovered several .243 shell casings on Mr. Shockley's field as well as several bullet fragments.  Three highway patrol ballistics experts compared the fragments found on Mr. Shockley's property to the slug pulled from Sergeant Graham's body.  All concluded that, in their expert scientific opinion, the three bullet fragments recovered from Mr. Shockley's field were fired from the same firearm as the one used to shoot the bullet into Sergeant Graham.  In addition to the .243 rifle, Mr. Shockley owned numerous other guns, including

26

three shotguns.  A ballistics expert testified that a shotgun wadding discovered on Mr. Shockley's property was consistent with the wadding found near Sergeant Graham's body.  The evidence was sufficient to support the imposition of a death sentence considering the strength of the evidence.

*Shockley I*, 410 S.W.3d at 203.

Having reviewed the evidence, the Court concludes that the Missouri Supreme Court reasonably found that "the circumstantial evidence [against Shockley] was strong."  *Id.*  The Court must accord this determination of fact appropriate deference.  28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").  Given the facts that the Missouri Supreme Court marshaled to support its judgment on the strength of the prosecution's case, Shockley fails to rebut the presumption in favor of the Missouri Supreme Court.  Therefore, AEDPA requires the Court to reject Shockley's weak-circumstantial-case theory.

Further, Shockley does not argue that he is actually innocent.  *See* Docs. 48, 56.  "In order to establish a valid claim of actual innocence, a defendant must show factual innocence, not simply legal insufficiency of evidence to support a conviction."  *McNeal v. United States*, 249 F.3d 747, 749 (8th Cir. 2001) (citation omitted) (explaining the notion of actual innocence in the context of procedural default); *see also Bousley v. United States*, 523 U.S. 614, 623 (1998) ("'[A]ctual innocence' means factual innocence, not mere legal insufficiency." (citation omitted)).  To succeed in a claim of actual innocence, a petitioner "must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"  *House v. Bell*, 547 U.S. 518, 536–37 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995), *superseded in part by* 28 U.S.C. § 2244(b)(2)(B)(i)).  In considering whether a petitioner is actually innocent—not simply whether the evidence

27

presented at trial was insufficient—"the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" *Id.* at 348 (citation omitted).

Shockley, however, makes no attempt to demonstrate actual innocence, as opposed to mere legal insufficiency. *See* Docs. 48, 56. Even when squarely addressing the issue of actual innocence in the context of the actual-innocence exception to the bar on procedurally defaulted claims, Shockley conspicuously avoids the issue. Doc. 56 at pp. 174–75. Arguing that he can overcome procedural default, Shockley says that "[t]he [actual-innocence] exception requires a habeas petitioner to present new evidence that affirmatively demonstrates that he is innocent of the crime for which he was convicted." *Id.* (citations omitted). He then argues only that some of the prosecution's evidence lacked reliability in light of new scientific studies, refusing to plainly state whether he is actually innocent. *Id.* This careful phrasing falls far short of an "affirmative[] demonstrat[ion] of innocence," *Id.*

Shockley's argument only alleges the "legal insufficiency of the evidence to support [Shockley's] conviction." *McNeal*, 249 F.3d at 749 (citation omitted). In the entirety of Shockley's briefing, the closest he comes alleging actual innocence is the following: "Shockley has always maintained his innocence of the crime, and the evidence against him was not strong." Doc. 48 at p. 22. This statement sits within a broader description of the events of the trial and the alleged insufficiency of the case against Shockley. *Id.* Rather than arguing that the Missouri-criminal-justice system has convicted a factually innocent man, Shockley's overarching theory of the case is that the police and jury wanted to convict him and that every defense attorney and court involved in the litigation of this case has acted unreasonably. *See* Doc. 48. In sum, the Court does not find even the seed of an actual-innocence argument in Shockley's

briefing, much less an argument that meets the standards established by the Supreme Court and

Eighth Circuit.  The Court now turns to Shockley's claims for relief.

> **B.      Claims adjudicated on the merits in state court**

Because federal habeas review serves only as a last resort against miscarriages of justice

in state criminal court, *Woods v. Donald*, 575 U.S. 312, 316 (2015) (citation omitted), federal

law circumscribes the power of federal courts.  "Under AEDPA, . . . a federal [habeas] court may

disturb a final state-court conviction in only narrow circumstances."  *Brown v. Davenport*, 142 S.

Ct. 1510, 1518 (2022).  For a federal court to issue a writ of habeas corpus brought by a person

disputing a state court's ruling, the petitioner must show that the state court's adjudication on the

merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the evidence presented in the
> State court proceeding.

§ 2254(d)(1)–(2).  Further raising the bar, AEDPA provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a
> person in custody pursuant to the judgment of a State court, a determination of a
> factual issue made by a State court shall be presumed to be correct.  The applicant
> shall have the burden of rebutting the presumption of correctness by clear and
> convincing evidence.

§ 2254(e)(1).

A state court's decision stands "contrary to" clearly established Supreme Court precedent

"if the state court either 'applies a rule that contradicts the governing law set forth in [Supreme

Court] cases' or 'confronts a set of facts that are materially indistinguishable from a decision of

[the] Court and nevertheless arrives at a result different from [the] precedent.'"  *Penry v.*

*Johnson*, 532 U.S. 782, 792 (2001) (citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)).

An unreasonable application of clearly established Supreme Court precedent occurs when the

state court identifies the correct governing legal principle but unreasonably applies that principle

to the facts of the case. *Id.* (citing *Williams v. Taylor*, 529 U.S. at 407–08). Finally, a state-court

decision counts as an unreasonable determination of the facts "only if it is shown that the state

court's presumptively correct factual findings do not enjoy support in the record." *Ryan v.*

*Clarke*, 387 F.3d 785, 790 (8th Cir. 2004) (citing § 2254(e)(1); *Boyd v. Minnesota*, 274 F.3d 497,

501 n.4 (8th Cir. 2001)). These standards create a high bar for any claim adjudicated on the

merits in state court.

### 1. Ineffective-assistance claims adjudicated on the merits in state court

#### a. *Strickland v. Washington*

Twenty of Shockley's 28 claims allege ineffective assistance of counsel, and Shockley

presented 12 of these claims in Missouri court. *See* Doc. 48. The Missouri Supreme Court

analyzed these claims under *Strickland v. Washington*, 466 U.S. 668 (1984), and the Court

accepts those analyses, so long as they meet § 2254(d)'s deferential standard. In *Strickland*, the

Supreme Court explained:

> A convicted defendant's claim that counsel's assistance was so defective
> as to require reversal of a conviction or death sentence has two components.
> First, the defendant must show that counsel's performance was deficient. This
> requires showing that counsel made errors so serious that counsel was not
> functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.
> Second, the defendant must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so serious as to deprive
> the defendant of a fair trial, a trial whose result is reliable. Unless a defendant
> makes both showings, it cannot be said that the conviction or death sentence
> resulted from a breakdown in the adversary process that renders the result
> unreliable.

466 U.S. at 687. For the sake of consistency, the Court will refer to the team of attorneys that

first represented Shockley as "initial counsel," the team of attorneys that represented Shockley at

trial as "trial counsel," the team of attorneys that represented Shockley on direct appeal as

"appellate counsel," the team of attorneys that represented Shockley during Rule 29.15 collateral review as "postconviction counsel," and his federal habeas counsel as "present counsel."

### i.   *Strickland*'s performance and prejudice prongs

A habeas court does not dissect trial counsel's conduct but instead looks to the trial counsel's performance as a whole.  *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986) ("Since '[t]here are countless ways to provide effective assistance in any given case,' unless consideration is given to counsel's overall performance, . . . it will be 'all too easy for a court examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.'" (internal citation omitted and alteration in original)); *see also Harrington v. Richter*, 562 U.S. 86, 111 (2011) ("[W]hile in some instances 'even an isolated error' can support an ineffective-assistance claim if it is 'sufficiently egregious and prejudicial,' . . . it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." (citation omitted)); *Jennings v. Stephens*, 574 U.S. 271, 276–82 (2015).  And, counsel's strategic decisions are "entitled to a 'strong presumption' of reasonableness."  *Dunn v. Reeves*, 141 S. Ct. 2405, 2411 (2021) (quoting *Harrington*, 562 U.S. at 104).  Thus, even a decision without an obvious explanation deserves a presumption of reasonableness, especially when the rest of the attorney's conduct reflects competence.  In other words, to prevail on a claim of ineffective assistance of counsel, Shockley must overcome a very high bar.

*Strickland* does not require the Court to scour counsel's behavior for everything that falls short of the ideal.  The performance stage of a *Strickland* analysis looks to whether an attorney's actions meet the standard of "reasonableness under prevailing professional norms."  *Strickland*, 466 U.S. at 688.  While sources such as American Bar Association standards may provide insight, a court that simply enforced ABA guidance as the benchmark for effective assistance

would undermine "the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Id.* at 689 (citation omitted). The Sixth Amendment does not guarantee perfection; it simply "ensure[s] that criminal defendants receive a fair trial." *Id.* Emphasizing this point, the Supreme Court held in *Harrington* that "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690). Federal courts must take care to avoid the temptation to "second-guess counsel's assistance after conviction or adverse sentence." *Strickland*, 466 U.S. at 689. To guard against this temptation, "[j]udicial scrutiny of counsel's performance must be highly deferential," and courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

The prejudice stage of a *Strickland* analysis requires more than "a showing that the errors impaired the presentation of the defense." *Id.* at 693 (internal quotation marks omitted). Although the Supreme Court considered requiring petitioners to "show that counsel's deficient conduct more likely than not altered the outcome in the case," it decided this standard "is not quite appropriate." *Id.* at 694. Instead, *Strickland* requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "[T]he difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Harrington*, 562 U.S. at 111–12 (quoting *Strickland*, 466 U.S. at 697). This prejudice standard requires a "substantial, not just conceivable" likelihood of a different result. *Id.* at 112. Thus, to succeed under *Strickland*, a petitioner must come close to meeting a "more-probable-than-not" standard. *Dorsey v. Vandergriff*, 30 F.4th 752, 757 (8th Cir. 2022) (citation omitted).

Shockley says that his many ineffective-assistance claims should have a cumulative effect:

> Conducting a cumulative review of counsel's deficiencies also follows [*Strickland*]. There, the Supreme Court repeatedly explained that lower courts must consider whether trial counsel's errors (plural) impacted the trial in a manner that violated the Sixth Amendment; it did not instruct that each individual error should be reviewed for prejudice, but rather the opposite.

Doc. 48 at p. 33.

While courts should take defense counsel's overall performance into account in applying the presumption of effective assistance, a court cannot amalgamate many weak ineffective-assistance claims into one strong ineffective-assistance claim. Consistently lackluster performance can erode a court's trust that an attorney acted reasonably under professional norms, and overall "active and capable advocacy" bolsters a court's confidence that counsel had strategic reasons for unexplained decisions. *Harrington*, 562 U.S. at 111 (citation omitted); *see Kimmelman*, 477 U.S. at 386. Yet, as a matter of analysis, prisoners cannot stack many small mistakes until they rise to the level of ineffective assistance. "*Strickland* does not authorize a cumulative inquiry of counsel's performance" and "[e]rrors that are not unconstitutional individually cannot be added together to create a constitutional violation." *Shelton v. Mapes*, 821 F.3d 941, 950–51 (8th Cir. 2016) (citations omitted). Just as *Strickland* does not authorize cumulative-performance analyses, it does not authorize cumulative-prejudice analyses. "[A] habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test." *Middleton v. Roper*, 455 F.3d 838, 851 (8th Cir. 2006) (citations omitted).

Therefore, to succeed under *Strickland*, a prisoner must show that an individual decision fell below the standard of competence under professional norms—not that counsel fell below a

standard of ideal performance with the benefit of hindsight.  The prisoner must also show that

the individual error had a reasonable likelihood of prejudicing his case—not just a speculative

possibility of prejudice.  The Supreme Court did not intend for *Strickland* to serve as a gateway

for protracted litigation over every time a defense attorney fumbles or sputters.  By design,

*Strickland* sets a high bar.

> ii.    **The ABA's guidelines do not set the standard for effective assistance**

The preceding section details what the standard for ineffective assistance is; the Court

must also say what the ineffective-assistance standard is not.  Shockley often relies on ABA

guidelines to support his various arguments that he received ineffective assistance.  *See* Doc. 48.

Given Shockley's repeated reliance on the ABA guidelines, the Court engages in a somewhat

detailed review and concludes that they do not apply.

Describing its guidelines for defense counsel in death-penalty cases, the ABA states that

its goal is "to ensure high quality legal representation for all persons facing the possible

imposition or execution of a death sentence by any jurisdiction."  ABA Guidelines for the

Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003),

*reprinted in* 31 Hofstra L. Rev. 913, 921 (2003).  These 178 pages provide wide-ranging and

thorough advice for capital defense counsel.  *See id.*  Thus, the ABA's goal is neither to state a

standard of the bare minimum required for professional competence nor to describe professional

expectations, but to prescribe a standard of high-quality representation.  *See id.* at 930 (arguing

the Supreme Court has removed protections for defendants and accepted "seriously deficient

performance" when applying *Strickland*, making it important for the ABA to "mandat[e] the

provision of high quality legal representation").  At best, these guidelines can only have

significance "to the extent they describe the professional norms prevailing when the

34

representation took place." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (citing *Strickland*, 466 U.S. at 688). The Supreme Court has stressed ABA guidelines do not define competent practice and lower courts must not treat the guidelines as "inexorable commands." *Id.* at 8. Despite this, the guidelines themselves purport to mandate counsel's conduct, e.g., the word "'should' is used [in the guidelines] as a mandatory term[,]" and immodestly state that the guidelines "are not aspirational . . . [but] embody the current consensus about what is required to provide effective representation in capital cases." ABA Guidelines for Death Penalty Cases, *supra* at 920–21. Addressing the ABA's capital-defense guidelines specifically, the Supreme Court noted both the "exhaustive detail" of the guidelines and their stringency. *Bobby*, 558 U.S. at 8. Despite the Supreme Court's caution about the ABA's guidelines in general and its capital-defense guidelines especially, Shockley consistently treats the ABA's recommendations as binding mandates. *See* Doc. 48.

Another reason to scrutinize whether the ABA guidelines provide a proper, or even objective, standard by which to evaluate the conduct of death-penalty trial counsel is the ABA's admitted lack of neutrality on the death penalty. While the ABA avoids taking any position on the death penalty considered in the abstract, it condemns the current death-penalty system as unjust; calls for increased federal scrutiny of state-court adjudications; and advocates for the suspension of all federal executions, pending more research on the equity of the current system. Testimony of Stephen F. Hanlon on behalf of the Am. Bar Assoc. before the U.S. House of Reps. Comm. on the Judiciary, Subcomm. on the Const., C. R., and C. L. (Dec. 8, 2009) (on file with the ABA); *see also* Brief of the Am. Bar Assoc. as Amicus Curiae in Support of Respondent, *Shoop v. Twyford*, 142 S. Ct. 2037 (2022) (No. 21-511); Brief of Amicus Curiae Am. Bar Assoc. in Support of Granting the Petition for a Writ of Certiorari, *Andrus v. Texas*, 142 S. Ct. 1866

(2022) (No. 21-6001); Brief for the Am. Bar Assoc. as Amicus Curiae Supporting Respondents, *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022) (No. 20-1009); Letter from Thomas M. Susman, Governmental Affairs Off., to the U.S. Senate (July 20, 2009) (on file with the ABA).  Given the ABA's vociferous public criticism of the death penalty, it is not unreasonable to consider whether its guidelines set an unachievable standard for trial counsel such that nearly all counsel will, under the guidelines, be deemed deficient.

For example, relying on the ABA guidelines, Shockley's present counsel repeatedly faults Shockley's various past counsel for not raising nearly every possible objection.  *See, e.g.*, Doc. 48 at p. 100 ("ABA Guidelines for capital counsel also demonstrate counsel's failures in voir dire."); *id.* at p. 153 ("Counsel is tasked with being familiar with the process of death qualification in order to be able to expose jurors who cannot meaningfully consider mitigation and to rehabilitate jurors who initially indicate opposition to the death penalty 'that make them possibly excludable.'" (quoting ABA Guideline 10.10.2(B) at 1049)).  According to Shockley, the ABA guidelines establish a mandate for competent attorneys to object whenever possible.  *Id.* at p. 336 ("Defense counsel's failure to object fell far below prevailing professional norms and denied Shockley the effective assistance of counsel."); Doc. 48 at p. 350 ("The ABA Guidelines for capital counsel repeatedly emphasize the duty of trial counsel to preserve all viable legal issues for later appellate review. . . . The duty to preserve 'any and all conceivable errors,' is 'one of the most fundamental duties of any attorney defending a capital case at trial.'" (citation omitted)); *Id.* at p. 377 ("Shockley can establish prejudice due to his counsel's failure to object. The use of the demonstrative rifle was prejudicial because it misled the jury into connecting Shockley with the murder weapon never produced by the State.").

Regardless of whether the ABA's elaborate capital guidelines stem from its advocacy against the death penalty, seasoned trial lawyers would reject the ABA's command to object always and everywhere.  *See Gonzalez v. United States*, 553 U.S. 242, 249 (2008) ("Numerous choices affecting conduct of the trial, including the objections to make . . . depend not only upon what is permissible under the rules of evidence and procedure but also upon tactical considerations of the moment and the larger strategic plan for the trial."); *Loefer v. United States*, 604 F.3d 1028, 1030 (8th Cir. 2010) (concluding trial counsel reasonably decided not to raise what he believed was a "meritless objection" to maintain "credibility with the district court"); James McElhaney, *When to Object*, ABA Journal 75 A.B.A. J. 98 (June 1989) ("You get no points for making every possible objection.").

Effective trial counsel should develop a theory of the case and shape trial strategy around that theory.  *Driscoll v. Delo*, 71 F.3d 701, 714 (8th Cir. 1995) (A "general trial strategy that included minimizing the number of objections . . . during the other side's closing argument" was objectively reasonable.).  Counsel must decide how vigorously to object to certain harmful evidence in front of the jury.  *See* McElhaney, *When to Object*, at 98 (Counsel has a "limited good-will account" with the judge and jury and objections are usually "withdrawals" from this account.).  To execute a sound trial strategy, counsel should consider whether to object or not; said differently, objecting always and everywhere, as the ABA guidelines purport to mandate, violates fundamental tenets of wise trial strategy.  The Court would therefore look with great skepticism on an object-always-and-everywhere strategy, and finds it at least conceivable that following such a strategy in itself could cause counsel's performance to fall below "an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688.

Although Shockley repeatedly asks the Court to treat ABA standards as the criterion for competence, *see* Doc. 48, *Strickland* warns that "[t]he availability of intrusive post-trial inquiry into attorney performance or detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges." 466 U.S. at 690. Because the ABA's guidelines do not set the standard for review of counsel's conduct, *Harrington*, 562 U.S. at 105; *Strickland*, 466 U.S. at 690, the Court does not treat the ABA's guidance as a legally authoritative statement of the minimum required for professional competence. Rather, the Court will evaluate each of Shockley's ineffective-assistance claims with due deference to his former counsel, as required by Supreme Court precedent. *Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential."); *Harrington*, 562 U.S. at 105 ("[T]he standard for judging counsel's representation is a most deferential one."); *Premo v. Moore*, 562 U.S. 115, 126 (2011) ("In applying and defining [*Strickland*'s] standard substantial deference must be accorded to counsel's judgment." (citation omitted)).

### iii.     *Strickland* and § 2254(d)

Setting aside the dogmatic notion of professional competence stated in the ABA guidelines, *Strickland* supplies a broad and flexible concept of effective assistance. Because *Strickland* creates "latitude" for defense attorneys, *Strickland* sets a high bar for any prisoner seeking to raise an ineffective-assistance claim. The bar for ineffective-assistance claims rises even higher once a state court rejects the claim, requiring federal courts to apply *Strickland* and § 2254(d) in tandem. Applying these two standards together, the Court undertakes a "doubly" deferential review:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against

> the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105 (internal citations omitted); *see also Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) ("[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009))).

So the combination of *Strickland* and § 2254(d) does more than place one high barrier to relief on another high barrier to relief: because *Strickland*'s language is so broad, it allows for a broad range of reasonable interpretations. To succeed on any of the ineffective-assistance claims adjudicated by the Missouri Supreme Court, Shockley must do more than show that he suffered a violation of his Sixth-Amendment rights. He must persuasively impugn the reasonableness of the Missouri Supreme Court's adjudication: Shockley must prove that no reasonable interpretation of *Strickland*'s repeated insistence on proper deference to counsel, and no reasonable view of the range of professional competence, could result in the Missouri Supreme Court's adjudication of his claims.

### b.    Claim 1

Shockley's first four claims relate to Juror 58's conduct during voir dire and while serving on the jury.

> Two months before serving on the jury, Juror 58 published a 184-page book, which he described as a fictionalized autobiography. The book contains six pages chronicling the protagonist's brutal and graphic revenge murder of a defendant who killed the protagonist's wife in a drunken-driving accident. The protagonist viewed the defendant as escaping justice in the court system because the defendant received only probation following his conviction. The book's front and back covers contain illustrations of blood spatter. The back cover states the protagonist's life changed forever when his wife was killed and her murderer was set free. The cover states the protagonist "sought vengeance" and "seeks justice" and "knows he will die fighting the system."

39

*Shockley II*, 579 S.W.3d at 893.

In claim 1, Shockley first alleges that trial counsel deprived him of effective assistance in jury selection by failing to search for juror bias when Juror 58 volunteered the statement that "I'm a published author . . . [a]nd so I thought maybe I should be coming out with fact [sic] as well." Doc. 48 at pp. 45–48; Doc. 20-3 at p. 83, Tr. at 710:19–22.  Second, Shockley argues that trial counsel failed to effectively litigate Juror 58's alleged juror misconduct in connection with their motion for a new trial.  Doc. 48 at pp. 62–77.  Shockley adds that counsel failed to preserve questions about Juror 58's impartiality for direct appellate review, *id.* at pp. 60–61, although the Missouri Supreme Court eventually reached the merits of the issue on postconviction appellate review, *Shockley II*, 579 S.W.3d at 893–905.  To grant relief under § 2254 for an ineffective-assistance claim, the Court must conclude that the Missouri Supreme Court contradicted the Supreme Court's standards for effective assistance of counsel, unreasonably applied *Strickland*, or premised its application on unreasonable factual findings.  *See* § 2254(d).  The Missouri Supreme Court found that trial counsel acted competently in both instances and that Juror 58 did not prejudice Shockley.  *Shockley II*, 579 S.W.3d at 893–98.  The state court adjudicated this claim reasonably.  *See* § 2254(d)(1)–(2).

### i.  Jury selection

Shockley first argues that, but for trial counsel's purportedly incompetent decision not to ask Juror 58 follow-up questions about his book, they could have struck Juror 58 for cause and the jury might have declared Shockley innocent or given him only a life sentence.  Doc. 48 at p. 45.  The Missouri Supreme Court held that trial counsel's questioning of Juror 58 passed constitutional muster, that the trial court would not have struck Juror 58 for cause, and that

Shockley failed to show that Juror 58 harbored bias against Shockley or harmed the impartiality of the jury's deliberations. *Shockley II,* 579 S.W.3d at 896–97.

To determine the competence of Shockley's counsel, the Missouri Supreme Court looked to trial counsel's reasoning in choosing to focus on questions about Juror 58's family ties with law enforcement at the expense of asking about his book. *Id.* at 895–96. According to Shockley's trial counsel, Juror 58 had personal experience related to their theory of the case. *Id.* Trial counsel asked Juror 58 about his son being a police officer and Juror 58's own knowledge of guns, as firearms evidence played a "crucial part[] in selecting jurors and in presenting their theory of the case." *Id.* Meanwhile, Juror 58's book seemed like a less fruitful avenue of inquiry, because trial counsel saw the novel as simply a "vanity project." *Id.*

The Sixth Amendment does not require counsel to pursue every issue to the furthest degree possible. *See Yarborough v. Gentry*, 540 U.S. 1, 7 (2003); *see also Clayton v. State*, 63 S.W.3d 201, 207–08 (Mo. 2001); *supra* Section VI.B.1.a.ii. As the Missouri Supreme Court noted, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." *Shockley II*, 579 S.W.3d at 897 (quoting *Collings v. State*, 543 S.W.3d 1, 16 (Mo. 2018) (quoting *Strickland*, 466 U.S. at 691)). In the Missouri Supreme Court's judgment, the details of trial counsel's deliberation demonstrate that they decided competently, not negligently, to not inquire about Juror 58's book in favor of other issues. *Shockley II*, 579 S.W.3d at 896–97.

Even if trial counsel did act incompetently, the Missouri Supreme Court still would not have decided in Shockley's favor. *Id.* at 897 ("[Shockley] cannot demonstrate he was prejudiced by trial counsel's failure to question Juror 58 about the book."). For reasons the Court describes

in greater depth in its discussion of Shockley's third claim, *see infra* Section VI.B.2.a., the

Missouri Supreme Court reasonably found that Juror 58 did not poison the jury's impartial

deliberations and did not prejudice Shockley. *Shockley II*, 579 S.W.3d at 897, 904–05. And this

finding merits deference under § 2254(d)(2). Ergo, Shockley's argument that his counsel failed

him in voir dire fails at both the performance and prejudice stages of the *Strickland* analysis. 466

U.S. at 687.

Shockley raises several arguments to the contrary. First, Shockley notes that lead trial

counsel declared himself ineffective after the fact, Doc. 48 at pp. 53–54, but federal law requires

that this Court defer to the Missouri Supreme Court's evaluation of counsel's competence, not

counsel's own retrospective evaluation. *See* § 2254(d)(1)–(2). Thus, counsel's retrospective

self-evaluation does not settle the issue of his reasonableness.

Second, Shockley points to a statement from another member of his trial team, stating

that they had no strategic reason for not asking Juror 58 about his novel. Doc. 48 at p. 71. But

the Missouri Supreme Court did not say that trial counsel had a strategic reason to avoid asking

further questions; rather, that court found that counsel reasonably believed that Juror 58's writing

a novel "had no bearing on his suitability as a juror in this particular case." *Shockley II*, 579

S.W.3d at 896. So while Shockley says that trial counsel failed to "examine [Juror 58] about all

of the revealed biases," Doc. 48 at p. 86 (citation omitted), the Missouri Supreme Court found

that Juror 58's statement about his novel during jury selection did not reveal a potential bias,

*Shockley II*, 579 S.W.3d at 896.

Third, Shockley finds fault with trial counsel's explanation that they did not ask Juror 58

about his book because he self-published the novel, which in counsel's eyes rendered it less

important. Doc. 48 at pp. 99–100. Shockley notes that Juror 58 did not say in voir dire that he

self-published his book, and so trial counsel could not have reasoned that the novel was self-published and, therefore, unimportant.  *Id.*  However, when deposed, lead trial counsel did not say whether he remembered Juror 58 explicitly saying that he self-published the book or whether counsel inferred that Juror 58 was not a professional author and concluded that the Juror 58 self-published his book.  Doc. 20-52 at p. 25, Tr. at 16:4–24.  Trial counsel said only that he knew Juror 58 self-published his novel, *id.*, so Shockley's argument that counsel's reasoning amounts to only a "post hoc rationalization" fails.  Doc. 56 at p. 21 (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)).  Shockley also says that a self-published work should have concerned counsel more than a published book, because it would contain the author's unedited views.  *Id.* However, the Missouri Supreme Court reasonably credited trial counsel's belief that Juror 58 only mentioned the book because of pride in his "vanity project," not because it had any objective significance to the trial, so trial counsel reasonably "did not see a reason to question him about it."  *Shockley II*, 579 S.W.3d at 896.

Fourth, Shockley says that trial counsel's allegedly unreasonable failure to exclude Juror 58 from the jury created "a reasonable probability of a motion for new trial being granted or the conviction and sentence [being] reversed on direct appeal due to juror misconduct."  Doc. 48 at p. 108.  Shockley more specifically argues as follows:  Juror 58 served as foreperson during the guilt phase; after the jury unanimously found Shockley guilty, trial counsel reviewed Juror 58's book and argued for a mistrial, which the court denied; instead, by consent of the parties, the trial court removed Juror 58 from the penalty phase, and the remaining jurors could not reach a unanimous sentencing decision.  *Id.* at p. 106.  Relying on the dissent in the Missouri Supreme Court's habeas review, Shockley then argues that he "may have had a reasonable probability of a life sentence had counsel not performed ineffectively and allowed Juror 58 to sit on the jury."

*Id*.  However, he provides no evidence, and no reasonable argument, to support the idea that had

Juror 58 never been on the jury in the first place, the jury—with someone other than Juror 58

sitting—would unanimously have agreed on sentencing him to life imprisonment.  *See id.*

Shockley relies primarily on the opinion of the lone dissenting judge.  *Id*.  After reviewing both

the trial evidence and the evidence presented to the Rule 29.15 postconviction motion court, the

Missouri Supreme Court rejected this speculative and unsupported argument.  *Shockley II*, 579

S.W.3d at 894–97.  Shockley does not and cannot articulate how that court unreasonably applied

federal law as established by the Supreme Court or unreasonably determined the facts in

rejecting his claim.  *See* § 2254(d).  Accordingly, Shockley's first argument in support of claim 1

fails.

<h3 style="text-align:center">ii.        Motion for a new trial</h3>

In claim 1 Shockley also argues that his attorneys represented him incompetently when

they chose not to support their motion for a new trial with juror testimony.  Doc. 48 at pp. 57–59,

86–88.  After Juror 58's book came to light and after the jury found Shockley guilty, the trial

judge suggested in an order that "[a] further hearing may be required with additional testimony"

to settle the issue of Juror 58's supposed misconduct.  Doc. 20-18 at p. 145.  But trial counsel

chose not to support the motion for a new trial with juror testimony.  *See id.* at pp. 148–53.  After

trial counsel filed the motion, the trial judge broached the matter again, asking the parties in a

letter if they intended to gather any juror testimony and making clear that Juror 58 gave a copy of

his novel to the bailiff.  *Id.* at p. 167.  After receiving the letter, Shockley's trial counsel chose

not to subpoena any witnesses to testify at the motion-for-a-new-trial proceeding.  Doc. 20-24 at

pp. 643–64, Tr. at 643:8–644:17

Trial counsel's statements demonstrate that they considered the advantages and

disadvantages of their choice.  *Id*.  They viewed the jury's decision not to sentence Shockley to

44

death as a victory. *Id.* at pp. 701–02, Tr. at 701:24–702:7. And the Missouri Supreme Court noted that Shockley's lead trial counsel "had significant trial experience and never had a trial judge impose a death sentence after the jury could not agree on a punishment in a case he tried." *Shockley II*, 579 S.W.3d at 898. Further, one of Shockley's trial lawyers believed that the trial judge would be less likely to sentence Shockley to death if they did not "open up [the] can of worms" of juror testimony. Doc. 20-24 at pp. 643–44, Tr. at 643:8–644:4. And another doubted the utility of subpoenaing any witness because "that person would have had at that point . . . two or three weeks or four weeks to have figured out some way to answer the questions." Doc. 20-52 at pp. 31–32.

Over the dissenting judge's view that counsel "had a duty to file a proper and supported motion for a new trial," *Shockley II*, 579 S.W.3d at 922, the majority of the Missouri Supreme Court found that counsel's reasoning behind their decision reflected their competence:

> Even though trial counsel's strategy failed in hindsight, the record clearly demonstrates that trial counsel evaluated their options, drew upon their experience, and chose to forego "opening the can of worms" regarding Juror 58's alleged misconduct in exchange for attempting to persuade the circuit court to impose a life sentence to save [Shockley's] life.

*Shockley II*, 579 S.W.3d at 898. "Ineffective assistance of counsel will not lie where the conduct involves the attorney's use of reasonable discretion in a matter of trial strategy, and it is the exceptional case where a court will hold a strategic choice unsound." *Id.* (quoting *State v. White*, 798 S.W.2d 694, 698 (Mo. 1990)). And indeed, the record does show that trial counsel decided strategically, drawing upon their significant experience and the resources available to them. The Court therefore finds the Missouri Supreme Court's holding reasonable. *See Clarke*, 387 F.3d at 790; 28 U.S.C. § 2254(d)(2).

Shockley objects to this reasoning. First, he insists that counsel's decision cannot count as strategic, because counsel chose not investigate Juror 58's conduct and "a strategy chosen without the benefit of an investigation is only reasonable to the 'extent reasonable professional judgment supported the limitations on investigation.'" Doc. 48 at p. 87 (citation omitted). Yet the trial judge forbade trial counsel from contacting jurors before filing a motion for a new trial, and the Missouri Supreme Court credited trial counsel's reasoning that investigating Juror 58 at the mistrial hearing would be "opening [a] can of worms." *Shockley II*, 579 S.W. 3d at 898. Further, even if counsel had investigated the issue, they would have found that Juror 58 did not bias the jury against Shockley, so trial counsel did not prejudice Shockley. *Id.* at 897. Therefore, Shockley fails at both *Strickland*'s performance prong and its prejudice prong.

Second, Shockley says that trial counsel unreasonably based their decision on the false impression that the judge ordered them "not to talk to or subpoena jurors." Doc. 48 at p. 111. But lead trial counsel acknowledged that he could have subpoenaed jurors. Doc. 20-52 at p. 32. Shockley also says that trial counsel based their decision on the belief that the trial judge did not want them to uncover juror misconduct, and says this belief was unreasonable. Doc. 48 at p. 111. Although lead trial counsel did think that the trial judge feared that they would uncover juror misconduct, he did not give this as the reason trial counsel chose not to subpoena jurors. Doc. 20-52 at pp. 31–32, Tr. at 22:25–23:13. He had a different reason: any juror he might have subpoenaed "would have had at that point now two or three weeks or four weeks to have figured out some way to answer the questions had we subpoenaed him." *Id.* Thus, Shockley's argument lacks factual support.

Third, although the Missouri Supreme Court found that lead trial counsel "had significant trial experience and never had a trial judge impose a death sentence after the jury could not agree

on punishment in cases he tried," *Shockley II*, 579 at 898, Shockley says that lead trial counsel

faced this set of circumstances "only one other time." Doc. 48 at p. 112–13. But instead of

supporting this proposition with a citation to the record, Shockley cites an Associated Press

article from 1989. Even if *Shinn* and § 2254(e)(2) allowed the Court to consider this article, and

even if this article could speak to lead trial counsel's experience nearly 20 years after the article's

publication, the Missouri Supreme Court reasonably considered trial counsel's decades of

capital-defense experience in analyzing the competence of counsel's decision. *Shockley II*, 579

S.W.3d at 898; *see also* Doc. 53 at pp. 13–14 (describing lead counsel's decades of experience as

a defense attorney).

Fourth, Shockley says that "if counsel wanted the judge to decide penalty [sic] knowing

that the jury had hung, they could have requested the judge and State consent to doing just that

even if a new trial were granted." Doc. 48 at p. 105 (citation and quotation marks omitted).

Shockley does not discuss whether trial counsel considered this option or why they decided

against it. *Id.* In the absence of any record of trial counsel's reasoning on this point, the Court

can only speculate: maybe counsel unreasonably failed to consider the option, or maybe counsel

thought the judge's view of Shockley would only sour after a second verdict of guilt. But either

way, this speculation would undermine the deference that the Court here owes to both the

Missouri Supreme Court and trial counsel. *See* § 2254(d); *Strickland*, 466 U.S. at 691. Because

Shockley gives no proper basis for this Court to second-guess the Missouri Supreme Court's

determination that Shockley's trial counsel acted competently, the Court denies claim 1.

### c.     Claim 5

In claim 5, Shockley argues that his trial counsel failed to adequately conduct voir dire

and challenge for cause Juror 3. Doc. 48 at pp. 148–60. Because Juror 3 stated that he felt

"probably more inclined" to impose a death sentence in a case involving a law-enforcement

victim, Shockley says that trial counsel should have highlighted this alleged prejudice and

challenged Juror 3 for cause.  *Id.*  The Missouri Supreme Court found Shockley's complaints

about Juror 3 too weak to support either cause or prejudice in a *Strickland* analysis, so a motion

to strike Juror 3 for cause would have failed.  *Shockley II*, 579 S.W.3d at 906.  Trial counsel,

then, served Shockley effectively.  *Cf. Sittner v. Bowersox*, 969 F.3d 846, 853 (8th Cir. 2020)

("Failure to raise a meritless objection cannot support a claim of ineffective assistance." (citation

omitted)).  This finding undercuts Shockley at both the "cause" and "prejudice" elements of this

*Strickland* analysis.  466 U.S. at 687.

 To succeed, Shockley must show that the Missouri Supreme Court's adjudication of the

claim fell below the standard set in § 2254(d).  It did not.  The state court described Juror 3's voir

dire as follows:

> During the death qualification voir dire, Juror 3 stated he would not
> consider sentencing until after the verdict.  Juror 3 was asked, "Does the fact
> [Victim] . . . has the status of a law enforcement officer then change your
> deliberation in the second stage?  Would you say that you automatically would be
> more inclined to give the death penalty simply because it was the murder of a law
> enforcement officer?"  Juror 3 answered, "I probably would be more inclined."
> [Lead trial counsel] explained the state had to prove an aggravating circumstance
> existed beyond a reasonable doubt during the penalty phase and a finding
> [Shockley] killed Victim would prove one aggravating circumstance beyond a
> reasonable doubt.  Juror 3 stated, "I respect law officers and what they have to do.
> I guess I would feel that's more of a crime than just an average --." [Lead
> counsel] responded, "Okay.  And that's fair."

*Shockley II*, 579 S.W.3d at 905 (first alteration in original).

Lead trial counsel pressed Juror 3 on these statements, asking whether this aggravating

factor would decide which penalty he deemed appropriate.  *Id.*  Juror 3 replied that he respected

law enforcement, but that this factor would not automatically make him more inclined to seek the

death penalty.  *Id.* at 906.  Juror 3 assured counsel that he could act impartially.  *Id.*  The

Missouri Supreme Court affirmed the motion court's judgment that this interaction could not

48

support a motion to strike Juror 3 for cause.  *Id.*  While Shockley complains that trial counsel

should have asked questions that would have revealed Juror 3's alleged latent biases, nothing he

says establishes a standard of performance that trial counsel fell below.  Doc. 48 at pp. 153–59.

Nothing he says undermines Juror 3's credibility.  *Id.*  The Missouri Supreme Court reasonably

evaluated the facts surrounding this claim and reasonably applied *Strickland* to those facts.  *See*

§ 2254(d).  Thus, the Court denies claim 5.

### d.   Claim 7

In claim 7, Shockley argues that counsel provided ineffective assistance when his

attorneys failed to call James Chandler to testify during the guilt phase of the trial.  Doc. 48 at p.

238.  According to Shockley, Chandler would have testified that he saw Shockley driving

roughly two hours before the murder.  *Id.* at p. 240.  Supposedly, this testimony would have

shown that Shockley did not lie in wait outside Sergeant Graham's home.  *Id.* at p. 241.

However, trial counsel believed this testimony would only highlight that Shockley had no alibi

for the time of the murder and undermine their defense theory.  *Shockley II*, 579 S.W.3d at 911.

The Missouri Supreme Court found that trial counsel made this decision competently.  *Id.*

Shockley calls this explanation "nonsensical," Doc. 48 at p. 247, notes that lead trial counsel did

not have specific memories of his reasoning on the issue, *id.* at p. 243, faults counsel for relying

on investigations by Shockley's initial counsel, *id.*, and insists that Chandler would have

undermined the State's timeline, *id.* at p. 244.  But given the reasons that trial counsel cites for

not calling Chandler, this Court concludes that the Missouri Supreme Court adjudicated the issue

reasonably, *see Shockley II*, 579 S.W.3d at 911; § 2254(d), and the Court denies claim 7.

### e.   Claim 9(a)

In claim 9, Shockley argues that his trial counsel violated his Sixth-Amendment rights by

failing to investigate and call Mila Linn to rebut the connection between Shockley and the red

car near the crime scene.  Doc. 48 at p. 258.  The Missouri Supreme Court concluded that trial

counsel had sound reasons to *not* call Linn and not much reason *to* call Linn, so trial counsel did

not ineffectively represent Shockley.  *Shockley II*, 579 S.W.3d at 912.  Shockley also questions

the effectiveness of trial counsel's decision to not investigate Linn, but he did not raise this issue

as a claim in state court, so the Court addresses it in Section VI.C.1.c.

Shockley says that Linn would have testified that she knew Shockley; that she saw a red

car in Sergeant Graham's neighborhood near the time of the murder, driven by someone she did

not recognize; that the car's driver looked different than Shockley; and that she had relayed this

information to the police, after looking at a photo line-up.  Doc. 48 at pp. 262–64.  Trial counsel

introduced some of this information into evidence by cross-examining one of the police officers

who spoke with Linn.  Doc. 20-4 at pp. 113–14, Tr. at 1336:1–1337:5.  The officer agreed that

Linn did not identify Shockley as the person driving the car.  *Id.* at p. 114, Tr. at 1337:1–5.

During closing arguments, trial counsel contended that the State's failure to present Linn's

testimony showed that the "state was hiding the ball."  *Shockley II*, 579 S.W.3d at 912.  The

Missouri Supreme Court found that "it is clear [Linn's] testimony would be undermined severely

due to her admission her memory of the events was impaired by heavy drinking," giving trial

counsel a reason not to call her to testify.  *Id.*  Still, trial counsel introduced the most important

information from Linn via cross-examination of the police officer, thereby avoiding the

significant risk of Linn being impeached by her alcohol-impaired memory and used Linn's

absence against the State.  These are reasonable strategic decisions, and "[o]rdinarily, the failure

to call a witness will not support an ineffective assistance of counsel claim because the choice of

witnesses is presumptively a matter of trial strategy,"  *Id.* (quoting *Tisius v. State*, 519 S.W.3d

50

413, 427 (Mo. 2017)); thus, "[t]rial counsel was not ineffective for failing to call Linn to testify at trial." *Id.*

Shockley objects to this account.  Doc. 48 at p. 264.  According to Shockley, trial counsel missed the most crucial elements of Linn's statement:  she knew Shockley, the people in the car did not look like Shockley, and she saw this car "at a location away from the scene of the crime." *Id.* at pp. 266–67.  Further, Shockley says that the Missouri Supreme Court ignored the importance of Linn's testimony.  *Id.* at pp. 264–65.  Shockley also says that trial counsel could have rehabilitated Linn with testimony from her son.  *Id.* at p. 269.  These objections do not demonstrate the unreasonableness of the Missouri Supreme Court's factual findings.  Although Shockley shows that trial counsel could have gained something from calling Linn and that they could have attempted to defend her testimony, he does not demonstrate that the advantages of calling Linn outweighed the disadvantages so decisively that trial counsel acted ineffectively. Shockley falls far short of showing that the Missouri Supreme Court decided the issue unreasonably.  *See* § 2254(d).  The Court denies the first part of claim 9 and takes up the second part below in Section VI.C.1.c.

### f.     Claim 10

In claim 10, Shockley argues that trial counsel assisted him ineffectively by failing to impeach Lisa Hart regarding the red car she saw near Sergeant Graham's home before the murder.  Doc. 48 at p. 270.  Hart provided police with a description of the car, including details about a yellow sticker, visible from the car's front.  *Id.* at pp. 273–74.  Later, she identified this as Shockley's grandmother's car, and that car had a yellow sticker on the back.  *Id.* at pp. 274–75.  Trial counsel did not impeach Hart with these prior statements.  *Shockley II*, 579 S.W.3d at 913.  Instead, they "attempted to bring out discrepancies in her testimony by calling her husband," although trial counsel conceded that this strategy "did not go well."  *Id.*  The Missouri

Supreme Court found that this strategy passed constitutional muster, and further that even if trial

counsel acted incompetently, this failure did not prejudice Shockley, considering the other

evidence tying him to the red car at the crime scene.  *Id.*  So, the Missouri Supreme Court

concluded that Shockley's ineffective-assistance claim fails.

Shockley says that this analysis rests on an unreasonable determination of the facts and

fails to comply with federal law.  First, he says that, although the Missouri Supreme Court found

that trial counsel "attempted to bring out discrepancies in her testimony by calling her husband,"

*Shockley II*, 579 S.W.3d at 913, trial counsel actually only questioned Mr. Hart about the red

car's license plate and "chose not to ask Roger Hart about any other detail of the car," Doc. 48 at

p. 280.  But Shockley is incorrect.  Trial counsel asked Mr. Hart whether he and his wife

reported what they saw to the police, including details about the yellow sticker.  Doc. 20-5 at pp.

88–89, Tr. at 2004:8–2007:13.  Mr. Hart said that he and his wife included everything they saw

in their police report, but that they did not include any details about a yellow sticker.  *Id.*, Tr. at

2004:19–21.  Trial counsel asked whether they assumed that the red car in the police parking lot

was the same red car they saw near Sergeant Graham's house.  *Id.*, Tr. at. 2006:5–8.  Mr. Hart

replied that they did not make this assumption but recognized the car.  *Id.*  Counsel pressed Mr.

Hart on how he and his wife could confidently identify the car when they could not list many

specific details about the car, besides identifying it as a red Pontiac Grand Am.  *Id.,* Tr. 2006:9.

Mr. Hart said that, because he owned a similar car, he could visually recognize the car, without

listing specific details from memory.  *Id.*, Tr. at 2006:10–2007:8.  Thus, the Missouri Supreme

Court correctly found that counsel did attempt to impeach Ms. Hart's testimony by questioning

her husband.  *Shockley II*, 579 S.W.3d at 913.

Second, Shockley argues that the way "law enforcement displayed [Shockley's grandmother's] Pontiac Grand Am was suggestive and impacted [Ms. Hart's] credibility." Doc. 48 at p. 278. According to Shockley, trial counsel "failed to impeach Lisa Hart's credibility with the circumstances of the line-up." *Id.* at p. 279. However, trial counsel asked Mr. Hart whether he and his wife "assumed this must have been the car that you had seen because it's a red car and it's at the police station." Doc. 20-5 at p. 88, Tr. at 2006:5–8. As noted, Mr. Hart said he did not make this assumption. *Id.* Thus, trial counsel did attempt to impeach the Ms. Harts' testimony with the circumstances of the line-up.

Third, Shockley argues that the Missouri Supreme Court incorrectly concluded that because "other witnesses" corroborated Ms. Hart's testimony, trial counsel's failed attempt to impeach Ms. Hart did not prejudice the defense. Doc. 48 at p. 281. Shockley says that contrary to that court's finding that multiple witnesses corroborated Ms. Hart's testimony, only one other witness—Rick Hamm—testified that he saw the red car. However, three witnesses testified that they saw the red car: Ms. Hart, Mr. Hart, and Rick Hamm. Doc. 20-5 at pp. 53–54, Tr. at 1865:22–1868:25 (Hamm's testimony about the red car); *id.* at pp. 60–61, Tr. at 1892:2–1898:8 (Ms. Hart's testimony about the red car); *id.* at pp. 88–89, Tr. at 2004:8–2007:13 (Mr. Hart's testimony about the red car). Shockley, not the Missouri Supreme Court, inaccurately describes the record.

Fourth, Shockley says that the Missouri Supreme Court failed to apply *Driscoll v. Delo*, 71 F.3d 701. Doc. 48 at p. 277. Shockley cites this case for the proposition that reasonable counsel would impeach a witness whose testimony evolves over time. *Id.*; *see also Driscoll*, 71 F.3d at 710. Counsel, though, did attempt to impeach Ms. Hart's credibility. Further, the change in Ms. Hart's testimony does not resemble the change in testimony discussed in *Driscoll*. 71

53

F.3d at 710 (finding that "counsel could [not] justify a decision not to impeach a state's eyewitness whose testimony . . . took on such remarkable detail and clarity over time"). Therefore, the Missouri Supreme Court did not fail to reasonably apply *Driscoll*. And *Driscoll* is an Eighth Circuit case, not a Supreme Court case. *Id.* at 701. Thus, the state court's analysis involves no unreasonable determination of fact and no unreasonable application of United States Supreme Court precedent. *See* § 2254(d). The Court denies claim 10.

### g. Claim 12

In claim 12, Shockley argues that his trial counsel incompetently failed to investigate and call Carol and Sylvan Duncan to rebut the State's timeline of events, Doc. 48 at p. 292, but he largely fails to address the Missouri Supreme Court's reasoning or the caselaw stating that decisions about which witnesses to call are presumptively matters of trial strategy. Doc. 48 at pp. 292–304. The Missouri Supreme Court found that:

> Trial counsel conducted a thorough investigation regarding the Duncans' testimony, including reviewing all their pretrial statements and meeting with them in person. Trial counsel determined the Duncans could, at best, provide an imperfect alibi, which [Shockley's counsel] explained trial counsel were not comfortable presenting.

*Shockley II*, 579 S.W.3d at 911. Further, trial counsel had good reason to *not* call the Duncans. *Id.* Counsel saw Carol Duncan as uncertain about the timeline of events and did not believe that Sylvan Duncan would hold up to cross-examination. *Id.* Also, the Duncans might have testified about Shockley's "graphic description of [Sergeant Graham's] face after being shot[.]" *Id.* ("[Shockley] told the Duncans [Sergeant Graham] had been shot in the face and 'I heard that you could just take the flap – his face and just pull it back and then lay it back over.'"). Thus, "[t]rial counsel were not ineffective for failing to call the Duncans to testify at trial." *Id.* Indeed, Shockley himself admits that the Duncans' testimony "could not provide an alibi to the charges," Doc. 48 at p. 302, acknowledging one of counsel's reasons to not call the couple, *Shockley II*,

579 S.W.3d at 911; *see also id.* at 912 (citing *Tisius*, 519 S.W.3d at 427, for the proposition that "[o]rdinarily, the failure to call a witness will not support an ineffective assistance of counsel claim because the choice of witnesses is presumptively a matter of trial strategy").  The Missouri Supreme Court adjudicated this claim reasonably, and its judgment warrants deference under § 2254(d).  The Court denies claim 12.

### h.      Claim 14

In claim 14, Shockley contends that trial counsel incompetently failed to object to the police presence in and around the courthouse during Shockley's trial and sentencing.  Doc. 48 at p. 325.  According to Shockley, the police presence prejudiced the jury and judge against him. *Id.*  The Missouri Supreme Court rejected this claim, but Shockley says that the state court's treatment of the jury issue misapplied federal law and its treatment of the judge issue distorted the facts.  Doc. 48 at pp. 332–34.  Neither argument succeeds.

Shockley's aunt testified that "seventy-five to one hundred police officers" stood outside the courthouse each day of the trial, and Shockley's attorney testified that the trial court excluded or prevented law-enforcement officers from watching or participating in the trial while dressed in uniform.  *Shockley II*, 579 S.W.3d at 917.  Shockley's counsel testified that the police were at the courthouse to protect Shockley from threats made against him.  *Id.* at 918.  Moreover, of the jurors who testified during the postconviction hearing, none observed a large police presence during the trial, none observed armed personnel watching over Shockley, and none testified that the police presence influenced their verdict.  *Id.*  Shockley further fails to point to any evidence that any of the jurors were aware of or were influenced by the police presence of uniformed law enforcement.  Doc. 48 at pp. 325–35.

The Missouri Supreme Court concluded that Shockley's trial counsel "were not ineffective for failing to object to the large police presence at [Shockley]'s trial and at

sentencing." *Shockley II*, 579 S.W.3d at 918. To this, Shockley only responds that "[c]ommon sense would tell you that the jury would notice a large number of uniformed officers in and around the courthouse." Doc. 48 at p. 332–33. This speculative assertion does not show that the Missouri Supreme Court unreasonably determined the facts of this claim.

Shockley faults the Missouri Supreme Court for not following *Woods v. Dugger*, 923 F.2d 1454, 1459 (11th Cir. 1991), where the Eleventh Circuit found that, based on the totality of the circumstances, the number of prison guards who attended Woods's trial in full uniform deprived Woods of his right to a fair trial. Doc. 48 at pp. 331–34. But the Court easily distinguishes *Woods* because that case concerned the attendance of uniformed law enforcement *during trial in the presence of the jury*. *See Woods*, 923 F.2d at 1459. Here, the trial judge excluded uniformed law enforcement from watching the trial in the jury's presence. *Shockley II*, 579 S.W.3d at 917. Shockley also cites *Woods* for the proposition that heightened police presence "is inherently prejudicial." Doc. 56 at p. 106. Because of the distinctions between *Woods* and this case, and because an alleged failure to follow something other than United States Supreme Court precedent would not qualify for relief under section 2254(d), Shockley's argument fails. The Missouri Supreme Court reasonably concluded that, because jurors never saw the heightened police presence—unlike in *Woods*—Shockley suffered no prejudice. *Shockley II*, 579 S.W.3d at 918. Accordingly, the Court denies the portion of claim 14 aimed at the supposed effect of police presence on the jury.

Shockley also argues that trial counsel violated his right to effective assistance by failing to object to an elected trial judge sentencing Shockley under the political pressure of heightened police presence. Doc. 48 at pp. 333–35. Shockley argues that the electoral pressure must have biased the trial judge against him. *Id.* The motion court noted procedural issues with this claim,

and concluded that Shockley had not demonstrated prejudice. *See Shockley II*, 579 S.W.3d at 918. The Missouri Supreme Court affirmed, reasoning that Shockley "failed to present any evidence regarding this claim at the evidentiary hearing" and rejecting the claim for lack of factual support. *Id.* at 918–19. Specifically, "[t]rial counsel were not asked about their failure to object or offer any reason why an elected circuit court judge could not impose sentencing." *Id.* at 919. Shockley, however, says that "[t]his is simply factually wrong. [Trial counsel were] explicitly asked about this and testified about the issue." Doc. 48 at p. 334.

Despite Shockley's incredulity, the record does not support his assertion. Lead counsel stated that he knew the trial judge held an elected position and explained why he did not object to police officers wearing uniforms during sentencing. Doc. 20-53 at pp. 6–7, Tr. 63:5–64:9. He did not say anything regarding the mere presence of police officers at sentencing or the trial judge's impartiality. *Id.* Thus, the Missouri Supreme Court reasonably found that the record contains no insight on trial counsel's decision not to question the judge's impartiality and that this ineffective-assistance argument lacks support in the record. *Shockley II*, 579 S.W.3d at 919. Further, Shockley does not supply any argument to support the idea that, if trial counsel had objected to the elected trial judge sentencing Shockley, this objection would have had a reasonable likelihood of securing a sentence free of supposed bias or resulted in a different, unelected judge to sentence him. Shockley only cites dissenting opinions to support his argument. Doc. 48 at pp. 333–35. The Court finds the Missouri Supreme Court's adjudication reasonable and denies claim 14. *See* § 2254(d).

### i.      Claim 15(a)

In claim 15, Shockley says that his trial counsel incompetently failed to object to "the prosecutor's comment on Lance Shockley's decision not to testify." Doc. 48 at p. 336. Shockley complains that trial counsel mishandled a prosecutor's vague remark during cross-examination

and a statement during closing arguments about the defense's failure to explain why Shockley's grandmother's car would appear near the crime scene. *Id.* at p. 337. The Missouri Supreme Court found that, because the first incident presented no grounds on which trial counsel could have objected, counsel's decision not to object meets the standard of effective assistance. *Shockley II*, 579 S.W.3d at 913–14. Because Shockley did not raise the second of these incidents in state court, the Court addresses the second part of this claim with the rest of Shockley's procedurally defaulted claims. *See infra* Section VI.C.1.f.

Shockley argues that, "in response to a witness stating that she did not know why Shockley's grandmother's car was across the street from where the victim was killed, the prosecutor pointedly replied, '[s]omeone does.'" Doc. 48 at p. 337. According to Shockley, this amounts to a comment on his decision not to testify. *Id.* Trial counsel did not object to this statement, though the judge told the prosecutor to "keep the comments to yourself." *Shockley II*, 579 S.W.3d at 913. The Missouri Supreme Court found several flaws in this argument: the prosecutor did not directly comment on Shockley's failure to testify, an objection would have drawn unwanted attention to the comment, a request for a curative instruction would have lacked merit, Shockley would not have received a new trial had counsel preserved the issue, and Shockley cannot demonstrate prejudice. *Id.* at 914; *see Sittner*, 969 F.3d at 853 ("Failure to raise a meritless objection cannot support a claim of ineffective assistance." (citation omitted)).

Shockley says that the Missouri Supreme Court's reasoning contradicted *Combs v. Coyle*, 205 F.3d 269, 279 (6th Cir. 2000), and *Gabaree v. Steele*, 792 F.3d 991, 998–99 (8th Cir. 2015). Doc. 48 at pp. 340–41. However, these cases do not bear any factual similarity to this case. *See Combs*, 205 F.3d at 279 (in which the defendant refused to answer questions from the police at the crime scene, the prosecutor argued that the defendant's refusal to answer evidenced the

defendant's recognition of "the gravity of the situation," and the judge instructed the jury that it could consider this refusal as evidence of the defendant's *mens rea*, and defense counsel unreasonably failed to object to the prosecutor's argument and the judge's instruction); *Gabaree*, 792 F.3d at 998–99 (evaluating counsel's decision not to object to two witness statements for fear of highlighting those statements, and finding counsel unreasonable because, in the first instance, the testimony played such a crucial role in the case and, in the second instance, because counsel did highlight the testimony in cross-examination).  Thus, Shockley's argument against the Missouri Supreme Court's reasoning does not stand.  More fundamentally, Shockley's argument cannot succeed because the Missouri Supreme Court reasonably found that the prosecutor did not comment on Shockley's decision not to testify, and any alleged misapplication of Circuit precedent is not a basis for relief under § 2254(d).  Because the Missouri Supreme Court applied *Strickland* reasonably, the Court denies the first part of claim 15.

### j.    Claim 17

In claim 17, Shockley argues that trial counsel deprived him of effective assistance by failing to object to an accumulation of victim-impact evidence during sentencing, including a funeral-casket photograph, a video montage shown at Sergeant Graham's funeral, and a drawing by Sergeant Graham's son depicting what the son described as Shockley shooting his father. Doc. 48 at p. 348.  The Missouri Supreme Court determined that an objection from trial counsel would have reflected negatively on Shockley, and that, in any event, Shockley suffered no prejudice because, even if counsel had objected, any objection would have "been nonmeritorious."  *Shockley II*, 579 S.W.3d at 915.

Shockley objects that this finding unreasonably discounts the emotional impact of this evidence, that a right to object exists under New Jersey law, and that the Missouri Supreme Court's finding that any objection would have failed misapplies *Strickland*'s prejudice standard.

Doc. 48 at pp. 352–54.  All of Shockley's arguments stand on unsteady ground because he cites

no binding legal standard to evaluate the evidence's admissibility.  *Id.* at pp. 348–56.

First, Shockley gestures toward an argument that the state court should have found the

evidence more egregious.  Doc. 48 at p. 352.  Shockley complains that the Missouri Supreme

Court does not specifically address the effect of a drawing from Sergeant Graham's five-year-old

child, which depicted Sergeant Graham's murder.  *Id.*  According to Shockley, it was "unfair" to

allow the jury to consider this drawing in judging the impact of the crime.  *Id.*  Yet, the Missouri

Supreme Court never says what impact it thought the evidence had.  *Shockley II*, 579 S.W.3d at

914–15.  Instead, the Missouri Supreme Court found that trial counsel correctly believed that

they had no legal basis to object to the victim-impact evidence.  *Id.*

Second, Shockley argues that the Missouri Supreme Court should have followed *State v.

Hess*, 23 A.3d 373 (N.J. 2011), which condemned inflammatory victim-impact evidence and

allegedly bears a factual resemblance to this case.  Doc. 48 at pp. 352–53.  But the Missouri

Supreme Court has not adopted *Hess* as the law in Missouri—and it explicitly distinguished

Shockley's case from *Hess*.  *Shockley II*, 579 S.W.3d at 915.  This Court cannot demand that

Missouri follow New Jersey law, s*ee* 28 U.S.C. § 2254(d)(1), much less a New Jersey case that

the Missouri Supreme Court found distinguishable.  Even if the state court failed to appreciate

the alleged analogy between *Hess* and this case, Shockley would have no basis for relief in a

federal habeas court.  Shockley presented *Hess* as the sole authority for his argument that trial

counsel could have objected to the victim-impact evidence.

Shockley also cites *Dodd v. Trammell*, 753 F.3d 971 (10th Cir. 2013), to support his

prejudice argument.  Doc. 48 at p. 355.  However, that case does not bear on Shockley's case,

because in *Dodd,* the State introduced impermissible victim impact testimony by asking the

victim's family members whether they recommended the death penalty.  753 F.3d at 996–99.

Here, the sentencing-phase evidence properly addressed the impact on "the victim and the impact

of the murder on the victim's family."  *Williams v. Norris*, 612 F.3d 941, 952 (8th Cir. 2010)

(quoting *Payne v. Tennessee*, 501 U.S. 808, 826–27 (1991)).  The Missouri Supreme Court

premised its analysis of the prejudice prong of Shockley's ineffective-assistance argument on the

fact that, here, the victim-impact evidence did not violate Shockley's rights.  *Shockley II*, 579

S.W.3d at 914–15.  Therefore, *Dodd* does not apply.

Further, the Missouri Supreme Court reasonably applied federal law in determining that

the victim-impact evidence did not wrong Shockley.  Eighth Circuit precedent provides the

constitutional standard for excessively inflammatory evidence:  "[t]he admission of evidence at a

state trial provides a basis for federal habeas relief when the 'evidentiary ruling infringes upon a

specific constitutional protection or is so prejudicial that it amounts to a denial of due process.'"

*Abdi v. Hatch*, 450 F.3d 334, 338 (8th Cir. 2006) (quoting *Turner v. Armontrout*, 845 F.2d 165,

169 (8th Cir. 1988)).  Shockley does not argue that the admission of the victim-impact evidence

described above infringes upon any specific constitutional protections or amounted to a denial of

due process.  Doc. 48 at pp. 352–56.  He does not give any federal standard for unduly

prejudicial evidence that he thinks the Missouri Supreme Court failed to respect.  *Id.*  Thus, the

Court takes "no issue with the Missouri court's application and interpretation of its evidentiary

rules."  *Skillicorn v. Luebbers*, 475 F.3d 965, 974 (8th Cir. 2007) (citing *Schleeper v. Groose*, 36

F.3d 735, 737 (8th Cir. 1994)).

Shockley also asks the Court to consider that an elected judge sentenced Shockley in its

evaluation of the propriety and impact of the sentencing-phase evidence.  Doc. 48 at pp. 355–56.

But he cites no binding authority to support the notion that any special standard for victim-

61

impact evidence should apply when an elected judge sentences a defendant.  *Id.*  The Court

declines to hold that an elected judge cannot consider victim-impact evidence in sentencing a

defendant.

Third, Shockley says that the Missouri Supreme Court applied the wrong test in deciding

whether prejudice existed in this case, because it concluded that Shockley "cannot demonstrate

the outcome of the trial would have been different," without including the words "reasonable

probability."  Doc. 48 at pp. 353–54 (quoting *Shockley II*, 579 S.W.3d at 915).  The Missouri

Supreme Court explained *Strickland*'s prejudice test in full earlier in its opinion, *Shockley II*, 579

S.W.3d at 892–93, and need not restate the full test each time it applies *Strickland*.  This

objection stands on especially weak ground, because the Missouri Supreme Court did not simply

find that an objection would likely not succeed, but instead found that "any objection to the

admissible exhibits would have been nonmeritorious."  *Shockley II*, 579 S.W.3d at 915; *see also*

*Sittner*, 969 F.3d at 853 ("Failure to raise a meritless objection cannot support a claim of

ineffective assistance." (citation omitted)).  Thus, the Missouri Supreme Court did not

unreasonably apply *Strickland*.  In sum, each of Shockley's accusations leveled against the

Missouri Supreme Court fail.  *See* § 2254(d).  The Court denies claim 17.

### k.      Claim 20

In claim 20, Shockley alleges that his trial counsel incompetently failed to object to the

introduction of a rifle as demonstrative evidence because "[t]he murder weapon was never found,

and the rifle introduced at trial was unrelated to the charged offense."  Doc. 48 at p. 374.  The

Missouri Supreme Court rejected this claim, holding that "any objection to the use of the

demonstrative exhibit would not have been meritorious," and that "[t]rial counsel will not be

held ineffective for failing to make a nonmeritorious objection."  *Shockley II*, 579 S.W.3d at 909

(citing *Tisius*, 519 S.W.3d at 429).

Shockley says that the Missouri Supreme Court's adjudication contradicts federal law, unreasonably applied that law, and unreasonably determined the facts.  Doc. 48 at p. 379. Specifically, Shockley says that the Missouri Supreme Court ignored several cases that hold that a court may not introduce a firearm into evidence if that firearm has no relevance to the crime. Doc. 48 at pp. 380–81 (citing *United States v. Goliday*, 145 F. App'x 502, 506 (6th Cir. 2005); *Walker v. United States*, 490 F.2d 683, 684–85 (8th Cir. 1974); *United States v. Matsunaga*, 158 F. App'x 783, 785 (9th Cir. 2005)).  Shockley cites these cases for the proposition that "when a defendant is not charged with a firearms violation and a firearm is not relevant to the crimes charged, a district court abuses its discretion in admitting the firearm."  *Goliday*, 145 F. App'x at 506.  For instance, a court may not admit a firearm simply as propensity or character evidence. *Walker*, 490 F.2d at 684–685.

However, these cases have no bearing on Shockley's case.  The Missouri Supreme Court did not deem the rifle admissible as character or propensity evidence; it deemed the rifle relevant to the crime:

> Witnesses testified [Shockley] had inherited a Browning .243 rifle from his father. This rifle was never recovered from any of the searches of [Shockley's] home or property, which comported with the state's theory that [Shockley] disposed of the rifle after shooting [Sergeant Graham].  Both ballistics experts testified the bullet recovered from [Sergeant Graham] belonged to the .22 to .24 caliber class of ammunition, which included a Browning .243 caliber rifle.  Finally, [lead trial counsel] testified, if [Shockley] would have taken the stand, [Shockley] was prepared to admit ownership of a .243 caliber rifle, and this fact was mentioned in the defense's opening statement.

*Shockley II*, 579 S.W.3d at 909.  According to the Missouri Supreme Court, the rifle presented was "relevant to the crimes charged."  *Goliday*, 145 F. App'x at 506; *Shockley II*, 579 S.W.3d at 909.  To the extent that this determination turns on Missouri's evidentiary rules, "[a] federal court may not re-examine a state court's interpretation and application of state law."  *Skillicorn*,

475 F.3d at 974 (citation omitted).  To the extent that this determination turns on the factual

relevance of the rifle, the Missouri Supreme Court adjudicated the issue reasonably.  *See*

§ 2254(d).  Thus, the Missouri Supreme Court's determination that any objection from trial

counsel to the rifle would have been meritless did not contradict or unreasonably apply federal

law as clearly established by the Supreme Court and did not determine the facts unreasonably.

*See* § 2254(d).  "Failure to raise a meritless objection cannot support a claim of ineffective

assistance."  *Sittner*, 969 F.3d at 853 (citation omitted).  Thus, the state court decided the issue

reasonably, and this Court denies claim 20.

### l.      Claim 23

In claim 23, Shockley alleges that his trial counsel provided ineffective assistance when

they failed to investigate and present evidence, specifically the testimony of Shockley's

grandfather, that Shockley did not inherit a Browning rifle from his father.  Doc. 48 at pp. 444,

448.  At trial, the State argued that this rifle had special sentimental value to Shockley, and that

the rifle's disappearance after the crime suggests that Shockley used the rifle to murder Sergeant

Graham and then disposed of the evidence.  Doc. 20-5 at p. 95, Tr. at 2031:2–11.  Shockley was

willing to testify that he owned a Browning .243 rifle.  Doc. 20-53 at p. 18, Tr. at 75:15–18.

Lead trial counsel remembered that Shockley received the gun from his father or another

relative, Doc. 20-52 at pp. 62–63, Tr. at 53:8–17, and later said that Shockley "received [the

rifle] as a gift from his dad," *id.* at p. 63, Tr. at 54:22–23.  But Shockley's grandfather testified

that Shockley came to live with him at thirteen years old, shortly before Shockley's father's

death, and did not possess an inherited Browning rifle while Shockley lived there.  Doc. 48-3 at

pp. 26–27, Tr. at 20:11–21:24.

Shockley says that trial counsel should have investigated the issue and presented his

grandfather's testimony at trial but failed to do either.  Doc. 48 at p. 446.  Shockley does not cite

any evidence to support the notion that counsel failed to investigate the issue. *See* Doc. 48 at pp. 444–54; Doc. 56 at pp. 212–20. *But see Shockley II*, 579 S.W.3d at 908 (noting that "trial counsel did not testify specifically about their strategic reasons for failing to call [Shockley's grandfather] during the guilt phase to rebut the state's witnesses who testified [Shockley] inherited a Browning .243 rifle").

The Missouri Supreme Court found that trial counsel did not represent Shockley ineffectively, because using Shockley's grandfather's testimony to "rebut the state's witnesses" might have harmed the defense. *Shockley II*, at 579 S.W.3d at 908. It held that trial counsel reasonably left open the possibility that Shockley would testify that he owned a .243 rifle. *Id.* at 908–09. Thus, the Missouri Supreme Court judged that "[t]he motion court did not clearly err in denying this claim." *Id.* at 909.

Shockley makes several arguments against the Missouri Supreme Court's factual findings and application of *Strickland*. Doc. 48 at p. 452–54. As to its application of *Strickland*, Shockley first insists the Missouri Supreme Court's decision violated clearly established federal law by discounting the importance of Shockley's grandfather's testimony. *Id.* Yet Shockley overstates the importance of this issue to the trial, *Shockley II*, at 579 S.W.3d at 908, and the Missouri Supreme Court decided the issue reasonably.

Second, Shockley says that the Missouri Supreme Court failed to abide by the holdings of *Williams v. Taylor*, Doc. 56 at p. 219, which says state courts must "evaluate the totality of the available mitigation evidence—both that adduced at trial and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." 529 U.S. at 397–98. Because this claim regarding evidence of guilt has nothing to do with aggravating or mitigating evidence,

and because the Missouri Supreme Court did evaluate the weight of the evidence, this Court finds Shockley's citation to *Williams v. Taylor* misses the mark.

Third, Shockley says that counsel acted incompetently by acknowledging in opening statements that Shockley owned a .243 rifle.  Doc. 48 at p. 450.  But he did not make this argument to the Missouri Supreme Court, *see* Doc. 20-59,[1] and the Missouri Supreme Court did not address this issue, *Shockley II*, 579 S.W.3d at 908–09.  Because Shockley did not present this argument to the Missouri Supreme Court, the argument has no relevance to the reasonableness of the state court's adjudication.  *See* § 2254(d).

Fourth and finally, Shockley argues that, because he did not testify, trial counsel should have presented testimony from his grandfather.  Doc. 48 at p. 454.  But Shockley does not support this argument with any discussion of when counsel knew that Shockley would not testify or whether they could have and should have called Shockley's grandfather at that point.  *Id.* Thus, the Missouri Supreme Court applied *Strickland* reasonably.  *See* § 2254(d).

Against the Missouri Supreme Court's factual findings, Shockley first argues that the Missouri Supreme Court found that Shockley's grandfather's testimony would have contradicted Shockley's testimony, but Shockley says this is incorrect.  Doc. 48 at p. 454.  "Even if Mr. Shockley had testified that he owned a Browning BLR or .243 caliber rifle, this would not have been equivalent to admitting that the [sic] inherited such a gun from his father."  Doc. 56 at p. 217.  However, lead trial counsel said that Shockley received the rifle from his father, Doc. 20-52 at p. 63, Tr. at 54:21–24, and the postconviction motion court noted this fact in finding that "[i]t was reasonable for [trial counsel] to pursue a defense strategy which would not undermine the credibility of [Shockley] if he chose to testify."  Doc. 20-55 at p. 40.  Thus, in reviewing the

---

[1] Shockley did not provide the Court with a complete copy of his brief to the Missouri Supreme Court.  The Court has accessed the remainder of this filing on Westlaw.

motion court's decision, the Missouri Supreme Court reasonably found that counsel had good reason to avoid a potential contradiction between Shockley and his grandfather.

Second, Shockley argues the Missouri Supreme Court unreasonably determined the facts when it said that "witnesses" testified that Shockley inherited the rifle from his father. Doc. 48 at p. 453; *Shockley II*, 579 S.W.3d at 908 ("However, the state called other witnesses who knew [Shockley] and testified he inherited a rifle from his father."). According to Shockley, the Missouri Supreme Court found that, because the State presented multiple witnesses who testified that Shockley did inherit the rifle from his father, Shockley's grandfather's testimony would have had no effect and so Shockley suffered no prejudice. Doc. 48 at p. 453–54. Shockley says that, at trial, the State presented only one witness who testified to this point. *Id.* at p. 453. The postconviction motion court heard testimony from multiple "individuals who knew [Shockley] and knew he had inherited the rifle," and noted multiple statements confirming that Shockley received the rifle from his father. Doc. 20-55 at p. 40. Yet, at trial, the prosecution pointed to a single witness who testified to this point. Doc. 20-5 at p. 95, Tr. 2031:2–11. So while it appears that the Missouri Supreme Court overstated the number of witnesses who testified *at trial* that Shockley inherited the rifle, it accurately stated that multiple witnesses testified at trial to the rifle's sentimental value.

Contra Shockley, the Missouri Supreme Court's reference to multiple witnesses played no explicit part in its reasoning. *Shockley II*, 579 S.W.3d at 908–09. Shockley says that "[t]he Missouri Supreme Court was also factually incorrect in the analysis as to why Shockley could not establish prejudice on this issue," Doc. 48 at p. 453, but the Missouri Supreme Court did not mention prejudice in its analysis, *Shockley II*, 579 S.W.3d at 908–09. Because this incorrect finding played no role in the state court's analysis, this error does not make that analysis

67

unreasonable.  Instead, the Missouri Supreme Court said that "[b]y not calling [Shockley's grandfather], trial counsel were pursuing a defense strategy that would not undermine [Shockley's] credibility if he chose to testify, which was reasonable." *Id.* at 909.  The Court finds the Missouri Supreme Court's analysis reasonable and denies claim 23.  *See* § 2254(d).

### m.    Claim 24

In claim 24, Shockley argues that trial counsel unreasonably failed to investigate, prepare, and rebut the ballistics evidence against Shockley with expert testimony from Steven Howard.  Doc. 48 at pp. 455, 459.  The Missouri Supreme Court rejected this claim, because "[t]he motion court determined trial counsel presented a sound trial strategy for failing to call Howard on [Shockley]'s behalf." *Shockley II*, 579 S.W.3d at 908; *see also id.* ("Counsel may choose to call or not call almost any type of witness or to introduce or not introduce any kind of evidence for strategic considerations." (quoting *Vaca v. State*, 314 S.W.3d 331, 337 (Mo. 2010))).  Specifically, trial counsel "discussed whether to call their own ballistics expert, but after looking at the state's experts, they decided against it." *Shockley II*, 579 S.W.3d at 907.  "[Lead trial counsel] stated he had bad experiences in the past with cross-examination of his own ballistic witnesses." *Id.*

Shockley says that lead trial counsel misremembered various details about his experience in a case from over twenty years before Shockley's trial and years before he testified before the motion court.  Doc. 48 at pp. 464–65.  Shockley's cavil that trial counsel gave an example of a bad experience with an expert on gunshot-residue evidence and not a firearms expert, and that he misremembered that expert's name, does not call into question counsel's substantive reasons for not calling a firearms expert on behalf of Shockley.  Doc. 48 at pp. 464–65.  The fact remains that lead trial counsel reasonably relied on his experience to judge the risks of calling his own expert witness, and the Missouri Supreme Court reasonably deemed this decision competent,

*Shockley II*, 579 S.W.3d at 906–07. "[Lead trial counsel] stated he would rather cross-examine two experts on the same side and get them to contradict each other than have his own 'hired gun.'" *Id.* "The trial transcript reflects [lead trial counsel] implemented this strategy of pointing out the contradictions between [the state's experts] during his cross-examination of both witnesses and throughout the trial." *Id.* Both the state court's application of *Strickland* and its determination of the facts qualify as reasonable, *see* § 2254(d); thus, the Court denies claim 24.

Shockley's argument about Howard relates to much broader accusations that Shockley directs toward trial counsel's handling of ballistics evidence in claim 21 and the trial court's handling of ballistics evidence in claim 22. *See infra* Sections VI.C.1.h., VI.C.2.b. Shockley attempts to bolster claim 24 with many miscellaneous arguments that the Court addresses in its analysis of claims 21 and 22. S*ee infra* Sections VI.C.1.h., VI.C.2.b.

However, Shockley presents one miscellaneous point in support of claim 24 that he does not mention in claim 21 or 22: Shockley complains that trial counsel incompetently "failed to conduct a complete forensic evaluation of available firearms/ballistics/bullet evidence . . . including, but not limited to analysis by a firearms expert, metallurgist, toolmark expert, and or analytical scientist or forensic expert(s)." Doc. 48 at p. 459 n.14. To the extent that this stands as a separate argument, Shockley fails to develop either an account of what counsel did or what competence requires. *Id.* Shockley raises this point in the context of a larger argument regarding trial counsel's failure to appreciate developing ballistics evidence, but, as the Court explains in its analysis of claim 22, *see infra* Section VI.C.1.h., Shockley did not raise this argument before the Missouri Supreme Court and cannot support it with evidence or overcome procedural default. *See* § 2254(e)(2); *see also Shinn*, 142 S. Ct. at 1727–28.

### 2.      Other claims adjudicated on the merits in state court

#### a.      Claim 3

In claim 3, Shockley argues that Juror 58 deprived him of his Sixth-Amendment right to a fair and impartial jury by (1) committing juror misconduct, (2) harboring bias, and (3) spreading bias to other jurors.  Doc. 48 at pp. 124–26.  These allegations arise from the same facts described in claim 1, *see supra* Section VI.B.1.b., where Shockley alleges that Juror 58's novel expressed hostility against criminal defendants and that trial counsel failed to protect Shockley from that hostility.  The Missouri Supreme Court found that the facts do not support the three complaints, holding that the "misconduct" amounted to a simple misunderstanding that did not reveal bias, that Juror 58 acted impartially, and that Juror 58 did not promote bias in other jurors.  *Shockley II*, 579 S.W.3d at 894–98, 900–05.  Shockley sees these three findings as factually and legally unreasonable.  Doc. 48 at pp. 105–07.  The Court disagrees.

First, the Missouri Supreme Court found that Juror 58 did not commit juror misconduct, and that even if he did, any supposed misconduct did not prejudice Shockley.  *Shockley II*, 579 S.W.3d at 900–05.  According to Shockley, Juror 58 committed misconduct by bringing his book to the sequestered jury, Doc. 48 at p. 124, despite the trial judge's instructions to "avoid movies and books about trials, particularly periodicals or legal documentaries," *Shockley II*, 579 S.W.3d at 901.  According to Shockley, the fact that other jurors "realized upon reading the book that they should probably not be looking at it" demonstrates that the novel breached the trial court's instructions.  Doc. 48 at p. 125.  Shockley says that Juror 58's alleged violations of the trial court's instructions "betray Juror 58's bias."  *Id.* at p. 132.  However, the Missouri Supreme Court found that Juror 58 "felt he complied" with the trial judge's instructions, that these instructions did not have the legal force of a Missouri Approved Instruction, that Juror 58 did not violate the spirit of these instructions, and that the issue amounted to a miscommunication.  *Id.* at 903–05.  In sum, the Missouri Supreme Court concluded that Juror 58 did not intentionally flout

70

the trial court's demands and did not reveal bias against Shockley through alleged misconduct. *Id.* The Missouri Supreme Court's findings do not unreasonably apply Supreme Court precedent or unreasonably determine the facts. *See* § 2254(d).

Second, Shockley argues that Juror 58's alleged bias against Shockley deprived him of his Sixth-Amendment rights to a fair and impartial jury and to a fair trial. Doc. 48 at pp. 105–07. After considering defense counsel's argument regarding Juror 58's bias against Shockley, the Missouri Supreme Court deemed this evidence too weak to outweigh the evidence of Juror 58's impartiality. *Shockley II*, 579 S.W.3d at 894–98. Rather than weighing the evidence for itself, the Court must grant the Missouri Supreme Court appropriate deference. § 2254(d)(2); § 2254(e)(1). To grant Shockley relief, the Court must find that the Missouri Supreme Court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(1). The Court can only accept Shockley's argument if "the state court's presumptively correct factual findings do not enjoy support in the record." *Lomholt v. Iowa*, 327 F.3d 748, 752 (8th Cir. 2003) (citations omitted). In other words, if "there is record support for the state court's factual findings," then the Court must reject Shockley's argument. *Bahtuoh v. Smith*, 855 F.3d 868, 873 (8th Cir. 2017).

To support his claim, Shockley notes facts that allegedly raise questions about Juror 58's impartiality: Juror 58's son worked in law enforcement; the plot of Juror 58's novel involves both a DUI-related manslaughter and the murder of a law enforcement officer; the novel depicts the criminal-justice system as consistently failing to punish evil defendants; the novel's main character sees the failings of the criminal-justice system as a reason to enforce gruesome vigilante justice and to detonate a nuclear weapon near St. Louis; Juror 58 described his book as a "fictionalized autobiography"; and, finally, when Shockley's trial counsel, the trial judge, and

71

the prosecutor learned of Juror 58's book, the issue caused them enough concern that the trial judge removed Juror 58 from the jury's sentencing deliberation. Doc. 48 at pp. 48–52, 78–81, 130–37. In Shockley's view, these facts demonstrate that Juror 58 could not have reasonably evaluated the evidence in Shockley's case. *Id.*

The Missouri Supreme Court rejected each of Shockley's arguments regarding Juror 58. *Shockley II*, 579 S.W.3d at 894–97, 904–05. It found that the contents of Juror 58's book did not reveal a bias against Shockley. *Id.* The mere fact that both the novel and Shockley's case involved a DUI-related manslaughter and the murder of a law-enforcement officer could not demonstrate bias. *Id.* at 895. Thus, Shockley's argument "is premised on a degree of factual congruity between the novel and the facts of the trial that does not exist." *Id.* (quoting *Shockley I*, 410 S.W.3d at 200–01). Likewise, that court rejected Shockley's argument that Juror 58 identified with the viewpoint of his vengeful main character, who attempts to punish the leniency of the criminal-justice system by plunging the United States into a nuclear dystopia. *Id.* at 896; Doc. 32-5 at p. 12.

Further, the Missouri Supreme Court disagreed with Shockley about the importance of the theme of leniency in the criminal-justice system within Juror 58's book. *Shockley II*, 579 S.W.3d at 895. Rather, that court credited Juror 58's testimony at a postconviction hearing, where he described the ways in which his experiences informed the novel, the differences between his experience and the events of the novel, his views on the criminal-justice system, and what led him to view Shockley as guilty. *Id.* Specifically, Juror 58 testified that he did not share his main character's dark view of the criminal-justice system. *Id.* Weighing Shockley's arguments against Juror 58's detailed statements, the Missouri Supreme Court affirmed the motion court's finding that Juror 58 acted as an impartial juror. *Id.* at 904–05.

The Missouri Supreme Court's factual findings deserve a high degree of deference, and the Court cannot accept Shockley's arguments.  The Court can only reject these findings if "every fairminded jurist would disagree" with the state court.  *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (citing *Knowles*, 556 U.S. at 123 (giving the standard of deference for a state court's determination on prejudice)).  Shockley contends that the book radiates prejudice, going so far as to conflate Juror 58 with the novel's "hero."  Doc. 48 at pp. 48–49, 51.  However, Juror 58's novel portrays a main character who hopes to use terrorism to create a world where, in the words of the novel, "[t]he weak and timid would die" and "[t]here'd be widespread looting and uncontrollable mobs."  Doc. 32-5 at p. 12.  As is typical of fiction pieces, the text of Juror 58's novel hardly compels its readers to view the main character as a heroic mouthpiece for the author.

Meanwhile, Juror 58's testimony on his views of the criminal-justice system and his impartial evaluation of the evidence against Shockley serve as "record support for the state court's factual findings."  *Bahtuoh*, 855 F.3d at 873.  "Juror 58 was questioned extensively about the book's themes and disavowed he personally held any of those ideas because it was not his personal belief that the court system was not good. . . . Juror 58 said it became clear to him [Shockley] was guilty only after his grandmother testified."  *Shockley II*, 579 S.W.3d, 895.  Rather than harboring bias against Shockley from the outset, Juror 58 became convinced of Shockley's guilt only after evaluating the testimony of Shockley's grandmother.  *Id.*  Therefore, § 2254(d)(2) requires that the Court affirm the Missouri Supreme Court's factual findings regarding Juror 58's alleged bias.

Third, Shockley argues that Juror 58 biased the deliberation of other jurors by sharing his book with them, and that the Missouri Supreme Court unreasonably discounted this as "fleeting"

73

contact.  Doc. 48 at p. 134.  Juror 58 gave his book to three other jurors.  *Shockley II*, 579 S.W.3d at 904.  Juror 3 said he did not read the book, Doc. 20-24 at p. 196, Tr. at 196:4–7, although Juror 58 said Juror 3 did read his book and liked it, Doc. 32-11 at pp. 15, 17, Tr. at 15:2–12, 17:5–6.  Juror 50 said she read two or three pages of the book, but no more.  Doc. 20-24 at p. 200, Tr. at 200:1–8.  Juror 117 said she skimmed the book, but did not read it.  *Id.* at pp. 128–29, Tr. at 128:4–129:19.  No juror indicated that he or she read the especially violent segments, or the passages that directly concerned the criminal-justice system.  Doc. 20-24.

While Shockley incredulously asserts the "obvious" prejudicial significance of these incidents, Doc. 48 at p. 135, the Missouri Supreme Court found Shockley's arguments about Juror 58's novel unpersuasive, *Shockley II*, 579 S.W.3d at 904.  Because no juror read the relevant sections of the book, "there was no evidence the sequestered jury was distracted by the book to the point it could not give due and fair consideration of the facts . . . ."  *Id.*  Shockley claims that this analysis contradicts the precedent set by several state cases with allegedly analogous facts but does not cite any factually similar federal cases.  Doc. 48 at pp. 132–33 (citations omitted).  The Missouri Supreme Court's holding comported with federal law and determined the facts reasonably.  *See* § 2254(d).  The Court denies claim 3.

### b.     Claim 4

In claim 4, Shockley argues that after the trial judge learned of Juror 58's book, he unlawfully failed to grant Shockley a mistrial and, alternatively, that he unlawfully failed to conduct an inquiry sua sponte into the jury's partiality.  Doc. 48 at p. 138.  As described in this Court's analysis of claims 1 and 3, *see supra* Sections VI.B.1.b., VI.B.2.a., Shockley did not gather testimony about juror bias until his case reached the collateral-review stage, where Missouri courts concluded that juror testimony demonstrated an absence of bias.  *Shockley II*, 579 S.W.3d at 894–95.  Yet, Shockley still tries to convince the Court that the trial judge violated his

fundamental rights by refusing to grant his unsupported motion and by declining to search for non-existent evidence of juror bias.  Doc. 48 at p. 138.

Missouri law provides several situations in which a court may grant a new trial.  Mo. Rev. Stat. § 547.020.  Among them, "[t]he court may grant a new trial . . . [w]hen the jury has received any evidence, papers or documents, not authorized by the court" or "[w]hen the jury . . . has been guilty of any misconduct tending to prevent a fair and due consideration of the case."  *Id.*  Shockley argued to the Missouri Supreme Court that both of these reasons to grant a new trial apply in this case.  Doc. 20-20 at p. 123.  Under Missouri precedent, juror misconduct without prejudice does not entitle a defendant to a mistrial.  *Smotherman v. Cass Reg'l Med. Ctr.*, 499 S.W.3d 709, 714 (Mo. 2016) (finding that juror misconduct without prejudice does not warrant a mistrial and affirming the trial court's determination that the alleged misconduct did not prejudice the defense); *see also State v. Viviano*, 882 S.W.2d 748, 712, 751 (Mo. Ct. App. 1994) ("[A] new trial is required *only if a defendant has been prejudiced*." (citing *State v. Kelly*, 851 S.W.2d 693, 695 (Mo. Ct. App. 1993))).

Although the record now contains testimony positively demonstrating a lack of prejudice, *Shockley II*, 579 S.W.3d at 904, the Missouri Supreme Court did not have this evidence when it adjudicated the issue on direct appeal, *Shockley I*, 410 S.W.3d at 199–202.  Missouri law holds that because appellate courts trust that trial courts stand in the best position to detect juror bias, appellate courts review a trial court's decision only for abuse of discretion.  *Id.*

On direct appeal, the Missouri Supreme Court did not find compelling Shockley's argument that Juror 58 prejudiced the jury against him.  *Shockley I*, 410 S.W.3d at 200.  In that court's estimation, Shockley exaggerated the similarity between his case and Juror 58's book. *Shockley I*, 410 S.W.3d at 200–01 (finding that the alleged "factual congruity between the novel

75

and the facts of the trial . . . does not exist").  The Missouri Supreme Court also found

unconvincing the idea that Juror 58 shared the violent extremist views depicted in his book.  *Id.*

Looking through the trial record, the Missouri Supreme Court found nothing suggesting that

Juror 58 shared his book with other jurors.  *Id.* at 200.  Most significantly, the Missouri Supreme

Court rejected the notion that Shockley might demand another trial after deliberately choosing

not to support his motion for a new trial with testimony.  *Id.*  In sum, the evidence Shockley

presented to prove prejudice failed to convince the Missouri Supreme Court on direct appellate

review.

Since Juror 58's actions proved nonprejudicial, the trial court's decision to deny the

motion for a mistrial also proved nonprejudicial.  Shockley's argument only became weaker as

more facts came to light in the postconviction-review process, leading the Missouri Supreme

Court to confirm its direct-appeal finding.  *Shockley II*, 579 S.W.3d at 894–98, 905.  Because

each of these findings enjoys support in the record and comports with federal law, this Court

defers to the Missouri Supreme Court's findings.  *See Bahtuoh*, 855 F.3d at 873; *see also*

§ 2254(d)(1)–(2).

Shockley insists that the trial judge's decision to remove Juror 58 from the penalty phase

shows that the trial judge recognized Juror 58's partiality.  Doc. 48 at p. 140.  Likewise, he says

that Juror 58, as the father of a police officer, could not have judged the case impartially.  *Id.* at

p. 144.  He again insists that the themes of Juror 58's book prove his bias.  *Id.* at 147.

Believing that these facts demonstrate that Juror 58 deprived Shockley of a fair trial, Shockley

says that he can demonstrate prejudice under Supreme Court precedent.  *Id.* at 145–46 (citing

*Remmer v. United States*, 347 U.S. 227, 229 (1954)).  Shockley notes federal cases holding that

courts cannot simply trust a juror's statement that he or she acted impartially.  *Id.* at 141 (citing

*Williams v. Taylor*, 529 U.S. at 440–45; *Williams v. Netherland*, 181 F. Supp. 2d 604, 609 (E.D.

Va. 2002); *Irvin v. Dowd*, 366 U.S. 717, 723–34 (1961)).  Yet, the Missouri Supreme Court did

not base its finding on bare assurances of impartiality from Juror 58; it looked to the contents of

the novel, Juror 58's testimony about his novel, Juror 58's evaluation of the evidence against

Shockley, and Juror 58's explanation of his own views on the criminal-justice system.  *Shockley

II*, 579 S.W.3d at 896–97.  Because the Missouri Supreme Court's finding that Juror 58 judged

the case impartially enjoys support in the record, this Court cannot reassess the state court's

findings.  *See Bahtuoh*, 855 F.3d at 873; *see also* § 2254(d).

>        Shockley also says that the Missouri Supreme Court failed to comply with various state-
court rules, including Missouri precedent.  Doc. 48 at pp. 143–47.  However, the Court can

overturn the Missouri Supreme Court's holdings only for contradicting federal law, unreasonably

applying federal law, or determining the facts unreasonably.  § 2254(d).  Thus, Shockley's claim

that the trial judge unlawfully denied his motion for a mistrial lacks support.

>        Alternatively, Shockley contends that the trial court owed him a sua sponte investigation

into whether Juror 58 sullied the jury's impartiality.  Doc. 48 at p. 138.  To support his claim,

Shockley points to *Smith v. Phillips*, 455 U.S. 209 (1982), Doc. 48 at 141, where the Supreme

Court held that "the remedy for allegations of juror partiality is a hearing in which the defendant

has the opportunity to prove actual bias," *Smith*, 455 U.S. at 216.   Shockley says that the trial

judge denied him such a hearing by failing to immediately tell his trial counsel that Juror 58 gave

his book to the bailiff.  Doc. 48 at p. 124.

>        Yet even if the trial judge's failure to disclose this information did amount to a denial of a

hearing, the analogy between *Phillips* and Shockley's case still would not hold.  "In

each . . . *Phillips*-type case, the trial courts had clear evidence of the jury's exposure to

77

extraneous information." *Tunstall v. Hopkins*, 306 F.3d 601, 611 (8th Cir. 2002). On direct

appeal, the Missouri Supreme Court held that the trial court did not have clear evidence that

Juror 58 shared his book within the jury. *Shockley I*, 410 S.W.3d at 200. Thus, when the

Missouri Supreme Court decided that Shockley did not have a right to a sua sponte inquiry into

juror bias, its judgment did not contradict "or involve an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States." §

2254(d)(1). Now, after the relevant jurors have testified that they did not read Juror 58's book,

Shockley still presses his meritless argument that the trial judge should have gathered evidence

for him. Because Shockley's attempts to undermine the Missouri Supreme Court's reasoning

fail, the Court denies claim 4.

### c.      Claim 16

In claim 16, Shockley challenges the trial court's decision not to sua sponte declare a

mistrial after the prosecutor allegedly commented on Shockley's decision not to testify, as

described in the Court's analysis of claim 15. *See supra* Section VI.B.1.i. Again, "in response to

a witness stating that she did not know why Shockley's grandmother's car was across the street

from where the victim was killed, the prosecutor pointedly replied, '[s]omeone does.'" Doc. 48

at p. 342; *Shockley I*, 410 S.W.3d at 189. Shockley did not object, though in the presence of the

jury, the judge admonished the prosecutor for the comment. *Shockley I*, 410 S.W.3d at 189.

Shockley raised this claim on direct appeal before the Missouri Supreme Court, which

found that the prosecutor did not directly comment on Shockley's choice not to testify. *Id.* That

court also found on direct appeal that, even if the prosecutor indirectly commented on

Shockley's silence, the comment would support a claim for relief only if the prosecutor

calculated the remark to draw attention to Shockley's silence. *Id.* at 190 (citing *State v. Neff*, 978

S.W.2d 341, 344 (Mo. 1998)). But the state court found that "[t]he facts do not demonstrate any

such calculated attempt by the State to cross the prohibited line." *Id.*  Further, the Missouri Supreme Court found that the prosecutor's comment would warrant a mistrial only if Shockley could establish "manifest prejudice affecting substantial rights." *Id.* (citing *State v. Parker*, 856 S.W.2d 331, 332 (Mo. 1993)).  The court found no such prejudice.  *Id.*

Although Shockley says that "[t]he state court's denial was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court," he makes no specific objections to the legal principles stated in the Missouri Supreme Court's analysis.  Doc. 48 at pp. 346–47.  Rather, he objects to the Missouri Supreme Court's factual determination that the prosecutor did not directly comment on his decision not to testify, *id.* at p. 346, its factual determination that the prosecutor did not intend to highlight Shockley's decision not to testify, *id*. at p. 347, and its factual finding regarding prejudice, *id*.  But the Court does not find any of those factual determinations unreasonable.  *See* § 2254(d)(2).  Thus, the Court denies claim 16.

### d.    Claim 18(a)

In claim 18, Shockley advances two theories.  First, he says that he "was deprived of his rights [to due process and a fair trial] under the United States Constitution because of the cumulative prejudicial effect of propensity and character evidence presented by the State," and second, that his "trial counsel similarly provided constitutionally ineffective assistance in violation of his rights . . . when they failed to object properly and request the appropriate remedy."  Doc. 48 at pp. 357–63.  The Missouri Supreme Court found that Shockley failed to preserve the argument he presents in the first part of this claim.  *Shockley I*, 410 S.W.3d at 195.  Because Shockley did not raise the second part of this claim in state court, the Court addresses it with the rest of Shockley's procedurally defaulted claims.  *See infra* Section VI.C.1.g.

Shockley claims that the Missouri Supreme Court "denied this claim on the merits," decided "that this cumulative evidence was not prejudicial," and made an "unreasonable determination of the facts." Doc. 48 at pp. 357, 361. Although the Missouri Supreme Court did address the merits of this claim in part, the state court chiefly focused on Shockley's procedural failures. *Shockley I*, 410 S.W.3d at 195–96 (finding that Shockley failed to preserve this argument and waived review of the failure). The state court held that two of the incidents in Shockley's cumulative-prejudice argument had no prejudicial impact and concluded that the motion court did not plainly err, but emphasized that Shockley had waived plain-error review. *Id.* "[A] federal habeas court cannot reach an otherwise unpreserved and procedurally defaulted claim merely because a reviewing state court analyzed that claim for plain error." *Clark v. Bertsch*, 780 F.3d 873, 874 (8th Cir. 2015).

Further, this Court will not question the state court's judgment on Missouri procedural issues. "It is not the office of a federal habeas court to determine that a state court made a mistake of state law." *Sweet v. Delo*, 125 F.3d 1144, 1151 (8th Cir. 1997) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)). As the State points out, "[t]he Due Process Clause does not permit the federal courts to engage in finely tuned review of state evidentiary rules." Doc. 51 at p. 110 (quoting *Estelle*, 502 U.S. at 72). Section 2254(d) allows federal habeas courts to review a state court's ruling only for failure to comport with federal law, reasonably apply federal law, or reasonably determine the facts. It does not authorize federal courts to reject a state court's application of state law. *See* § 2254(d); *Sweet*, 125 F.3d at 1151.

Shockley insists that "[t]o the extent that prior counsel defaulted this aspect of the claim, Shockley can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and state post-conviction counsel." Doc. 48 at

p. 357 (citations omitted).  He also states that "imposing default would be a miscarriage of

justice."  *Id.* at p. 358.  The Court addresses these arguments with Shockley's other defaulted

ineffective-assistance claims.  *See infra* Section VI.C.1.g.  The Court denies the first part of

claim 18.

e.        **Claim 19**

In claim 19, Shockley challenges the trial court's denial of his motion for a mistrial after

a law-enforcement-officer witness commented on Shockley's "violent history."  Doc. 48 at pp.

364–74; *Shockley I*, 410 S.W.3d at 190–91.  This claim concerns the first of the four incidents at

issue in claim 18.  *Shockley I*, 410 S.W.3d at 194.  Trial counsel objected that this comment

constituted improper character evidence.  *Id.* at 192–93.  Yet, on direct appeal, Shockley argued

that this comment constituted improper propensity evidence, not character evidence.  *Id.*  Finding

a mismatch between Shockley's original objection and his appeal, the Missouri Supreme Court

rejected this claim as unpreserved.  *Id.*  The state court nevertheless addressed Shockley's claim

on the merits, finding that the comment did not constitute improper character evidence.  *Id.* at

194 (explaining that the officer referenced Shockley's violent history to explain the presence of a

SWAT team at his interview with Shockley and did not reference Shockley's character to

suggest that he acted in conformity with that character by murdering Sergeant Graham).

Likewise, the state court found that the comment did not prejudice Shockley.  *Id.* (noting

the evidence before the jury that Shockley threatened investigators by saying, "[d]on't come

back to my house without a search warrant, because if you do there's going to be trouble and

somebody is going to be shot").  Shockley says that the Missouri Supreme Court's distinction

between character evidence and propensity evidence is a "distinction . . . without a difference"

and that Missouri's adjudication of the issue contradicts Missouri Rule of Evidence 404 and "the

common-law tradition."  Doc. 48 at p. 371.  By appealing to common law and Missouri's rules

81

of evidence, Shockley acknowledges that whether propensity evidence and character evidence are the same is an issue of state law.  But § 2254(d) does not authorize federal courts to overturn state-court rulings for misapplications of state law.  "It is not the office of a federal habeas court to determine that a state court made a mistake of state law." *Sweet*, 125 F.3d at 1151.  "The Due Process Clause does not permit the federal courts to engage in finely tuned review of state evidentiary rules." *Estelle*, 502 U.S. at 72 (citation omitted).  Thus, the Court cannot question the Missouri Supreme Court's judgment that Shockley procedurally defaulted this claim.

Shockley does not attempt to excuse his procedural default.  Doc. 48 at pp. 364–74.  And even if he had not defaulted this claim, Shockley states no clear standard from the Supreme Court that the Missouri Supreme Court contradicted or failed to reasonably apply.  *See* § 2254(d), *see also* Doc. 48 at pp. 364–74.  Instead, Shockley quotes highly general rules.  *See* Doc. 48 at p. 368 ("A party seeking to invoke evidentiary error as a basis for habeas relief must show that such error had a 'substantial and injurious effect on the verdict.'" (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993))).  So, even if Shockley could overcome the procedural bar on this claim—which he does not attempt to do—the Missouri Supreme Court's treatment of the merits deserves deference under § 2254(d).  The Court denies claim 19.

### f.    Claim 25

In claim 25, Shockley argues that prosecutors deprived him of his Fifth, Sixth, and Fourteenth Amendment rights when they failed to provide alleged *Brady* materials.  Doc. 48 at p. 468.  According to Shockley, Sergeant Graham had computer files documenting his alleged investigations of official wrongdoing.  Doc. 48 at pp. 471–72.  These files allegedly reveal other individuals with a motive to murder Sergeant Graham.  *Id.*  Shockley says that investigators knew the significance of these files and collected Sergeant Graham's home computer, mobile computer, and work computer.  *Id.* at p. 471.  Shockley's trial counsel had access to all this

evidence and reviewed the evidence, along with law-enforcement reports on the seizure and examination of the hard drives.  Doc. 20-56 at p. 35.  After an evidentiary hearing, the motion court found:

> The evidence adduced at the evidentiary hearing was that the computer hard drive from the victim's home was taken into evidence in the course of the investigation of his murder.  That hard drive remains in evidence even as of the date of this Order.  The trial attorneys in this case were provided access to all of the evidence seized in order to investigate potential defenses and evaluate the State's evidence against [Shockley].  The trial attorneys in this case did review that evidence and all law enforcement reports, which included reports that related to the examination and seizure of the victim's computer hard drives, according to their hearing and deposition testimony.  Although, as the parties herein have stipulated, the hard drives are no longer accessible due to the passage of time and other factors, there is no evidence that the State, either with or without intent, withheld the files on the computer hard drive.

*Id.*; *see also* Doc. 20-24 at pp. 477–78, Tr. at 477:16–478:20 (recording the parties' agreement to the stipulation before the postconviction motion court).  Yet Shockley now insists that the State suppressed this evidence, in violation of *Brady*.  Doc. 48 at p. 470.

To prove a *Brady* violation, Shockley must show that "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  Rejecting this claim, the Missouri Supreme Court found each of *Brady*'s three elements absent:  the State did not suppress evidence; nothing indicated that the alleged suppressed evidence would favor Shockley; and, likewise, nothing indicated that the alleged suppression prejudiced him.  *Shockley II*, 579 S.W.3d at 920–21.

Shockley's argument that the Court should reject the Missouri Supreme Court's adjudication of this issue largely fails to engage with the state court's analysis; instead, he opts to present an elaborate conspiracy theory, relying on unsupported assertions, citations to his own

past unsupported assertions, and gross distortions of the record.  To address the conspiratorial

web of red string that Shockley presents in place of an argument supported by the record, the

Court sorts Shockley's allegations into five categories:  (1) Shockley's argument that Sergeant

Graham maintained files documenting his investigation into official corruption; (2) Shockley's

allegations that Sheriff Greg Melton involved himself in a criminal conspiracy; (3) Shockley's

general allegations regarding alternative suspects and the alleged criminal conspiracy;

(4) Shockley's argument that the State suppressed evidence, including Sergeant Graham's

alleged files; and (5) Shockley's few arguments that directly address the Missouri Supreme

Court's reasoning.

### i.    Allegations regarding files on Sergeant Graham's computers

First, Shockley argues that Sergeant Graham investigated and documented official

corruption, the subjects of that investigation may have murdered him, and the State

suppressed this evidence.  Doc. 48 at p. 470.  To support these allegations, Shockley

appeals to statements from several people who spoke to Sergeant Graham's fiancée[2] after

his murder.

Cathy Runge was Sergeant Graham's fiancée at the time of his murder.  Doc. 20-

24 at p. 387, Tr. at 386:24–387:3.  Runge testified that Sergeant Graham never told her

that he was investigating police misconduct, and that she did not recall his mentioning

files in his home about other officers.  *Id.* at pp. 387–89, Tr. at 387:25–389:25.  Although

she assumed that Sergeant Graham, as a supervisor, had files about other officers at his

---

[2] Cathy Runge stated that she and Sergeant Graham "were going to get married . . . [but] were not formally engaged."  Doc. 20-24 at p. 387, Tr. at 386:24–387:3.  Shockley, however, refers to Runge as Sergeant Graham's "fiancé," *see, e.g.,* Doc. 48 at p. 470, and the Missouri Supreme Court referred to her as his "fiancée," *see* Shockley II, 579 S.W.3d at 920—21.  For the sake of consistency, the Court will refer to her as Sergeant Graham's fiancée.

home, he did not speak to her about such files, and she had no firsthand knowledge of such files. *Id.* at p. 389, Tr. 389:24–25. Sergeant Graham had a home computer and a filing cabinet, but Runge says that she did not know what was in the filing cabinet, and never accessed the computer, saw files on the computer, or saw Sergeant Graham use the computer for work. *Id.* at pp. 393–95, Tr. at 393:14–395:13. She reported having no specific knowledge about any of his files. *Id.* at p. 393, Tr. at 393:14–17. She did not know of any conflict between Sergeant Graham and other law enforcement offices. *Id.* at p. 394, Tr. at 394:11–13. Finally, Runge said that she never told anyone anything that contradicted the testimony described above. *Id.* at p. 396–97, Tr. at 396:24–397:1.

After Sergeant Graham's murder, Runge lived with Mike and Jeanne Kingree for a period of time. *Id.* at p. 390, Tr. at 390:1–17. Jeanne Kingree testified that, during this time, Runge mentioned that Sergeant Graham kept files about other officers on his home computer, but "you could tell she didn't know what was in the files." *Id.* at pp. 401–02 at Tr. at 401:8–402:3; *Id.* at p. 403, Tr. at 403:3–22. When asked more pointedly whether Runge told the Kingrees about files containing negative information about other officers, Jeanne Kingree testified that Runge did not say any such thing, but that Runge said only that "he kept files at his home on his home computer," but Runge had "no idea" whether the files concerned other officers. *Id.* at p. 402, Tr. at 4:02:9–18.

Krista Kingree remembered that Runge mentioned files about other officers but did not remember if Runge said where Sergeant Graham kept the files. *Id.* at p. 436, Tr. at 436:7–17. She said that the files seemed to have a negative connotation, *id.* at p. 437, Tr. 437:1–4, although she later clarified that "in some positions everyone has a file . . . sometimes the positive, sometimes the negative, everything goes in that file, your reviews," *id.* at p. 441, Tr. at 441:9–12.

85

So, Krista Kingree said that the files Runge mentioned might have been personnel files.  *Id.,* Tr. at 441:17–19.

Unlike Jeanne and Krista Kingree, Mike Kingree did not give a postconviction deposition, as he had passed away, *id.* at p. 436, Tr. at 436:4–6, but he did earlier provide statements on the issue to a special prosecutor investigating allegations of Sergeant Graham's secret investigations, Doc. 48-3 at pp. 277–79.  The special prosecutor reported that "Michael said [C]athy Runge never told him the files contained embarrassing information or evidence of wrongdoing but that he made that assumption based on his belief that the Patrol would remove embarrassing files."  *Id.* at p. 279.

Carly Carter also testified regarding conversations that she had with Runge in the days after Sergeant Graham's murder.  Doc. 20-24 at pp. 430–31, Tr. at 430:1–431:23.  When asked whether Runge said anything about Sergeant Graham "investigating or looking into another officer," Carter said that "she had mentioned Greg Melton that [sic] he had a case that he was looking into with him."  *Id.* at p. 430, Tr. at 430:14–15.  Carter's testimony remained somewhat ambiguous as to whether she remembered Runge saying that Sergeant Graham investigated wrongdoing *by* Melton or that Sergeant Graham investigated wrongdoing *with* Melton.  Carter testified that, according to Runge, "[Sergeant Graham] had several cases that he was working on and that Greg Melton was one of them, a traffic stop and there was something that wasn't marked in his car or I mean I don't know all the specifics but she did mention he was looking into an incident with Greg Melton."  *Id.* at 430–31, Tr. at 430:23–431:2.  When asked whether Sergeant Graham's investigation "pertain[ed] to Greg Melton," Carter said, "yes," *id.* at p. 431, Tr. 431:17–18, and that "[Runge] made another statement again about Greg Melton you know that he was looking into other cases," *id.* at pp. 432, Tr. at 4:32:4–6.  She said that "[t]here was a

mention of a traffic stop and something unmarked in the car." *Id.* at p. 433, Tr. 433:3–4, *see also* Doc. 48-2 at pp. 592, 633–38, 643–44 (When deposed, Melton stated that he worked with Sergeant Graham on an investigation of Scott Sayler, a Missouri Water Patrol officer, whom Sergeant Graham arrested for possession of methamphetamines during a traffic stop.).  However, Carter did not state whether Runge mentioned files documenting Sergeant Graham's alleged investigations and denied any personal knowledge of such files. Doc. 48-3 at pp. 430–33, Tr. at 430:1–433:22.

Shockley attempts to use Jeanne Kingree, Krista Kingree, and Carly Carter's testimony to support the idea that Sergeant Graham kept files documenting police corruption on his home computer.  Shockley says that these witnesses "confirmed in a post-conviction hearing that Graham's fiancé[e] was concerned about her safety due to the ongoing investigations Graham was conducting."  Doc. 48 at p. 472.  This is false.  *See* Doc. 20-24 at pp. 386–405, 428–45, Tr. at 386:13–404:23, 428:13–445:25.  If anything, Krista Kingree's testimony indicates that Runge trusted law enforcement, because she first stayed away from her home out of concern for the unknown murderer and "once they found out and put [Lance Shockley] in custody . . . then she may have went back to her own home at night."  *Id.* at pp. 444–45, Tr. 444:12–445:4.  Shockley asserts that Krista Kingree claimed that Runge said that "Graham maintained files on other officials he was actively investigating."  Doc. 48 at p. 472.  This too is false.  To the extent that Krista Kingree gave any concrete description of Sergeant Graham's alleged files on other officers, she described possible personnel files.  Doc. 20-24 at p. 441, Tr. at 441:2–19.

Shockley next claims that Carter said that she and Runge had "'numerous conversations' about investigations Sergeant Graham was involved in."  Doc. 48 at p. 473 (quoting Doc. 20-24 at p. 430).  This likewise is false.  Carter said that she and Runge had "numerous conversations,"

Doc. 20-24 at p. 430, Tr. at 430:6, and that they "talked about life and all kinds of things," *id.* at

p. 431, Tr. at 431:6–7.  But she only mentions two occasions when Runge mentioned Graham

"investigating something . . . . pertaining to Greg Melton."  *Id.* at pp. 430–32, Tr. at 430:11–

432:6 ("[Runge] had made another statement again about Greg Melton you know that he was

looking into other cases.").  Shockley says that Runge "did not deny that [the conversations with

Carter regarding Graham's investigations] took place."  Doc. 48 at p. 473.  This is false.  Runge

said that (1) she did not recall telling Carter that "Sergeant Graham was looking into some things

that were going on in Carter County," Doc. 20-24 at pp. 391–92, Tr. 391:24–392:1, (2) she did

not "say anything similar to that," *id.* at p. 392, Tr. 392:4–5, (3) she was "not aware of any issues

between [Sergeant Graham] and any other law enforcement officer," *id.* at p. 394, Tr. at 394:11–

13, (4) she had no knowledge of the alleged investigations and files, and (5) she never told

anyone anything that contradicted this testimony, *id.* at pp. 396–97, Tr. at 396:3–397:1.  In sum,

Shockley attempts to use testimony from Carter and the Kingrees to support his idea that

Sergeant Graham kept records of his investigations into police corruption, but he repeatedly fails

to describe this testimony accurately.

Reviewing these statements, the postconviction motion court did not find that these

statements demonstrated that Sergeant Graham maintained files on police corruption:

> The testimony of witnesses about the contents of the home computer is vague and
> speculative at best.  There is no evidence before the court that the contents of any
> files on the computer hard drive constituted evidence which is material to issues
> of [Shockley's] own guilt and punishment.  At most, the Court is considering
> speculative statements about what the victim's former fiancée assumed could be
> on the computer due to the nature of the victim's employment, but never once saw
> for herself.

Doc. 20-56 at p. 35.  The Missouri Supreme Court agreed with these findings.  *Shockley II*, 579

S.W.3d at 920–21.  Because this reasoning enjoys support in the record, these findings are

reasonable, and the Court must accept them.  *See Ryan*, 387 F.3d at 790.

Shockley attempts to use two juror affidavits to bolster his argument that "[t]his evidence

could have been especially powerful to [the] jury."  Doc. 48 at p. 497.  One juror said she would

have considered evidence that Sergeant Graham investigated law-enforcement corruption.  Doc.

48-5 at p. 90.  Another juror said this evidence would have interested her and that she had heard

rumors about suspicious events related to Carter County law enforcement.  *Id.* at pp. 94–95.  The

State argues that "[t]he juror affidavits are not admissible" because the "Federal Rule of

Evidence 606 prohibits juror testimony about 'any statement made or incident that occurred

during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or

any juror's mental process concerning the verdict.'"  Doc. 51 at p. 128 (quoting Fed R. Evid.

606(b)(1)).  Shockley says that these affidavits concern what the hypothetical effect of the

allegedly suppressed evidence might have been, not the juror's actual mental process.

The Eighth Circuit has held that "the principle behind this prohibition [of Federal Rule of

Evidence 606(b)] extends to testimony about what those mental processes would have been had

the evidence at trial been different."  *United States v. Burns*, 495 F.3d 873, 875 (8th Cir. 2007).

Thus, Federal Rule of Evidence 606(b) bars these affidavits.  *C.f. supra* Section V.C.1. (finding

that § 2254(d) precludes Shockley from introducing further evidence to support claims

adjudicated on the merits in state court).  Further, the Court cannot use these affidavits to assess

the reasonableness of the Missouri Supreme Court, both because the state court never saw those

affidavits and because a couple of jurors' retrospective interest in seemingly non-existent

evidence does not affect the Missouri Supreme Court's findings that no reliable evidence shows the files existed and that the State did not suppress evidence.  *Shockley II*, 579 S.W.3d at 920–21.

Shockley also says that "[s]hortly after Graham's murder, his fiancé[e] told investigators about [Sergeant Graham's investigations into official misconduct], which prompted her to move out of the house as she was fearful for her life."  Doc. 48 at p. 471; *see also id.* at p. 482 ("Graham's fiancé[e] reportedly shared these concerns with investigators before trial."); Doc. 56 at pp. 236, 246 (making the same assertions).  But Shockley never cites any source for this notion.  *See* Doc. 48 at pp. 471, 482; Doc. 56 at pp. 236, 246.

While Shockley does not attempt to support his allegations about Runge's allegedly informing investigators about Sergeant Graham's alleged files, he does attempt to support the notion that Runge feared law enforcement after Sergeant Graham's murder.  Shockley says that an earlier statement from Krista Kingree reported that Runge told her that "she was 'very scared' about 'some things that had been going on,'" and that "[Runge] reported her fear was based on an investigation 'about other officers' and 'it wasn't a good thing.'"  Doc. 48 at p. 482 (citing Doc. 48-3 at pp. 233–43).  To support this claim, Shockley cites to one of his state-court filings, describing an investigation by a special prosecutor.  *Id.*  However, Shockley's earlier filing does not say that Runge was afraid because of "some things that had been going on" or because of "other officers":

> [Krista Kingree] said that Ms[.] Runge had told her that Sgt. Graham had kept files in his home "due to *some things that had been going on*."  Ms. Kingree told the investigator:  "It was about *other officers* . . . I do know it was about other officers."  And:  "I just remember . . . it wasn't a good thing."  She recalled that Ms[.] Runge had been "*very scared*" about her own safety after Sgt. Graham was murdered, until she learned that "they were[] positive" that Mr. Shockley had committed the crime.

Doc. 48-3 at pp. 239 (second alterations in original) (internal citations omitted).  In turn, this statement cites a recording of the special prosecutor's interview of Krista Kingree, *id.*, which Shockley has not included with his filing of the special prosecutor's report, *see* Doc. 48-3.  Even taking Shockley's earlier statement at face value, it asserts a vague, fuzzy connection between Sergeant Graham's files and something negative about other officers.  It does not say that Runge feared other officers.  To the extent that Shockley's previous filing accurately represents Krista Kingree's earlier statement to the special prosecutor, nothing in that statement clearly contradicts her later testimony.  Further, when deposed, Krista Kingree said that she did not recall Runge saying that Sergeant Graham kept "files on another officer that it was due to some things [sic] that he was looking into that had been going on."  Doc. 20-24 at p. 438.

## ii.  Allegations regarding Sheriff Greg Melton

Shockley next supplements his *Brady* claim with a morass of reports, suggestions, and speculation that supposedly support the notion that Sheriff Greg Melton murdered Sergeant Graham.  Doc. 48 at pp. 487–96.  He acknowledges that "the State did share prior to trial, in discovery, some concerns about Sheriff Melton and his possible involvement in Graham's murder."  *Id.* at p. 487.  Shockley does not describe what discovery the State produced or cite any source that might lead to this information.  *Id.*  However, in the course of deposing Melton, Shockley's initial counsel asked Melton about his relationship with Sergeant Graham.  Doc. 48-2 at p. 641, Tr. at 128:16–18.  Melton said, "I seen [sic] him a lot.  I think we had a good working relationship."  *Id.*, Tr. 128:19–20.  When counsel pressed Melton about any conflict between them, Melton explained that they had a normal level of disagreements, but "didn't have any problems as far as work relationships."  *Id.* at p. 642, Tr. 129:1– 4.  Yet Shockley argues Melton took part in criminal wrongdoing that Sergeant Graham might have investigated.  Doc. 48 at p. 493.

91

According to Shockley, "[t]here was evidence that Graham was investigating Sheriff Melton for seizing guns without proper authority to do so.  Graham was also investigating . . . Melton on suspicions he was trafficking drugs." *Id.* (citations omitted). Shockley supports his allegation of gun-related misconduct with two citations.  First, he cites a statement made by his counsel to the postconviction motion court, which says that "there was a memo from 2003 where Sergeant Graham wrote that one of his lieutenants from the highway patrol was saying Melton is seizing guns that he basically shouldn't be seizing when he's executing these search warrants."  Doc. 20-24 at p. 82, Tr. at 82:3–7.  However, this statement by Shockley's postconviction counsel about a memo by Sergeant Graham about a statement by a lieutenant about Melton hardly supports Shockley's claim that Melton illegally seized guns.  In the same argument to the motion court, Shockley's postconviction counsel also mentioned various kinds of alleged wrongdoing among Carter County police and said that Melton's successor said that a sergeant said "we all know what the deal was with Greg [Melton]." *Id.* at p. 83, Tr. at 83:10–11.  Again, these vague statements, buried under layers of hearsay, hardly show that Melton committed misconduct or that Sergeant Graham had records of wrongdoing that somehow attracted the attention of corrupt law-enforcement officers.

Shockley also supports his allegation that "Graham was investigating Sheriff Melton for seizing guns without proper authority" via another citation to a statement by his postconviction counsel.  Doc. 48 at p. 493 (citing Doc. 20-43 at p. 18).  His postconviction counsel alleged that she learned about Melton's wrongdoing from various sources who "reported information that they had heard and did not have direct knowledge of and many of the sources wanted to remain anonymous." Doc. 20-43 at p. 18.  However, neither postconviction counsel nor present counsel give concrete statements to support these speculative allegations. *Id.*; Doc. 48 at p. 493.

92

Shockley also attempts, with several citations, to support his claim that Melton engaged in drug trafficking.  Doc. 48 at pp. 493, 495.  First, Shockley cites a statement by postconviction counsel to the motion court, *id.* at p. 493, referring to "an email from a [Holly] Lewis that have [sic] been forwarded and circulated through the Missouri State Highway Patrol that a man named Dale from Van Buren stated that Sheriff Melton had been involved in drugs and was involved in [Sergeant Graham's murder]," Doc. 20-24 at p. 75.  According to that email from Lewis, a man named Dale said that Melton and Shockley were coconspirators in a drug-trafficking scheme; that Melton invited Shockley to come attack Sergeant Graham together, but Shockley arrived after Sergeant Graham had already been shot; and that "Melton later made some sort of comment to Shockley about taking care of business, and that Graham should have minded his own business."  Doc. 48-3 at p. 295.  The email does not explain how Dale could know any of this but admits that "Dale rattles a lot."  *Id.*  Unsurprisingly, Shockley does not mention the details of this email in his briefing.  *See* Doc. 48 at p. 493.  Instead, Shockley attempts to bolster the weight of this email by describing it as a "report[] generated by the State" that "substantiated" the idea that "Sherriff Melton was involved in Graham's murder," *id.* at pp. 495–96, despite the fact that the State did not generate this email and the email did not substantiate Dale's story, Doc. 48-3 at p. 295.  Rather, the email stated that "I know that this seems far fetched, and there is a possibility that if questioned on it, Dale will either completely deny it, or change his story."  *Id.*  So, this rumor lacks credibility, and Shockley's presentation of it lacks candor.

Second, Shockley attempts to support the notion that Melton committed drug-related crimes with a citation to a motion from his postconviction counsel, which again mentions the email about Dale from Van Buren, but also mentions another report that Melton murdered Sergeant Graham.  Doc. 20-26 at p. 9 (citing "Bates Stamped Discovery Pages 2523, 6579,"

93

where page 6579 gives the email regarding Dale from Van Buren and page 2523 records the second report regarding Melton.).  This report describes a Missouri State Highway Patrol officer's interview of a man named Scott Hicks.  Doc. 48-3 at pp. 112–13.  Hicks said that a man who may have called himself Barney Mayberry told Hicks that Greg Melton killed Sergeant Graham.  *Id.* at p. 112.  "Barney Mayberry" claimed to be Melton's cousin and said that Melton killed Sergeant Graham using only a shotgun and then swept his footprints away so that no forensic evidence would point to him.  *Id.*  The officer taking the interview noted that Hicks "did not have the correct details of the crime scene and seemed to have a grudge against the sheriff," so the report lacked reliability.  *Id.* at p. 113.  In a deposition, Shockley's first trial team began to ask Melton about this allegation, but then said "[i]t doesn't matter.  It's convoluted," and moved on to a different topic.  Doc. 48-2 at p. 647, Tr. at 134:1–16.

Again, Shockley does not mention any of the details of this flawed hearsay report in his briefing.  Doc. 48 at p. 493.  And again, Shockley attempts to bolster the significance of this document by describing it as a report generated by the State that substantiates the idea that Melton murdered Sergeant Graham.  Doc. 48 at pp. 495–96 (citing Doc. 48-3 at pp. 112–13 as "App. 001448-001449").  Shockley might have more accurately described this as a report generated by the State that records a rumor and explained why that rumor lacks any credibility.

Third, Shockley again cites the statement by his postconviction counsel about the many sources who "reported information that they had heard and did not have direct knowledge of and many of the sources wanted to remain anonymous."  Doc. 20-43 at p. 18.  According to prior counsel's description of what these sources said, "Melton was engaged in illegal activities while he was sheriff, including the unlawful seizure of weapons, the use of illegal drugs, and drug trafficking."  *Id.*  Because the Court has no record of these statements and, because the sources

94

admittedly lacked first-hand knowledge of the matter, Shockley's reliance on these sources is misplaced.

Fourth, Shockley says that "Sheriff Melton and Officer [Scott] Sayler were dealing drugs together." Doc. 48 at p. 495 (citing Doc. 20-24 at pp. 77–78). Again, Shockley cites statements from postconviction counsel. *Id.* Here, counsel stated that "Sergeant Graham stopped Scott Sayler, who was a former water patrolman in Carter County" and that "Sayler was then charged with several offenses." Doc. 20-24 at pp. 77–78. According to "information" obtained by Shockley's postconviction counsel, "Scott Sayler was associated with Greg Melton." *Id.* Melton said that he knew of Sayler, but he "didn't know a lot about Scott." Doc. 48-2 at p. 592, Tr. 79:5–19. Shockley does not add any substantiated details that indicate that Melton associated with Sayler, let alone that they cooperated in a criminal conspiracy, although he does cite "reports" to disparage Sayler. *See infra* Section VI.B.2.f.iii. (discussing Shockley's allegations against Sayler).

Beyond the various allegations that Shockley attempts to bolster, he makes various accusations against Melton without any attempt to tie those accusations to the record. Shockley says that "[p]ost-conviction counsel was also informed that at the time of Graham's murder, Sheriff Melton was very involved in the meth trade and had a motive to kill Graham because he believed that Graham was investigating his various wrongdoings." Doc. 48 at p. 493. Shockley asserts that "[a]nother party informed post-conviction counsel that Mark White and Richard Kearby assisted Sheriff Melton in the transportation of drugs through Carter County." *Id.* at p. 494. Shockley further says that "[h]ad Sheriff Melton not died in 2008, he likely would have faced the same criminal charges brought against his successor . . . , since many of the illegal activities [the successor] was charged with . . . were ongoing at the Sheriff's department when

95

Melton was in charge." *Id.* at p. 496.  Shockley does not explain why the Court should accept

these assertions without support in the record, or how the Court could use these assertions to

evaluate the reasonableness of the Missouri Supreme Court's adjudication of this claim.  *See id.*

at pp. 494–96.

In sum, Shockley argues that Melton engaged in criminal conduct.  However, the

combined weight of Shockley's citations to his own past statements on Melton's alleged

crimes—referring to absurd, unreliable, or unrecorded statements, many of which are double or

triple hearsay—does not provide a reasonable basis to believe that Melton murdered Sergeant

Graham.  Even if the Court accepted Shockley's conspiracy theory, Shockley does not explain

how the Court could conclude that Sergeant Graham had secret files about Melton's alleged

crimes, that the State obtained these files, and that the record demonstrates the existence of these

files so definitively that the Missouri Supreme Court's adjudication of the issue does not enjoy

support in the record.  While he relies on rumors to support his argument, Shockley fails to

appreciate that some of the rumors of criminal conspiracies also implicate him.  *See* Doc. 48-2 at

pp. 589–90, Tr. 76:20–77:17 (recording Melton's testimony that he knew Anne Dowdy claimed

to have "information that Lance [Shockley] and Scott Sayler might have shot Sergeant

Graham").  Thus, even if these were admissible evidence, rumors implicating Shockley and a co-

conspirator would not establish a basis to grant Shockley habeas relief.  Thus, the Court finds

Shockley's argument regarding Melton entirely lacking in merit.

### iii.        Allegations of a criminal conspiracy

Turning to the third broad category of allegations within claim 25, Shockley makes an

even more diffuse argument regarding wrongdoing in Carter County, in hopes of somehow

supporting the idea that the State suppressed Sergeant Graham's alleged files.  First, Shockley

refers to an affidavit about a conversation with Melton's successor, former Sheriff Tommy

Adams.  Doc. 48 at p. 493 (citing Doc. 48-5 at p. 119).  That affidavit does not indicate that

Adams had any specific knowledge of Sergeant Graham's alleged secret files but states that

"Adams was aware of rumors that Sgt. Graham was starting to investigate other officers and

internal police staff about possible corruption."  Doc. 48-5 at p. 119.  Adams allegedly insinuated

that Sergeant Graham drew the ire of corrupt officials and that someone implied that Melton had

been murdered for speaking about the criminal conspiracy.  *Id.*

The State objects that "[t]he affidavit is essentially a hearsay affidavit that the declarant

has no personal knowledge about an investigation of corruption by [Sergeant Graham], but that

he has heard rumors.  Hearsay is not admissible."  Doc. 51 at p. 128.  The State adds that the

affidavit "is an attempt to expand the current claim beyond what was presented in the Missouri

courts and the original petition."  *Id.*  Shockley admits that the state-court record does not include

this affidavit, Doc. 56 at p. 263, but contends that the affidavit does not "fundamentally alter the

claim that was considered by the state courts," *id.* at p. 464.  He argues that "[b]ecause Adams's

affidavit adds relevant support but does not change the nature of the fully exhausted and timely

original *Brady* claim, procedural constraints do not bar the affidavit from this Court's

consideration."  *Id.*

Shockley's argument does nothing to answer the State.  First, Shockley fails to address

the State's argument that the affidavit is inadmissible hearsay.  Second, Shockley's invocation of

the rules of procedural default entirely misconstrues the State's argument that Shockley cannot

cite information outside the state-court record.  Shockley did not present this affidavit to the

Missouri Supreme Court and so the Court cannot consider it in evaluating the reasonableness of

the Missouri Supreme Court's judgment.  *Shoop*, 142 S. Ct. at 2043–44.  Further, § 2254(e)(2)

provides that a petitioner who fails to develop a claim in State court can develop the record

further only with new law or previously unavailable facts. This affidavit does not fall into either

exception, and Shockley does not claim that it does. Doc. 56 at p. 265. So, even if this affidavit

contained more than a hearsay report of a rumor of wrongdoing, the Court could not consider it.

*See supra* Section V.C.1. (rejecting Shockley's discovery request for claim 25).

Shockley makes further allegations regarding a criminal conspiracy in Carter County to

murder Sergeant Graham. He says that "[a]nother party informed post-conviction counsel that

Mark White and Richard Kearbey assisted Sheriff Melton in the transportation of drugs through

Carter County." Doc. 48 at p. 494. No citation supports this claim. *Id.* Shockley says that

Sergeant Graham posed a threat to this conspiracy and that a criminal case against White "was

dismissed . . . due to Graham's death." *Id.* (citing Doc. 48-3 at pp. 109–10). Although Shockley

implies that White or his alleged coconspirators may have killed Sergeant Graham to avoid

White's conviction, the police report Shockley cites does not support this idea. *Id.* That report

details Trooper Eric Hackman's interview of White after Sergeant Graham's death. Doc. 48-3 at

p. 109. The report notes that Sergeant Graham had arrested White for possession of marijuana

and that when Trooper Hackman went to White's residence, White freely admitted that he had

just been smoking marijuana and voluntarily handed his bag of drugs over to Hackman. *Id.*

Thus, the police report does not support Shockley's depiction of White as a member of a

secretive murderous cabal.

Shockley also claims that Scott Sayler took part in the same conspiracy with Mark White

and Greg Melton. Doc. 48 at p. 494. Shockley repeatedly mentions that "Sayl[e]r was a trained

sniper, which is significant to this case, given that Graham was shot from a substantial distance

with pinpoint accuracy." Doc. 48 at pp. 494–95, 514; *but see Shockley II*, 579 S.W.3d at 890–91

("[Sergeant Graham] was shot from behind with a high-powered rifle that penetrated his Kevlar

vest. . . . The killer then approached [Sergeant Graham], who was still alive, and shot him twice more with a shotgun into his face and shoulder."). According to Melton, Sergeant Graham found drugs on Sayler during a traffic stop, but the prosecutor dropped the charges after Sergeant Graham's death. Doc. 48-2 at p. 643, Tr. at 130:10–24. Shockley says that Sayler's arrest— among other factors—resulted in his termination and that Sayler "threatened his supervisor at his employment after his termination." Doc. 48 at p. 495 (citing Doc. 48-3 at pp. 123–24). The police report Shockley cites for these claims supports Shockley's claim regarding Sayler's termination but makes no mention of Sayler threatening anyone. Doc. 48-3 at pp. 123–24.

Finally, Shockley suggests that someone murdered Melton. He claims that "[a]lthough [Melton's] death was ruled a suicide, the investigation conducted during post-conviction proceedings revealed that there were people who believed Sheriff Melton was murdered." Doc. 48 at p. 496. Shockley leaves the Court to draw its own conclusions as to how this speculation on Melton's death might contribute to his *Brady* claim. *Id.*

Shockley scatters these accusations against various residents of Carter County throughout his *Brady* argument, creating a vague impression of a shadowy network of drug dealers and murderers. *Id.* at pp. 470–71, 473, 477, 486, 493–96. At best, these speculative, hearsay-bound assertions provide a chimerical indication that a possible conspiracy existed for Sergeant Graham to investigate and document. However, the Court cannot view these allegations as a serious legal argument that Sergeant Graham possessed records concerning this alleged criminal conspiracy and that the Missouri Supreme Court unreasonably concluded that Sergeant Graham did not possess these alleged files.

<strong>iv.     Allegations of suppression of evidence</strong>

The Court now turns to the fourth broad category of allegations within claim 25. In addition to Shockley's many arguments that—contra the holdings of the Missouri Supreme

99

Court—Sergeant Graham did possess files that would reveal other suspects, Shockley also

presents an extended argument that the State suppressed this evidence. *Id.* at pp. 471, 476–85,

487–88, 492.  Shockley says that after Sergeant Graham's murder, investigators "recognized that

his electronic files contained valuable information" and seized Sergeant Graham's computers.

*Id.* at p. 471 (citing Doc. 48-3 at pp. 100-01, 111 (stating that investigators seized Shockley's and

Graham's computers, but found nothing of evidentiary value on either)).  Shockley says that "the

Circuit Court ordered the State to turn over all electronic files obtained during the investigation

into Graham's death," Doc. 48 at p. 477, and that "[e]lectronic copies of these files were never

turned over to defense counsel," *id.* at p. 471.

Although Shockley does not support these claims with citations, statements made by

postconviction counsel and the State before the postconviction motion court give more detail on

this discovery dispute.  Doc. 20-24 at pp. 71–102, Tr. at 71:5–102:24.  Postconviction counsel

stated that Sergeant Graham had three computers—a home computer, a mobile computer, and a

work-zone computer—and that defense attorneys requested a copy of the home computer's hard

drive.  *Id.* at pp. 71–72, Tr. at 71:25–72:9.  The State explained that it attempted to give a copy of

Sergeant Graham's home computer hard drive to the defense, but realized it could not copy the

hard drive onto a disk and would need to copy it onto another hard drive.  *Id.* at pp. 88–89, Tr. at

88:20–89:4.  The State asked the defense to provide a hard drive that it could use for this

purpose, but according to the State, "the public defender's office never followed up on that so

that's why it was never given over to the public defender's office."  *Id.* at p. 89, Tr. 89:5–9.  The

State explained that it received "no further communications" on the issue.  *Id.*, Tr. at 89:15.

Further, the State argued that it copied the files from Sergeant Graham's work-zone computer

onto a disk and disclosed this fact to the defense, but the files from that computer had no

apparent relevance to Shockley's case and the defense never requested a copy of the disk.  *Id.* at

pp. 92–93, Tr. at 92:21–93:14.

Shockley's postconviction counsel objected that the State still should have disclosed the

files from the work-zone computer before the trial.  *Id.* at p. 93, Tr. at 93:16–21.  During

postconviction discovery, Shockley received the files from Sergeant Graham's work-zone

computer.  *Id.* at p. 69, Tr. 69:16–18.  This exchange makes clear that the State did not provide a

copy of Sergeant Graham's home computer hard drive or a copy of the files from his work-zone

computer to Shockley's trial counsel.  Yet, after an evidentiary hearing, the postconviction

motion court found that the State provided counsel *access to* these hard drives and Shockley's

attorneys *viewed* those hard drives:

> The trial attorneys in this case were provided access to all of the evidence seized
> in order to investigate potential defenses and evaluate the State's evidence against
> [Shockley].  The trial attorneys in this case did review that evidence and all law
> enforcement reports, which included reports that related to the examination and
> seizure of the victim's computer hard drives, according to their hearing and
> deposition testimony.

Doc. 20-56 at p. 35.

Shockley does not attempt to refute this finding that his attorneys reviewed the hard

drives and the reports about the hard drives.  *See* Doc. 48 at pp. 498–501.  He does not mention

this finding at all.  *See id.* at pp. 468–501; Doc. 56 at pp. 233–69.  Instead, Shockley

disingenuously couches his claims in a way that sidesteps the fact that counsel accessed the

physical hard drive, stating that "[e]lectronic copies of these files were never turned over to

defense counsel," Doc. at p. 471, "the electronic records were not accessible," *id.* at p. 472, and

"the State failed to turn over electronic files to the defense," *id.* at p. 486.  Leaving aside the

concerns this raises about whether Shockley's present counsel have fulfilled their duties of

candor to this Court (and whether counsel justify such conduct on the basis of the inapplicable

ABA guidelines), the motion court's reasonable adjudication of this claim based on the unrebutted evidence in the record dooms Shockley's *Brady* claim.

Shockley never argues that the State must, under *Brady*, go beyond simply giving Shockley access to the hard drives or that it must give Shockley electronic copies of the hard drives. *See* Doc. 48 at pp. 468–501; Doc. 56 at pp. 233–69. Such an argument would contradict *Brady*'s concept of suppression. *See United States v. Stuart*, 150 F.3d 935, 937 (8th Cir. 1998) ("Evidence is not suppressed if the defendant has access to the evidence prior to trial by the exercise of reasonable diligence." (citing *United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992))); *see also United States v. Reed*, 641 F.3d 992, 993 (8th Cir. 2011) ("*Brady* addressed only the government's duty to provide access to evidence favorable to an accused upon request."). Thus, Shockley's argument ignores both the facts and the law.

Shockley also adds a number of details that he does not develop into real arguments that the State suppressed evidence, in an attempt to arouse suspicion of a general atmosphere of suppression. First, Shockley complains that "[t]he State's response claim[s] that it was 'not aware of any information that would tend to negate the guilt of the defendant,'" Doc. 48 at p. 476 (citation omitted), even though, according to Shockley, the State "withheld evidence involv[ing] other investigations Graham was conducting relating to government corruption," *id.* at p. 471.

Second, Shockley mentions a series of discovery motions denied by state courts. *Id.* at pp. 479–83. But he does not develop an argument that these rulings violated his rights. *See id.*

Third, Shockley complains that the State failed to investigate an alleged report by Runge that Sergeant Graham kept files on police corruption. *Id.* at p. 482. However, whenever Shockley discusses this alleged statement to investigators, he cites no evidence. *See id.* at pp. 471, 482; Doc. 56 at pp. 236, 246.

102

Fourth, Shockley gives an extended discussion of the conflict between his postconviction counsel and the State leading up to the stipulation that Graham's home hard drive and mobile computer had become inaccessible.  Doc. 48 at pp. 483–86.  Although Shockley generally insinuates that the State wanted to wrongfully hide something about Sergeant Graham's hard drives, he concludes that "[u]ltimately the dispute between the Circuit Court's Order and the State's refusal to comply with it was resolved."  *Id.* at p. 485.  Rather than develop a legal argument based on this conflict, Shockley seemingly mentions it as an unwarranted insinuation of wrongdoing by the State.

Fifth, Shockley asserts that the State did not properly investigate the email regarding allegations by Dale from Van Buren that Melton—conspiring with Shockley—killed Sergeant Graham.  He complains that "the Missouri State Highway Patrol forwarded the email to Assistant Attorney General Kevin Zoellner and asked, 'What do you think we should [do] about this?'"  *Id.* at p. 487 (alteration in original) (quoting Doc. 48-3 at p. 127)).  Shockley says that "[n]o response to the email was provided in discovery."  Doc. 48 at p. 487.  To the extent that Shockley intends to raise this as a distinct argument, rather than an addition to his general complaint about the State's actions, this argument cannot succeed.  Shockley does not allege that Zoellner responded to this email and does not argue that, if Zoellner did respond, the State should have produced that response pursuant to *Brady*.  *Id.*  Further, Shockley did not raise this argument before the Missouri Supreme Court; his *Brady* claim addressed only the alleged secret files.  *See* Doc. 20-59.  He does not attempt to explain how he could overcome procedural default.  *See* Doc. 48 at p. 487.  Therefore, his argument remains fundamentally undeveloped.

Sixth, Shockley complains that, although the State produced a memorandum regarding the email about Dale, the State failed to produce records of its investigation and failed to

investigate the issue thoroughly. *Id.* at p. 487. The memo, written by Sergeant D.J. Windham, states that, "I was contacted in reference to an email on the Sergeant Dewayne Graham homicide." Doc. 48-3 at p. 125. Windham does not specify whether this is the email about Dale, but Shockley assumes that the memo concerns the email about Dale's allegations. Windham says that he inquired into the procedures for investigations of police corruption and concluded that Sergeant Graham had no assignment to investigate Melton. *Id.* He further notes that "[d]uring the course of the lengthy investigation of Sergeant Graham's murder by federal, state, and local agencies, there had never been any information obtained or substantiated that Sheriff Melton was involved in drug trafficking or that Sergeant Graham was investigating Sheriff Melton." *Id.* The memo indicates that Windham completed his report later the same day he learned about the email. *Id.*

Shockley complains that discovery indicated no investigation of the email between the date when the State received the email and Windham's eventual memo. Doc. 48 at p. 487. Yet, the memo describes the details of Windham's brief investigation. Doc. 48-3 at p. 298. Shockley gives no reason to think the State investigated this hearsay rumor any further. *See* Doc. 48 at pp. 487–88. Shockley also complains that the memo contradicts both the alleged statement from Runge to investigators and the email about Dale. *Id.* However, Shockley never cites any information indicating that Runge made the alleged statement to investigators. *See id.* at pp. 471, 482; Doc. 56 at pp. 236, 246. Also, an email that explicitly states that Dale is not a reliable source and that his story is farfetched, Doc. 48-3 at p. 295, cannot count as evidence, much less probative evidence "substantiat[ing] that Sheriff Melton was involved in drug trafficking," *id.* at p. 125. Indeed, the Missouri Supreme Court concluded that no evidence "beyond speculation and conjecture" indicated that these files existed. *Shockley II*, 579 S.W.3d at 920. So,

Shockley's complaints about the State's response to the email about Dale from Van Buren constitute innuendo, not legal argument.

Seventh, Shockley makes a series of complaints about two investigations by a special prosecutor into allegations of suppressed evidence.  Doc. 48 at pp. 478–83.  He complains that a letter from the special prosecutor "declared that no evidence was suppressed," though "the special prosecutor had not even interviewed several key witnesses" at that time.  *Id.* at p. 480.  In reality, the letter stated that although the special prosecutor had not completed his report, he had "found no evidence that is inconsistent with Mr. Shockley's guilt," Doc. 48-3 at p. 247; the letter did not "declare[] that no evidence was suppressed," Doc. 48 at p. 480.

Shockley complains that a special master, rather than a special prosecutor, should have made these determinations.  Doc. 48 at p. 479.  But he does not develop any argument that he had a legal right to a special master as opposed to a special prosecutor.  *Id.*  Shockley also complains that the special prosecutor was not as communicative as Shockley wanted.  *Id.* at p. 480.  Shockley also asserts without support that a judge, rather than a special prosecutor, should have determined the credibility of the *Brady* allegations.  *Id.* at p. 482.

Neither investigation by the special prosecutor revealed a *Brady* violation.  The first special-prosecutor investigation concerned a report by Scott Faughn.  Doc. 48-3 at p. 250.  Faughn—a felon convicted of three counts of forgery—recounted that he, Kyle Walsh, and Rocky Kingree—the recently elected prosecutor for Carter County—had a conversation in which Rocky Kingree displayed a micro cassette tape.  *Id.* at p. 251.  Rocky Kingree supposedly said that the tape "contained a conversation between Ernie Richardson, the Carter County Prosecutor from January 2007[–]December 2010, and Kevin Zoellner, the Assistant Attorney General assigned to prosecute [Shockley's] case."  *Id.*  Faughn said that Rocky Kingree said that the

105

conversation recorded on the tape concerned suppressed evidence on Sergeant Graham's murder. *Id.*

But this report had several flaws.  First, Richardson had no involvement in Shockley's case.  Second, "[t]he allegation is at best second, perhaps third hand information."  *Id.* at p. 260. Third, both Rocky Kingree and Walsh recalled the conversation described by Faughn, but said that "there was no mention of Shockley, Zoellner, Richardson or withholding evidence from defense attorneys."  *Id.*  Rocky Kingree gave his statement under oath.  Fourth, Faughn had a motive to disparage Zoellner, as Zoellner prosecuted Faughn.  *Id.* at p. 262.  Thus, the special prosecutor concluded that "absolutely no credible evidence exists" to support this rumor of a *Brady* violation.  *Id.*

The special prosecutor's second report addressed the allegations about Runge's conversation with the Kingrees.  Doc. 48-3 at pp. 268–85.  During direct-appellate review, Michael Kingree reportedly told Shockley's counsel that Runge told the Kingrees that "Sgt. Graham kept files on people Graham suspected were involved in criminal activity in the Carter County area. . . . [I]t was clear to [counsel] that [Michael] Kingree was including law enforcement officers and troopers, in the suspect group."  Doc. 48-3 at p. 275.  The special prosecutor concluded that:

> The credible evidence absolutely establishes that Sgt. Graham did not maintain any such files as those described by Michael Kingree.  Because there is no evidence that such files ever existed, the Patrol could not have removed any such files from his home and withheld them from the parties in this case.

*Id.* at p. 285.  Thus, Shockley's discussion of the special prosecutor does not support a *Brady* argument.

### v.       The Missouri Supreme Court's findings

Beyond Shockley's general argument that the State suppressed favorable evidence in his case, Shockley makes more specific arguments against the Missouri Supreme Court's adjudication of the issue.  First, Shockley says that "[t]he Missouri Supreme Court's application of the prejudice prong of *Brady* was contrary to federal law" because "the Missouri Supreme Court discounted the tremendous amount of material evidence, claiming that Shockley 'cannot demonstrate the outcome of his trial would have been different if he had access to [the hard drives].'"  Doc. 48 at p. 499 (second alternation in original) (quoting *Shockley II*, 579 S.W.3d at 921).  Shockley contends that "[t]his is not only incorrect, it is also an error no fair-minded jurist could make."  *Id.*

Shockley's exaggerated rhetoric stands totally divorced from the record.  The Court demonstrated above the falsity of Shockley's unsupported assertions regarding Runge.  *See supra* Section VI.B.2.f.i.  Because Runge testified that she had no knowledge of these files, the Missouri Supreme Court's finding enjoys support in the record and this Court must defer to it.  *See Ryan*, 387 F.3d at 790.  Further, since no one testified that Sergeant Graham had files on investigations of law-enforcement corruption, Shockley's reference to "the tremendous amount of material evidence" is another exaggeration without support in the record.  *See* Doc. 48 at p. 499.  In short, the Missouri Supreme Court reasonably adjudicated the issue.

Second, Shockley says that the Missouri Supreme Court contradicted federal law by failing to apply the standard of materiality established by *United States v. Agurs*, 427 U.S. 97, 112 (1976):  "The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. . . . [I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed."  Doc. 48 at p. 500 (quoting *Agurs*, 427 U.S. at 112).  Shockley also quotes *Kyles v. Whitley*, 514 U.S. 419, 433 (1995), stating that "[t]he

107

question is not whether the defendant would more likely than not have received a different

verdict with the evidence." *Id.* at p. 499 (alteration in original).  Shockley says that, by not

applying the standard set in *Agurs*, "[t]he Missouri Supreme Court egregiously misapplied the

proper standard in favor of a standard that the Supreme Court of the United States expressly

excluded from any analysis of prejudice in *Brady* claims." *Id.* at p. 500.

Yet, Shockley's quotation of *Kyles* obscures the fact that evidence counts as "material"

when it creates a reasonable probability of a different result.  514 U.S. at 434.  The full passage

reads:

> [The] touchstone of materiality is a "reasonable probability" of a different result,
> and the adjective is important.  The question is not whether the defendant would
> more likely than not have received a different verdict with the evidence, but
> whether in its absence he received a fair trial, understood as a trial resulting in a
> verdict worthy of confidence.  A "reasonable probability" of a different result is
> accordingly shown when the government's evidentiary suppression "undermines
> confidence in the outcome of the trial."

*Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

According to the Missouri Supreme Court, a *Brady* violation occurs only when the State

suppresses evidence "material to either the guilt or penalty phase," and "[e]vidence is material

only if there is a reasonable probability that, had the evidence been disclosed to the defense, the

result of the proceedings would have been different." *Shockley II*, 579 S.W.3d at 920 (citations

omitted).  So, the Missouri Supreme Court applied exactly the same reasonable-probability

standard set in *Kyles*.  Applying this standard, the Missouri Supreme Court agreed with the

postconviction motion court that "[Shockley] could not demonstrate prejudice because he could

not present evidence beyond speculation and conjecture about the hard drives' contents" and

concluded that "[Shockley] cannot demonstrate the outcome of his trial would have been

different if he had access to what is only vague and speculative information." *Id.* at 921.  The

Missouri Supreme Court did not rearticulate its statement of the materiality standard in concluding that Shockley's *Brady* claim failed.

Thus, Shockley's argument depends on cherry-picking language from both the United States Supreme Court and the Missouri Supreme Court. Shockley relies chiefly on *Agurs*'s statement of the requirements for materiality under *Brady*. Doc. 48 at p. 500. While the United States Supreme Court has not explicitly repudiated *Agurs*, it has "reformulated the *Agurs* standard for the materiality of undisclosed evidence." *Bagley*, 473 U.S. at 682. In *Bagley*, the Court adopted a reasonable-probability standard for materiality, stating that "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*; *see also Kyles*, 514 U.S. at 434. In turn, *Strickland* says its reasonable-probability standard and a standard requiring a likelihood of a different result should diverge "only in the rarest case." *Strickland*, 466 U.S. at 698. In determining whether a *Brady* violation has prejudiced a petitioner, the Supreme Court continues to use the reasonable-probability standard from *Bagley*. *See, e.g.*, *Turner v. United States*, 582 U.S. 313, 324 (2017).

Shockley mentions none of this. *See* Doc. 48 at p. 499–500. Instead, he appeals to the language from *Agurs* that frames materiality chiefly in terms of reasonable doubt. *Id.* Shockley says that, by not applying the standard set in *Agurs*, "[t]he Missouri Supreme Court egregiously misapplied the proper standard in favor of a standard that the Supreme Court of the United States expressly excluded from any analysis of prejudice in *Brady* claims." *Id.* at p. 500. However, Shockley's failure to mention the standard set forth in *Bagley* and his selective quotation of *Kyles* means that he fails to accurately state the law that the Missouri Supreme Court must apply. Shockley's counsel does not provide any basis for failing to discover this on-point authority or

for citing a case that is not good law and has not been for over three decades.  *See* Doc. 48 at pp. 499–500; Doc. 56 at p. 267; *see also* Mo. Sup. Ct. R. 4-3.3(a)(3) ("A lawyer shall not knowingly . . . fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel . . . .").

Shockley also distorts the Missouri Supreme Court's analysis, plucking language out of context.  The Missouri Supreme Court stated that Shockley "cannot demonstrate the outcome of his trial would have been different if he had access to what is only vague and speculative information," *Shockley II*, 579 S.W.3d at 921, and Shockley says that this amounts to a requirement that material evidence "ensure acquittal," which is "a standard that the Supreme Court of the United States expressly excluded."  Doc. 48 at pp. 499–500.  However, this characterization of the Missouri Supreme Court's analysis treats a single sentence as if it were the whole or the crux of the state court's decision.  "[T]he language of an opinion is not always to be parsed as though we were dealing with [the] language of a statute." *Davenport*, 142 S. Ct. at 1528 (second alteration in original) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)).  Because Shockley's argument depends on both a misstatement of the relevant law and the Missouri Supreme Court's findings, the Court rejects that argument.

Shockley then reiterates his argument that Missouri Supreme Court unreasonably discounted the testimony from Carter and the Kingrees as "vague and speculative at best."  Doc. 48 at p. 501.  Shockley vehemently asserts that:

> These statements were not speculative.  The witnesses were not speculating what was on the hard drive.  They were relaying information that Graham's fiancé[e] had directly told them as close family or friends.  Testimony at the evidentiary hearing clearly established that Graham's fiancé[e] told authorities shortly after his death that he had been investigating other officers and officials in Carter County.

*Id.* However, these claims lack any fidelity to the record. None of these individuals had any first-hand knowledge of Sergeant Graham's hard drive. None of them testified that Sergeant Graham had files recording official corruption. None of them testified that Runge told investigators that Sergeant Graham had investigated official corruption and that she lived in fear of a cabal of corrupt officials. Any support this testimony might lend to Shockley's case is vague and speculative at best. So, despite Shockley's accusation that the Missouri Supreme Court "egregiously" misapplied federal law and that "no fair-minded jurist" could agree with its factual determinations, *id.* at p. 500, Shockley's briefing of this claim demonstrates a troubling failure to describe the record accurately and raises serious questions about whether counsel have violated the Missouri Rules of Professional Conduct, which govern in this Court. The Court finds the Missouri Supreme Court's adjudication reasonable and denies claim 25. *See* § 2254(d).

### g.      Claim 28

In claim 28, Shockley alleges three errors that the Missouri Supreme Court addressed and rejected on the merits. He argues that (1) the jury instructions on sentencing improperly shifted the burden onto the defense to establish that the mitigating factors outweighed the aggravating factors; (2) the jury instructions improperly notified the jury that the judge would sentence Shockley in the event the jury could not agree on a sentence; and (3) the judge, improperly took on the role of the jury when he sentenced Shockley. *Id.* at pp. 519–30. These arguments fail.

First, Shockley claims that, under Missouri law, a defendant can only face a death sentence if the jury finds that the aggravating factors outweigh or equal the mitigating factors. Doc. 48 at pp. 522–23 (citing *State v. Whitfield*, 107 S.W.3d 253, 262 (Mo. 2003)). He adds that, under *Ring v. Arizona*, 536 U.S. 584, 589–609 (2002), if a finding of fact would increase the maximum authorized penalty, then the jury must find that fact beyond a reasonable doubt. Doc.

111

48 at p. 522 (citing *Ring*, 536 U.S. at 589–609).  Therefore, according to Shockley, federal law requires that he could face the death penalty only if the jury had found that the aggravating factors outweighed or equaled the mitigating factors.  *Id.* at p. 522–24.  This argument depends on Shockley's assertion that Missouri law only authorizes the death penalty where "the weight of the aggravating evidence is at least equal to that of the mitigating evidence." *Id.* at p. 521.

To the contrary, the Missouri Supreme Court concluded that Missouri law "does not impose on the State the burden of proving beyond a reasonable doubt that the aggravating circumstances outweigh those in mitigation." *Shockley I*, 410 S.W.3d at 197 & n.9 (*citing* Mo. Rev. Stat. § 565.030.4(3)).  Section 565.030.4, which governs the sentencing process for defendants guilty of murder in the first degree, requires that—unless the defendant waives his right to trial by jury, *see* Mo. Const. art. 1, § 22(a)—the jury must "assess and declare the punishment at life imprisonment" if the jury "concludes that there is evidence in mitigation of punishment . . . which is sufficient to outweigh the evidence in aggravation."  Rather than saying that a finding on the weight of mitigating evidence against aggravating evidence makes a defendant eligible for the death penalty, Missouri law says the opposite—that a specific factual finding makes a defendant ineligible for the death penalty; instead of conditioning an increase in the maximum penalty on this factual finding, Missouri law conditions a decrease of the maximum penalty on this factual finding.  *Id.*  Shockley argues that the Missouri Supreme Court's interpretation of this statute contradicts Missouri law, Doc. 48 at p. 523, but a federal habeas court cannot correct a state court's view of state law.  *Sweet*, 125 F.3d at 1151 (citation omitted).  Because Missouri does not condition an increase in the maximum penalty for Shockley's crime on whether the factfinder concluded that the evidence in aggravation outweighs or equals the evidence in mitigation, *Ring* does not apply.  536 U.S. at 589 ("Capital

defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment.").

In response, Shockley argues that, although Supreme Court precedent allows a judge to reweigh aggravating and mitigating evidence, it does not permit a judge "to step into the role of the jury in evaluating the statutory aggravators for purposes of death eligibility." Doc. 56 at p. 286. Shockley complains that the Missouri Supreme Court's holding "does not require adherence to the jury's findings." *Id.* at pp. 286–87. This argument seems to contemplate a case where a jury finds aggravating factors that would not make a defendant eligible for the death penalty, and then, in the process of weighing aggravating and mitigating factors, a judge finds additional aggravating factors that make a defendant eligible for death. However, this argument stands completely disconnected from both the law and the facts. Missouri law makes only guilt of first-degree murder and at least one aggravating factor prerequisites for the death penalty. Mo. Rev. Stat. § 565.030.4. Further, *Shockley I* held that, for a judge to weigh aggravating and mitigating factors pursuant to § 565.030, the jury must first find at least one aggravating factor. 410 S.W.3d at 198–99. Because a judge can only weigh aggravating and mitigating factors pursuant to § 565.030 once the jury has found the prerequisites for the death penalty, Shockley's arguments have no basis in Missouri law.

Second, Shockley asserts that the Missouri Supreme Court's rejection of his argument— that the jury instruction explaining what would happen if it could not agree on a punishment— contradicted the United States Supreme Court's holding in *Caldwell v. Mississippi*, 472 U.S. 320 (1985). Doc. 48 at pp. 524–27. In accordance with Missouri law, the trial court instructed the jurors "that the court will assess the punishment itself at either death or life imprisonment *only if* the jury is *unable* to agree on punishment after it unanimously determines that one or more

statutory aggravators have been proved beyond a reasonable doubt and the jury fails to

unanimously find that the factors in mitigation outweigh those in aggravation." *Shockley I*, 410

S.W.3d at 198 (citing Mo. Rev. Stat. § 565.030.4); *see id.* at 197 n.10 (providing the complete

jury instruction at issue—in another troubling instance of lack of candor by Shockley's present

counsel, Shockley omits the lasts sentence of the instruction, which provides "[y]ou must bear in

mind, however, that under the law, it is the primary duty and responsibility of the jury to fix the

punishment.").

In *Caldwell*, the Supreme Court held "that it is constitutionally impermissible to rest a

death sentence on a determination made by a sentencer who has been led to believe that the

responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472

U.S. at 328–29.  In that case, the prosecutor informed the jury that, even if it sentenced the

defendant to death, the sentence would be subject to appellate review.  *Id.* at 325–26.  The

Supreme Court found this comment unlawful and warned that "the presence of appellate review

could effectively be used as an argument for why those jurors who are reluctant to invoke the

death sentence should nevertheless give in."  *Id.* at 333.

As the Missouri Supreme Court pointed out, the jury instruction that Shockley contests

does not inform the jury of the appellate-review process, nor does it "diminish the jury's sense of

responsibility for determining the appropriateness of a death sentence."  *Shockley I*, 410 S.W.3d

at 198.  The state court's decision neither contradicted nor unreasonably applied *Caldwell*:  the

jury instruction does not mention appellate review, bringing this claim outside the holding in

*Caldwell*.  Moreover, the instruction neither states nor implies that "the responsibility for

determining the appropriateness of the defendant's death rests elsewhere."  *Caldwell*, 472 U.S. at

329; *see Shockley I*, 410 S.W.3d at 197 n.10.  The contested instruction instead advises the jurors

what will happen only if the jury cannot agree on a punishment.  The instruction does not imply that the trial judge, an appellate court, or any other authority would review the jury's sentencing decision.  *Shockley I*, 410 S.W.3d at 198.  Shockley adds that the Missouri Supreme Court unreasonably distinguished this case from *Caldwell* by noting that this case involves a statement by a judge, where *Caldwell* involved a statement by a prosecutor.  Doc. 48 at p. 527.  But this distinction appears nowhere in the Missouri Supreme Court's analysis.  *Shockley I*, 410 S.W.3d at 198–99.  Further, despite Shockley's omission, the instruction directly advises the jury that "it is the primary duty and responsibility of the jury to fix the punishment."  *Shockley I*, 410 S.W.3d at 197 n.10.  Thus, the state-court decision comported with and reasonably applied federal law.  *See* § 2254(d)(1).

Finally, the Missouri Supreme Court upheld the constitutionality of Mo. Rev. Stat. § 565.030.4.  This law permits a judge to weigh mitigating evidence against aggravating evidence when:  (1) the sentencing jury finds the state has proved one or more aggravators beyond a reasonable doubt, (2) the factors in mitigation do not outweigh those in aggravation, and (3) the jury cannot unanimously agree on a punishment.  *Shockley I*, 410 S.W.3d at 198–99 & n.11.  If the jury finds no aggravating evidence or if the jury finds that mitigating evidence outweighs aggravating evidence, then the defendant cannot receive the death penalty and the judge will not weigh the aggravating and mitigating factors.  *McLaughlin v. Precythe*, 9 F.4th 819, 823–24 (8th Cir. 2021).  Shockley claims the state court decided this claim contrary to *Ring*, 536 U.S. 584, because "nothing in Missouri's statutory scheme requir[es] the trial court follow the jury's [findings]."  Doc. 48 at p. 530.  Shockley does not explain how he thinks Missouri law allows the trial court to deviate from a jury's findings or how *Ring* applies to the issue.  *Id.* at pp. 528–30.

115

The state court faithfully followed *Ring*. "Under *Ring* . . . a jury must find the aggravating circumstance that makes the defendant death eligible." *McKinney v. Arizona*, 140 S. Ct. 702, 707 (2020). However, "a jury (as opposed to a judge) is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the ultimate sentencing decision within the relevant sentencing range." *Id.* Simply put, "[s]tates that leave the ultimate life-or-death decision to the judge may continue to do so." *Id.* at 708 (quoting *Ring*, 536 U.S. at 612 (Scalia, J., concurring)). "Here, the jurors answered special interrogatories listing three statutory aggravators that they found unanimously beyond a reasonable doubt," just as *Ring* required. *Shockley I*, 410 S.W.3d at 198. The Missouri Supreme Court made clear that a judge can weigh aggravating and mitigating factors once a jury has already found one aggravating factor and not found that mitigating evidence outweighs aggravating evidence, but cannot agree on the "final step" of determining "whether a death or life sentence is appropriate." *Shockley I*, 410 S.W.3d at 198. Permitting the judge to consider and weigh aggravators and mitigators "does not negate the fact that the jury already had made the required findings." *McKinney*, 140 S. Ct. at 707. The Missouri Supreme Court's adjudication of the issue therefore does not contradict *Ring*.

Shockley also cites *McLaughlin v. Steele*, 173 F. Supp. 3d 855 (E.D. Mo. 2016), to support his argument that the Missouri Supreme Court's interpretation of § 565.030 "sidestep[s] the basic language in the statute and does not resolve the issues concerning the statutory language allowing a trial court to make their own determinations, unguided by the verdict form." Doc. 48 at p. 529. *McLaughlin* held § 565.030 unconstitutional, because it supposedly allowed judges to make a factual finding required to impose death. 173 F. Supp. 3d at 865. Two important details undermine his argument. First, *McLaughlin*'s reasoning hinges its acceptance of the Missouri Supreme Court's interpretation of § 565.030 in *Whitfield*, *id.* at 894, 897, which

the Missouri Supreme Court now rejects, *Shockley I*, 410 S.W.3d at 198; *see also State v. Wood*, 580 S.W.3d 566, 585 (Mo. 2019).  Second, on appeal, the Eighth Circuit overturned *McLaughlin v. Steele* because Missouri courts no longer follow *Whitfield*.  *McLaughlin v. Precythe*, 9 F.4th at 834.  In fact, *McLaughlin v. Precythe* rejected exactly the argument Shockley makes here.  *Id.*

Shockley incoherently attempts to distinguish his argument from the argument rejected in *Precythe*, insisting that *Precythe* primarily addresses jury instructions, not the constitutionality of § 565.030; that *Precythe* relied on *Wood*, which "focused on the specific jury instructions"; and that *Wood* contradicts the Supreme Court's holding in *Ring*.  Doc. 56 at pp. 283–87.  Shockley obfuscates the relevant caselaw: *Wood* held that § 565.030 only allows the judge to "confirm[] the [jury's] finding of at least one aggravating circumstance and make[] the non-factual, discretionary determinations that the aggravating circumstances outweigh mitigating circumstances" once "the constitutional role of the jury as the finder of fact has already been fulfilled."  *Wood*, 580 S.W.3d at 588.  In turn, the Eighth Circuit held that "[w]e do not sit in judgement of a state supreme court's interpretation of state law, and the district court should not have, either."  *Precythe*, 9 F.4th at 834.  Deferring to *Wood*'s interpretation of Missouri law, the Eighth Circuit rejected the district court's finding that § 565.030 "violates *Ring* because it unconstitutionally vests the authority to make factual findings in the judge."  *Id.* at 833.  Shockley's attempts to distinguish *Precythe* fail by refusing to squarely address the opinion's text and by failing to intelligibly explain how he thinks his sentencing violated the rule established in *Ring*.  For these reasons, the Missouri Supreme Court's decision does not contradict or unreasonably apply Supreme Court precedent.  *See* § 2254(d)(1).  Thus, the Court denies Shockley's claim 28.

C.     **Procedurally defaulted claims**

The Court now turns to claims that Shockley did not raise in state court.  Generally, the

Court cannot apply § 2254(d)'s standards of deference to a state-court adjudication to these

claims because no Missouri court has adjudicated these claims on the merits.  The Court applies

the law of procedural default.  Under Missouri law, "[c]laims that were cognizable on direct

appeal or in postconviction proceedings are procedurally barred."  *State ex rel. Kelly v. Inman*,

644 S.W.3d 554, 556 (Mo. 2020) (citing *Clay*, 37 S.W.3d at 217).  So, Shockley has

procedurally defaulted any claim he did not raise in state court during his direct appeal and

postconviction review.  However, this does not necessarily imply that a federal habeas court

must deny the claim without reviewing the underlying constitutional issues.  Rather, the prisoner

must satisfy the standard set by *Coleman v. Thompson*:

> In all cases in which a state prisoner has defaulted his federal claims in state court
> pursuant to an independent and adequate state procedural rule, federal habeas
> review of the claims is barred unless the prisoner can demonstrate cause for the
> default and actual prejudice as a result of the alleged violation of federal law, or
> demonstrate that failure to consider the claims will result in a fundamental
> miscarriage of justice.

501 U.S. at 750.

In the context of *Coleman*'s cause-and-prejudice standard, "cause" means "something

*external* to the petitioner, something that cannot fairly be attributed to him."  *Id.* at 753.  "[T]he

existence of cause for a procedural default must ordinarily turn on whether the prisoner can show

that some objective factor external to the defense impeded counsel's efforts to comply with the

State's procedural rule."  *Id.* (citation omitted).  While *Coleman* and its progeny do not give a

definitive statement of what does and does not count as cause for default, *Coleman* gives several

examples that clarify the issue.  "A showing that the factual or legal basis for a claim was not

reasonably available to counsel" establishes cause.  *Id.* (citation omitted).  If "interference by

officials made compliance impracticable, [this too] would constitute cause under this standard." *Id.* (cleaned up).  "[I]f the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State."  *Id.* at 754 (citation omitted).  This last example of cause has inspired many further important holdings, germinating from *Martinez*.  *See infra* Section VI.C.1.

To satisfy *Coleman*'s actual-prejudice element, the prisoner "must show a reasonable probability" that, but for the alleged constitutional violation, the prisoner would not face conviction or whatever other harm the prisoner alleges.  *Thomas v. Payne*, 960 F.3d 465, 477 (8th Cir. 2020).  The Eighth Circuit has found that "reasonable probability" has the same meaning in the *Coleman* context that the phrase has in the *Strickland* context.  *Id.* (citation omitted).  The Court accordingly applies the same standards relevant to *Strickland*'s prejudice prong to *Coleman*'s actual-prejudice requirement:  "[T]he difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'"  *Dorsey*, 30 F.4th at 756 (quoting *Harrington*, 562 U.S. at 111–12).  So, while *Coleman* does not require a prisoner to prove prejudice by a preponderance of the evidence, its standard is only "slight[ly]" less demanding.  *Id.*; *Thomas*, 960 F.3d at 477.

*Murray v. Carrier*, 477 U.S. 478, 496 (1986), and later Supreme Court cases "recognize[] a narrow exception to the cause requirement where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense."  *Dretke v. Haley*, 541 U.S. 386, 393 (2004) (quoting *Carrier*, 477 U.S. at 496); *see also Gordon v. Arkansas*, 823 F.3d 1188, 1197 (8th Cir. 2016) ("[A] state prisoner who fails to satisfy state procedural requirements forfeits his right to present his federal claim through a federal habeas corpus petition, unless he can meet strict cause and prejudice or actual innocence standards."

(citation omitted)).  This requirement protects against fundamental miscarriages of justice.

*Dretke*, 541 U.S. at 393.  To benefit from this safeguard, a prisoner cannot simply argue that his

conviction is unfair; he must demonstrate his actual innocence.  *Calderon v. Thompson*, 523 U.S.

538, 559 (1998) ("[T]he miscarriage of justice exception is concerned with actual as compared to

legal innocence." (citation omitted) (alteration in original)); *see also Coleman*, 501 U.S. at 758.

### 1.    Procedurally defaulted ineffective-assistance claims

The Court analyzes Shockley's procedurally defaulted ineffective-assistance claims under

*Martinez*.  *Martinez* provides one route for a petitioner to demonstrate "cause" under *Coleman*.

566 U.S. at 9.  Specifically, *Martinez* sets the standard for petitioners who hope to establish

cause for a procedurally defaulted ineffective-assistance-of-trial-counsel claim by pointing to

postconviction counsel's ineffective assistance.  *Id.*  Under *Coleman*, a violation of the Sixth

Amendment's guarantee of effective assistance qualifies as cause for procedural default.  501

U.S. at 754.  However, because no constitutional right to postconviction counsel exists, a

defendant usually bears responsibility for the incompetence of postconviction counsel, meaning

that postconviction counsel's ineffectiveness usually cannot qualify as "cause" under *Coleman*.

*Shinn*, 142 S. Ct. at 1733 (citation omitted).  In the limited context where state law only allows

ineffective-assistance claims at the postconviction-review stage, this would mean that defendants

never have the right to effective assistance in litigating ineffective-assistance claims.  *Martinez*,

566 U.S. at 11–12; *see also* Mo. Sup. Ct. R. 29.15(a) (providing the "exclusive procedure" to

litigate "claims of ineffective assistance" at the postconviction-review stage).

However, *Martinez* established that, under certain circumstances, "attorney negligence in

a postconviction proceeding" can demonstrate "cause" in the context of an "initial-review

collateral proceeding for claims of ineffective assistance of counsel at trial."  566 U.S. at 15.  So,

in this limited context, postconviction incompetence counts as cause for failure to raise trial

incompetence, *id.*, even though "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a *ground for relief* in a proceeding arising under section 2254," 28 U.S.C. § 2254(i) (emphasis added).

Because "the right to counsel is the foundation of our adversary system," the Supreme Court created an exception to the usual rules of procedural default, protecting defendants against these cases of double-layered ineffective assistance. *Martinez*, 566 U.S. at 12. The year after *Martinez*, the Supreme Court clarified its holdings in *Coleman* and *Martinez*:

> We consequently read *Coleman* as containing an exception, allowing a federal habeas court to find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (explaining *Martinez*, 566 U.S. at 13–18) (alterations in original).

Likewise, the Eighth Circuit has interpreted *Martinez* as requiring that:

> (1) the claim of ineffective assistance of trial counsel was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; and (3) the state collateral review proceeding was the "initial" review proceeding with respect to the "ineffective-assistance-of-trial-counsel claim."

*Marcyniuk*, 39 F.4th at 996 (quoting *Harris v. Wallace*, 984 F.3d 641, 648 (8th Cir. 2021)).

The Eighth Circuit has not always analyzed *Martinez* claims under this three-element framework articulated in *Marcyniuk*. *Compare Marcyniuk*, 39 F.4th at 996, *with Dorsey*, 30 F.4th at 756–59 (using only the substantial-claim element), *and Deck v. Jennings*, 978 F.3d 578, 582 (8th Cir. 2020) (merging the substantial-claim element with the ineffective-assistance-of-

121

postconviction-counsel element into a substantial-enough element).  Yet, precedent most

strongly supports the standard stated in *Marcyniuk*.  First, *Marcyniuk*'s standard mirrors the

standard set by the Supreme Court in *Trevino*.  *Compare Marcyniuk*, 39 F.4th at 996 (listing the

three elements quoted above as the standard for a *Martinez* claim), *with Trevino*, 569 U.S. at

423–29 (listing the three elements in *Marcyniuk* and the further requirement that postconviction

review must be the first opportunity for ineffective-assistance claims).  Second, *Marcyniuk* gives

the Eighth Circuit's most recent statement of the *Martinez* standard.  *See Marcyniuk*, 39 F.4th at

996 (decided July 8, 2022).  Third, *Marcyniuk* gives the same elements for a *Martinez* claim as

the Eighth Circuit's first treatment of a *Martinez* claim after *Trevino*, making it the beneficiary of

the first-in-time rule.  *See Dansby v. Hobbs*, 766 F.3d 809, 828 (8th Cir. 2014) (giving the three

elements listed in *Marcyniuk* as the test for *Martinez* claims); *Mader v. United States*, 654 F.3d

794 (8th Cir. 2011) ("[W]hen faced with conflicting panel opinions, the earliest opinion must be

followed 'as it should have controlled the subsequent panels that created the conflict.'" (quoting

*T.L. ex rel. Ingram v. United States*, 443 F.3d 956, 960 (8th Cir. 2006))).  In sum, precedent

supports the three elements for a *Martinez* claim listed in *Marcyniuk*.

Three rules further clarify how a petitioner can overcome procedural default under

*Martinez* and *Coleman*; these three rules explain *Martinez*'s substantial-claim element,

*Martinez*'s postconviction-counsel-incompetence element, and *Coleman*'s actual-prejudice

element.  First, a "substantial" claim must have "some merit," which, in turn, requires that the

ineffective-assistance-of-trial-counsel claim "must at least be debatable among jurists of reason."

*Marcyniuk*, 39 F.4th at 998 (quoting *Dorsey*, 30 F.4th at 756).  Second, postconviction counsel's

decision not to raise a claim "is not deficient performance unless that claim was plainly stronger

than those actually presented."  *Deck*, 978 F.3d at 584 (quoting *Davila v. Davis*, 582 U.S. 521,

122

533 (2017)) (determining the standard for postconviction-counsel performance within a *Martinez*

analysis). Third, "the difference between *Strickland*'s prejudice standard and a more-probable-

than-not standard is slight and matters 'only in the rarest case.'" *Dorsey*, 30 F.4th at 757

(quoting *Harrington*, 562 U.S. at 111–12). This prejudice standard requires a "substantial, not

just conceivable" likelihood of a different result. *Harrington*, 562 U.S. at 112. This substantial-

likelihood standard of prejudice also applies to *Coleman*'s "actual prejudice" element. *See*

*Thomas*, 960 F.3d at 477 (holding that, to demonstrate actual prejudice under *Coleman*, a

petitioner would need to show a reasonable probability of a different result under *Strickland*); *see*

*also Schlup*, 513 U.S. at 327 n.45 (citing *Strickland* for the standard for prejudice in the context

of the cause-and-prejudice analysis for procedural default).

Together, these rules yield the following approach to *Martinez* and *Coleman*: to

overcome the procedural bar on ineffective-assistance-of-trial-counsel claims not presented in

state court, a petitioner must show: (1) that reasonable jurists could debate whether trial counsel

acted ineffectively, creating a substantial likelihood of prejudice to the petitioner, *Dorsey*, 30

F.4th at 756; *Harrington*, 562 U.S. at 111–12, and (2) that the ineffective-assistance-of-trial-

counsel claim plainly presented a stronger case than the claims actually raised by postconviction

counsel, *Deck*, 978 F.3d at 584. After establishing cause in this manner, a petitioner can then

proceed to attempt to show actual prejudice, *Coleman*, 501 U.S. at 750, as opposed to merely

debatable prejudice, and only then can the petitioner present the merits of the ineffective-

assistance-of-trial-counsel claim to a federal habeas court, *Martinez*, 566 U.S. at 17. With these

standards in mind, the Court now turns to Shockley's procedurally defaulted ineffective-

assistance claims.

### a.      Claim 6

In claim 6, Shockley argues that trial counsel incompetently failed to "investigate and present mental health evidence in the penalty phase." Doc. 48 at pp. 161–237. However, Shockley did not present this claim in state court, nor did he present any evidence that could support this claim in state court. *Id.* at p. 161. To hurdle the procedural bar on claims not presented in state court, Shockley must meet the standard stated in *Martinez*. 566 U.S. at 14. As Section V.C.1. details, the first step of a *Martinez* analysis requires Shockley to show his claim has debatable merit. *See Dorsey*, 30 F.4th at 756. To expand the record with the evidence necessary to argue that his claim has debatable merit, Shockley must meet the standard set in § 2254(e)(2). Shockley's claim, however, does not rely on "a factual predicate that could not have been previously discovered through an exercise of due diligence." *Id.* Instead, he argues that counsel should have investigated and developed evidence that was available at the time: his personal history and mental health. Shockley cannot reasonably blame his various former counsel for failing to "find" evidence that he also says they could not have discovered through an exercise of due diligence. Shockley therefore cannot satisfy § 2254(e)(2)'s requirement that the "factual predicate [for the claim] could not have been previously discovered through the exercise of diligence . . . ."

Because Shockley cannot satisfy § 2254(e)(2), he cannot introduce new evidence, leaving this claim without evidentiary support. *See supra* Section V.C.3. (discussing Shockley's motion for further discovery on claims 6, 13, and 26). And because Shockley cannot support his claim with evidence, he cannot show that the claim has debatable merit, thus failing the first step of the *Martinez* analysis. 566 U.S. at 16 (describing an insubstantial ineffective-assistance-of-trial-counsel claim as one "wholly without factual support"). So claim 6 remains procedurally barred; both § 2254(e)(2) and *Martinez* demand that the Court deny this claim.

### b. Claim 8

In claim 8, Shockley contends that his trial counsel incompetently failed to adequately investigate and cross-examine witness Rick Hamm.  Doc. 48 at p. 248.  Shockley acknowledges that he procedurally defaulted this claim, as he "did not fully present" it in state court.  *Id.* at pp. 248–50.  To excuse his default, Shockley invokes *Martinez*.  *Id.*  As described in Section V.C.1., a *Martinez* analysis requires, among its other elements, that Shockley demonstrate the constitutional inadequacy of postconviction counsel's assistance.  *See Deck*, 978 F.3d at 582 (holding that, in a *Martinez* analysis, the "key question is whether postconviction counsel was ineffective" in failing to raise a claim).  "Moreover, '[d]eclining to raise a claim . . . is not deficient performance unless that claim was plainly stronger than those actually presented.'"  *Id.* at 584 (alterations in original) (quoting *Davila*, 582 U.S. at 533).  So, to cure his procedural default under *Martinez*, Shockley must show the superiority of this claim to the claims presented by postconviction counsel.

Shockley argues that trial counsel failed to attack the supposed inconsistency and fluidity of Hamm's testimony on the timeline of events surrounding the murder.  Doc. 48 at p. 248.  At trial, Hamm testified that he saw a red car near Sergeant Graham's house about three times over a half-hour period.  Doc. 20-5 at p. 56, Tr. at 1878:2–4.  Hamm did not remember the exact timing of this half-hour period, but he stated that the period lay at some time between 3:45 p.m. and 4:45 p.m.  *Id.*, Tr. at 1878:5–8.  In a deposition, Hamm testified that he saw the red car three times between 3:45 p.m. and 4:45 p.m., that he saw the car for the third time "closer to 4:45 p.m.," and that he did not notice the car between 4:30 p.m. and 4:45 p.m.  Doc. 48-2 at pp. 487–88, Tr. at 38:9–42:4.  In a statement to the police, Hamm said that he first saw the car at approximately 4:10 p.m. and noticed the car's absence at approximately 4:45 p.m.  Doc 48-3 at p. 105.  Shockley says that trial counsel failed to "impeach Hamm with his prior statements [and]

125

the fluidity in his timeline," depriving Shockley of his right to effective assistance.  Doc. 48 at p. 254.

The Court sees no contradiction between Hamm's deposition testimony and his trial testimony.  Further, the Court does not see these timeframes as excessively fluid, so this claim does not present an especially strong argument for relief.  Postconviction counsel raised numerous other claims.  *See Shockley II*, 579 S.W.3d at 893–921.  Although none ultimately proved successful, counsel could have reasonably concluded that an argument regarding Hamm's testimony "would have only detracted from other, stronger arguments."  *Deck*, 978 F.3d at 584. Because Shockley fails to show he received ineffective assistance from postconviction counsel, "[i]t follows that the *Martinez* exception . . . is unavailable to him."  *Id.*

Alternatively, even if Shockley could demonstrate that postconviction counsel incompetently decided not to raise this claim, Shockley still would not succeed.  Shockley cannot demonstrate that trial counsel's supposed failures prejudiced his case.  *See Coleman*, 501 U.S. at 750 (holding that a petitioner can overcome a procedural bar on a claim only after demonstrating "actual prejudice").  To show a "substantial" likelihood of prejudice, Shockley would need to come close to proving that the alleged incompetence probably changed the trial's outcome. *Harrington*, 562 U.S. at 112.  That is, if he cannot show that the alleged ineffectiveness "more-probab[ly]-than-not" altered the trial's result, he must hope to fall into that set of "rarest case[s]" where the substantial-likelihood test requires less than a probably different result.  *Id.*  But a substantial likelihood of a different result does not exist.  Because Hamm's two statements present a consistent and adequately precise sequence of events and because this testimony only added to the State's cumulative case, trial counsel's cross-examination of Hamm did not have a substantial likelihood of altering the trial's outcome.  Shockley fails at multiple steps necessary

to demonstrate cause under *Martinez* and prejudice under *Coleman*, so the Court denies this claim as procedurally barred.

### c.      Claim 9(b)

In claim 9, Shockley argues that his trial counsel failed to competently defend him using testimony from Mila Linn.  The first part of this claim, which the Court rejected above, challenges trial counsel's decision not to call Linn to testify.  The Missouri Supreme Court found that trial counsel presented the most important parts of Linn's testimony by cross-examining an officer who questioned her, that trial counsel had reasonable concerns about the State's ability to impeach Linn, and that trial counsel used Linn's absence to question the State's candor before the jury.  *Shockley II*, 579 S.W.3d at 912.  The Court finds this adjudication reasonable.  *See supra* Section VI.B.1.e.  Here, the Court addresses the second part of claim 9, which concerns trial counsel's decision not to investigate Linn.

Shockley argues that trial counsel acted ineffectively by failing to interview or even attempt to contact Linn.  Doc. 48 at pp. 259, 261.  Shockley's initial team of attorneys deposed Linn, but his eventual trial counsel did not.  Doc. 48-3 at p. 44.  Because Shockley did not raise this claim in state court, Doc. 48 at p. 259, he can only proceed by satisfying the elements of *Martinez* and *Coleman* discussed in Section V.C.1.:  Shockley's underlying ineffective-assistance claim must have debatable merit, *Dorsey*, 30 F.4th at 756, Shockley's actual postconviction claims must present weaker arguments than this ineffective-assistance claim, *Deck*, 978 F.3d at 584, and trial counsel's failures must have actually prejudiced Shockley, *Coleman*, 501 U.S. at 753–54.  Shockley offers no argument that trial counsel's failure to interview Linn prejudiced him.  Doc. 48 at pp. 268–69.  Given that trial counsel had access to Linn's deposition, *Shockley II*, 579 S.W.3d at 912, Shockley cannot show that counsel's decision

not to interview her was anything other than a reasonable trial strategy.  Shockley therefore

cannot succeed at any step of the *Martinez* analysis.  The Court denies the second part of claim 9.

### d.    Claim 11

In claim 11, Shockley argues that his trial and postconviction counsel incompetently

failed to investigate and introduce testimony from Linn's son, Zachary McClure, who was ten or

eleven years old at the time of the murder.  Doc. 48 at p. 283.  Shockley argues that McClure

would have testified that he saw a red car driving in the neighborhood where the murder

occurred but that he could not identify the driver.  *Id.* at pp. 288–89.  Shockley initially

presented, and then abandoned, this claim in state court, but he now argues that the Court can

hear this claim under *Martinez*.  *Id.* at p. 284.

The State argues that this claim lacks merit because no reasonable probability exists that

McClure's testimony would have changed the trial's outcome, given that he could not identify

the driver of the red car.  Doc. 51 at p. 91.  At most, McClure's testimony would have served

only to corroborate Linn's statements placing a red car away from the murder scene but in the

same neighborhood.  Doc. 48 at pp. 262, 266.  That McClure could not identify Shockley as the

driver did not have a substantial probability of affecting the trial's outcome.  *See* Doc. 48-3 at p.

103 ("Linn further stated she and her son, Zachary, observed the driver of the vehicle. . . . Linn,

[and] her son[] did not identify any of the photos as the driver of the red car.").  Although

Shockley says that Zachary "denied [Shockley] was the person he observed in the red car," Doc.

48 at p. 291, the police report Shockley cites only says that Zachary did not identify Shockley,

Doc. 33-26.  Further, Linn's deposition does not support the notion that Zachary denied seeing

Shockley in the red car.  Doc. 33-27.  To support his allegation of postconviction-counsel

incompetence, Shockley also mentions, without citing any evidence, that postconviction counsel

mistakenly thought that "Zachary was only 4 or 5 years old at the time of the crime."  Doc. 48 at

p. 290.

Because of these faults, this argument cannot satisfy *Martinez*:  it lacks debatable merit,

*Dorsey*, 30 F.4th at 756, it presents a weaker claim than those postconviction counsel actually

presented, *Deck*, 978 F.3d at 584, and it does not show actual prejudice, *Harrington*, 562 U.S. at

111–12.  Further, the Eighth Circuit "generally entrust[s] cross-examination techniques . . . to the

professional discretion of counsel."  *United States v. Villalpando*, 259 F.3d 934, 949 (8th Cir.

2001) (citations omitted).  The Court denies claim 11.

### e.      Claim 13

In claim 13, Shockley presents several different constitutional claims.  Doc. 48 at p. 305.

Shockley did not present these claims in state court.  *Id.*  Hoping to avoid the procedural bar on

these claims, Shockley couches each argument as a *Martinez* claim, saying that trial counsel

failed to address the underlying constitutional violation and then postconviction counsel failed to

make a claim out of trial counsel's supposed incompetence.  *Id.* at pp. 305, 313.  To undo his

past decision to stay silent about these claims, Shockley must meet the requirements of the

*Martinez* and *Coleman* body of law, as Section V.C.1. details.

Shockley focuses on two specific instances of alleged police misconduct.  First,

prosecutors convinced Shockley's uncle to wear a wire into an interview with Shockley's

attorney.  Doc. 48 at p. 305.  At trial, Shockley's uncle testified about this conversation.  *Id.* at p.

307.  Shockley says that the prosecutor "used the conversation to insinuate that defense counsel

attempted to fabricate testimony" and that "the wiring of [Shockley's uncle] created a chilling

effect" on the defense's ability to interview witnesses.  *Id.* at pp. 316–17.  Second, a jail guard

allegedly overheard a loud conversation between Shockley and his attorney, where counsel

criticized Shockley for using too many weapons to murder Sergeant Graham.  *Id.* at p. 308; Doc.

51-1 at p. 1, Tr. at 457:20–458:21.  Although the State chose not to introduce these facts into the

trial, Shockley's initial trial counsel thought that they could not continue to represent Shockley.

Doc. 48 at p. 308–09.  Shockley argues that the State's actions in this first incident violated his

Fourth-Amendment right to freedom from unreasonable search and seizure, his Sixth-

Amendment right to counsel, his Sixth-Amendment right to a fair trial, and his Fourteenth-

Amendment right to due process.  *Id.* at p. 305.  The jail-guard incident creates a similar set of

constitutional issues.  *Id.*  For the reasons articulated in Section V.C.2., to determine the

substantiality of the underlying claims, the Court only considers the materials presented to the

state court.  However, Shockley cannot meet *Martinez*'s requirements on any of these claims.

Shockley asserts that the State and his uncle violated his Fourth-Amendment right to

freedom from unreasonable searches and seizures.  *Id.* at p. 305.  He provides no explanation of

how this recording of a conversation with his lawyer could qualify as an unlawful search of his

person or property.  *Id.* at p. 305–24.  Since Shockley cannot articulate an argument supporting

this claim, postconviction counsel did not act incompetently by failing to make this claim.

*Martinez* cannot help this meritless argument.

Next, Shockley asserts that the wiring incident "was a clear attempt to invade the

attorney-client relationship."  *Id.* at p. 310.  To support this argument, Shockley cites *United

States v. Valencia*, 541 F.2d 618, 620–21 (6th Cir. 1976), where a government informant worked

as the defendant's lawyer's secretary.  *Valencia* bears no similarity to this case.  Shockley also

cites *State v. Martinez*, 220 A.3d 489 (N.J. Super. Ct. App. Div. 2019), which does present

similar facts, but at best provides only persuasive authority that a Missouri court might consider.

Shockley never explains why a recording of a conversation between trial counsel and a potential

witness could count as an intrusion into Shockley's privileged relationship with his lawyer.  "To

be privileged, attorney-client communications must remain confidential . . . ." *Gray v. Bicknell*, 86 F.3d 1472, 1483 (8th Cir. 1996) (citations omitted).  "Comments to a third party . . . are not confidential attorney-client communications."  *United States v. Davis*, 583 F.3d 1081, 1090 (8th Cir. 2009).  For this reason, courts deciding factually analogous cases have found no privilege. *See, e.g.*, *United States v. Melvin*, 650 F.2d 641, 644–46 (5th Cir. 1981) (citing *United States v. Gartner*, 518 F.2d 633 (2d Cir. 1975)) (finding that government agents did not violate attorney-client privilege and the Sixth Amendment by convincing a third party to wear a transmitting device into a conversation with the defendant and his lawyer, because there was "no reasonable expectation of confidentiality").  Shockley does not address these flaws.  *See* Doc. 48 at pp. 305–25.

Turning to the *Martinez* analysis, Shockley immediately faces difficulties.  A single case from New Jersey shows that reasonable jurists could debate whether the State violated Shockley's rights, but the case does not plainly show that reasonable jurists could debate whether trial counsel acted incompetently by not raising this argument.  *See Dorsey*, 30 F.4th at 756. Even if Shockley can succeed at this first step, he fails at the next two steps.  Shockley cannot plainly show the superiority of this claim to the ones he presented in state court.  *Deck*, 978 F.3d at 584.  Further, Shockley's argument comes nowhere close to demonstrating that this supposed ineffective assistance "more-probabl[y]-than-not" prejudiced his case.  *Harrington*, 562 U.S. at 111–12.  This argument remains procedurally barred.

Shockley asserts that the State violated his Sixth-Amendment right to a fair trial by questioning his uncle about the recorded conversation.  Doc. 48 at p. 313.  However, Shockley dedicates only a single sentence to explaining his Sixth-Amendment argument, dropping that explanation in the middle of his due-process argument.  *Id.* at p. 314.  Shockley says, "[w]hen

there is an intentional intrusion into the attorney-client relationship, there is 'direct interference with the Sixth Amendment rights of a defendant,' 'such an intrusion must constitute a per se violation of the Sixth Amendment,' and 'prejudicial effect on the reliability of the trial process must be presumed.'" *Id.* (citing *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995)). However, the court in *Shillinger* did not contemplate facts like those at issue here, 70 F.3d at 1141 (discussing circumstances that would count as an intrusion into the attorney-client relationship), and Shockley fails to explain why these events would constitute an intrusion into the attorney-client relationship, Doc. 48 at p. 314.  So, Shockley provides a rule of law without any explanation for how that rule could apply to the facts of this case.  Because Shockley does not present a true argument supporting the portion of this claim related to the Sixth Amendment, the Court denies this section of claim 13.

Shockley also argues that the State's questioning of his uncle violated his Fourteenth-Amendment right to due process.  Doc. 48 at p. 315.  Missouri and federal courts interpret the United States Constitution's Due-Process Clause to prohibit outrageous law-enforcement conduct that "violates 'that fundamental fairness, shocking the universal sense of justice, mandated by the Due Process Clause of the Fifth Amendment.'"  *United States v. Bugh*, 701 F.3d 888, 894 (8th Cir. 2012) (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973)).  Shockley presents no precedent indicating that wiring a witness's interview with defense counsel could meet this standard.  Doc. 48 at p. 315.  Instead, he offers general statements on the importance of the attorney-client privilege.  *Id.* (citing *United States v. Grand Jury Investigation*, 401 F. Supp. 361, 369 (W.D. Pa. 1975); *United States v. United Shoe Mach. Corp.*, 89 F. Supp. 357, 358 (D. Mass. 1950)).  So, Shockley offers no authority for the notion that the facts of this case could support an ineffective-assistance claim.  *Id.*

This dearth of support makes *Martinez* an insurmountable obstacle for Shockley.  His underlying ineffective-assistance claim does not have debatable merit.  *See Dorsey*, 30 F.4th at 756.  It does not stand superior to the actual postconviction-review claims.  *See Deck*, 978 F.3d at 584.  It does not offer a substantial likelihood of changing the result of the case.  *See Harrington*, 562 U.S. at 111–12.  Thus, Shockley triply fails to show cause and prejudice.  The argument remains procedurally barred.

Shockley presents a similar array of arguments regarding a memo concerning a conversation between Shockley and his first trial counsel.  Doc. 48 at p. 308.  In the break room of the Carter County Jail, a deputy sheriff overheard a conversation between Shockley and an attorney from his initial defense team.  *Id.* at pp. 308–09.  The deputy reported hearing Shockley's lawyer speak in a loud voice and say, "[w]hy the [expletive] did you take two guns?  Couldn't you just kill him with the deer rifle?  It makes no sense to take two guns, period."  Doc. 51-1 at p. 1, Tr. at 458:5–7.  The deputy reported hearing Shockley respond, "yes," before lowering his voice.  *Id.*, Tr. at 458:8–10.  The deputy immediately called the prosecutor to recount the conversation and the prosecutor told the deputy to write a memorandum setting out what happened.  *Id.*, Tr. at 458:16–21.  The parties brought the matter to the trial judge's attention and initial counsel asked to withdraw from the case.  *Id.* at pp. 1–3, Tr. at 456:2–467:12.  Though the parties disagreed as to whether the attorney spoke so conspicuously that the communication could not count as privileged, the prosecutor stipulated that he would not use the conversation at trial.  *Id.* at pp. 2, 4, Tr. at 461:11–13, 472:13–16.  The court sustained the motion to withdraw on July 9, 2008, *id.* at p. 9, Tr. at 491:18–22; Shockley's lead trial counsel entered his appearance in the case on September 17, 2008, Doc. 20-13 at p. 162; and jury selection began on March 18, 2009, Doc. 33-54 at p. 30, Tr. at 498:1.  Thus, new trial counsel

had six months to prepare for trial, *id.*, with the benefit of the several years of discovery and pretrial work having already been completed by initial trial counsel, *see* Docs. 48-1, 48-2, 48-3.

Shockley does not address how a loud conversation with counsel in a jail's breakroom could, without any suggestion of surreptitious or illegal conduct by a jail official, come within the attorney-client privilege.  Doc. 48 at pp. 305–24.  He gives no factual support for the claim that this incident harmed his case at trial.  *Id.*  He supplies no relevant precedent on the attorney-client-privilege issue, the ineffective-assistance-of-trial-counsel issue, or the ineffective-assistance-of-postconviction-counsel issue.  *Id.*  At most, he argues that the attorney in the incident stated that the conversation "was not inculpatory at all and that she was not yelling at the time."  Doc. 48 at p. 309.  In sum, the argument lacks support.

Shockley does not distinguish various constitutional claims arising from the jail-guard incident and instead tangles these complaints together with his discussion of the wiring incident.  Doc. 48 at pp. 313–16.  Thus, Shockley's treatment of the jail-guard incident cannot support multiple distinct *Martinez* analyses.  However, the overarching lack of legal and factual support leaves the claim without any reasonably debatable merit, *Dorsey*, 30 F.4th at 756, let alone a showing of postconviction-counsel incompetence, *Deck*, 978 F.3d at 584, or actual prejudice, *Harrington*, 562 U.S. at 111–12.

Although claim 13 arises primarily from two incidents when prosecutors learned information from Shockley's counsel, Shockley also adds diffuse remarks about supposed police misconduct, which allegedly form a "pattern of law enforcement misconduct."  *See, e.g.*, Doc. 48 at p. 307 (stating that Shockley's uncle felt pressured by police to change his testimony); *see also* Doc. 20-4 at p. 127, Tr. at 1392:20–21 (recounting when he saw Shockley on the day of the murder, Shockley's uncle stated that "I felt like some of the highway patrolmen wanted me to

134

push the time [that he saw Shockley on the day of the murder] on up, but I think it was between

3:00 and 4:00.").  Yet, Shockley does not develop these complaints into genuine legal arguments,

and the Court does not consider them.  *See id.*; *see also Aulston v. Astrue*, 277 F. App'x 663, 664

(8th Cir. 2008) (refusing to consider an undeveloped argument and citing *SmithKline Beecham*

*Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006), for the proposition that

"undeveloped arguments are waived.")*.*  Thus, the Court denies claim 13.

### f.      Claim 15(b)

In claim 15, Shockley argues that his trial counsel incompetently failed to object to two

comments by the prosecution allegedly concerning Shockley's choice not to testify.  Shockley

raised the first of these in state court, and the Court addresses that first part of claim 15 with the

rest of the claims Shockley adjudicated in state court.  *See supra* Section VI.B.1.i.  Here, the

court addresses the part of claim 15 that Shockley did not raise in state court.

Shockley complains of comments the prosecutor made during closing arguments.  Doc.

48 at p. 337.  The prosecutor argued that only the State had presented an explanation for why

Shockley's grandmother's car would appear near the crime scene.  *Id.* at p. 337.  However,

Shockley did not present this portion of claim 15 in state court.  *See* Doc. 20-33 at pp. 1–6

(presenting this claim in state court and complaining only of the prosecutor's aside during

witness Hart's testimony).  Shockley does not invoke *Martinez*.  Doc. 48 at pp. 336–40.  Because

Shockley makes no attempt to invoke *Martinez*'s exception to *Coleman*'s general bar on

procedurally defaulted claims, *Coleman*, 501 U.S. at 750, the Court cannot consider this claim.

Even so, were Shockley to present a *Martinez* argument, the Court would find that it fails.

Under the *Coleman–Martinez* standard as set forth in *Trevino* and *Marcyniuk*, Shockley first

must establish that the claim is "substantial."  *See supra* Section VI.C.1.  Shockley's claim falls

far short of "substantial" for the same reasons the Supreme Court of Missouri denied Shockley's

135

direct-appeal and postconviction claims regarding failure to object.  *Shockley I*, 410 S.W.3d at

189–91 and n.5 (citing *State v. Clemons*, 946 S.W.2d 206, 228 (Mo. 1997)); *Shockley II*, 579

S.W.3d at 913–14.  Further, Shockley asserts contradictory positions in claims 15 and 16

regarding whether prosecutors directly or indirectly commented on Shockley's decision not to

testify.  *Compare* Doc. 48 at pp. 337, 343 (asserting the prosecutor "made additional direct"

comments), *with id.* at p. 344 (asserting "the prosecutor did not directly comment on Shockley's

decision not to testify").

Because Shockley fails to present a debatable claim, he cannot satisfy *Coleman* and

*Martinez*'s other requirements.  This claim is too weak to be debatable, and Shockley cannot

show the plain superiority of this claim to the claims actually presented by postconviction

counsel.  *See Deck*, 978 F.3d at 584.  Likewise, because the prosecutor's closing statement did

not comment on Shockley's decision not to testify, Shockley cannot show that this non-existent

comment actually prejudiced his case.  *See Coleman*, 501 U.S. at 750.  Therefore, the Court

denies the second part of claim 15.

### g.      Claim 18(b)

In claim 18, Shockley advances both a due-process argument and an ineffective-

assistance argument that he did not present in state court.  The Court addresses the due-process

argument in Section VI.B.2.d.  The Court now addresses the defaulted ineffective-assistance

claim.

In the second part of claim 18, Shockley argues that trial counsel deprived him of his

right to effective assistance by failing to request a mistrial based on a purported accumulation of

character evidence.  Doc. 48 at p. 357.  Shockley refers to a law enforcement officer's comment

on Shockley's "violent history," in addition to a series of other events:

> [T]he prosecutor's split-second projection during trial of a photograph that
> displayed Mr. Shockley in an orange prison jumpsuit; a gratuitous comment by a
> highway patrol officer who stated that it was Mr. Shockley who shot Sergeant
> Graham and that the shooting was deliberate; and a comment by the prosecutor in
> closing argument that, Mr. Shockley alleges, demonstrated Mr. Shockley's
> propensity to kill and was evidence of bad acts and bad character.

*Shockley I*, 410 S.W.3d at 194–95.

Although trial counsel objected to some of these incidents individually, Doc. 48 at pp.

358–59, they did not lodge an objection against the cumulative effect of these incidents, *Shockley*

*I*, 410 S.W.3d at 195.  Now, Shockley introduces the argument that, by failing to raise this

cumulative-error argument, trial counsel represented him incompetently and that postconviction

counsel incompetently failed to raise a claim based on trial counsel's supposed incompetence.

Doc. 48 at p. 357.  Because he did not present this argument in state court, Shockley invokes

*Martinez*, without any *Martinez* analysis.  *Id.*  To show cause and prejudice under *Martinez* and

*Coleman*, Shockley must meet the requirements detailed in Section V.C.1.

However, Shockley fails at each step of the analysis.  Besides the simple assertion that

trial counsel failed to raise a cumulative claim, Shockley offers no argument that trial counsel

fell below the standard of competence.  *Id.* at p. 361.  His prejudice argument assumes the

cumulative prejudicial impact of these incidents and simply brushes aside the effect of the trial

judge's curative instructions, while insisting that a vehement cumulative objection had a

reasonable likelihood of rectifying the jury's understanding of its role.  *Id.* at p. 362.  The

Missouri Supreme Court's finding that two of these incidents had no prejudicial impact, *Shockley*

*I*, 410 S.W.3d at 194–96, coupled with its finding on postconviction review that direct-appeal

appellate counsel was not ineffective in handling these two incidents, *Shockley II*, 579 S.W.3d at

919–920, makes this argument such that no reasonable jurist could find it debatable.  Shockley

makes no argument regarding postconviction counsel's performance.  Doc. 48 at pp. 357–63.

Finally, since Shockley cannot demonstrate reasonably debatable prejudice, he cannot demonstrate actual prejudice.  Thus, Shockley cannot show cause or prejudice for his failure to raise this claim in state court and, therefore, the Court cannot reach the merits of this claim.

Shockley also asserts that the Court should forgive his procedural default, because "imposing default would be a miscarriage of justice," but he does not support this assertion. Doc. 48 at p. 358, Doc. 56 at p. 128.  The miscarriage-of-justice exception to the bar on procedurally defaulted claims applies to actually innocent petitioners who can show that "it is more likely than not that no reasonable juror would have convicted [them] in the light of . . . new evidence." *Schlup*, 513 U.S. at 327.  However, Shockley does not argue that he is actually innocent, Docs. 48, 56, and a reasonable juror could find him guilty, given the cumulative case against him, *see supra* Section VI.A. (discussing the evidence against Shockley and Shockley's failure to make an actual-innocence argument under the relevant caselaw).  Therefore, Shockley cannot overcome his procedural default, and the Court denies the second part of claim 18.

### h.    Claim 22

In claim 22, Shockley alleges that his trial counsel failed to competently challenge the State's firearm and toolmark evidence.  Doc. 48 at p. 426.  Shockley complains that trial counsel failed to investigate firearms evidence, failed to call an expert witness to contradict the State's witnesses, and failed to attack the kind of firearm-comparison evidence used by the State.  Doc. 48 at pp. 427–28.  Before the Missouri Supreme Court, Shockley presented a narrower version of this claim, dealing specifically with counsel's choice not to call ballistics expert Steven Howard. *Shockley II*, 579 S.W.3d 906–08; *see supra* Section VI.B.1.m. (discussing Shockley's claim regarding Howard).  Shockley now raises a broader version of the claim, which the Missouri Supreme Court did not address, Doc. 56 at p. 196, although Shockley did raise this broader claim before the motion court, Doc. 20-32 at p. 29–40.  So, Shockley says that, to the extent that he has

procedurally defaulted this claim, he can demonstrate cause for his default under *Martinez*.  Doc. 56 at p. 197.  Yet, his argument does not have enough factual support to succeed on a *Martinez* analysis, and the Missouri Supreme Court reasonably adjudicated the portion of this claim that Shockley presented to it.

Trial counsel made a strategic decision not to call their own expert witness.  Lead trial counsel preferred to avoid calling a ballistics expert because "he had bad experiences in the past with cross-examination of his own ballistics witnesses."  *Shockley II*, 579 S.W.3d at 907.  Because one of the State's witnesses found that bullets from Shockley's gun matched those at the crime scene, while another of the State's witnesses found that the ballistics results were inconclusive, lead trial counsel "stated he would rather cross-examine two experts on the same side and get them to contradict each other than have his own 'hired gun.'"  *Id.*  Trial counsel executed this strategy "during his cross-examination of both witnesses and throughout the trial."  *Id.*

Shockley contends that "[d]efense counsel could not have made a strategic decision if they never obtained the information necessary to make a careful consideration of whether to call their own experts or to rely on the State's 'experts.'"  Doc. 56 at p. 191.  Since trial counsel did not consult with an expert, Shockley says that lead trial counsel unreasonably relied on his knowledge of ballistics evidence from "work performed 21 years before Shockley's trial."  *Id.* at p. 200.  Supposedly, lead trial counsel's failure to investigate made him incompetent to cross-examine the State's ballistics experts.  *Id.* at 206.  Shockley claims that "[a]s a result of this failure, the jury heard unrebutted and uncontested evidence of the firearm and toolmark analysis."  Doc. 48 at p. 438.  Shockley says that if counsel had investigated the issue they would have discovered "a growing body of evidence around the time of Shockley's trial that [firearm

and toolmark] analysis and the basics of pattern evidence were under attack as scientifically unreliable." *Id.* at p. 435. According to Shockley, the law of effective-assistance says that "cross-examination is not enough by itself to challenge [unreliable] evidence." *Id.* at p. 436. Instead, Shockley urges that the Sixth Amendment requires "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" as "the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (alteration in original) (citing no habeas or ineffective-assistance cases, but instead only citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993)). In Shockley's estimation, trial counsel does not meet Shockley's proposed standard. *Id.*

However, this attack on trial counsel's performance suffers from a number of flaws. First, even though the team that represented Shockley at his trial did not consult experts, Doc. 48-5 at p. 117, Shockley's initial counsel had "sought expert assistance from several people," and "[trial counsel] . . . recognized the significance of the ballistics evidence, . . . [and] reviewed the entire file provided by [initial counsel] including the ballistics information," Doc. 20-55 at p. 34. These facts contradict Shockley's claim that trial counsel "did nothing to prepare." Doc. 48 at p. 432. Because trial counsel had the benefit of the investigations performed by Shockley's initial counsel, the arguments against trial counsel's performance—that counsel did not make a strategic decision about whether to call an expert, relied on outdated experience with ballistics evidence, and must have cross-examined the State's experts incompetently—all lack support.

Second, Shockley supports his argument that trial counsel's failures prejudiced him with statements from Dr. Scurich and Mr. Nichols, which are outside the state-court record. *Id.* at p. 438; Doc. 48-4 at pp. 437–48, 621–29. As discussed above, *Shinn* precludes this Court from considering any evidence outside the state-court record. *See supra* Section V.C.2.; *Shinn*, 142 S.

Ct. at 1734.  Even if the Court could consider this evidence, it would not prove Shockley's point. The motion court found that "[t]he initial trial team . . . conducted an extensive investigation into the [ballistics] evidence," Doc. 20-55 at p. 34, yet, Shockley incorrectly argues that "[t]he relevant evidence in this case . . . did not become available until Shockley's federal habeas counsel discovered it," Doc. 56 at p. 167.  This undermines Shockley's assertion that, had trial counsel consulted with ballistics experts, they would have uncovered experts questioning the soundness of the State's evidence.  So, even if Shockley could expand the record with testimony questioning the State's evidence, the record demonstrates that trial counsel reasonably relied on prior counsel's extensive investigation.

Third, trial counsel made a calculated decision on how to combat the State's evidence. The Missouri Supreme Court found that trial counsel strategically chose not to add another ballistics expert to the trial, whose testimony they would need to defend.  *Shockley II*, 579 S.W.3d at 907.  Instead, trial counsel chose to highlight contradictions between the State's two experts during cross-examination, relying on lead trial counsel's many years of experience.  *Id.* "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."  *Strickland*, 466 U.S. at 690.  In concluding that trial counsel's strategy regarding ballistics evidence meets the standard of effective assistance, the Missouri Supreme Court affirmed the postconviction motion court's finding that "trial counsel's testimony that they reviewed the first trial team's entire file was credible."  *Shockley II*, 579 S.W.3d at 907–08.  So, Shockley's argument that trial counsel did not make a strategic decision fails.

Fourth, Shockley says that, because trial counsel did not call their own expert, "the jury heard unrebutted and uncontested evidence of the firearm and toolmark analysis."  Doc. 48 at p.

438.  But the State's own experts contested each other's conclusions regarding whether the ballistics evidence pointed to Shockley's weapon.  *Id.* at p. 428.  When Shockley says that trial counsel failed to use expert testimony to defend him, he ignores trial counsel's using the State's experts to defend him by pointing out their contradictions.  *Id.* at p. 436.  The cases Shockley cites to support the importance of expert testimony do not involve State experts with contradictory testimony and, therefore, are distinguishable from this case.  Doc. 48 at pp. 436–37 (citing *Daubert*, 509 U.S. at 596; *Richey v. Mitchell*, 395 F.3d 660, 685 (6th Cir. 2005); *Knott v. Mabry*, 671 F.2d 1208, 1213 (8th Cir. 1982)).  The Missouri Supreme Court found that trial counsel reasonably decided to use the State's own contradictory testimony to undermine the reliability of its claim that the bullets at the crime scene matched bullets fired from Shockley's rifle.  For all of these reasons, Shockley's arguments fail.

More generally, Shockley fails to recognize the deference owed to counsel under *Strickland*.  He argues as though the Court should accord no deference to his various past attorneys and evaluate trial counsel's strategy through a lens of twenty-twenty hindsight.  Judicial scrutiny of counsel must be highly deferential:  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Strickland*, 466 U.S. at 689.  "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  *Id.* at 691.

These flaws in Shockley's argument prove fatal in the *Martinez* analysis.  Without support from outside the record, no reasonable jurist could debate whether this supposed trial-counsel error created a reasonable probability of prejudice against Shockley.  *See Dorsey*, 30

142

F.4th at 757.  Given the weaknesses of this claim, postconviction counsel reasonably focused on the stronger arguments that they actually presented.  *See Deck*, 978 F.3d at 584.  Further, because Shockley cannot show that counsel's conduct debatably created a reasonable probability of a different result at the first step of the analysis, he also cannot show actual prejudice.  *See Coleman*, 501 U.S. at 750.  Because Shockley cannot succeed under *Martinez*, he cannot avoid procedural default.

Alternatively, Shockley argues that the Court should forgive his procedural default because "imposing default would be a miscarriage of justice."  Doc. 48 at p. 431.  Although Shockley does not develop this argument, this exception to the bar on procedurally defaulted claims exists only for petitioners who are actually innocent and who can show that "it is more likely than not that no reasonable juror would have convicted [them] in the light of . . . new evidence."  *Schlup*, 513 U.S. at 327.  However, Shockley does not argue actual innocence, *see* Docs. 48, 56; *supra* Section VI.A. (discussing the evidence against Shockley and Shockley's failure to make an actual-innocence argument under the relevant caselaw), and based on the weight of the totality of the evidence of Shockley's guilt, a reasonable juror could find him guilty, *see supra* Section VI.A. (discussing the evidence against Shockley and Shockley's failure to make an actual-innocence argument under the relevant caselaw).  So, Shockley cannot avail himself of the miscarriage-of-justice exception to the bar on procedurally defaulted claims.  Therefore, the Court denies claim 22.

### i.      Claim 26

In claim 26, Shockley alleges that further juror misconduct deprived him of a fair trial.  Doc. 48 at pp. 502, 504–06.  He also argues that counsel incompetently failed to investigate and present these claims, *id.* at p. 502, and admits that he did not raise this claim in state court, invoking *Martinez* to excuse the procedural default.  *Id.* at p. 503.  Because the federal statute of

limitations bars claim 26 as amended, the Court need not determine whether to excuse the default.

The parties do not dispute the timeliness of Shockley's original Petition. *See* Doc. 51 at p. 45 ("The filing appears to have occurred on the 364th day of the one-year limitations period . . . . So, the original petition appears timely."); 28 U.S.C. § 2244(d) (one-year limitation period). With leave of Court, Shockley filed an amended petition approximately ten months after the expiration of the limitations period. *See* Docs. 47, 48. So, to satisfy the statute of limitations, the claims in the Amended Petition must arise out of the same "common core of operative facts" as those alleged in the original, timely Petition. *Mayle v. Felix*, 545 U.S. 644, 664 (2005); *see* Fed. R. Civ. P. 15(c)(1)(B). "In order for the claims in an amended motion to relate back . . . they must be of the same 'time and type' as those in the original motion . . . ." *United States v. Hernandez*, 436 F.3d 851, 858 (8th Cir. 2006) (citing *Mayle*, 545 U.S. at 650, 657, 664). A claim in an amended petition does not relate back to the claim in the original petition simply because both claims involve the same "trial, conviction, or sentence." *Id.* at 857 (citing *Mayle*, 545 U.S. at 656–57).

Further, two claims do not share a common core of facts simply because both assert that a particular right was violated at trial. *See Dodd v. United States*, 614 F.3d 512, 516 (8th Cir. 2010) (citing several cases holding that an ineffective-assistance claim cannot relate back to an ineffective-assistance claim based on a different set of facts). Although courts generally decide this issue by comparing the concrete facts in the amended petition to concrete facts in the original petition, *see id.*, courts have found that a claim in an amended petition cannot relate back to a claim that asserts no facts, *Clifton v. United States*, No. 4:10-CV-01990-CEJ, 2014 WL 1048584, at *2 (E.D. Mo. Mar. 18, 2014) ("These 'new' facts, however, cannot be said to have

144

'arisen out of the same set of facts as [the movant's] original claims,' because there was no set of

facts set forth in the original claim."); *Robertson v. Pierce*, No. 12-CV-03108, 2016 WL

2593344, at *6 (N.D. Ill. May 5, 2016) ("[B]ecause Petitioner's original ineffective-assistance-

of-appellate-counsel claim lacks any factual specificity, it is impossible to conclude that

Petitioner's supplemental claim shares a common core of facts with that original claim.  To hold

otherwise would allow a habeas litigant to avoid AEDPA's one-year limitations period by filing

placeholder claims . . . .").  Indeed, reduced to its base, permitting amendments to relate back to

placeholder claims would allow a petitioner to file an omnibus placeholder claim preserving

"any and all future claims."  The Court thus agrees with the reasoning of the *Clifton* and

*Robertson* courts.

    As initially pleaded, claim 26 served as a "placeholder" juror-misconduct claim.

Shockley admitted that, at the time of filing, he had "no indication that any misconduct ha[d]

occurred," but he wished to file claim 26 "in an incomplete state to preserve [his] arguments in

regards to the evidence that has yet to be disclosed."  Doc. 23 at pp. 461–68.  Shockley alleged

only that Juror 58 committed misconduct, as detailed in claim 3, and that other jurors may have

similarly tainted Shockley's trial, although Shockley mentions no facts supporting this suspicion.

*Id.* at pp. 461–68.  Then, long after the expiration of the limitations period, Shockley amended

claim 26 with specific allegations that Juror 50 knew Shockley's cousin, who was one of the

prosecution's witnesses, and both Jurors 50 and 78 overheard negative comments about

Shockley's upbringing and saw Shockley in shackles and a bulletproof vest.  Doc. 48 at pp. 505–

06.  The original Petition made no allegations regarding either juror or any such facts mentioned

in the Amended Petition; it only stated a hunch that jurors might have committed misconduct.

Doc. 23 at pp. 461–68 (citations omitted).  Because the original claim pleaded no facts, the

amended claim 26 does not arise out of the same "common core of operative fact" as the original claim. *Mayle*, 545 U.S. at 664. Thus, the amended claim 26 does not relate back to the original claim 26, and the Court denies amended claim 26 as time barred.

### 2.    Other procedurally defaulted claims

Shockley presents several other claims that he did not present in state court. Because Shockley did not raise these claims for postconviction review—and because Missouri's deadline for such claims passed nearly a decade ago—Shockley has defaulted these claims and must demonstrate why the Court should excuse this procedural default under *Coleman*. *See* Section VI.C. (discussing Shockley's procedurally defaulted claims in more detail). *Coleman* provides several avenues for prisoners to overcome procedural default without arguing ineffective assistance of counsel. 501 U.S. at 753. For instance, "a showing that the factual or legal basis for a claim was not reasonably available to counsel" establishes cause. *Id.* If a prisoner can also make a showing of actual prejudice, that prisoner overcomes his procedural default. *Id.* at 750. *Coleman* also allows a prisoner to hurdle his procedural bar by demonstrating that "a constitutional violation has probably resulted in the conviction of one who is actually innocent" and, therefore, that his conviction would constitute a miscarriage of justice. *Id.* at 748. Although *Coleman* leaves open other possible ways to demonstrate cause and prejudice, Shockley only asserts not-reasonably-available-to-counsel and miscarriage-of-justice theories, though as noted, he does not argue actual innocence.

### a.    Claim 2

In claim 2, Shockley argues that the trial judge violated Shockley's Sixth-Amendment rights to a fair trial and to effective counsel when the trial judge failed to inform trial counsel that he received a copy of Juror 58's book that Juror 58 gave to the court bailiff. Doc. 48 at pp. 115–

24.  However, Shockley procedurally defaulted this claim by failing to present it to the Missouri Supreme Court.

Shockley presented a cornucopia of complaints regarding the trial judge to the motion court.  Doc. 20-34 at p. 42; Doc. 20-35 at pp. 1–8.  Chiefly, Shockley argued that the trial court had a duty to inform counsel that Juror 58 gave his book to the bailiff and to warn them about the nature of the book.  *Id.*  The motion court rejected this claim, relying on *Rushen v. Spain*, 464 U.S. 144 (1983), in which the Supreme Court found no prejudice because jury deliberations remained unbiased.  Doc. 20-58 at pp. 24–26.  In the motion court's judgment, the trial judge's actions in Shockley's case presented less cause for concern than those in *Rushen*.  *Id.*

On postconviction appeal to the Missouri Supreme Court, Shockley dropped the arguments he presented to the motion court regarding the trial judge's nondisclosure of Juror 58's interaction with the bailiff.  *See* Doc. 20-59.  Instead, Shockley raised a new argument:  the trial judge violated Shockley's rights by failing to disclose that Juror 58 brought his book to the *sequestered jury*.  *Id.* at p. 40.  The Missouri Supreme Court held that Missouri law procedurally barred Shockley's new claim.  *Shockley II*, 579 S.W.3d at 899–900.  Because it disposed of the claim on procedural grounds, that court said little on the merits of the case, finding only that Shockley's sequestered-jury claim is not "supported by the record," and that "[t]he motion court did not clearly err in denying this claim."  *Id.* at 900.

Now, Shockley reverts to the argument he presented to the motion court, insisting that his claims regarding the trial judge's supposed misconduct have remained the same since the beginning and that "the Missouri Supreme Court never reached the merits of the underlying claim."  Doc. 48 at p. 115–16.  However, that court did not view these as the same claim.  *Shockley II*, 579 S.W.3d at 899.  It reasoned that the issue of Juror 58's giving his book to the

147

bailiff stands distinct from the issue of Juror 58's bringing his book to the sequestered jury.  *Id.*
Although Shockley urges this Court to reject the Missouri Supreme Court's application of
Missouri procedural law, Doc. 48 at pp. 118–20, "[a] federal court may not re-examine a state
court's interpretation and application of state law," *Skillicorn*, 475 F.3d at 974 (citation omitted).
So, Shockley procedurally defaulted this claim under Missouri law.  And he makes no attempt to
overcome this procedural default.  Doc. 48 at pp. 115–24.  Therefore, the Missouri Supreme
Court's adjudication stands, and the Court denies claim 2.

### b.      Claim 21

In claim 21, Shockley alleges that the trial court erred when it admitted "fundamentally
unreliable forensic evidence" at trial, referencing the firearm and toolmark evidence used to
compare the bullets at the murder scene with bullets fired from Shockley's rifle.  Doc. 48 at
p. 382.  Whether Shockley could possibly succeed in his argument—and what elements he would
need to prove to succeed—remains unclear because neither the Supreme Court nor the Eighth
Circuit has stated that petitioners have the right to relitigate the scientific reliability of the
evidence used to convict them.  *See Feather v. United States*, 18 F.4th 982, 986 (8th Cir. 2021)
(assuming without deciding that "use of false or discredited scientific evidence could violate a
criminal defendant's right to due process," but concluding petitioner "failed to prove that his trial
and conviction were fundamentally unfair").  In addition to this substantive problem, Shockley
faces a procedural problem:  he admits that he did not raise this claim in state court.  Doc. 48 at
p. 383.

Shockley gives three alternative explanations for how he can overcome his procedural
default.  First, he argues that, if the information that allegedly undermines the State's ballistics
evidence did not exist at the time of trial, then the Court should excuse his failure to raise this
claim in state court.  Doc. 56 at pp. 161–68.  Second, if that allegedly undermining information

148

did exist at the time of trial, then Shockley asserts that his trial counsel unreasonably failed to raise this claim, allowing Shockley to proceed under *Martinez*. *Id.* at pp. 168–73. Third, Shockley claims that, if these two earlier arguments fail, the Court still must hear Shockley's claims to avoid "a fundamental miscarriage of justice." *Id.* at p. 174. None of Shockley's attempts to overcome his procedural default can succeed.

These three arguments depend on evidence from outside the state-court record because Shockley did not raise this claim or any analogous claim in state court. *See Shockley II*, 579 S.W.3d 881. So Shockley must contend with § 2254(e)(2). Shockley correctly notes that, "[u]nder the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Doc. 56 at pp. 186–87 (quoting *Williams v. Taylor*, 529 U.S. at 432). Shockley says that "[t]here has been no lack of diligence on his part." *Id.* at p. 187. He does not elaborate on this assertion, *id.*, but he presumably refers to the same arguments he makes in support of cause for his procedural default: ineffective assistance of counsel and the past unavailability of evidence, *id.* at p. 161–75. However, neither of these attempts to demonstrate his diligence succeeds. First, as the Supreme Court held in *Shinn*, ineffective assistance of counsel does not allow a petitioner to bypass § 2254(e)(2)'s requirements. 142 S. Ct. at 1734. Further, when a party attempts to introduce previously unavailable evidence, the Supreme Court still applies § 2254(e)(2)'s strictures. *See Shoop*, 142 S. Ct. at 2044. Otherwise, § 2254(e)(2)'s rules for when a party may introduce previously unavailable evidence would become entirely meaningless. Thus, § 2254(e)(2)'s strict rules apply.

But Shockley cannot satisfy § 2254(e)(2). To do so, he would need to show that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that

but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." § 2254(e)(2)(B).  If Shockley had been successful at trial in excluding or discrediting the State's ballistics evidence, other—and substantial—evidence still points to Shockley as the murderer. *See supra* Section VI.A.  As in *Feather*, Shockley discredits one piece of a cumulative case.  18 F.4th at 987.  And the Court finds that, like in *Feather*, the jury would have faced "at most, conflicting testimony and thus a reasonable juror considering all the evidence . . . could still convict [the defendant]." *Feather*, 18 F.4th at 987  (internal quotation marks and citation omitted).  Because Shockley cannot show by clear and convincing evidence that a reasonable juror could not have convicted him, § 2254(e)(2) bars him from introducing new evidence to support his claim and demonstrating cause for his default.

Yet, even if Shockley could introduce evidence to support his argument, he still could not demonstrate cause and prejudice for his default.  Shockley presents three arguments to overcome the bar on procedurally defaulted claims:  (1) this claim was factually and legally unavailable to him in state court; (2) trial and postconviction counsel incompetence allow him to overcome procedural default, pursuant to *Martinez*; and (3) the Court must reach the merits of this claim to avoid a fundamental miscarriage of justice.  Doc. 56 at p. 161. These arguments fail.

### i.    The factual and legal availability of a ballistics-evidence claim during state-court review

Shockley says that "[t]here is cause for a procedural default if the petitioner was not aware of the important facts that underlie a claim until it is too late to present the claim to state court." *Id.* at p. 161 (citing *Williams v. Taylor*, 529 U.S. at 442).  "[A] showing that the factual or legal basis for a claim was not reasonably available to counsel . . . constitute[s] cause" for a procedural default. *Coleman*, 501 U.S. at 753 (quoting *Carrier*, 477 U.S. at 488).  Shockley notes that, at the time of his sentencing in May of 2009, "firearm and toolmark examination was

routinely accepted in the Missouri courts." Doc. 56 at p. 163 (citing *State v. Woodworth*, 941 S.W.2d 679, 698 (Mo. Ct. App. 1997)). Indeed, the Eighth Circuit continues to accept firearm-and-ballistics-analysis evidence. *See, e.g.*, *United States v. Perry*, 61 F.4th 603, 607 (8th Cir. 2023). According to Shockley, evidence undermining the ballistics evidence presented at his trial first appeared in the months after his sentencing when the National Academy of Sciences' Committee on Identifying the Needs of the Forensic Science Community declared that the methodology of firearm and toolmark analysis lacked "any meaningful scientific validation, determination of error rates, or reliability testing to explain the limits of the discipline." Doc. 56 at p. 163 (citing Nat'l Rsch. Council, *Strengthening Forensic Science in the United States: A Path Forward* 108 (2009)). In November 2009, the Supreme Court voiced its concern that "[s]erious deficiencies have been found in the forensic evidence used in criminal trials." *Id.* at p. 164 (alteration in original) (citing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 337 (2009) (citing various academic sources, including the National Academy of Sciences report)). Thus, the "groundbreaking report" that questioned the methodology of the ballistics evidence used to convict Shockley was not available to trial counsel. *Id.* at p. 163.

Despite Shockley's argument that he could not have raised this claim until now, Shockley's timeline does not unequivocally support his theory that trial counsel did not have the facts to present this due-process argument. Shockley also mentions a report predating his trial, noting that the scientific validity of firearm and toolmark evidence had not yet been verified. Doc. 48 at p. 397; *see also* Nat'l Rsch. Council, *Ballistics Imaging* 26 (Daniel L. Cork et al. eds., 2008). This undercuts Shockley's claim that "trial counsel would not be expected to be on notice of the issues with the method's underlying reliability." Doc. 56 at p. 166. Further, trial counsel knew from experience that experts on ballistics analysis might not stand up to cross-examination

and that the State's experts in this case contradicted each other. *Shockley II*, 579 S.W.3d at 907. So, trial counsel had some notion of the unreliability of ballistics experts and of the State's ballistics experts against Shockley. *Id.* Shockley speculates that trial counsel should have called a witness to explain the unreliability of ballistics evidence, but he fails to show how the decision not to call an expert of his own fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688.

Although Shockley asserts counsel first learned of the factual basis of this argument during federal habeas review after learning of "a researcher's opinions regarding the validity of the studies supporting the forensic science method," Doc. 56 at p. 167, the facts do not support this argument. This subverts Shockley's attempt to argue that counsel did not have the information to present this claim until federal habeas review.

Even if trial counsel had no access to the evidence casting doubt on firearm and toolmark analysis, postconviction counsel certainly did. Shockley says that the evidence casting doubt on the State's ballistics evidence "did not become available until Shockley's federal habeas counsel discovered it," *id.* at p. 167, but Shockley's own briefing proves otherwise, *see id.* at pp. 163–64. As Shockley notes, the National Academy of Sciences published the report—which supposedly undermines the evidence used against Shockley—in 2009. Likewise, in 2009, the Supreme Court highlighted the report's finding of "subjectivity, bias, and unreliability of common forensic tests such as . . . toolmark and firearms analysis." *Melendez-Diaz*, 557 U.S. at 321 (citation omitted). Thus, in 2013, when Shockley's direct appeal process ended, *see Shockley I*, 410 S.W.3d 179, Shockley's postconviction counsel had ample time to notice the concerns about firearm and toolmark analysis stated in *Melendez-Diaz* and follow the Supreme Court's citations to the National Academy of Sciences' report. Armed with this information, postconviction

152

counsel could have argued that the State's ballistics evidence deprived Shockley of a fair trial and violated his right to due process. *See* Mo. Sup. Ct. R. 29.15(a) (allowing for postconviction review of constitutional claims).

If *postconviction* counsel has access to the factual basis of a claim, then a petitioner cannot demonstrate cause for his or her procedural default arguing only that *trial* counsel had no access to the factual basis of the claim. *Marcyniuk*, 39 F.4th at 1001–02 (affirming the district court's finding that the petitioner failed to overcome the procedural bar because the petitioner failed to show that "the factual or legal basis of his claims was not reasonably available to [the petitioner's] state appellate and post-conviction counsel"). Because "the factual basis for [Shockley's] claim . . . was reasonably available to [him] at the time of his state postconviction hearings," Shockley cannot demonstrate cause for his default. *Cornell v. Nix*, 976 F.2d 376, 380 (8th Cir. 1992) (en banc).

Shockley also suggests that he can demonstrate cause by showing that the legal foundation for this due-process argument only developed recently. According to Shockley, courts first began to consider the kind of argument he presents here in 2012. Doc. 56 at p. 166. However, the direct-appellate review of Shockley's case continued through 2013, *see Shockley I*, 410 S.W.3d 179, meaning that, according to Shockley's own timeline, this due-process claim was legally available to Shockley's counsel both before and during postconviction review. Shockley also suggests that this claim did not become legally available until *United States v. Tibbs*. Doc. 56 at p. 166; *see also United States v. Tibbs*, No. 2016-CF1-19431, 2019 WL 4359486 (D.C. Super. Ct. Sept. 5, 2019). Although *Tibbs* does question firearm and toolmark analysis, it does not consider any kind of due-process argument. 2019 WL 4359486. So, *Tibbs* had no effect on when this claim became available. Thus, Shockley's timeline demonstrates that

153

postconviction counsel had access to the facts and law that form the basis of Shockley's claim, meaning that Shockley cannot demonstrate cause for his default by arguing that the factual and legal basis for the claim "was not reasonably available to him until now." Doc. 56 at p. 168.

### ii.      The competence of counsel in choosing not to raise a ballistics-evidence claim

Shockley argues that, if the information that supposedly undermines the evidence used to convict him was available to his counsel, then Shockley can demonstrate cause by showing ineffective assistance of trial and postconviction counsel under *Martinez*. *Id.* at p. 161. As the Court details above, Shockley argues that trial counsel had no access to the facts that form the basis of this claim, although evidence indicates otherwise. To the extent that trial counsel had no access to the factual basis of this claim, the Court cannot find that trial counsel unreasonably failed to raise this claim. However, *Martinez* only allows a petitioner to overcome procedural default if he or she can show both trial-counsel incompetence and postconviction-counsel incompetence. *See Trevino*, 569 U.S. at 421–23 (explaining the elements of *Martinez*). So, to the extent that trial counsel could not have known of the alleged unreliability of firearm and toolmark analysis, *Martinez* cannot help Shockley overcome his procedural default because postconviction counsel could have known these matters.

To the extent trial counsel did know of the subjectivity involved in firearm and toolmark analysis, postconviction counsel acted reasonably in choosing not to argue that this ballistics evidence violated Shockley's right to due process. The Eighth Circuit has pointedly refused to acknowledge that this kind of due process claim could succeed and has only considered such a claim *ad argumentum* in the process of denying the claim. *See Feather*, 18 F.4th at 986. Given the choice between focusing on a proven legal argument and a nebulous, theoretical due-process right, postconviction counsel had good reason to focus on arguments with a sound precedential

basis.  Some courts have given petitioners a right to relitigate the scientific validity of the evidence used to convict them, but even those courts have required petitioners to show that the State's remaining evidence lacked sufficient weight to prove guilt beyond a reasonable doubt.  *See, e.g.*, *Han Tak Lee v. Houtzdale SCI*, 798 F.3d 159, 169 (3rd Cir. 2015).  To succeed, Shockley would need to contend with the remaining evidence against him.  But the State's cumulative case against Shockley presents ample reason to conclude that he murdered Sergeant Graham, and Shockley does not assert actual innocence, *see supra* Section VI.A.

Thus, Shockley cannot succeed in a *Martinez* analysis.  To present a substantive claim, Shockley would need to show he debatably suffered prejudice because of the contested ballistics evidence.  *See Dorsey*, 30 F.4th at 756–57 (providing the standard for substantive claims and stating that "*Strickland*'s prejudice standard and a more-probable-than-not standard [differ] 'only in the rarest case.'" (citation omitted)).  Given trial counsel's efforts to undermine that evidence and the strength of the other evidence against Shockley, *see supra* Section VI.A., Shockley fails to state a substantive claim.  A claim asserting a right without any support from the United States Supreme Court or Eighth Circuit cannot present a plainly stronger argument than the claims actually presented by postconviction counsel.  *See Deck*, 978 F.3d at 584.  Although Shockley presents an affidavit from postconviction counsel tailored to support an ineffective-assistance argument, "failing to make an argument that would 'require the resolution of unsettled legal questions' is generally not 'outside the wide range of professionally competent assistance.'"  *Id.* at 583 (quoting *Dansby*, 766 F.3d at 836).  So, postconviction counsel did not act unreasonably in choosing not to raise this due-process claim.  Finally, because it is not clear that the right Shockley asserts exists, or that Shockley's conviction depended on ballistics evidence, counsel's decision not to raise this argument did not have a substantial likelihood of affecting the result of

this case.  *See Harrington*, 562 U.S. at 111–12.  So, to the extent that trial counsel could have

raised this claim, trial and postconviction counsel did not represent Shockley incompetently by

vigorously cross examining the State's contradictory experts and choosing to focus on other

arguments.

iii.      **The miscarriage-of-justice exception to the bar on procedurally defaulted claims**

Shockley argues that the Court must reach the merits of this claim to avoid "a

fundamental miscarriage of justice."  Doc. 56 at p. 161.  A petitioner can bypass *Coleman*'s

cause-and-prejudice analysis by showing that "the failure to consider his claims would result in a

fundamental miscarriage of justice."  *McCall v. Benson*, 114 F.3d 754, 758 (8th Cir. 1997)

(citing *Coleman*, 501 U.S. at 750).  Only a petitioner claiming that he or she "is actually

innocent" can come within this exception to the bar on defaulted claims.  *Id.* (citing *Brownlow v.

Groose*, 66 F.3d 997, 999 (8th Cir. 1995)).  A claim of actual innocence must stem from new

evidence and must prove that "it is more likely than not that no reasonable juror would have

found petitioner guilty beyond a reasonable doubt."  *Schlup*, 513 U.S. at 327.  Shockley says that

the "the firearms evidence was a critical component" of the State's case and that jurors "afford

significant weight to firearm testimony."  Doc 56 at p. 174.

Notably, Shockley does not argue that he is actually innocent.  *See* Docs. 48, 56; *see also

supra* Section VI.A. (discussing Shockley's failure to make an actual-innocence argument under

the relevant caselaw).  And, even if the Court accepts the importance of the ballistics evidence,

these allegations fail to show that no reasonable juror would find Shockley guilty.  Even without

the ballistics evidence, a reasonable jurist could find the evidence against Shockley persuasive

enough to convict him.  *See supra* Section VI.A. (discussing the evidence against Shockley).

Thus, Shockley cannot overcome the bar on procedurally defaulted claims.

156

Shockley supplements this claim with an argument that, even if firearm and toolmark analysis had scientific merit, the State's evidence "was also invalidly applied in this case." Doc. 48 at p. 414. Shockley says that a proper ballistics analysis should have been inconclusive, *id.* at p. 418, as one of the State's experts found, *id.* at p. 410. Shockley also says that bias may have affected the State's ballistics analysis. *Id.* at p. 424. However, Shockley does not address how this as-applied argument can overcome procedural default. *See* Docs. 48, 56.

In summary, Shockley does not attempt to show cause for his default by alleging that facts about the State's methodology remained hidden until recently. *Id.* He vaguely suggests that the State suppressed evidence but does not develop this into an argument. Doc. 48 at p. 399 ("If the State failed to disclose this material evidence to Shockley's defense team, Shockley's due process rights were violated irrespective of good or bad faith."). Finally, Shockley cannot rely on the actual-innocence exception to the bar on procedurally defaulted claims because he does not argue that he is actually innocent. *See McCall*, 114 F.3d at 758 (citation omitted); *see also* Docs. 48, 56. So, even if Shockley could overcome § 2254(e)(2) to introduce evidence on the reliability of firearm and toolmark analysis, he cannot overcome his procedural default. Therefore, the Court denies claim 21.

### c.    Claim 27

In claim 27, Shockley presents a placeholder claim, asserting that "there is evidence favorable to his defense (above and beyond what is raised in ground for relief 25), that remains suppressed." Doc. 48 at p. 511. Shockley says that he "intends to promptly amend this claim upon discovery of additional evidence." Doc. 23 at p. 469 (filed Sept. 2, 2020). To date, three years later, Shockley has not attempted to amend this claim to "state specific, particularized facts which entitle him . . . to habeas corpus relief." *Adams v. Armontrout*, 897 F.2d 332, 334 (8th Cir. 1990) (citing Habeas Corpus Rule 2(c)). He assures the Court that, when he does eventually find

facts supporting another *Brady* claim, *Mayle* will allow him to relate back those allegations to the placeholder claim in his original Petition. *Id.* at p. 476 (citing *Mayle*, 545 U.S. at 648) (holding that a Fifth-Amendment claim based on the petitioner's pretrial statements did not relate back to an earlier Sixth-Amendment claim based on the introduction of a prerecorded witnesses' statement).

Shockley recounts the factual allegations from the *Brady* claim he raises in claim 25, but he alleges no further facts that might qualify as a *Brady* violation. Doc. 23 at pp. 471–72. Instead, he indulges in rank speculation about conceivable *Brady* claims. Because a claim in an amended petition can only relate back to a claim with a common core of facts, nothing Shockley could introduce now would relate back to his factually barren placeholder claim. *See supra* Section VI.C.1.i. (describing the relation back to an earlier claim); *see also Clifton*, 2014 WL 1048584, at *2; *Robertson*, 2016 WL 2593344, at *6. Because claim 27 fails to comply with Habeas Rule 2(c)'s requirement that a claim state specific, particularized facts, the Court denies it.

## VII.    Law-and-justice standard

To receive federal habeas relief as to claims the state court adjudicated, a petitioner must show:  (1) that he satisfies the conditions set forth by Congress in AEDPA; and (2) that "law and justice" require relief. *Davenport,* 142 S. Ct. at 1520 (2022) (quoting 28 U.S.C. § 2243) (citing *Fry v. Pliler*, 551 U.S. 112, 119 (2007); *Horn v. Banks*, 536 U.S. 266, 272 (2002)). Shockley— who does not argue that he is actually innocent—fails at step one, as discussed thoroughly above, but he also fails at step two. Given that "a federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [the Supreme] Court's equitable precedents or AEDPA[,]" *Davenport*, 142 S. Ct. at 1524, the Court must deny Shockley's Amended Petition.

*Davenport* found that "Congress invested federal courts with discretion when it comes to supplying habeas relief—providing that they 'may' (not must) grant writs of habeas corpus, and that they should do so only as 'law and justice require.'"  *Id.* (quoting 28 U.S.C. §§ 2241, 2243). So, courts have the authority to deny habeas relief "in light of equitable and prudential considerations" and "[f]oremost among those considerations is the States' 'powerful and legitimate interest in punishing the guilty.'"  *Id.* (citations omitted).  Federal habeas relief "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority."  *Harrington*, 562 U.S. at 103 (citation omitted).  So, even if Shockley could succeed under AEDPA—and he cannot—equitable considerations do not weigh in favor of relief.

In the wake of the Supreme Court's two recent "landmark habeas decisions" in *Davenport* and *Ramirez*, the Fifth Circuit recently held that "[l]aw and justice do not require habeas relief—and hence a federal court can exercise its discretion not to grant it—when the prisoner is factually guilty."  *Crawford v. Cain*, 68 F.4th 273, 287 (5th Cir. 2022), *vacated and reh'g en banc granted*, 72 F.4th 109 (2023) (citing *Davenport,* 142 S. Ct. at 1521 (citing *Bushell's Case*, 124 Eng. Rep. 1006, 1009–10 (C. P. 1670))).   The *Crawford* court explained that "[r]equiring prisoners to show factual innocence also comports with the federalism principles undergirding AEDPA."  *Id.*  Adding to the equitable considerations the Supreme Court discussed in *Davenport* and *Harrington*, the *Crawford* court reasoned that requiring factual innocence "protects other parties not before the court."  *Id*.  Those "other parties" include factually innocent habeas petitioners with meritorious claims—a particular interest given the

explosion of non-meritorious habeas claims in the years since the Supreme Court opened the floodgates in 1953. *Id.* (referring to *Brown v. Allen*, 344 U.S. 443, 537 (1953)).

The Fifth Circuit has since vacated *Crawford* to rehear the case en banc. *Crawford*, 72 F.4th 109. Assuming that *Crawford*'s "factual innocence" standard prevails and applies *Davenport* correctly, Shockley's Amended Petition falls far short. Shockley asserts 28 claims for habeas relief, and his arguments for relief span no fewer than 820 pages of briefing. Yet, nowhere in that vast sea of briefing does Shockley argue for or even clearly assert factual innocence. Instead, Shockley urges this Court, a federal court, to overturn his state conviction that no fewer than five state courts, and 9 state-court judges, have imposed or affirmed. If nothing else, the strictures of AEDPA and the federalism principles underlying the writ of habeas corpus counsel thoughtful deference and restraint.

## VIII.    Certificate of appealability

For the reasons stated in this order, the Court finds that Shockley has not made a substantial showing of the denial of a constitutional right, as he must do before a certificate of appealability can issue. 28 U.S.C. § 2253(c); *see also Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997) (explaining that a "substantial showing" means a showing where "issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings" (citing *Flieger v. Delo*, 16 F.3d 878, 882–83 (8th Cir. 1994))). The issues raised in Shockley's Amended Petition lack debatable merit, the Court could not resolve them differently, and now, well past the seventeenth anniversary of Shockley's murder of Missouri Highway Patrol Sergeant Carl DeWayne Graham, Jr., the issues do not deserve further proceedings. Therefore, the Court does not issue a certificate of appealability as to any claims raised in Shockley's Amended Petition.

**IX.    Conclusion**

The Court denies Shockley's [57] Motion for Discovery, [64] Motion for a *Rhines* Stay,

and [48] Amended Petition for Writ of Habeas Corpus and dismisses Lance Shockley's

Amended Petition with prejudice.  The Court does not issue a certificate of appealability.

So Ordered this 29th day of September 2023.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE