UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LANCE SHOCKLEY,                    )
                                   )
        Petitioner,                )
                                   )
    v.                             )        Case No. 4:19-cv-02520-SRC
                                   )
TRAVIS CREWS,                      )
                                   )
        Respondent.                )

## Memorandum and Order

On March 20, 2005, Petitioner Lance Shockley murdered Sergeant Carl DeWayne Graham, Jr.; on March 28, 2009, a jury found him guilty of first-degree murder; and on May 22, 2009, Judge David Evans sentenced Shockley to death. *Shockley v. State*, 579 S.W.3d 881, 890–91 (Mo. 2019); *State v. Shockley*, No. 05C2-CR00080-01, 2009 WL 10733289 (Mo. Cir. May 22, 2009).   Shockley then presented his case to the Supreme Court of Missouri for direct-appellate review, then to the same court for postconviction review, and finally to this Court for federal-habeas review. *See id.*; doc. 48.  On September 29, 2023, this Court denied Shockley's Amended Petition in a 165-page order, and Shockley now moves the Court pursuant to Federal Rule of Civil Procedure 59(e) to alter or amend its order.  Docs.  74, 87.  After reviewing Shockley's motion, the related briefing, and its prior order, the Court's analysis of Shockley's case remains unchanged.

## I.    Background

Shockley does not proclaim his innocence or contest his guilt.  In its prior order, the Court noted that Shockley nowhere argues that he is actually innocent, despite the many hundreds of pages of briefing he submitted for the Court's consideration.  Doc. 74 at 15–16.  In

his motion, Shockley does not object to or in any way contest the Court's finding.  *See* doc. 87.

Thus, this case concerns exclusively whether Shockley has received the procedural protections

guaranteed by the United States Constitution, especially the right to effective assistance of

counsel.  *See* doc. 48; *see also* 28 U.S.C. § 2254(d); *Strickland v. Washington*, 466 U.S. 668

(1984).

In its prior order, the Court ruled on Shockley's Amended Petition, Motion for

Discovery, and Motion for a *Rhines* Stay.  *See* doc. 74 at 165.  The Court denied Shockley's

motions, found that each of his claims lacked debatable merit, and, therefore, did not issue a

certificate of appealability.  *Id.* at 164–65.  Shockley argues that the Court should amend its

analysis of his *Rhines* motion; the applicability of ABA guidelines; claims 1, 7, 9, and 12;[1] and

the certificate-of-appealability issue.  Docs. 87, 93.  The Court addresses each of these issues in

turn.

## II.    Standard

Rule 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later

than 28 days after the entry of the judgment."  "A district court has broad discretion in

determining whether to grant or deny a motion to alter or amend judgment pursuant to Rule

59(e), and [the Eighth Circuit] will not reverse absent a clear abuse of discretion."  *United States

v. Metro. St. Louis Sewer Dist.*, 440 F.3d 930, 933 (8th Cir. 2006).   The district court should

only grant the motion to correct "manifest errors of law or fact" or to allow the movant "to

present newly discovered evidence."  *Id.* (citations omitted).

---

[1] In his Motion to Amend, Shockley asks the Court to reconsider its analysis of claims 1, 7, 8, and 12.  Doc. 87 at 12.  Claim 8 relates to trial counsel's alleged incompetence in investigating and cross-examining Rick Hamm.  Doc. 48 at 248.  However, Shockley's Motion to Amend does not mention Hamm.  *See* doc. 87.  Instead, he refers to his trial counsel's alleged incompetence in choosing not to call Mila Linn, doc. 87 at 12, which Shockley addressed in claim 9 of his Amended Petition, doc. 48 at 258.  Thus, the Court treats this portion of the Motion to Amend as relating to claims 1, 7, 9, and 12; not 1, 7, 8, and 12.

III.     **Discussion**

A.       **Shockley's motion for a *Rhines* stay**

A court should grant a *Rhines* stay when (1) the petition includes both exhausted and

unexhausted claims, (2) the petitioner had good cause for failing to exhaust the unexhausted

claims, (3) the unexhausted claims have potential merit, and (4) the petitioner did not engage in

dilatory litigation tactics.  *Rhines v. Weber*, 544 U.S. 269, 278 (2005).  To exhaust a claim, a

petitioner must present the claim as part of a state's standard review process, or fail to present the

claim in state court such that the claim becomes barred under the state's procedural rules.  *Welch

v. Lund*, 616 F.3d 756, 758 (8th Cir. 2010); *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).  Typically,

a federal court cannot grant relief on an unexhausted claim.  *Wade v. Mayo*, 334 U.S. 672, 679

(1948).

On June 9, 2022, nearly three years after filing his habeas petition in this Court, Shockley

moved for a *Rhines* stay.  Doc. 64.  According to Shockley, the Missouri Supreme Court's ruling

in *State ex rel. Johnson v. Blair*, 628 S.W.3d 375, 381 (Mo. 2021), *cert. denied*, 142 S. Ct. 2856

(2021), opened a new avenue for him to file a Missouri Supreme Court Rule 91 petition in state

court and litigate claims that he had presented for the first time in federal court.  Doc. 64 at 1–2.

The Court denied this request for three reasons.  Doc. 74 at 10–18.  First, regardless of whether

*Blair* allowed Shockley to return to state court to request an extraordinary remedy under Rule 91,

Shockley had already presented his case for adjudication according to the state's standard review

process.  *Shockley v. State*, 579 S.W.3d at 892.  Missouri's procedural rules barred any claim that

he did not raise during Rule 29.15 postconviction review, thereby exhausting the claim.  Mo.

Sup. Ct. R. 29.15(b); *Woodford*, 548 U.S. at 93.  Because Shockley has exhausted all his claims,

he cannot satisfy any of *Rhines*'s first three elements.  *Rhines*, 544 U.S. at 278.

3

Second, *Blair* does not allow Shockley to return to state court, as explained in more detail below.  *See Blair*, 628 S.W.3d at 375.  Third, if Shockley had believed that some of his claims remained unexhausted, he should have immediately informed the Court of that contention, because federal courts generally cannot grant relief for unexhausted claims.  *See* § 2254(b).  Instead, Shockley reached this conclusion only after the Supreme Court placed strict new limits on his ability to support the claims he previously posited as unexhausted with new evidence.  *See* doc. 64.  That is, Shockley became convinced that some of his claims were not appropriate candidates for federal review only once federal review became much less available.  Thus, even indulging the assumption that Shockley's claims remained unexhausted, he needlessly delayed this case by failing to alert the Court and seek a stay at the earliest moment.  Each of these three reasons independently required the Court to deny Shockley's motion.

In his Motion to Amend, Shockley objects to the Court's finding that *Blair* did not allow him to return to state court and the Court's finding that he engaged in dilatory tactics.  Doc. 87 at 2–5.  He does not address the Court's finding that Shockley has exhausted all his claims independent of whether he can seek Rule 91 review.  *Id.*  Thus, even if entirely persuasive, Shockley's arguments could not affect the Court's denial of a *Rhines* stay.  And in any event, Shockley's arguments are entirely unpersuasive, as the Court explains below.

First, Shockley contends that in *Blair*, the Missouri Supreme Court "not only considered Rule 91 claims that had been previously raised but also considered state habeas claims that did not fit the standards the [c]ourt outlined in *State ex rel. Laughlin v. Bowersox*, 318 S.W.3d 695, 701 (2010)."  Doc. 87 at 3.  According to Shockley, the pre-*Blair* standard for petitioners to overcome Missouri's procedural bar and to receive Rule 91 review "all but foreclosed pursuing Rule 91 habeas petitions for the types of claims raised in Shockley's petition."  *Id.*  However,

4

Shockley's Motion to Amend, like his original motion for a *Rhines* stay, fails to address the relevant standards. *See id.* at 2–5.

Under Missouri law, a petitioner who fails to raise a claim for state postconviction review completely waives that claim. Mo. Sup. Ct. R. 29.15(b). However, the Missouri Supreme Court will still review a habeas claim—that is, a Rule 91 claim—if the petitioner who failed to raise that claim for postconviction review meets a stringent standard. *State ex rel. Zinna v. Steele*, 301 S.W.3d 510, 516–17 (Mo. 2010). Shockley refers to this standard as "the standards . . . outlined in *State ex rel. Laughlin v. Bowersox*." Doc. 87 at 3; *compare Bowersox*, 318 S.W.3d at 701, *with Steele*, 301 S.W.3d at 516. But *Bowersox*'s standard is one for claims that a petitioner did not raise for Missouri postconviction review. Thus, when Shockley argues that *Blair* "considered Rule 91 claims that had been previously raised," doc. 87 at 3, he fails to make a relevant point; Shockley would need to prevail under the standard for claims that have *not* been previously raised. Further, *Blair* also addressed a claim that the petitioner failed to raise during his standard direct appeal and postconviction review:  it denied that claim as procedurally barred. *Blair*, 628 S.W.3d at 387–88. Indeed, the *Blair* court rejected that claim because it did not fall within one of the exceptions established by the *Bowersox* standard. *Compare id. with Bowersox*, 318 S.W.3d at 701. Thus, Shockley's appeal to *Blair* fails because he relies on inapposite rulings of the case.

Second, Shockley's argument regarding whether he delayed this proceeding also fails. Shockley explains his decision to seek a *Rhines* stay as follows. On August 31, 2021, *Blair* gave Shockley the opportunity to litigate his claims in state court. Doc. 87 at 3. On May 23, 2022, the Supreme Court's decision in *Shinn v. Ramirez*, 596 U.S. 366 (2022), undermined his ability to support his supposedly unexhausted claims. *Id.* Now that the possibility for state review of

these claims had opened and the possibility of federal review of these claims had all but closed, the "habeas community's collective wisdom" counseled Shockley to seek a *Rhines* stay, so that he could litigate his unraised claims in state court without dismissing his federal case and entirely giving up his opportunity for federal review. *Id.* at 3–4. This argument initially suggests that Shockley delayed this case for just over one year, from August 31, 2021—the date when *Blair* supposedly created a possibility for further state review—to June 9, 2022—the date when Shockley moved for a *Rhines* stay. However, Shockley quickly aims to dispel this impression, stating that "[m]any of Shockley's *Martinez* claims [that is, the supposedly unexhausted claims] have always been unexhausted." Doc. 87 at 4. Thus, by Shockley's own admission, he delayed this litigation for nearly three years.

Shockley argues that his change in "litigation posture" does not amount to intentional delay because *Shinn* gave him good reason to move for a *Rhines* stay. Doc. 87 at 2–4; *see also* doc. 93 at 5 ("The *Shinn* decision necessitated Shockley pursue a different legal strategy to preserve his opportunity to have his unexhausted ineffective assistance of trial claims heard in federal habeas."). Shockley's argument confirms that he changed his position on the exhaustion issue to suit his strategic needs. Faced with *Shinn*'s limitations on further discovery in federal court, Shockley could only expand the record by returning to state court—but to return to state court, at least one of his claims needed to be unexhausted. *Rhines*, 244 U.S. at 278.

Shockley argues that the Court has discounted his need for a *Rhines* stay, stating that "[t]he Court's approach downplays the sea change in habeas litigation that occurred when the Supreme Court completely reversed course" in *Shinn*. Doc. 87 at 2. Seemingly, Shockley believes that he only had reason to argue that some of his claims remained unexhausted—and therefore that this Court should wait for further state litigation to rule on these claims—once the

Supreme Court decided *Shinn*.  However, the Court's finding of intentional delay has nothing to do with whether Shockley had good reasons to want to present his claims in federal court or good reasons to present those claims in state court.  Federal law dictates that, where a state provides a meaningful opportunity to litigate claims in state court, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b).

In short, the change in law wrought by *Shinn* did nothing to change whether Shockley's claims were exhausted.  What *Shinn* did, insofar as this case is concerned, was preclude Shockley from reopening the record, while in federal court, on his claims.  Having taken the position before *Shinn* that this Court could adjudicate his unexhausted claims, Shockley decided post *Shinn* to change course and assert that those very claims somehow required adjudication in state court.  But just as *Shinn* did not change the status of Shockley's claims, *Shinn* likewise did not grant Shockley license to do a 180-degree turn on his prior assertions to this Court.   If Shockley had failed to exhaust some of his claims, he should have deferred seeking federal review of those claims.  Or, if after having asserted those claims, he later discovered that they were in fact unexhausted and therefore ineligible for relief, he should have immediately informed the Court.  *Shinn* simply did not change Shockley's duty to candidly inform this Court whether he has exhausted his remedies—that is, whether he can no longer present his case according to Missouri's standard review process.  Thus, even if the Court were to indulge the assumption that Shockley's claims were unexhausted, the Court finds no legitimate explanation or excuse for his belated arrival at this conclusion.  To be clear, because the Court finds that Shockley has no

state-court remedies available, the Court's finding of intentional delay only rests on this indulged assumption.

Setting this hypothetical aside, the law governing exhaustion demonstrates that Shockley has exhausted all his claims. *See* doc. 74 at 11–17. And Shockley's refusal to address this Court's discussion of this crucial point strongly indicates that Shockley's counsel understand that he has exhausted his claims.

To bolster his case, Shockley cites four purportedly analogous cases where the district court granted a *Rhines* stay. The Court finds these cases unpersuasive. First, Shockley cites *Irish v. Cain*, No. CV 15-480, 2023 WL 2564397 (W.D. La. Mar. 16, 2023). Doc. 87 at 4. In that case, the court acknowledged § 2254(b)'s rule that a federal court may only grant relief when a petitioner has exhausted his claims, but the court noted that the petitioner "planned to circumvent that exhaustion requirement by relying on *Martinez v. Ryan*, 566 U.S. 1 (2012)." *Irish*, 2023 WL 2564397 at *1. Believing that the petitioner had unexhausted claims, the court then applied the remaining *Rhines* elements. *Id.* at *2–4. However, this reasoning misstates the law of exhaustion. *Martinez* does not allow a petitioner to "circumvent" the exhaustion requirement; *Martinez* includes no reference to exhaustion. *See Martinez v. Ryan*, 566 U.S. 1 (2012). Rather, a procedurally defaulted claim counts as "technically exhausted." *Shinn*, 596 U.S. at 378. Because defaulted claims are exhausted, they provide no basis for a *Rhines* stay. And because *Martinez* includes no way to "circumvent" § 2254(b)'s exhaustion requirement, petitioners must present only exhausted claims for federal habeas review. *See Martinez*, 566 U.S. at 1; § 2254(b). If they present unexhausted claims for federal review and only reveal that § 2254(b) bars relief once they wish to return to state court, they have intentionally delayed their

8

federal proceedings.  Given the *Irish* court's misstatement of the law of exhaustion, this Court cannot view that court's reasoning as persuasive.

Second, Shockley cites *Taylor v. Dir. - Nev. Dep't of Corr.*, No. 2:20-cv-01962-GMN-DJA, 2023 WL 2189062 (D. Nev. Feb. 22, 2023).  In that case, the court noted that the respondents "argue[d] that Grounds 1 and 2 should be dismissed as unexhausted and/or procedurally defaulted."  *Id.* at *3.  Conversely, the petitioner "assert[ed] that Grounds 1 and 2 [were] technically exhausted."  *Id.*  The court then analyzed the other *Rhines* elements and granted a *Rhines* stay, but never explained why it deemed Grounds 1 and 2 unexhausted.  *Id.* at *3–5.  Likewise, the *Taylor* court only addressed the issue of intentional delay in passing, and did not address the intentional-delay concerns present in this case.  *Id.*

Third, Shockley cites *Pandeli v. Shinn*, No. CV-17-01657-PHX-JJT, 2022 WL 16855196 (D. Ariz. Nov. 10, 2022).  In that case, the court did not analyze whether the petitioner exhausted his claims, noting instead that "[a]s Respondents acknowledge, Pandeli's petition is mixed, containing both exhausted and unexhausted claims."  *Id.* at *3.  Likewise, that case does not discuss whether the petitioner's failure to raise the fact that § 2254(b) barred relief demonstrates intentional delay.  *Id.* at *5–6.

Fourth, Shockley cites *Moncada v. Perry*, No. 3:19-cv-00231-MMD-CLB, 2022 WL 3636467 (D. Nev. Aug. 23, 2022).  This case contains the most substantive discussion of whether the petitioner exhausted his claims.  *Id.* at *3–5.  The court found that the petitioner would face a procedural bar if he returned to state court.  *Id.* at *4.  However, Nevada and the federal courts employed essentially the same standard for petitioners attempting to overcome procedural default.  *Id.*  Thus, if the petitioner could overcome the federal procedural bar, he could likely

also overcome the state procedural bar. *Id.* The court concluded that "[t]he state courts should have the opportunity to consider these . . . arguments in the first instance." *Id.*

However, that reasoning does not persuade this Court. First, the *Moncada* court does not explain why a petitioner's ability to overcome procedural default negates the fact that procedural default exhausts a claim. *Id.* The court is not aware of any authority stating that procedural default exhausts a claim unless the petitioner can meet the state's standards to overcome its procedural bar. Second, the court does not explain how it could grant a *Rhines* stay without actually finding that some of the petitioner's claims remained unexhausted and instead leave that question to the state courts. *Id.*

Further, several features of Shockley's case make *Moncada*'s logic inapplicable. First, a claim becomes exhausted when a petitioner can no longer present that claim in the state's standard review process. *Welch*, 616 F.3d at 758. Direct-appellate review and postconviction review provide Missouri's standard review process. *Bowersox*, 318 S.W.3d at 701. But Shockley can no longer present his claims for direct-appellate review or postconviction review, *see* Mo. Sup. Ct. R. 29.15(a)–(b); rather, he says he can present his claims for Rule 91 review, seeking an extraordinary remedy. *See* doc. 64 at 1–2; doc. 87 at 3; *Clay v. Dormire*, 37 S.W.3d 214, 217 (Mo. 2000) (noting the limited and extraordinary scope of Rule 91 habeas review). Ergo, Missouri's standard review process—which includes direct-appellate review and postconviction review, but not Rule 91 review—is no longer available to Shockley, rendering his claims exhausted. *Welch*, 616 F.3d at 758. *Moncada* does not address any analogous problem. *Moncada*, 2022 WL 3636467at *1.

Second, the Court has already found that Shockley cannot overcome his procedural default to obtain Rule 91 review. Doc. 74 at 15–17. Allowing Shockley to return to state court

to face a procedural bar he cannot overcome would be an exercise in futility and would pointlessly prolong this case. *Moncada* includes no substantive analysis the of dilatory-tactics element, *see Moncada*, 2022 WL 3636467 at *4 (noting only that intentional delay is rare in non-capital cases), so this Court cannot look to *Moncada*'s treatment of the intentional-delay issue for persuasive authority. In sum, the Court does not find Shockley's several citations persuasive, and not one of them changes this Court's analysis.

### B.    The ABA Guidelines

Throughout his briefing, Shockley cites to guidelines adopted by the ABA to show that his various previous attorneys have provided ineffective assistance of counsel. *See* doc. 48 (citing American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Habeas Cases*, 31 Hofstra L. Rev. 913 (2003)[2]). The Court addressed Shockley's reliance on the ABA Guidelines in detail, concluding that they "do not apply"—that is, they do not provide the standard for effective assistance. Doc. 74 at 38–42. Rather, *Strickland* provides the applicable standard, and the ABA Guidelines can only support an ineffective-assistance claim to the extent that they provide background in applying *Strickland*. Doc. 74 at 39. Shockley asks the Court to reconsider. Doc. 87 at 5.

First, Shockley points out that this Court has adopted the Criminal Justice Act Plan, which instructs all counsel appointed in federal capital cases to comply with the ABA Guidelines. *Id.* at 6. From this, Shockley concludes that "[w]hile the ABA Guidelines do not represent strict mandates for counsel, they at a minimum establish appropriate guidelines this Court expects counsel to adhere to when representing capital defendants." *Id.* Shockley does not explain how this Court's adoption of the CJA Plan affects the standard for the Sixth Amendment right to effective assistance of counsel. *Id.* Further, Shockley does not relate the

---

[2] https://www.americanbar.org/content/dam/aba/administrative/death_penalty_representation/2003guidelines.pdf.

professional norms in this Court in 2023 to the professional norms that existed in the Missouri circuit courts in 2009. *Id.* Thus, the Court finds this argument inapposite. To the extent that Shockley's argument relates to his counsel's strategic decisions in this case, the Court notes that they were appointed in 2019 and not under the 2023 CJA Plan. *See* doc. 9.

Second, Shockley argues that the Court has overstated his reliance on the ABA Guidelines. Doc. 87 at 6. Shockley first states that he did not argue that "the ABA Guidelines [are] binding mandates for performance of counsel." *Id*. He then argues he only cites the ABA Guidelines in nine of his 28 claims. *Id.* at 7. However, the Court finds these arguments unpersuasive.

Shockley complains that the Court did not cite specific instances of his reliance on the ABA Guidelines and that he did not argue that those guidelines establish the standard for effective assistance. *Id.* at 6. The Court has in mind instances such as Shockley's use of the ABA Guidelines on page 100 of his Amended Petition. *See* doc. 48 at 100. Shockley states that "[t]he 2003 ABA Guidelines for capital counsel also demonstrate counsel's failure in voir dire." *Id.* Shockley then cites two passages from those guidelines. *Id.* Shockley does not proceed to argue that those guidelines described the prevailing professional norm or that every competent capital defense attorney would comply with the ABA Guidelines. *See id.* Rather, Shockley argues that his trial counsel's alleged failure to comply with the ABA Guidelines *ipso facto* "demonstrate[s]" that they failed in voir dire. *Id.*

Throughout his Amended Petition, Shockley cites to the ABA Guidelines without providing any substantive discussion of how those standards relate to professional norms or the standards for a reasonable attorney. *See, e.g.,* doc. 48 at 103–04, 149–50, 153–54, 217. Thus, Shockley treats the ABA Guidelines as automatically setting the standard for capital counsel.

Shockley correctly says that he never states that the ABA Guidelines, rather than *Strickland*, set the standard for effective assistance.  *See* doc. 87 at 6.  Rather, he treats the ABA as setting that standard by citing those guidelines as though they definitively and independently established the bar for effective assistance.  *See* doc. 74 at 39 ("Shockley consistently treats the ABA's recommendations as binding mandates.").  By asking the Court to accept these arguments, he asks the Court to likewise treat the ABA Guidelines as though they defined a capital defendant's Sixth Amendment rights.  *See id.* at 42 ("Shockley repeatedly asks the Court to treat the ABA standards as the criterion for competence").

Shockley also attempts to downplay his reliance on the ABA Guidelines, stating that he "cited to the ABA Guidelines as support for a legal position on a total of 17 pages of his 513-page habeas petition" and cited those guidelines "in support of only 9 of the 28 habeas claims." Doc. 87 at 7.  This hardly shows that the ABA Guidelines played only a negligible role in Shockley's arguments.  Shockley cites the ABA Guidelines to support roughly a third of his claims, and the Court saw fit to address his reliance on those guidelines.  *See* doc. 48; doc. 74 at 38–42.  Shockley's argument provides no basis to alter the Court's prior order.

Shockley also notes that, in discussing his reliance on the ABA Guidelines for the proposition that competent counsel should raise all possible objections, the Court included citations to two pages of his Amended Petition where Shockley does not mention the ABA Guidelines.  Doc. 87 at 7 n.1.  The Court included these citations as instances of Shockley's advancing an ineffective-assistance claim resting on his view that competent defense counsel must object always and everywhere, which he elsewhere supports with reference to the ABA Guidelines.  *See generally* doc. 48 at 350 (citation omitted) (in which Shockley noted that the

ABA Guidelines repeatedly emphasize defense counsel's obligation to "preserve 'any and all conceivable errors.'").

To the extent that Shockley believes the Court has overstated his reliance on the ABA Guidelines, his objections to the Court's finding on the inapplicability of those guidelines cannot affect the soundness of the Court's decision to deny relief.  Shockley's argument could only bear on the Court's decision if he believed that the Court's supposedly faulty view of the ABA Guidelines or of his use of the ABA Guidelines undermined the Court's analysis of one of his ineffective-assistance claims.  But Shockley makes no such argument.  *See* doc. 87.  He does not object that, by allegedly overemphasizing his reliance on the ABA, the Court has missed the true foundations of one of his claims or applied the wrong legal standard.  *Id.*  Thus, Shockley's contention that the Court has misunderstood his reliance on the ABA Guidelines has no bearing on the Court's denial of his Amended Petition.

Third, Shockley cites various Supreme Court cases that cite the ABA Guidelines as guides to the professional norms that define effective assistance.  *Id.* at 7–8 (citations omitted). He argues that "[t]his Court's wholesale rejection of the ABA Guidelines" contradicts these cases.  *Id.* at 7.  However,  in each of the cases Shockley cites, the Supreme Court applied *Strickland*,  and nothing in those cases contradicts the Court's prior order.  *See id.* at 7 (citing *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (referring to the ABA Guidelines only in a passing citation but finding counsel incompetent under *Strickland*); *Wiggins v. Smith*, 539 U.S. 510, 522 (2003) (referencing the ABA Guidelines but applying *Strickland*); *Florida v. Nixon*, 543 U.S. 175, 190–91 (2004) (referring to the ABA Guidelines in relation to trial strategy generally but finding counsel competent under *Strickland*); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (referring to the ABA Guidelines in the context of *Strickland*)). The ABA Guidelines only bear

14

on the standard of effective assistance to the extent that they describe professional norms, as the Court noted in its prior order.  *See* doc. 74 at 38–39 (quoting *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009)).

In his motion briefing, Shockley criticizes the State for relying on the Supreme Court's decision in *Bobby* to refute Shockley's ABA-Guidelines arguments.  Doc. 93 at 2–3.  But in *Bobby*, the Supreme Court rebuked the Sixth Circuit for treating the ABA Guidelines "as inexorable commands with which all capital defense counsel must fully comply."  558 U.S. at 8 (citation and internal quotation marks omitted).  In other words, this Court's criticism of Shockley's reliance on the ABA Guidelines largely parallels the Supreme Court's criticism in *Bobby* of the circuit court.  *Id.*; doc. 74 at 38–42.

As discussed above, Shockley does not attempt to connect the ABA Guidelines to the professional norms for capital-defense attorneys, so his citations to cases where the Supreme Court treated those guidelines as evidence of a professional norm do not support his point.  This Court's discussion of the ABA Guidelines did not conclude that those guidelines can play no part in a sound ineffective-assistance case.  *See* doc. 74 at 38–42.  Rather, the Court finds Shockley's use of the guidelines unpersuasive because he does not attempt to relate those guidelines to an applicable standard and instead at times treats them as inexorable commands.  *See* doc. 48. Shockley objects that, absent the ABA Guidelines, courts would lack a standard to consistently decide ineffective-assistance claims.  Doc. 87 at 7–8.  To the contrary, *Strickland* and its progeny supply the standard.

Fourth, Shockley insists that the Court should not have cited non-capital cases in its discussion of whether defense counsel should raise every objection possible.  *Id.* at 8.  As the Court explained in its prior order, an attorney who raises every possible objection will soon

irritate the judge and jury, squandering precious credibility in the process. Doc. 74 at 41. The Court cited *Gonzalez v. United States*, 553 U.S. 242, 249 (2008) and *Loefer v. United States*, 604 F.3d 1028, 1030 (8th Cir. 2010) for support. *Id.* Shockley notes that neither of these cases involve the possibility of a death sentence, but he includes no citation for the proposition that cases discussing the standard for effective assistance in the non-capital context cannot apply to the capital context. *See* doc. 87 at 8. Indeed, the Eight Circuit cites non-capital cases in deciding questions of effective assistance in capital cases. *See, e.g., McLaughlin v. Precythe*, 9 F.4th 819, 828–29 (8th Cir. 2021) (citing *United States v. Jewell*, 614 F.3d 911, 926 (8th Cir. 2010); *United States ex rel. Hanna v. McGinnis*, No. 90 C 7004, 1991 WL 203806, at *6 (N.D. Ill. Oct. 4, 1991)). Thus, Shockley gives the Court no reason to doubt its citations to non-capital cases in support of its point of questioning the inexorable command of the Guidelines to object always and everywhere. *See* doc. 87, doc. 74 at 41. And, while the Court appreciates the gravity of the capital context, the possibility of a death sentence does not transform a tactic that would undermine the credibility of counsel, or the defendant, into a strategy that all constitutionally effective counsel must adopt. In sum, Shockley does not persuade the Court to alter its analysis of the applicability of the ABA Guidelines, and he further fails to explain what relief the Court could grant even if it somehow found his arguments persuasive.

###### C.    Claim 1

Shockley asks the Court to reconsider its analysis of claim 1. Doc. 87 at 9. The claim concerns whether trial counsel provided ineffective assistance in choosing not to question Juror 58 during vior dire about his being an author. Doc. 74 at 43–44. Further, the claim concerns whether the Missouri Supreme Court reasonably determined that Juror 58's inclusion in the jury did not prejudice Shockley. *Id.* The Court describes the underlying factual details of this claim

in its prior order. *Id.* at 43–48. Shockley argues that (1) this Court's analysis of the claim mischaracterizes the Missouri Supreme Court's reasoning, (2) the Missouri Supreme Court contradicted the Supreme Court of the United States, (3) the Missouri Supreme Court unreasonably found that Juror 58's book did not parallel the facts of Shockley's case to the degree alleged by Shockley, and (4) the Missouri Supreme Court unreasonably found that Juror 58 did not share the views of his novel's main character. Doc. 87 at 9–12.

First, Shockley argues that this Court has mischaracterized the Missouri Supreme Court's discussion of the issue. *Id.* at 9. During postconviction review, David Bruns—a member of Shockley's trial team—stated he had "no strategy reasons [sic]" for choosing to not ask Juror 58 about his book but assumed from his knowledge of Juror 58's military experience that the book was a military journal. Doc. 20-24 at 639. In short, Bruns thought he had no reason to ask about the book and no reason to avoid asking about the book. The Missouri Supreme Court cited the testimony of Brad Kessler—Shockley's lead trial counsel—who said he thought the book was a self-published vanity project. *Shockley v. State*, 579 S.W.3d at 896. According to the Missouri Supreme Court, "Kessler did not see a problem with Juror 58 being a self-published author or see a reason to question him about it." *Id.* at 896–97. Instead, Kessler questioned Juror 58 on what he as lead trial counsel deemed more pertinent issues. *Id.*

The Missouri Supreme Court found that "trial counsel were aware of Juror 58's status as an author but chose to forego that line of questioning in favor of implementing their reasonable trial strategy of uncovering pro-law enforcement bias and helpful knowledge about firearms." *Id.* at 896 n.5. In his Amended Petition, Shockley argued that the Missouri Supreme Court's finding contradicted Bruns's testimony. Doc 48 at 71. This Court found no contradiction, stating, "the Missouri Supreme Court did not say that trial counsel had a strategic reason to avoid

17

asking further questions; rather, that court found that counsel reasonably believed that Juror 58's writing a novel 'had no bearing on his suitability as a juror in this particular case.'" Doc. 74 at 46 (citation omitted). Shockley now objects that this Court's statement, "the Missouri Supreme Court did not say that trial counsel had a strategic reason to avoid asking further questions [about the book]," contradicts the Missouri Supreme Court's finding that counsel "chose to forego that line of questioning in favor of implementing their reasonable trial strategy." Doc. 87 at 9–10 (comparing doc. 74 at 46 with *Shockley v. State*, 597 S.W.3d at 896 n.5).

The Court finds that Shockley's argument confuses the record. Bruns's testimony shows he believed he had no reason to ask about Juror 58's book and no reason to avoid asking about Juror 58's book. Doc. 20-24 at 639. Kessler's testimony shows he believed he had no reason ask about Juror 58's book and had good reasons to ask about other topics instead. *Shockley v. State*, 579 S.W.3d at 896. The Missouri Supreme Court found that trial counsel reasonably chose to ask about matters that might relate to the trial instead of asking about matters with no apparent connection to the trial. *Id.* This Court found no contradiction between Bruns and the Missouri Supreme Court and found that court's finding reasonable. Doc. 74 at 46, 48. Shockley's attempts to find some contradiction between Bruns and the Missouri Supreme Court and between the Missouri Supreme Court and this Court fail.

Second, Shockley argues that the Missouri Supreme Court's analysis runs afoul of two Supreme Court cases. Doc. 87 at 10. Shockley cites *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) for the proposition that "the right to an impartial jury, guaranteed by the Sixth and Fourteenth Amendments, cannot be secured without 'an adequate *voir dire* to identify unqualified jurors.'" *Id.* (quoting 504 U.S. at 729 (citation omitted)). *Morgan* does not concern an ineffective-assistance claim. *See* 504 U.S. at 719. Rather, Morgan decided whether a capital

18

defendant has the right to an impartial jury during sentencing; whether a defendant has the right to challenge for cause and remove any prospective juror who would automatically vote for the death penalty and ignore the trial court's instructions; whether, upon request, the trial judge must inquire into a prospective juror's views on capital punishment; and whether the voir dire at issue met constitutional muster. *Id.* at 725.  Indeed, *Morgan* involves judge-conducted voir dire rather than counsel-conducted voir dire. *Id.* at 723–24.  Shockley does not explain how this case could set the standard for effective assistance in a case involving counsel-conducted voir dire.  Doc. 87 at 10.  To the extent that *Morgan* supports the proposition that defendants have a right to adequate voir dire, this citation contributes little to Shockley's argument, as the Missouri Supreme Court noted that the unfavorable views of the justice system expressed in six pages of the book "does not prove Juror 58 personally held the beliefs espoused in his book rendering him unfit to serve on the jury," and further found that had trial counsel questioned Juror 58 about the contents of the book, "the record does not support . . . that Juror 58 would have been struck for cause absent some showing the book reflected his personal beliefs."  *Shockley v. State*, 579 S.W.3d at 896.  Shockley also cites *Rompilla*, 545 U.S. at 382, for the proposition that counsel must "reasonably explore potentially fruitful avenues of investigation."  Doc. 87 at 10.  Although *Rompilla* does not concern the standard for effective assistance in voir dire, Shockley's argument has a more fundamental problem:  the Missouri Supreme Court found that Kessler reasonably thought he had no reason to question Juror 58 about his book.  *Shockley v. State*, 579 S.W.3d at 895–96.  Shockley has not cited any case holding that during voir dire counsel must ask about issues they have no reason to think bear on the case.  *See* doc. 87 at 9–12.  Thus, the Court remains convinced that the Missouri Supreme Court did not contradict the United States Supreme Court.

19

Shockley also maintains that trial counsel did not act reasonably in choosing to not ask about the book, because "[w]hile trial counsel's assumption that Juror 58 might have been proud of his novel might have been true, it was equally plausible Juror 58 raised the issue because of the subject matter of his novel." *Id.* at 11.  Shockley provides no authority or argument to support this assertion. *Id.*  In the abstract, the Court finds little reason to think that a juror who mentions some personal accomplishment unrelated to the case during voir dire might be presenting a veiled hint at some secret prejudice.  Given the weakness of Shockley's analysis, he cannot overcome the combined deference owed to trial counsel and to the Missouri Supreme Court under *Strickland* and § 2254(d), respectively.  The Missouri Supreme Court reasonably decided that trial counsel reasonably judged that further questions about Juror 58 would waste time that they could spend asking more relevant questions.  *See* doc. 74 at 48; *Shockley v. State*, 579 S.W.3d at 896.

Shockley asks the Court to rely on Kessler's statement that, by not uncovering Juror 58's alleged biases in voir dire, counsel acted ineffectively.  Doc. 87 at 11; *see also* doc. 20-52 at 26 (transcribing postconviction deposition testimony in which Kessler agreed that he "recall[ed] that the prosecutor argued to the judge that [Kessler] should have inquired more of juror 58 during voir dire and that [Kessler] then said [he] would have to concede that [he was] ineffective for not having done so.").  But as the Court's prior order explained, this Court must defer to the reasonable findings of the Missouri Supreme Court, doc. 74; *see also* § 2254(d), and the Missouri Supreme Court must defer to counsel's reasonable strategic decisions, *Strickland*, 466 U.S. at 690–91.  The Missouri Supreme Court reasonably found that trial counsel reasonably chose to ask about Juror 58's familiarity with law enforcement and firearms instead of asking about Juror 58's book.  *Shockley v. State*, 579 S.W.3d at 896.  This settles the issue.  Counsel's

20

own conclusory evaluation of his conduct—especially when made in a motion for a mistrial in a death-penalty case—does not upend the binding standards established by *Strickland* and § 2254(d).

Third, Shockley objects to the Missouri Supreme Court's finding that Juror 58's book did not parallel the facts of his case. Doc. 87 at 11–12. He rearticulates his prior argument that the Missouri Supreme Court unreasonably failed to grasp the alleged similarity between Juror 58's book and the case against Shockley. *Id.* According to Shockley, "the plot of the book could have been plucked directly from Shockley's case. The novel's plot includes a man who drives drunk and kills a person, flees the scene, and is inevitably put on trial for murder, as well as the death of [a] police officer." Doc. 87 at 11.

The Court summarizes the novel's plot as follows: A Blackfoot Indian fights in the Vietnam War and becomes a Green Beret. Thomas Canter, *Indian Giver* 10–11, 71 (2008). The man has a son, *id.* at 78, who grows up to become an FBI agent, *see id.* at 105. Shortly after the man's retirement from the army, he learns that a drunk driver has killed his wife. *Id.* at 105–06. The jury convicts the killer of involuntary manslaughter, but the judge sentences the killer to only probation. *Id.* at 110. The veteran finds the killer in the act of raping a teenager and tortures the killer to death. *Id.* at 111, 114. Then, the veteran comes to believe—incorrectly— that his son has died in the line of duty, and that his son's putative murderer enjoys diplomatic immunity. *Id.* at 129. Seeking vengeance on the country he once protected, the veteran hatches a plan to steal a nuclear weapon and detonate it near St. Louis. *Id.* at 163. Just before the veteran completes his terrorist plot, the FBI-agent son shoots his father in the head. *Id.* at 176. The veteran survives but suffers severe brain damage. *Id.* at 177. Eventually, the veteran dies, and the son lives happily with his wife. *Id.* at 182–83.

Thus, Shockley's claim that "the plot of the book could have been plucked directly from Shockley's case" dramatically exaggerates their similarity.  Doc. 87 at 11.  And Shockley does not tease out any factual or legal similarities to support that conclusory assertion.  The Missouri Supreme Court found that "[Shockley's] argument [that Juror 58 falsely said he could serve as an impartial juror] is premised on a degree of factual congruity between the novel and the facts of the trial that does not exist."  *Shockley v. State*, 579 S.W.3d at 895 (citation omitted).  The Court remains confident that the Missouri Supreme Court decided this question reasonably.

Fourth and finally, Shockley objects to the Missouri Supreme Court's finding that Juror 58 harbored no prejudice against Shockley:

> The Missouri Supreme Court relied on an unreasonable determination of fact that the contents of [Juror 58's] fictionalized *autobiography* was not a reflection of Juror 58's supercharged feelings on the death penalty, an indication of what the juror thought the proper punishment was for someone in Shockley's exact situation, or his lack of confidence in the justice system. . . . The Missouri Supreme Court . . . refused to recognize that author [sic], Juror 58, was the protagonist of the, albeit fictionalized, *autobiography*.

Doc. 87 at 11 (emphasis in original).

However, Shockley's argument only restates an argument he presented in his Amended Petition and that the Court has already addressed in full.  *Compare* doc. 87 at 11–12 *with* doc. 74 at 75–77.  While Shockley insists that the views of the novel's main character "must necessarily be imputed to the author," doc. 87 at 12, the Court finds nothing to support this assertion. Indeed, that the FBI-agent son stops his father's terrorist plot by shooting his father in the head suggests that Juror 58 did not identify with the main character's viewpoint.  As the Missouri Supreme Court explained, "Juror 58 was questioned [in post-trial proceedings] extensively about the book's themes and disavowed [that] he personally held any of those ideas because it was not his personal belief [that] the court system was not good. . . . Juror 58 said it became clear to him

[that Shockley] was guilty only after his grandmother testified." *Shockley v. State*, 579 S.W.3d 881, 895 (Mo. 2019). This Court must defer to the Missouri Supreme Court's findings where those findings have support in the record, as explained in its prior order. *See* doc. 74 at 77 (citations omitted). The Missouri Supreme Court supported its finding with details from Juror 58's testimony, and this Court finds those factual determinations reasonable. Thus, Shockley's arguments regarding Juror 58 remains unpersuasive.

### D.      Claims 7, 9, and 12

Shockley asks the Court to reconsider its analysis of claims 7, 9, and 12.[3]  Doc. 87 at 12–15. In each of these claims, Shockley argues that his trial counsel failed to properly investigate and call a certain witness or witnesses and that the Missouri Supreme Court unreasonably found that trial counsel acted competently. *Id.*  Shockley's Motion to Amend adds little or nothing to his original petition. *Compare id. with* doc. 48 at 238–248, 258–269, 292–304.

Shockley argues that his trial counsel should have further investigated and called James Chandler. Doc. 87 at 14. At a postconviction hearing, Chandler testified that, on the day of the murder, he saw Shockley driving a pick-up truck. Doc. 20-24 at 184. According to Chandler, this occurred outside Chandler's home between 2:00 p.m. and 2:30 p.m. *Id.* at 178, 185. At trial, Lisa Hart testified regarding the features of a red Pontiac Grand Am that she noticed was parked on the wrong side of the road just after 1:45 p.m. near Sergeant Graham's home. Doc. 20-5 at 59–63. Shockley's grandmother testified that the car was hers, and that Shockley had borrowed it at roughly 12:20 p.m. and returned it at roughly 4:50 p.m. Doc. 20-5 at 38–40. The murder occurred at 4:03 p.m. *Shockley v. State*, 579 S.W.3d at 890.

The Missouri Supreme Court addressed trial counsel's decision not to call Chandler as follows:

---

[3] *See supra* note 1.

> Kessler testified [Shockley] had input on whether to call Chandler as a witness. Kessler explained Chandler's testimony would only highlight for the jury there was a timeframe in which something could have happened, as opposed to arguing [Shockley] was not there at all, undermining their defense theory. The motion court found Chandler's testimony would not have provided [Shockley] a viable alibi defense. This Court agrees. Even if the jury believed Chandler's testimony, it would not provide [Shockley] with an alibi because Chandler's testimony does not account for [Shockley's] whereabouts at the time [Sergeant Graham] was shot.

*Shockley v. State*, 579 S.W.3d at 911. This Court found this adjudication reasonable. Doc. 74 at 53.

To this, Shockley first argues that counsel conducted an insufficient investigation to make a reasonable strategic decision about whether to call Chandler. Doc. 87 at 13. According to Shockley, counsel conducted only a "limited investigation" of Chandler and "didn't interview" him. *Id.* Bruns testified that Shockley's trial team received the records of the voluminous discovery conducted by Shockley's previous defense counsel. Doc. 20-24 at 626. Mollyanne Henshaw Francis—the third member of Shockley's trial team—testified that she reviewed this evidence, which included Chandler's deposition. Doc. 20-53 at 50; *Shockley v. State*, 579 S.W.3d at 911. Shockley argues that trial counsel's later testimony about their decision not to call Chandler, Linn, Sylvan Duncan, or Carol Duncan shows that they had "no recollection or vague memories of the witnesses," which "evidences a lack of investigation." Doc. 87 at 13. Shockley then cites several cases holding that effective assistance requires proper investigation. *Id.* at 13–14 (citations omitted).

However, Shockley provides no argument to show that counsel's lack of memory demonstrates a lack of proper investigation. Doc. 87 at 13. The Court notes that trial counsel testified on the matter in 2016, seven years after Shockley's trial. *Compare* doc. 20-53 at 41 *with State v. Shockley*, 2009 WL 10733289 at *1. Further, Shockley cites no authority to show that

24

defense counsel cannot rely on the discovery performed by another attorney in making a strategic decision. Doc. 87 at 13. Thus, Shockley provides no reason to conclude that trial counsel lacked the information to make a reasonable decision about whether to call Chandler. Indeed, he fails to point to any information counsel might have discovered if they had personally interviewed Chandler, or explain how any such unidentified information would have made Chandler's would-be testimony less damaging to the strategy adopted by trial counsel. Doc. 87 at 12–15.

Shockley then objects to the Missouri Supreme Court's finding that trial counsel had a strategic basis for choosing not to call Chandler. *Id.* at 13. That court credited Kessler's explanation that "Chandler's testimony would only highlight for the jury there was a timeframe in which something could have happened [that is, in which Shockley could have lied in wait for Sergeant Graham]." *Shockley v. State*, 579 S.W.3d at 911. Shockley argues that "[t]he 'imperfect alibi[,]' as trial counsel described it, would have demonstrated that the State could not prove their case beyond a reasonable doubt. Indeed, the State's only theory of culpability relied on connecting Shockley to the red car observed near the crime scene." Doc. 87 at 14. This argument has two problems. First, given Shockley's grandmother's testimony that Shockley borrowed her car at roughly 12:20 p.m. and Hart's testimony that she saw the car just after 1:45 p.m., a jury would likely believe that Chandler misremembered when he saw Shockley in a truck. Doc. 20-24 at 184–85; doc. 20-5 at 38–40, 59–63. More importantly, the State did not rely solely on Shockley's connection to the red car: this Court's prior order discusses the evidence against Shockley in detail. *See* doc. 74 at 5–7, 30–31. Given the various factors tying Shockley to the crime, the Missouri Supreme Court reasonably found that counsel competently decided that Chandler would only highlight Shockley's lack of a genuine alibi. *Shockley v. State*, 579 S.W.3d at 911.

Having addressed trial counsel's reliance on prior counsel's discovery and the strength of the State's case against Shockley, the Court does not find it necessary to restate its analysis of Shockley's claims regarding Linn and the Duncans. Shockley notes that "[t]his Court did not address the relative import of the witnesses' testimony in the context of the State's case against Shockley." Doc. 87 at 15. To the extent that any statement on the relative significance of these witnesses to the State's case is necessary, the Court finds that it has already addressed this issue in its prior order. Doc. 74 at 55 ("Although Shockley shows that trial counsel could have gained something from calling Linn and that they could have attempted to defend her testimony, he does not demonstrate that the advantages of calling Linn outweighed the disadvantages so decisively that trial counsel acted ineffectively."); *id.* at 58 (noting that, like Chandler, the Duncans could not provide Shockley an alibi, but they might have harmed his case by testifying regarding his graphic description of Sergeant Graham's corpse). However, Shockley's invitation to weigh the merits of counsel's decisions obscures the relevant standard. This Court must give due deference to the Missouri Supreme Court pursuant to § 2254(d), and the Missouri Supreme Court must give due deference to trial counsel under *Strickland*. This Court remains persuaded that the Missouri Supreme Court reasonably found that trial counsel satisfied *Strickland*.

### E.     Certificate of appealability

Shockley argues that the Court should amend its prior order to grant him a certificate of appealability. Doc. 93 at 7. In its response to Shockley's Motion, the State argues that the Court correctly denied Shockley a certificate of appealability because none of his claims have debatable merit. Doc. 89 at 7–9. Specifically, the State argues that the Court has properly deferred to the Missouri Supreme Court's judgment to the extent required by § 2254(d). *Id.* at 8–

9.  In turn, Shockley argues that the State has presented the wrong standard for whether to grant a certificate of appealability.  Doc. 93 at 7.

According to Shockley, the State asks the Court to accept the standard rejected by *Miller-El v. Cockrell*, 537 U.S. 332, 336 (2003).  Doc. 93 at 7.  "When a court decides whether a [certificate of appealability] should issue, '[t]he question is the debatability of the underlying constitutional claim, not the resolution of the debate.'"  *Id.* (quoting *Miller-El*, 537 U.S. at 342).  While Shockley does not clearly say how he thinks the State deviated from this standard, he seems to believe the Court should not consider the deference it owes to the Missouri Supreme Court under § 2254(d) when deciding the certificate-of-appealability issue.  *Id.*  Rather, the Court should look only at the debatability of his underlying claims viewed in isolation from the Missouri Supreme Court's judgment.  Shockley is incorrect.

The Eighth Circuit has held that, in deciding whether to grant a certificate of appealability for a claim governed by § 2254(d), the district court must look to whether its decision regarding the reasonableness of the state court's decision is debatable.  *Vang v. Hammer*, 673 Fed. App'x 596, 598 (8th Cir. 2016).  It must not ignore § 2254(d)'s "highly deferential standards" in deciding whether to grant a certificate of appealability.  *Id.*  Supposing that Shockley's claims were debatable when presented to the Missouri Supreme Court, § 2254(d) has foreclosed any reasonable debate.  Under the correct standard, which this Court applied in its original order and applies again here, the Court finds that no basis exists to grant Shockley a certificate of appealability.

Viewed in light of § 2254(d), claim 1 lacks merit—that is, it does not present a reasonably debatable question.  To succeed, Shockley would need to show that the Missouri Supreme Court contradicted or unreasonably applied federal law as stated by the United States

27

Supreme Court. § 2254(d)(1). Alternatively, Shockley could succeed by showing that the Missouri Supreme Court made "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2).

Shockley avers that he can debatably satisfy either requirement, warranting a certificate of appealability. Doc. 93 at 9. Shockley's argument that the Missouri Supreme Court contradicted or unreasonably applied United States Supreme Court caselaw depends on the supposition that counsel acted incompetently in choosing not to ask Juror 58 about his book and that the Missouri Supreme Court could not reasonably find otherwise. Doc. 87 at 10. Thus, Shockley's certificate-of-appealability argument rests on whether his argument that the Missouri Supreme Court acted unreasonably in finding trial counsel competent has any merit. Doc. 93 at 9.

Shockley points to Judge Stith's dissent in his postconviction case as a clear demonstration that reasonable minds can differ on the merits of his case. *Id.* However, this Court faces a different question than the Missouri Supreme Court did. Justice Stith found that trial counsel had no reasonable basis for choosing not to ask Juror 58 about his book because "[c]ounsel could, and should, examine the potential juror about all of the revealed biases. It is not reasonable to pick only one disqualifying or biasing issue to examine further. Yet, that is what counsel admitted they did here." *Shockley v. State*, 579 S.W.3d at 922. Conversely, the majority found that Kessler reasonably thought that Juror 58's statement about his book revealed no potential bias and that trial counsel had no reason to press for further information. *Id.* at 896.

But this Court is not in the position to determine whether Kessler reasonably thought he had no good reason to inquire further; this Court must decide only whether the Missouri Supreme Court adjudicated the issue reasonably. *See* § 2254(d). And if Judge Stith's dissent

demonstrates that a reasonable person could find in Shockley's favor, as Shockley contends, doc. 93 at 9, then the majority opinion certainly demonstrates that a reasonable judge could reject his claim.  While a reasonable person could debate whether trial counsel should have asked about the book and could debate whether trial counsel acted competently in choosing not to ask, the Court finds no room for debate over whether the Missouri Supreme Court could reasonably accept Kessler's stated justification for his actions pursuant to *Strickland*'s deferential standard. *Strickland*, 466 U.S. at 691.  Likewise, the Court does not find that reasonable jurists could debate whether the Missouri Supreme Court reasonably found that counsel acted strategically in choosing not to call Chandler, Linn, or the Duncans.

Shockley also contends that his claims "at least deserve[] encouragement to proceed further."  Doc. 93 at 10 (citation and internal quotation marks omitted).  He argues that "the possibility that Shockley's ineffective assistance of counsel claims may falter down the stretch should not necessarily bar them from leaving the starting gate." *Id.* (citation and internal quotation marks omitted).  But Shockley's claims have faltered on direct appeal, postconviction review, and federal habeas review.  He is now 17 years past the starting gate. *State v. Shockley*, 2009 WL 10733289.  Having carefully considered all of Shockley's claims and his Motion to Amend, the Court sees no basis for further litigation under the standards set by Congress and the United States Supreme Court.

Further, Shockley states his certificate-of-appealability argument for the first time in his reply brief. *Compare* doc. 87 *with* doc. 93 at 7–11.  After noting that the Court denied him a certificate of appealability at the outset of his brief, Shockley's Motion to Amend contains only one reference to certificates of appealability: "Courts have specifically used Rule 59(e) as a vehicle in which to amend the judgment to grant a [certificate of appealability] on habeas

claims." Doc. 87 at 1 (citation omitted).  Only later, prompted by the State's arguments, does

Shockley's reply brief contain a relatively full discussion of the issue.  Doc. 93 at 7–11.  If

Shockley believed the Court used the wrong standard to determine whether to grant a certificate

of appealability, he should have raised it in his Motion to Amend, rather than improperly raising

it in his reply brief.  *See McGhee v. Pottawattamie Cnty., Iowa*, 547 F.3d 922, 929 (8th Cir.

2008) (explaining when a party can and cannot raise a new issue in a reply brief).  Even if the

Court were to excuse that failure, Shockley is not entitled to a certificate of appealability on the

merits.

IV.    **Conclusion**

The Court denies Shockley's [87] Motion to Alter or Amend.

So ordered this 5th day of December 2023.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE