UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LANCE SHOCKLEY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-cv-02520-SRC |
| | ) | |
| TRAVIS CREWS, | ) | |
| | ) | |
| Respondent. | ) | |

## **Order**

Recognizing that this is a death-penalty-habeas case, the Court treads carefully and accords counsel the benefit of the doubt so as not to inhibit zealous advocacy.  But when advocacy exceeds the boundaries of the rules, the Court must hold counsel accountable to preserve the integrity of the judicial process and the pursuit of justice.

After denying Petitioner Lance Shockley's Amended Petition for Writ of Habeas Corpus, *see* docs. 48, 74, the Court entered an order requiring Shockley's habeas counsel—Jeremy Weis, Paula Harms, and Justin Thompson—to show cause why the Court should not sanction them for violating Federal Rule of Civil Procedure 11 and the Missouri Rules of Professional Conduct, doc. 76.  The Court did so "[a]fter deep consideration and careful examination of the conduct of Petitioner's counsel." *Id.* at 1.  The Court ordered Habeas Counsel to respond to the show-cause order, provided Respondent Travis Crews's counsel the opportunity to address Habeas Counsel's response, and permitted Habeas Counsel the opportunity to reply. *Id.* at 13.  Having carefully considered the briefing on the show-cause order, the Court now addresses counsel's conduct.

I.     **Background**

For the background of this case, see the Court's 161-page opinion denying each of Shockley's 28 claims, doc. 74, and the Court's opinion denying Shockley's Motion to Alter Judgment, doc. 95.  And for further background, see the opinions issued by various Missouri state courts, each rejecting all of Shockley's claims:  *State v. Shockley*, No. 05C2-CR00080-01, 2009 WL 10733289 (Mo. Cir. May 22, 2009); *State v. Shockley*, 410 S.W.3d 179 (Mo. 2013) (en banc); doc. 20-55 at 10–48 (first half of the motion court's order); doc. 20-56 at 1–36 (second half of the motion court's order); *Shockley v. State*, 579 S.W.3d 881 (Mo. 2019) (en banc).

After denying Shockley's habeas petition, the Court ordered his counsel to show cause why it should not sanction them for violating Federal Rule of Civil Procedure 11 and the Missouri Rules of Professional Conduct.  Doc. 76; *see also* Fed. R. Civ. P. 11(c)(3) (empowering a court to order, on its own initiative, "an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated" the ethical obligations listed in Rule 11). The Court's order outlined 23 distinct instances in which it appeared that Habeas Counsel had misled the Court about controlling law or misrepresented to the Court portions of the voluminous record in this case.  Doc. 76.  Habeas Counsel vigorously contest each point, arguing that their representation of Shockley satisfied their duties to the Court and that in some instances they merely should have been clearer or more precise.  *See* doc. 90.

Meanwhile, Crews takes no position on whether the Court should sanction Habeas Counsel, citing the Missouri Attorney General's reluctance to seek sanctions that could affect the outcome of a case and desire to avoid gaining a litigation advantage based on fear of sanctions. Doc. 92 at 1–3.  The Court understands, and shares, those concerns, and remains mindful of them as it considers the appropriate course in this matter.

## II.    Standard

Habeas cases are subject to specific rules in the federal courts, and those rules, in turn,

provide that a court may apply the Federal Rules of Civil Procedure "to the extent that they are

not inconsistent" with habeas-specific rules or statutory provisions.  *See* Habeas Rule 12.

Among the applicable rules is Rule 11.  *See Johnson v. Lumpkin*, 74 F.4th 334, 342–43 (5th Cir.

2023) (finding that the district court did not abuse its discretion in ordering attorneys in a § 2254

case to explain why the court should not impose Rule 11 sanctions).  That rule governs, in

relevant part, the duties of attorneys practicing before the federal courts:

> (b)   REPRESENTATIONS TO THE COURT.   By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> . . .
>
> (2)  the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]
>
> (3)  the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Fed. R. Civ. P. 11(b).  In the event that an attorney runs afoul of that provision, Rule 11 also

grants federal courts the authority to impose appropriate sanctions for such improper conduct:

> (c)  SANCTIONS.
>
> (1)  *In General*.  If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation.
>
> . . . .

> (4) *Nature of a Sanction.*  A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated.  The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.
>
> . . . .
>
> (6) *Requirements for an Order.*  An order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction.

Fed. R. Civ. P. 11(c).

The Federal Rules of Civil Procedure also allow federal district courts to "adopt and amend rules governing its practice," Fed. R. Civ. P. 83(a)(1), and the Eastern District of Missouri has exercised that authority to adopt the Rules of Professional Conduct promulgated by the Supreme Court of Missouri, E.D. Mo. L.R. 12.02.  Among those rules is Missouri Supreme Court Rule 4-3.3, which, like Federal Rule 11, addresses candor to the courts:

(a)  A lawyer shall not knowingly:

> (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer [or]
>
> (2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel . . . .

Mo. Sup. Ct. R. 4-3.3(a).  To enforce such rules, federal courts are imbued with an "inherent power" including "the power to discipline attorneys appearing before the court" through "monetary or other sanctions appropriate for conduct [that] abuses the judicial process." *Harlan v. Lewis*, 982 F.2d 1255, 1259 (8th Cir. 1993).

District courts have broad discretion in their choice of sanctions.  *Vallejo v. Amgen, Inc.*, 903 F.3d 733, 747 (8th Cir. 2018) (citation omitted).  The Advisory Committee Notes to Federal

Rule 11 suggest a variety of possibilities: "striking the offending paper; issuing an admonition, reprimand, or censure; requiring participation in seminars or other educational programs; ordering a fine payable to the court; [or] referring the matter to disciplinary authorities." Fed. R. Civ. P. 11(c) advisory committee's note to 1993 amendment; *see also Scott v. Vantage Corp.*, 64 F.4th 462, 477 (3d Cir. 2023) (noting that "the available options run the gamut from an award of attorneys' fees . . . to 'a written order admonishing by name the individual lawyers responsible for the Rule 11(b) violations'" (quoting *Morris v. Wachovia Secs., Inc.*, 448 F.3d 268, 285 (4th Cir. 2006))); *Morris*, 448 F.3d at 285 (contemplating an admonition by name of individual lawyers responsible for violating Rule 11(b)). When determining what sanction is appropriate, courts should "consider which sanction 'constitutes the least severe sanction that will adequately deter the undesirable conduct.'" *Vallejo*, 903 F.3d at 747 (quoting *Kirk Cap. Corp. v. Bailey*, 16 F.3d 1485, 1490 (8th Cir. 1994)). Whenever sanctions are at stake, "[d]ue process is satisfied if the sanctioned party has a real and full opportunity to explain its questionable conduct before sanctions are imposed." *Coonts v. Potts*, 316 F.3d 745, 753 (8th Cir. 2003) (citation omitted).

## III.   Discussion

The Court first addresses Habeas Counsel's general arguments against the imposition of sanctions, and then addresses each potential violation that the Court outlined in its show-cause order. *See* doc. 76.

### A.   Habeas Counsel's general arguments against imposing sanctions

As Habeas Counsel rightly explain, a district court abuses its discretion in ordering sanctions if counsel "set forth colorable factual and legal arguments to support their claims." Doc. 90 at 3–4 (quoting *Wolfchild v. Redwood Co.*, 824 F.3d 761, 771 (8th Cir. 2016)). And the Court recognizes the propriety of Respondent's desire to avoid gaining a litigation advantage in

death-penalty cases via the threat of sanctions.  *See* doc. 92 at 1–3.  But before the Court are not

sanctions threatened by an opponent for tactical advantage.  Instead, these are Court-initiated

sanctions that aim to protect the integrity of the litigation process in the face of Habeas Counsel's

proffering of entirely unsupported claims.

In many of the instances enumerated below, Habeas Counsel crossed the carefully drawn

line separating zealous advocacy from improper tactics that undermine both the ability of courts

to deliver justice and the confidence of the public in the integrity of the justice system.  That this

is a capital-habeas case does not diminish Habeas Counsel's responsibility to engage candidly

with the Court.  In fact, it is those cases of utmost gravity—like this one—that emphasize the

need for adherence to the ethical requirements governing attorneys' representations to the Court.

After applying the law to the facts, the Court must reach the right result; all the more so in a case

with the gravest of consequences.  Misrepresentations undermine that process.

Habeas counsel point to First and Fifth Circuit precedent for the proposition that habeas

courts should, due to the nature of the Great Writ, impose sanctions in only the most egregious of

cases.  Doc. 90 at 2–3 (first citing *United States v. Quin*, 836 F.2d 654 (1st Cir. 1988); then citing

*Anderson v. Butler*, 886 F.2d 111 (5th Cir. 1989)).  But neither opinion, even if binding upon this

Court, would caution against imposing sanctions in this case.  In *Anderson*, the Fifth Circuit

explained that "the standard for imposing sanctions [in habeas cases] must reflect the writ's

special role, the resources of prisoners, and the uncertainty in the law. . . . [C]ases [in which

sanctions are warranted] seldom should be found, and rarely outside the presentation of

successive writs."  886 F.2d at 114.  The court then determined that sanctions were not

appropriate in significant part because petitioner was not represented by counsel.  *Id*.

"Prisoners," the court explained, "because they are prisoners, must be given especial latitude in

6

their contentions of illegality" in part because "they are usually without substantial means." *Id.* at 113–14.

This Court does not disagree with the standard articulated in *Anderson* but faces very different circumstances from the pro se habeas petitioner in that case. Here, Shockley is represented by a team of experienced and specialized death-penalty lawyers who spared no effort to articulate numerous arguments—some colorable, others not—spanning over five hundred pages of briefing. *See* doc. 3 (describing the Missouri Capital Habeas Unit's qualifications and its partnership with the Federal Public Defender's Office for the Southern District of Ohio in defending Shockley); doc. 13 (moving to appoint the Office of the Federal Public Defender, Southern District of Ohio Capital Habeas Unit as co-counsel); doc. 48 (Shockley's Amended Petition). In fact, even in the habeas context, the *Anderson* court affirmed that the relevant inquiry for the imposition of Rule 11 sanctions is "whether the contention is utterly frivolous and whether it is asserted with no good faith belief in its validity." 886 F.2d at 114. The sanctionable instances enumerated below fall squarely within the reach of that rule.

The First Circuit's opinion in *Quin* proves no more helpful to Habeas Counsel. There, the court noted that a claim made in a habeas petition was "so palpably unreasonable as to warrant censure" and affirmed the imposition of Rule 11 sanctions. *Quinn*, 836 F.2d at 656. And though the court sympathized with the view that "where a penal consequence is genuinely at issue, counsel's fear of personal sanctions might impermissibly restrict free recourse to the Great Writ," it did not go so far as to say that a court should never impose sanctions under such circumstances. *Id.* at 657. Instead, it explained that a court should not apply the Federal Rules of Civil Procedure if doing so "would be inconsistent or inequitable in the overall framework of habeas corpus." *Id.* (citation and internal quotation marks omitted). Habeas Rule 12 explicitly

7

reflects that view, and in any event, it is hardly "inconsistent or inequitable in the overall framework of habeas corpus," *Quin*, 836 F.2d at 657 (citation omitted), to require that habeas counsel be candid in their legal and factual arguments to the Court.  Habeas Counsel's conduct warrants sanctions not because Shockley's case was "ultimately determined to be without merit," doc. 90 at 3 (quoting *Quin*, 836 F.2d at 659 (Coffin, J., dissenting)), but because in various circumstances Habeas Counsel intentionally and egregiously misrepresented both the facts and the law to the Court.

While some courts have adopted a rather laissez-faire approach to the conduct of counsel in habeas cases generally, and capital-habeas cases specifically, *see, e.g., United States ex rel. Potts v. Chrans*, 700 F. Supp. 1505, 1525 (N.D. Ill. 1988) (holding that applying Rule 11 in the habeas context "would present a barrier to the ability of individuals to obtain the special relief only habeas provides"), the Court finds that approach inconsistent with the law and detrimental to the administration of justice.  Applying that approach encourages what occurred here— misrepresentations and misstatements to the Court—and eviscerates Rule 11, and for that matter, Rule 1, which requires the Court to apply the rules to ensure the "just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1.  The Court finds that according counsel in capital-habeas cases a degree of wider latitude is appropriate, but not to the point of the wholesale discarding Rule 11 and the applicable rules of professional conduct.  In short, the Court rejects the notion that "this is a capital case, so the rules don't apply."

**B.      Show-cause order**

The Court's show-cause order identified 23 instances of potential violations.  Doc. 76. Habeas Counsel have responded to each of those paragraphs, arguing they committed no violations and that this Court should be reticent to impose sanctions in the habeas context.  *See*

doc. 90.  Having carefully considered both the record in this case and all relevant briefing, the Court concludes that some of the enumerated instances warrant sanctions; that others violate the letter of the rules but should not result in sanctions; and that still others do not constitute violations at all.  The Court discusses each instance enumerated in its show-cause order in turn.

In the end, the Court imposes sanctions for each of 11 distinct and especially troubling violations.  Those violations stand out for two main reasons:  (1) they are the most open and obvious, and (2) they best demonstrate how Habeas Counsel have undermined the confidence of the public—especially those directly or indirectly affected by the murder of Sergeant Carl DeWayne Graham, Jr.—in the judicial process.  But the import of applying Rule 11 does not end there.  By their fabrications and misrepresentations, Habeas Counsel have compelled the Court and opposing counsel to address meritless, frivolous, specious, and unsupported arguments.  Capital habeas cases consume tremendous amounts of judicial resources, and rightly so, but many of Habeas Counsel's arguments here needlessly placed added drains on those limited resources.

Habeas Counsel's actions affect others, too.  They have questioned and at times directly besmirched the character of numerous actors involved, even tangentially, in the litigation of Shockley's murder.  The impact of such improprieties is especially magnified when, as here, the facts of the case at hand arise out of a small, rural area.  Shockley murdered Sergeant Graham in Carter County, Missouri, a county of just over 5,000 people in which the largest city is a town of fewer than 800 inhabitants.  *See Shockley*, 579 S.W.3d 881; United States Census Bureau[1] (last visited Jan. 31, 2024).  The damage done to the fabric of such a community by Habeas Counsel's misrepresentations is impossible to quantify, but the impact of such a tragedy and the many

---

[1] https://data.census.gov/profile/Carter_County,_Missouri?g=050XX00US29035.

litigious years that have followed is no small matter.  By misstating the law and the facts, Habeas Counsel exceeded any duty they had to their client and at times showed little regard for the truth, or for the effects their misrepresentations may have had on a troubled public.  Rule 11 and the Missouri Rules of Professional Conduct provide the appropriate means by which to hold Habeas Counsel accountable.

### 1.    Misrepresentations of Krista Kingree's testimony

Rule 11(b)(3) provides that an attorney filing papers with the Court certifies that to the best of counsel's belief formed after reasonable inquiry, the factual contentions therein have "evidentiary support."  But here, Habeas Counsel repeatedly misrepresented the record to the Court, stating as fact inferences that the record simply does not support.

In Shockley's Petition, Habeas Counsel asserted that Krista Kingree testified, when recalling a conversation she had with Sergeant Graham's fiancée, Cathy Runge, that "Graham maintained files on the other officials he was actively investigating."  Doc. 48 at 472.  But Krista Kingree never made any such statement.  When asked, in the relevant testimony, about the personnel files in question, Kingree said, "from what I remember it seemed [they were] negative."  Doc. 20-24 at 437.  She was then asked whether Graham had been keeping the files "due to some things that he was looking into that had been going on," to which she flatly replied, "no."  *Id.* at 438.  She explained on cross examination that Graham "had files on officers etc. . . . from where he worked at, from the highway patrol."  *Id.* at 440.  And when asked about the contents of those files, she opined that they were not "necessarily [of] a positive connotation," but then added,

> I know for instance . . . everyone has a file in their position, in some job positions, so sometimes the positive, sometimes the negative, everything goes in that file, your reviews, etc., so . . . I had heard about several negatives however that doesn't necessarily mean that there wasn't [sic] also positives in those files.

*Id.* at 441.  Driving home the point, the examining attorney asked, "so what you're describing sounds like a file that a supervisor would keep on his employees?"  *Id.*  Kingree replied, "possibly yes."  *Id.*

That exchange simply cannot give rise to the inference that Graham was "actively investigating," doc. 48 at 472, any official.  Kingree's testimony contains no support for the proposition that Graham's files contained records of ongoing investigations.  *See* doc. 20-24 at 434–46.  Habeas Counsel resist this conclusion, arguing that because Kingree (1) discussed these files with Runge shortly after the murder and (2) recalled the name of one official, Greg Ponder, reflected in the files, and added that "there were others," her words reasonably "led Habeas Counsel to believe Krista Kingree had testified Graham had investigated and obtained negative evidence on multiple other officers."  Doc. 90 at 11–12 (quoting doc. 20-24 at 445).  But the mere timing of Kingree's conversation with Runge and the fact that Greg Ponder and others featured in the files does not reasonably permit the inference that Graham investigated fellow officers.

Alternatively, Habeas Counsel argue that Kingree provided speculative responses to leading questions, therefore permitting them not to afford those answers any weight when attempting to draw reasonable inferences from her testimony.  Doc. 90 at 12–13.  But even if Habeas Counsel could rightly discount parts of her testimony when drawing inferences about that same testimony as a whole, the mere existence of files, some of which included negative connotations about law enforcement officers, does not support any reasonable inference that Graham "actively investigat[ed]," doc. 48 at 472, other officials, much less that those files recorded the details of those investigations.

11

Because Habeas Counsel plainly misrepresented Kingree's testimony, the Court finds that their assertion that she had heard that "Graham maintained files on other officials he was actively investigating," *id.*, does not have "evidentiary support," Fed. R. Civ. P. 11(b)(3). Therefore, such misrepresentation violates Rule 11(b)(3).

### 2.      Representations of Jeanne Kingree's testimony

In the second point of its show-cause order, the Court questioned whether Habeas Counsel accurately represented the testimony of Jeanne Kingree (mother-in-law of Krista Kingree) regarding what files Sergeant Graham may have kept on his home computer.  Habeas Counsel had written that "Jeanne Kingree testified that during this stay, Runge told her that Graham kept files on his men on the computer at his home."  Doc. 48 at 472 (internal quotation marks omitted).  The Court noted in its order that Jeanne[2] also testified that she had "no idea" regarding "what the files were pertaining to from that conversation."  Doc. 20-24 at 402.

Having carefully considered the record, the Court finds no violation here.  Habeas Counsel's writing faithfully reflects the last question and answer on Jeanne's direct examination: "directly from Cathy Runge" during her stay with Jeanne, Jeanne "heard . . . that [Graham] kept files on his men on the computer at his home."  *Id.* at 403.  Earlier in the questioning, Jeanne had been asked whether she "had any idea what the files were pertaining to from that conversation," to which she replied, "no, no idea."  *Id.* at 402.  Though the statements are sufficiently ambiguous to leave open the possibility of tension between them, they are best understood as addressing different questions:  one about the existence of those files, the other about their contents.

---

[2] The Court sparingly uses first names only for the sake of clarity, not to imply familiarity.

Jeanne Kingree's "no idea" response is therefore best understood as pertaining to the actual content of the files, not their very existence on Graham's home computer. The "no idea" testimony, however, reinforces the Court's conclusion as to the first point of its show-cause order, above, that Habeas Counsel misrepresented Krista Kingree's testimony. Habeas Counsel faithfully represented the record on this point, and accordingly, the Court discharges this point of its show-cause order.

### 3.  Misrepresentations of the record as to the existence of "reports" on Melton

In the course of presenting claim 25, Habeas Counsel presented a conspiracy theory regarding a shadowy ring of corrupt officials, including the now-deceased Sheriff Greg Melton. *See* doc. 48 at 493. According to Habeas Counsel, "during post-conviction proceedings, Shockley's counsel learned of additional evidence about Carter County Sheriff Greg Melton, who . . . was engaged in numerous illegal activities. These include the unlawful seizure of weapons, the use of illegal drugs, and drug trafficking." *Id.* After further accusations against Melton and his alleged coconspirators, Habeas Counsel argued as follows:

> Counsel recognizes that these are very serious allegations against public officials. However, they are supported by the criminal charges brought against Sayler and White. They are also substantiated by two reports generated by the State during the investigation into Graham's homicide. These reports stated that Sheriff Melton was involved in Graham's murder.

*Id.* at 495–96. Thus, Habeas Counsel stated to the Court that two state-generated reports substantiate Habeas Counsel's accusations against Melton and that these reports reflect that Melton was involved in Graham's murder. Upon reviewing these documents, the Court finds Habeas Counsel's description beyond the bounds of proper advocacy, and beyond the pale.

The first citation to a supposed state-generated substantiating report actually refers to an email that both reported a wild rumor and questioned that rumor's reliability. *See* doc. 48-3

13

at 295.  On March 27, 2007, Holly Lewis—a concerned citizen and former police officer, *see*

doc. 40-3 at 295 (describing Lewis as "a former Butler County Deputy, who now is an insurance

salesperson")—emailed a member of the Missouri State Highway Patrol regarding a

conversation with a man whom she calls "Dale" without any last name.  *Id.*  The email states in

relevant part:

> I obtained this information from my DSC, (Dale) who is from Van Buren.  I don't
> know where he got this information, or how valid it is, or if it is at all.
>
> According to Dale:  Carter County Sheriff, Greg Melton, is involved in drug
> trafficking.  Sgt Graham had started to investigate Melton, or Melton thought that
> Graham was investigating him. . . . Shockley was also part of Melton's trafficking
> system.  Someone, (Dale thought it was Melton) told Shockley to meet Graham at
> his house.  When Shockley arrived, Graham had already been shot.
>
> For some reason, I am thinking that he said something about Melton had called
> Shockley to meet at Grahams [sic], to "jump" him. . . . Melton later made some sort
> of comment to Shockley about taking care of business, and that Graham should
> have minded his own business.
>
> Dale rattles a lot, but he seemed just convinced that Greg Melton had Sgt. Graham
> killed to protect his drug trade.  Now, I know that this seems far[-]fetched, and there
> is a possibility that if questioned on it, Dale will either completely deny it, or change
> his story.  But, just on the off chance that there is a grain of truth to this story, I feel
> better having told someone.

*Id.*  Habeas Counsel cannot honestly describe this email as a "report[] generated by the

state" that "substantiate[s]" their allegations of drug trafficking and murder.  Doc. 48 at 495–96.

It is not a report.  It was not generated by the state.  It does not substantiate allegations against

Melton.  The author questions the veracity of "Dale" in stating that "he rattles a lot[,]" and

further relates some strained credulity ("I know that this seems far[-]fetched . . . .").  Doc. 40-3 at

295.  Thus, the Court ordered Habeas Counsel to explain why they should not face sanctions.

Doc. 76 at 4.

The second document that Habeas Counsel cite presents a police report:

1. On March 28, 2005, I interviewed Scott R. Hicks . . . in reference to the homicide of Sergeant C. D. Graham.  Hicks contacted me in person at Troop E Headquarters.

2. The interview began by Hicks saying that he was at Scooters II, a bar at the intersection of U.S. 60 and Route T in Butler County, Missouri.  Hicks said he was talking to "Barney" and the topic of Sergeant Graham's homicide came up.  Hicks was unsure of Barney's real name, but thought his last name was Mayberry.  Hicks said Barney told him that someone other than Lance Shockley had murdered Graham.  Hicks said that . . . he thought his cousin, Greg Melton, was responsible. . . . I questioned Hicks about the details of the crime that Barney had related to him.  Hicks said Barney told him that the person who committed the crime had swept their footprints away and had only used a shotgun because there is no way to trace the bullet.

3. I questioned Hicks further about how he knew Barney, and he said he used to live in Van Buren and that the police were dirty there.  I asked, "Have you been in trouble with the police?"  He said, "No, but some of my friends were told to leave town." . . .

4. Since Hicks did not have the correct details of the crime scene and seemed to have a grudge against the sheriff, I found his information to be unreliable.

Doc. 48-3 at 112–13.

Again, this police report does not substantiate allegations of criminal wrongdoing against Melton.  Rather, it reports a hearsay rumor regarding Graham's murder and explains why that rumor lacks credibility.  Thus, the Court likewise ordered Habeas Counsel to explain why this representation does not warrant sanctions.  Doc. 76 at 4.

Habeas Counsel attempt to explain their actions by stating that they "agree[] that the referenced documents do not prove Melton's involvement in the Graham murder or other criminal conduct.  However, Habeas Counsel did not cite to this record as proof positive that Melton was engaged in criminal conduct or that he had murdered Graham."  Doc. 90 at 15 (citation omitted).  Still, Habeas Counsel maintain that these documents "substantiate" their allegations against Graham.  *Id.*  They also note that they "referred to the 2007 email as a document that 'alleged that Sheriff Melton' was involved in drug trafficking and Graham's

murder." Doc. 90 at 15 (quoting doc. 48 at 496).  "It was Habeas Counsel's intent to cite to the
two documents to demonstrate that allegations had been made against Melton and that the State
had been aware of those allegations . . . ." *Id.*

However, "two reports generated by the State" which "substantiate[]" allegations against
Melton are a very different thing than simply two records of allegations against Melton.  Habeas
Counsel's description of Holly Lewis's email as a state-generated report that substantiates these
allegations suggests credible allegations, not just allegations.  It suggests that the allegations
come from a source the Court should accord some trust when it reports police misconduct.  In
context, the word "report" implies serious investigation or consideration of the issues, and the
word "substantiated" implies that the allegations have some degree of credibility.  *See* Random
House Dictionary of the English Language (2d ed. 1987) (defining "report" as "an account or
statement describing in detail an event, situation or the like, usually as the result of observation,
inquiry, etc."); *id.* (defining "substantiate" as "to establish by proof or competent evidence").
Habeas Counsel cannot retract their former statement by arguing that they only meant to say that
allegations existed.  Nor do Habeas Counsel attempt to defend the reliability of "Dale" or
"Barney," which is at the heart of whether their words "substantiated" the allegations.  *See* doc.
90 at 14–16.  The statement that two state-generated reports substantiate these allegations
amounts to a "factual contention" that lacks any "evidentiary support."  *See* Fed. R. Civ. P. Rule
11(b)(3).  Thus, Habeas Counsel have violated Rule 11.

### 4.    Misrepresentations of the record as to a possible *Brady* violation

The fourth point of the Court's show-cause order concerns Habeas Counsel's statement
that "[e]lectronic copies of [the files from Sergeant Graham's home computer] were never turned
over to defense counsel," thereby constituting a *Brady* violation.  Doc. 48 at 471, 475 (citing

16

*Brady v. Maryland*, 373 U.S. 83 (1963), which requires that prosecutors not suppress evidence).

But that statement thoroughly misleads the reader into thinking that Shockley's counsel were

unlawfully barred from the benefits of those files as evidence.  Following an evidentiary hearing

on the matter, a state court explained that counsel had had full access to those files:

> The evidence adduced at the evidentiary hearing was that the computer hard drive
> from [Graham's] home was taken into evidence in the course of the investigation
> of this murder. . . . The trial attorneys in this case were provided access to all of the
> evidence seized in order to investigate potential defenses and evaluate the State's
> evidence against [Shockley].   The trial attorneys in this case did review that
> evidence and all law enforcement reports, which included reports that related to the
> examination and seizure of the victim's computer hard drives . . . . Although, as the
> parties have herein stipulated, the hard drives are no longer accessible due to the
> passage of time and other factors, there is no evidence that the State, either with or
> without intent, withheld the files on the computer hard drive.  Thus, the element of
> Brady requiring that the State must have suppressed the evidence in question is not
> met.

Doc. 20-56 at 35.  In the wake of the show-cause order, Habeas Counsel admit that "the State

offered access to Graham's personal computer hard drives to Shockley's initial pre-trial

counsel," but add that "the Shockley attorneys who received those offers withdrew in July 2008

without obtaining the copies, and subsequent counsel did not receive the files, or a further offer

to review the files."  Doc. 90 at 17–18.  They also insist that "*Brady* mandates that the State must

*disclose* evidence favorable to the defense, not just offer access to a hard drive to pre-trial

counsel."  *Id.* at 18.

That response to the show-cause order distances itself from Habeas Counsel's own initial

forceful language ("*never* turned over," doc. 48 at 471 (emphasis added)).  But then Habeas

Counsel replace their misstatement of the record with a misstatement of the law.  *Brady* simply

does not distinguish between "disclosure" of evidence and "offering access to" to the same.  *See*

*Brady*, 373 U.S. at 87–88 (prohibiting only the "suppression" of evidence).  Nor does the mere

furnishing of access to (without "turning over") evidence *ipso facto* yield a *Brady* violation.  *See*

17

*United States v. Walrath*, 324 F.3d 966, 969 (8th Cir. 2003) (holding that "[a] defendant fails to show the prosecution suppressed evidence when the defendant was aware of and had access to the evidence," and explaining that there was no suppression in that case because the evidence "was acknowledged and made available to" the defendant).   Habeas Counsel insist otherwise, relying entirely on two out-of-context sentences lifted from the Supreme Court's opinion *Banks v. Dretke*, 540 U.S. 668 (2004).   *See* doc. 90 at 19 ("[T]he Supreme Court rejected that 'defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed.['] 'A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process.'" (quoting *Dretke*, 540 U.S. at 695–96)).   But that case cuts decisively against Habeas Counsel's position in this case.   The majority explained:   "*Brady*, we reiterate, held that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process . . . .'" *Dretke*, 540 U.S. at 691 (quoting *Brady*, 373 U.S. at 87).   "[Among the] essential elements of a *Brady* prosecutorial misconduct claim . . . [is that the] 'evidence must have been suppressed by the State . . . .'" *Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)).   The facts of that case featured the State's "concealment and misrepresentation" of evidence that a "key witness for the prosecution" was a paid informant for the lead investigator of the case.   *Id.* at 676–87, 695.   Together, both the facts and the law at play in the *Dretke* case doom Habeas Counsel's insistence upon the physical "turning over" of evidence.   First, unlike in *Dretke*, and as the state court made clear, no concealment or misrepresentation by the State of the files on Graham's computer occurred.   Shockley's counsel had access to and reviewed all evidence pertaining to those files.   Doc. 20-56 at 35–36.   Second—and more importantly—the

State hardly violates *Brady*'s rule against "suppression" of evidence when it provides opposing counsel with access to all relevant files.

Because "suppression" is the touchstone of a *Brady* violation, Habeas Counsel's hair-splitting between "disclosure of" and "offering access to" evidence is entirely immaterial. Neither can be fairly understood as "suppressing" evidence.  Accordingly, that "legal contention" is hardly "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."  Fed. R. Civ. P. 11(b)(2).

Nevertheless, the Court is mindful of the gravity of imposing sanctions upon counsel, and of the high bar for misconduct that ought to be cleared before sanctions are at play.  The Court also notes that Habeas Counsel's statement was technically true.  The State, though *Brady*-compliant, did not "turn[] over" "[e]lectronic copies" of Graham's files.  Doc. 48 at 471.  For that reason, the Court, in its discretion, declines to impose sanctions for the fourth point of its show-cause order.  *See* Fed. R. Civ. P. 11(c)(1) ("If . . . the court determines that Rule 11(b) has been violated, the court *may* impose an appropriate sanction . . . ." (emphasis added)).

### 5.      Arguments that the Court should ignore *Shinn v. Ramirez*

Rule 11(b)(2) provides that when an attorney files papers with the Court, he certifies that to the best of his belief formed after reasonable inquiry, the legal contentions therein are "warranted by existing law or by a nonfrivolous argument for . . . reversing existing law." Shockley's Habeas Counsel unapologetically ran afoul of that ethical requirement in their arguments on the application of *Shinn v. Ramirez*, 596 U.S. 366 (2022), to this case.

When the Supreme Court handed down *Shinn* in the midst of this habeas proceeding, the Court ordered the parties to provide supplemental briefing on how *Shinn* affected Shockley's then-pending motion for discovery.  Doc. 61.  Habeas counsel responded by arguing, in no

19

uncertain terms, that this Court should ignore binding Supreme Court precedent altogether. "Applying [*Shinn*[3]] and its interpretation of [28 U.S.C.] § 2254(e)(2)," they argued, "would . . . violate[] numerous constitutional and statutory provisions," including, among others, the due process right afforded by the Fifth Amendment; the writ of habeas corpus itself; the "Equal Protection Clause of the Fifth and Fourteenth Amendments"; the "Ancient Principle of **Ubi Jus, Ibi Remedium**"; and the Privileges and Immunities Clause of Article IV of the Federal Constitution.  Doc. 64 at 8–9.  This argument that the Court has the power to ignore Supreme Court precedent is stunning on its face.  Counsel are, of course, free to disagree privately with any of the Supreme Court's rulings, or to preserve arguments to make to the Supreme Court that *that court* should reverse its decision in *Shinn*.  But to argue that this Court should blithely ignore binding Supreme Court precedent flies in the face of Rule 11's requirement that counsel limit themselves to arguments "warranted by existing law."  Fed. R. Civ. P. 11(b)(2).

Nor do Habeas Counsel make a "nonfrivolous argument . . . for reversing existing law." *Id.*  This Court has no power to reverse the Supreme Court, and *Shinn*, decided just in 2022, obviously passes constitutional muster in the Supreme Court's eyes.  And Habeas Counsel made no good-faith effort to distinguish *Shinn* from the case at hand.  But nevertheless, Counsel insisted that abiding by clearly applicable Supreme Court precedent would put this Court at odds with the Constitution, and argued that this Court should set aside Supreme Court precedent in favor of such principles as "*ubi jus, ibi remedium*" and "fundamental fairness," doc. 64 at 8–9— contradicting the very notion of the Supreme Court's supremacy on constitutional questions established in *Marbury v. Madison*.  *See* 5 U.S. (1 Cranch) 137, 146–47 (1803).  Arguments for utter lawlessness, even by capital-habeas counsel, do not comport with Rule 11.

---

[3] The original reads "*Martinez*" rather than "*Shinn*" or "*Ramirez*," but context makes clear that this is a typographical error.  *See* doc. 64 at 8.

In response to the Court's show-cause order, Habeas Counsel protest that they "have a duty to preserve potential future legal arguments that, although foreclosed at the time by precedent, may bear fruit at a later date." Doc. 90 at 21. The Court agrees, but Habeas Counsel did not do that. Instead, they affirmatively urged this Court to thumb its nose at the Supreme Court. Habeas Counsel made a critical and simple error: they never acknowledged that this Court must follow *Shinn*, and openly urged that this Court ignore the case altogether. Doc. 64 at 8–9. The Court observes that Habeas Counsel may have had a visceral reaction to the *Shinn* decision, and rather than temper that reaction with cool reflection, they vented their passions. Perhaps understandable, but better left on the cutting-room floor. The Court appreciates passionate advocacy, but the bounds of passionate advocacy stop well short of advocating anarchy.

In defense of that move, Habeas Counsel point to a concurring opinion issued by a panel of the Fifth Circuit for the proposition that it is good practice for counsel to bring foreclosed arguments in the name of preserving them for the future. Doc. 90 at 22 (citing *United States v. Garza-De La Cruz*, 16 F.4th 1213, 1214–15 (5th Cir. 2021) (Costa and Ho, JJ., concurring)). But that case only reinforces the point: there, the defendant affirmatively conceded that Supreme Court precedent foreclosed his argument, thereby alerting the court that his was a losing argument under existing law but preserving the issue for possible later review. *See Garza-De La Cruz*, 16 F.4th at 1213. The concurrence went on to explain that such preservation is appropriate because "parties may litigate in anticipation of a good faith expectation of legal change." *Id.* at 1215 (Costa and Ho, JJ., concurring) (cleaned up) (quoting *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 277 (5th Cir. 2019) (Ho, J., concurring in judgment)). Here, by contrast,

Habeas Counsel never acknowledged that *Shinn* applied as binding law, nor did their arguments reflect a "good faith expectation of legal change."  *See* doc. 64 at 8–9.

Because Habeas Counsel urged the Court to ignore Supreme Court precedent and failed to acknowledge that *Shinn* is adverse, on-point, and binding law, the Court finds that their arguments are not "warranted by existing law" or any "nonfrivolous argument for extending, modifying, or reversing existing law or establishing new law."  Fed. R. Civ. P. 11(b)(2). Likewise, this argument is not an attempt, much less a proper attempt, to preserve an issue for appeal.  *See* doc. 64.  Counsel therefore violate Rule 11(b)(2).

### 6.    Misrepresentations of the collective testimony of Carly Carter, Jeanne Kingree, and Krista Kingree

In claim 25, Habeas Counsel argued that the State suppressed "evidence involve[ing] other investigations Graham was conducting relating to government corruption in Carter County, Missouri."  Doc. 48 at 471.  While attempting to support this point, Habeas Counsel stated that "multiple witnesses confirmed in a post-conviction hearing that Graham's fiancé[e] was concerned about her safety due to the ongoing investigations Graham was conducting in Carter County, Missouri, at the time of his death."  Doc. 48 at 472.  After reviewing the testimony that Habeas Counsel cited, the Court found no support for that assertion.  *See* doc. 74 at 91 (citing doc. 20-24 at 386–405, 428–45).

Habeas Counsel argue that the combined testimony of Jeanne Kingree, Krista Kingree, and Carly Carter support the inference that Runge feared for her safety because of Graham's investigations.  Doc. 90 at 24–26.  Habeas Counsel point to Krista Kingree's testimony that Runge feared Graham's killer in the weeks following the murder.  *Id*. at 24.  Habeas Counsel also point to testimony that Graham kept files on his men, including that Krista Kingree stated that Graham kept the files at home for some unspecified reason.  *Id.*  Further, Jeanne Kingree

also mentioned that someone in her home mentioned files Graham kept on his men at his house. *Id*. at 25.  And Habeas Counsel refer to Carly Carter's description of a conversation she had with Runge about Graham's investigations.  *Id.*  Finally, Habeas Counsel note a statement by Michael Kingree, who told a special prosecutor that Graham had files about an officer named "Ponder" and that investigators had removed those files from Graham's house.  *Id.*  Habeas Counsel then explain that they inferred from this collection of testimony that Runge "was concerned about her safety due to the ongoing investigations Graham was conducting."  Doc. 90 at 26 (quoting doc. 48 at 472).

This explanation suffers from two problems.  First, it lacks the crucial connection between the files and Runge's fear.  Habeas Counsel draw this connection to suggest that the files contained records of grave official wrongdoing, something so embarrassing or incriminating that the corrupt officials may have murdered Graham, leaving Runge with reason to think they might murder her too.  Thus, Habeas Counsel's argument turns on whether the existence of the files *caused* the fear.  *See* doc. 48 at 472.  Counsel state that, "[b]ased on the collective testimony of Krista Kingree, Jeanne Kingree, and Carly Carter, and Michael Kingree's 2012 interview . . . Habeas Counsel made a good-faith connection between testimony [that] Runge was afraid and that the concerns were related to Graham's investigations."  Doc. 90 at 26.  However, the Court finds nothing other than a house of cards of speculation to support this supposed "good-faith connection."

Second, even if the collective testimony did license Habeas Counsel's connection between the files and the fear, the testimony does not itself draw that connection.  *See* doc. 20-24 at 386–405, 428–45.  But Habeas Counsel stated that "multiple witnesses confirmed in a post-conviction hearing that Graham's fiancé[e] was concerned about her safety due to the ongoing

23

investigations Graham was conducting in Carter County, Missouri, at the time of his death."
Doc. 48 at 472.  The Court acknowledges that the fiancée of a murdered law-enforcement officer
would reasonably experience fear for her safety, but fear in itself is not the point.  It's that
Habeas Counsel improperly connected that fear to the existence of files Sergeant Graham
purportedly kept on other officers to bolster Shockley's arguments that the State suppressed
evidence of government corruption in Carter County.  Thus, as counsel would have it, showing
that others had motives to murder Sergeant Graham.  Assuming for the sake of argument, and to
give counsel the benefit of the doubt, that the collective testimony provided some support for
Habeas Counsel's "good-faith inference," it still does not "confirm," in so many words, that
Runge's fear related to Graham's files on other officers. Thus, this statement by Habeas Counsel
stands as a "factual contention" that does not "have evidentiary support."  *See* Fed. R. Civ. P.
Rule 11(b)(3).  Rather, counsel invented a causal connection between different pieces of
testimony and then ascribed that connection to the various witnesses.  By doing so, Habeas
Counsel violated Rule 11.  *Id.*

### 7.   The applicability of *United States v. Agurs*

In Shockley's petition, Habeas Counsel argued that the Missouri Supreme Court
"egregiously misapplied the proper standard" for the materiality of evidence by failing to apply
*United States v. Agurs*, 427 U.S. 97 (1976).  Doc. 48 at 500.  In *Agurs*, the court held that "[t]he
proper standard of materiality must reflect our overriding concern with the justice of the finding
of guilt . . . . [I]f the omitted evidence creates a reasonable doubt that did not otherwise exist,
constitutional error has been committed."  427 U.S. at 112.  But nearly a decade later, the
Supreme Court decided *United States v. Bagley*, 473 U.S. 667 (1985), in which it held that
"evidence is material only if there is a reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682. And though it did not cite *Bagley* by name, the Missouri Supreme Court applied the same standard verbatim. *See Shockley v. State*, 579 S.W.3d 881, 920 (Mo. 2019) (en banc).

The Court's show-cause order questions why Habeas Counsel failed to acknowledge the newer case, and that the Missouri court therefore applied the correct standard. Doc. 76 at 6. In response, Habeas Counsel merely say that "the Supreme Court did not supersede or overrule *Agurs* in *Bagley*" and that "*Bagley* is thus not directly adverse precedent to *Agurs*. . . . *Agurs* and *Bagley* apply a consistent standard." Doc. 90 at 28. That's exactly the Court's point. Habeas Counsel once insisted that the Missouri Supreme Court, which had applied the *Bagley* standard, was wrong for failing to apply *Agurs*. But not only is *Bagley* the more recent articulation of the correct standard—it is also merely, as the Supreme Court put it, "the *Strickland* formulation of the *Agurs* test for materiality." *Bagley*, 473 U.S. at 682.

To be sure, Habeas Counsel should have notified the Court of the new governing articulation. But in the end, Habeas Counsel simply accused the Missouri Supreme Court of applying the wrong standard when it was actually applying a newer articulation of the same standard. That error bespeaks more ignorance than deceit. For that reason, the Court finds that Habeas Counsel's arguments on this point do not rise to the level of sanctionable conduct.

### 8.      Misstatements of the law of privilege

Shockley's petition describes how the State convinced his uncle to wear a recording device during an interview with Shockley's defense attorney, an unsavory tactic, and accuses the State of thereby "intruding on the attorney-client privilege." Doc. 48 at 308. The Court's show-cause order questions why Habeas Counsel failed to raise or address the obvious problem with that claim: that "comments to a third party . . . are not confidential attorney-client

25

communications." *United States v. Davis*, 583 F.3d 1081, 1090 (8th Cir. 2009). In response, Habeas Counsel admit that they "inadvertently mislabeled the communication" and that the recording was "more properly identified as an invasion of the work-product protection, not the attorney-client privilege." Doc. 90 at 29. That generous take on Habeas Counsel's statement does little more than replace a frivolous argument with a highly questionable one. After all, the work-product doctrine typically protects tangible items (briefs, memoranda, and the like) or "opinion work product" such as an attorney's mental impressions, conclusions, opinions, and legal theories. *See State ex rel. Rogers v. Cohen*, 262 S.W.3d 648, 654 (Mo. 2008) (en banc). It is hardly obvious, then, that the work-product doctrine could accomplish for Habeas Counsel's arguments what the attorney-client privilege could not.

Nevertheless, while a close call, this error again more likely suggests ignorance than deceit. The Court accepts that Habeas Counsel's failure to discuss clearly adverse authority on the attorney-client privilege issue stems from their mislabeling of the privilege claim in the first place. Accordingly, the Court discharges this point of its show-cause order.

### 9. Misrepresentations of Runge's interactions with investigators

Habeas Counsel repeatedly claim that after Sergeant Graham's death, Runge told investigators that she feared for her life because of alleged investigations by Graham into the wrongdoing of other officials. Doc. 48 at 471, 482; Doc. 56 at 236, 246–47. But as the Court's show-cause order notes, no evidence or testimony support that claim, nor, as Habeas Counsel admit, did they cite to the record in making the claim. Doc. 76 at 7; doc. 90 at 27. In response to the show-cause order, Habeas Counsel address this point alongside the sixth point of the order, and rely heavily on the testimony of witnesses to support their inference that Runge was fearful because of the contents of Graham's files. Doc. 90 at 23–27.

For the reasons explained in the Court's discussion above, *see supra* Part III.B.6, Habeas Counsel wrongly suggest that the deposed witnesses themselves testified that Runge was fearful because of Graham's alleged investigations and attendant record-keeping.  Habeas Counsel are likewise wrong to make the inference themselves that Runge's fear was related to Graham's files.  To be sure, and as described above, support exists for the claim that Runge was fearful for her life after Graham's murder, as well as for the claim that Graham kept files regarding the men under his supervision on his computer at home.  But from there, Habeas Counsel go on to take the deceitful step of inferring, with scant support and nary a citation, that Runge feared for her life because of Graham's investigations and files.  The best Habeas Counsel can do, short of pointing to Runge's fear and the existence of Graham's files, is to emphasize that Runge's statements about the files took place "close in time to the murder."  *See* doc. 90 at 26.  It goes without saying that more evidence is needed before Habeas Counsel could honestly infer a causal relationship between Runge's fear and Graham's files.

Despite this absence of evidentiary support, the Court, in its discretion, declines to sanction Habeas Counsel on this point.  Unlike in point six, which discusses Habeas Counsel's misrepresentations of the testimony of witnesses regarding Runge's fear and Graham's files, here, Habeas Counsel merely draw the inference for themselves.  Though no support exists for a causal inference between the two, it is not entirely unfathomable that Runge's fear might relate to corruption investigations in which Graham might have been involved.  It is the confidence with which Habeas Counsel insist upon the existence of that causal connection that most troubles the Court.  Nevertheless, mindful of the severity of imposing Rule 11 sanctions, and having already decided to impose sanctions for similar misconduct discussed in the sixth point above, the Court declines to impose sanctions on this point.

### 10.    Misstatements of the record as to claims raised in state court

Habeas Counsel stated in Shockley's petition that "Claims 6, 13, 21, 22, 24, 25, 26, and 27 . . . were not raised in the state courts" and therefore exempt from the Supreme Court's holding in *Cullen v. Pinholster*, 563 U.S. 170 (2011).  Doc. 59 at 7–8.  But as noted in the Court's show-cause order, Shockley did, in fact, raise claims 24 and 25 in state court.  Doc. 76 at 7.  Habeas Counsel concede as much in their response, averring that their error "was merely a drafting error and not evidence of an intent to mislead this Court regarding the facts or procedural history of the case."  Doc. 90 at 31.  Though the Court is not in the habit of excusing misstatements of facts as innocent mistakes, here, given the complexity of the record and that Habeas Counsel do not go on to argue the point as to those claims, the Court accepts Habeas Counsel's excuse.  Their less-than-careful editing on this point is not a sanctionable offense.  Accordingly, the Court discharges this point of its show-cause order.

### 11.    Failure to notify the Court of *Deck v. Jennings*

The eleventh point of the show-cause order questioned why Habeas Counsel "failed to notify the Court of *Deck v. Jennings*, 978 F.3d 578 (8th Cir. 2020), a directly adverse legal authority stating that a decision by postconviction counsel to not raise a claim constitutes ineffective assistance only where that claim is 'plainly stronger' than those that postconviction counsel actually presented."  Doc. 76 at 7 (quoting *Deck*, 978 F.3d at 584).  Missouri Supreme Court Rule 4-3.3(a)(2) drives the Court's inquiry:  "[a] lawyer shall not knowingly . . . fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel."  In a helpful alert to the Court, the State noted that it had, in fact, cited raised the *Deck* case on multiple occasions.  Doc. 92 at 7–8.

Habeas Counsel insist that *Deck* is distinguishable from, and therefore immaterial to, their arguments that Shockley's postconviction counsel was ineffective. *See* doc. 90 at 31–32. In *Deck*, the Eighth Circuit held that the failure to raise an argument that, though possibly successful, would have been "novel" (or relied on more than only firmly established law), did not render counsel ineffective. 978 F.3d at 583–84. The court articulated the general principle that "[d]eclining to raise a claim . . . is not deficient performance unless that claim was plainly stronger than those actually presented." *Id.* at 584 (alterations in original) (quoting *Davila v. Davis*, 582 U.S. 521, 533 (2017)). In other words, a claim cannot be "plainly stronger" when it is based on "novel" arguments. Habeas Counsel insist that this holding does not bear on Shockley's arguments: his arguments were not novel, so *Deck* is not on point. Though technically true, Habeas Counsel can hardly escape that the "plainly stronger" principle undergirds the *Deck* holding, and that principle applies to this case.

The more important question, however, is whether the State's citations to *Deck* spare Habeas Counsel from needing to raise the case at all. The language at the tail end of the Missouri rule—"and not disclosed by opposing counsel"—is somewhat ambiguous: does counsel's duty to disclose adverse authority turn on whether opposing counsel end up raising the case at some point down the line? Or does that duty attach if, at the time of counsel's arguments, opposing counsel has not, at that point, raised the case already? On the former view, counsel are free to avoid mentioning on-point but adverse authority in their initial arguments, leaning on the opportunity to file a reply or sur-reply in the event that opposing counsel fail to raise the case themselves. On the latter, counsel are required to raise adverse authority even when they are the first to speak, no matter whether opposing counsel would have raised the authority in their response.

Unfortunately, no Missouri caselaw appears to shed light on this question, but the comments promulgated alongside the text of the Missouri rules provide some help:

> Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal.  A lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities.  Furthermore, as stated in [the rule], an advocate has a duty to disclose directly adverse authority in the controlling jurisdiction *that has not been disclosed* by the opposing party.  The underlying concept is that legal argument is a discussion seeking to determine the legal premises properly applicable to the case.

Mo. Sup. Ct. R. 4-3.3(a) cmt. [4] (emphasis added).  That language (particularly the emphasized language) strongly suggests that counsel's duty to disclose on-point, adverse authority attaches if, at the time of the filing or argument, opposing counsel has not yet raised the case.

Nevertheless, even on that view, and even on the view that Habeas Counsel fail to adequately distinguish *Deck*, the Court hesitates to be the first to adopt the harsher of two possible readings in the context of the imposition of sanctions.  There is sufficient ambiguity in the meaning of the text of the rule to doubt whether Habeas Counsel could have had adequate notice of its fair meaning.  In that context, the Court finds it inappropriate to impose sanctions.  Accordingly, the Court discharges this point of its show-cause order.

### 12.    Statements of the law as to the availability of discovery

In Shockley's motion for discovery and evidentiary development, Habeas Counsel "move[d] this Court for leave to conduct discovery" for claims 21, 22, and 24.  Doc. 57 at 25.  Before the Court ruled on the motion, the Supreme Court decided *Shinn*, which held that a federal habeas court may not, based on ineffective assistance of post-conviction counsel, conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record.  596 U.S. at 382.  So, the Court asked both parties for supplemental briefing regarding how the decision would affect the pending motion.  Doc. 61.  In response, Habeas Counsel wrote in relevant part,

> After *Shinn v. Ramirez*, this Court can also still grant evidentiary development of Claim 21 and Claim 22 because Shockley satisfies Section 2254(e)(2). . . . Shockley raised three possible reasons for the Court to grant evidentiary development. [Among them is that] Shockley's post-conviction counsel failed to raise the claim. *Ramirez* did not overrule *Martinez* [*v. Ryan*, 566 U.S. 1 (2012)]. *Martinez* recognized that ineffective assistance of state post-conviction counsel may constitute 'cause' . . . for failure to present the trial-ineffectiveness claim.

Doc. 64 at 6 (citation omitted).

The Court begins with a brief review of the facts and law.  First, consider the principle expounded in *Martinez*.  There, the Supreme Court held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."  *Martinez*, 566 U.S. at 9.  In other words, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."  *Id.* at 17.  Critically, however, the *Shinn* court declined to expand *Martinez*, expressly rejecting the view that "where, per *Martinez*, a prisoner is not responsible for state postconviction counsel's failure to *raise* a claim, . . . the prisoner [should not be held] responsible for the failure to *develop* that claim."  596 U.S. at 384 (emphases added).  The point is this:  though *Martinez* excuses procedural default of ineffective-assistance-of-trial-counsel claims when postconviction counsel is ineffective, it does not excuse, under any circumstances, a prisoner's failure to develop the state-court record under § 2254(e)(2).  *Id.* at 384–85.  Finally, the Court left open the question of whether federal courts could hold evidentiary hearings to determine whether cause and prejudice (i.e., constitutionally ineffective assistance of postconviction counsel) obtain.  *Id.* at 388–89; *but see id.* at 389 ("There are good reasons to doubt [that courts could hold such hearings], but we need not address [the matter] . . . .").

31

Now consider the record.  Habeas Counsel's language in Shockley's supplemental briefing is uncertain at first:  they open the relevant paragraph with reference to both Claim 21 and Claim 22, but then go on to argue for evidentiary development because "Shockley's post-conviction counsel failed to raise the claim."  Doc. 64 at 6.  Which claim?  Their supporting citations reveal which claim Habeas Counsel meant:  Claim 21.  *See id.* (citing only doc. 48 at 383 and doc. 56 at 161, both addressing only Claim 21).  In Claim 21, Shockley asserted that the admission of scientifically unverified forensic evidence at his trial constituted a violation of his constitutional rights.  Doc. 48 at 382–83.  Though Shockley did not raise this claim in state court, rendering it ostensibly unexhausted, he insisted, in part by relying on *Martinez*, that he could obtain habeas review—and evidentiary development—of the claim because of postconviction counsel's failure to raise the claim before the state court.  *Id.* at 383; doc. 64 at 6.

But immediately, Habeas Counsel's error becomes clear:  after *Shinn*, evidentiary development of Claim 21 without satisfying § 2254(e)(2) is not possible.  *Shinn*, 596 U.S. at 384–88.  Their insistence to the contrary constitutes a clear misstatement of the law.  *See* doc. 64 at 6.  The strictures of § 2254(e)(2) apply in full force, with one possible—though disparaged—exception left unaddressed by the Supreme Court:  evidentiary hearings limited to the question of whether postconviction counsel was so ineffective as to excuse the default of an ineffective-assistance-of-trial-counsel claim.  *Shinn*, 596 U.S. at 388–89.  But even if this Court were to deem such so-called "*Martinez* hearings" appropriate, *see id.* at 388, Claim 21 would not fit that bill:  it seeks to excuse procedural default of a due-process claim, not an ineffective-assistance-of-trial-counsel claim, *see* doc. 48 at 426; *Shinn*, 596 U.S. at 386 ("This Court's holding in *Martinez* addressed only one kind of claim:  ineffective assistance of trial counsel.")

Notwithstanding Habeas Counsel's fervent wishes to the contrary, *Shinn* binds this Court, and forecloses granting evidentiary development as to Claim 21.  *See supra* Section III.B.5.  Nevertheless, the Court, in its discretion, declines to impose sanctions for that misstatement of law.  Though *Shinn* is doubtless binding precedent, its relationship with *Martinez* is complex.  In this Court's judgment, Habeas Counsel's arguments regarding the availability of evidentiary development under *Martinez* as molded by *Shinn* are more likely the consequence of misapprehension than intent to deceive.  For that reason, the Court declines to impose sanctions on this point.

### 13.  Representations of Runge's testimony

In their discussion of Runge's alleged conversations with Carly Carter, Jeanne Kingree, and Krista Kingree regarding Graham's files, Habeas Counsel wrote:  "When asked about the conversations [regarding investigations and files kept by Graham] she had with [them], Runge did not deny that such conversations took place.  Instead, she repeatedly testified to having 'no recollection of' such conversations."  Doc. 48 at 472–73.  The Court's show-cause order questioned why Habeas Counsel appeared to ignore Runge's testimony that she had no knowledge of the contents of Graham's investigations or files at all.  Doc. 76 at 8.  Consider Runge's testimony:

> Q.  Did Sergeant Graham tell you that he was looking into things concerning an officer or officer's conduct?
>
> A. No.
>
> . . .
>
> Q.  Did Sergeant Graham tell you or were you otherwise aware that [he] had files in his home . . . about another officer?
>
> A.  No he did not tell me that.

Q.  Did he tell you something similar to that?

A.  No.  I assumed because he was a supervisor that he would have supervisory files.

. . .

Q.  Did you tell Jeanne or Mike Kingree . . . that Sergeant Graham had files at his home of another officer or officers?

A.  I have no recollection of telling her that.

Q.  Did you tell Jeanne or Mike Kingree that Sergeant Graham had files in his home and the Missouri State Highway Patrol removed the files from his home?

A.  I have no recollection of telling her that.

Q.  Did you tell Jeanne or Mike Kingree that Sergeant Graham had files in his home which were of a negative connotation about another officer?

A.  I have no recollection of telling them that.

. . .

Q.  Did you tell . . . Carly Cleaver Carter that Sergeant Graham was looking into some things that were going on in Carter County?

A.  I have no recollection of telling her that.

Q.  Did you say anything similar to that?

A.  No.

. . .

Q.  Did you tell Krista Kingree, your niece, that Sergeant Graham had files in his home on another officer or officers?

A.  I have no recollection of telling her that.

Q.  Did you tell Krista Kingree that Sergeant Graham had files in his home because he was looking into some things that were going on in Carter County?

A.  I have no recollection of telling her that.

Q.  Do you recall anything similar to that at all?

34

A.  No.

. . .

Q.  You didn't know what files, if any, Sergeant Graham was keeping?

A.  No.

Q.  You never looked at his home computer that he used to look to see what files were on there?

A.  No.

Q.  You didn't use that computer?

A.  No.

. . .

Q.  You never saw him doing any sort of work on that computer or drafting documents, that sort of thing?

A.  No.

Q.  You never saw any computer record relating to officer misconduct?

A.  No.

. . .

Q.  Sergeant Graham had file cabinets at his home correct?

A.  Yes.

Q.  Do you know what was in those filing cabinets?

A.  No.

Q.  Did he ever tell you what was in the filing cabinets?

A.  No.

. . .

Q.  Did you ever tell anyone anything different from what you've said here today?

A.  No.

Doc. 20-24 at 388–95 (cleaned up).  This testimony makes two things apparent.  First, contrary to Habeas Counsel's assertion that Runge "did not deny" her alleged conversation with Carter regarding investigations by Graham, Runge denies saying anything to Carter regarding such investigations.  *Id.* at 392.  Second, although it is true that she merely denies recalling conversations on the same subject with Jeanne and Krista Kingree, immediately before and after that testimony, she also disclaims knowing or having been told about Graham's files or potential investigations at all.

The logical inference of such testimony is that Runge did not recall the alleged conversations with the Kingrees because they could not have happened—that is, because she was so uninformed as to the subject of those alleged conversations that she could not have spoken about it.  Habeas Counsel insist that "as a matter of law, a witness's inability to recall a conversation or event . . . 'does not constitute a denial.'"  Doc. 90 at 35 (quoting *Genger v. Genger*, 663 F. App'x. 44, 49 n.4 (2d Cir. 2016)).  Rightly so.  But a witness's denial of any knowledge on a subject matter about which she allegedly discussed in detail certainly comes closer.  Habeas Counsel's statement, therefore, in the light of Runge's full testimony, hardly epitomizes faithful reflection of the record.

Nevertheless, and notwithstanding Habeas Counsel's plain error regarding Runge's testimony on her conversations with Carter, the Court finds that Habeas Counsel's assertion does not rise to the level of a sanctionable offense.  Their statement as it pertains to the Kingrees, though questionable in light of Runge's full testimony, does accurately reflect part of her answers.  And their inclusion of Carter in the statement more likely signals carelessness than

deceit.  The Court gives Habeas Counsel the benefit of the doubt, and the Court finds sanctions inappropriate on this point.

### 14.      Misrepresentations of the record as to Sheriff Melton

Rule 11 requires that counsel's "factual contentions" have "evidentiary support."  Fed. R. Civ. P. 11(b)(3).  Habeas Counsel's repeated allegations regarding Sheriff Melton, however, lack any evidentiary support.  In Shockley's petition, Habeas Counsel wrote the following:

> [D]uring post-conviction proceedings, Shockley's counsel learned of additional evidence about Carter County Sheriff Greg Melton, who prior to 2005 and in 2005, was engaged in numerous illegal activities.  These include the unlawful seizure of weapons, the use of illegal drugs, and drug trafficking.  Post-conviction counsel was also informed that at the time of Graham's murder, Sheriff Melton was very involved in the meth trade and had a motive to kill Graham because he believed that Graham was investigating his various wrongdoings.  There was evidence that Graham was investigating Sheriff Melton for seizing guns without proper authority to do so.  Graham was also investigating . . . Melton on suspicions he was trafficking drugs.

Doc. 48 at 493 (citations omitted).  In the ensuing pages, Habeas Counsel added, "two reports generated by the State . . . stated that Sheriff Melton was involved in Graham's murder," *id.* at 495–96, and "postconviction counsel uncovered evidence indicating that Sheriff Melton had discussed hiring a hitman to kill Sgt. Graham," *id.* at 514.

The evidence for the totality of such grave claims is at best gossip and at worst nonexistent.  The best Habeas Counsel offer are Graham's own notes from a sergeant's meeting in which he paraphrases from another officer:

> Do not take anything, especially guns, if it is not going to be used as evidence.  This comes into play with our recent search warrant assists for the Carter County Sheriff's Department where Greg wants to take all the guns in the house, even if they have nothing to do with the case…. DON'T DO IT.

Doc. 90-1 at 1.  Fair enough:  albeit tenuous, some support exists for the limited claim that Melton may have been "seizing guns without the proper authority to do so."  Doc. 48 at 493.  But

37

no support exists for the proposition that Graham was investigating Melton for allegedly improper seizures, trafficking drugs, or anything else.

The Court finds the remaining "evidence" cited by Habeas Counsel in the petition and in their show-cause response unreliable.  First, Habeas Counsel cite to an interview with Melton's successor, Tommy Adams, who testified as follows:

> [Q.] . . . [T]he reason we were addressing some of these issues [is] that people have told me that uh you've replaced a lot of the meth in the evidence locker with ground up uh[—]
>
> [A.]  Absolutely not.
>
> [Q.]  Tylenol and other sh*t.
>
> [A.]  Absolutely not, no.
>
> [Q.]  That's not true?
>
> [A.]  No.
>
> [Q.]  They even describe the type of bags you use and every thing else.
>
> [A.]  Absolutely not, no.
>
> [Q.]  Okay.
>
> [A.]  I took that one baggy…
>
> . . .
>
> [Q.]  Cocaine?
>
> [A.]  Yep. And it wadn't real.
>
> [Q.]  If we test some of the uh, the meth and stuff that's in there as evidence, it won't test to be ground..
>
> [A.]  Uh-huh.  Yeah.  If there is any in there, I don't think there is any in there.
>
> . . .

[Q.]  Can we go to the prosecutor's office and pull out all the drug cases you guys have made?

[A.]  Yeah.

[Q.]  Have you sent all the drugs to the lab to be tested?

[A.]  The ones they said they'd prosecute on.  Yeah.

[Q.]  And so, if we went back into the evidence on 'em and pulled that evidence…

[A.]  I don't think there's gonna be any in there, yeah.

[Q.]  There is not any in there? . . . [T]here's not…

[A.]  The cocaine ain't in there. I check it out…

[Q.]  What happened to all the stuff when you took over, that was left in there from Mountain, or was there any left from Mountain?

[A.]  No. There was nothin' in there.

[Q.]  No drugs?

[A.]  There was some oregano-looking stuff.

[Q.]  That's about it?

[A.]  I mean yeah, there was some cases that said, uh, whatever it said on the bag, when I opened 'em up, half of 'em wadn't right.

. . .

[Q.] . . . I mean the deal with Greg, I mean we all kind of know what his deal was…

[A.]  Yeah, ya'll think you do, so…

[Q.] You think there is more to it? I mean everybody says that because that's Carter County.

[A.]  Yeah, that's right, ever, ever' thang gets blamed on Carter County, but…

[Q.]  So what do you think the deal was with Greg?

[A.]  There's a hell of a lot more to it than what got released to the public.

Doc. 90-2 at 1–3.  Short of quoting the above, Habeas Counsel make no effort to explain how the testimony demonstrates, or provides support for, evidence of Melton's "illegal activities."  His name appears only at the tail end of the questioning, yielding nothing but innuendo.  Even assuming that "Mountain" refers to Melton as well, the testimony indicates only that by the time Adams took over as Sheriff, previously seized drugs had disappeared and other seized drugs had been mislabeled.  The testimony does not, contrary to Habeas Counsel's insinuations, point to Melton as the reason for the disappearance or mislabeling of the drugs.

Habeas Counsel next point to an email from Holly Lewis, *see supra* Part III.B.3, to support their claim that Melton participated in drug trafficking.  In March 2007, Lewis sent an email regarding "information" from "Dale" (no last name included) "from Van Buren."  Doc. 48-3 at 128.  "I don't know where he got this information," she cautioned, "or how valid it is, or if it is at all." *Id.*  "Dale rattles a lot . . . . But, just on the off chance [sic] that there is a grain of truth to this story, I feel better having told someone." *Id.*  The story is this:

> According to Dale:  Carter County Sheriff, Greg Melton, is involved in drug trafficking.  Sgt Graham had started to investigate Melton, or Melton thought that Graham was investigating him. . . . Shockley was also part of Melton's trafficking system. . . .
>
> For some reason, I am thinking that he said something about Melton had called Shockley to meet at Grahams [sic], to "jump" him.  But that when Shockley arrived, Graham had already been shot . . . and that Melton later made some sort of comment to Shockley about taking care of business, and that Graham should have minded his own business.

*Id.*

In other words, Lewis heard a rumor about Melton that came from a man about whose credibility she had reservations and about which she had minimal details.  One year later, the Missouri State Highway Patrol prepared a memorandum regarding that email:  "During the course of the lengthy investigation of Sergeant Graham's murder by federal, state, and local

agencies, there had never been any information obtained or substantiated that Sheriff Melton was involved in drug trafficking or that Sergeant Graham was investigating Sheriff Melton." *Id.* at 125. Nevertheless, Habeas Counsel insist that such unsubstantiated and debunked rumors constitute "evidence support[ing that] Melton was engaged in wrongdoing." Doc. 90 at 40. But of course, the Court would not rely on such rumors as "evidence" in its decision-making process. *Cf.* Fed. R. Evid. 602 (requiring that evidence come from a witness with personal knowledge of the matter); Fed. R. Evid. 802 (generally prohibiting hearsay evidence); Fed. R. Evid. 102 (requiring that the rules of evidence be construed to promote "ascertaining the truth and securing a just determination").

Similarly, Habeas Counsel point to a Missouri State Highway Patrol interview of Scott Hicks, quoted above at length. *See supra* Section III.B.3. There, Hicks recounted a meeting at a bar with "Barney" and said that Melton was responsible for Shockley's murder. Doc. 48-3 at 112–13. After some questioning, the interviewing officer concluded: "Since Hicks did not have the correct details of the crime scene and seemed to have a grudge against the sheriff, I found his information to be unreliable." *Id.* at 113.

Next, Habeas Counsel point to the affidavit of Mary Collins, a juror in the Shockley trial. She spoke vaguely about "talk of corruption:"

> In the time period leading up to the trial there were several strange occurrences and deaths involving law enforcement in Carter County and talk of corruption. A sheriff was killed or committed suicide, and there was talk that it was not really a suicide. Another man named Freeze was killed around this same time and there was talk of a possible connection between the two deaths.

Doc. 48-5 at 94.

41

Finally, Habeas Counsel offer the affidavit of Keith Taylor, an investigator with the Federal Public Defender's Capital Habeas Unit in the Southern District of Ohio.  There, he described a conversation with Tommy Adams, successor to Melton as Carter County's sheriff:

> During the call, Mr. Adams denied knowing Lance [Shockley] or Sgt. Graham personally. . . .
>
> . . .
>
> Mr. Adams reported to me that he has doubts about Lance's guilt.  Mr. Adams was aware of rumors that Sgt. Graham was starting to investigate other officers and internal police staff about possible corruption, which may have made him a target. . . . He identified Sgt. Graham as a "straight arrow" and [said] that he was "stepping on the wrong toes."

Doc. 46-6 at 119.

Habeas Counsel stack rumor upon rumor to defend their assertions of evidence, but myriad rumors provide no real support for the proposition that Melton was involved in "numerous illegal activities," much less that Graham was investigating Melton, that Melton was involved in Graham's murder, or that Melton "discussed hiring a hitman to kill Sgt. Graham." Doc. 48 at 514; *see id*. at 493, 495–96.  A rumor repeated 1,000 times does not make it fact, nor does not make it admissible evidence.  Habeas Counsel insist that they did no more than make "circumstantial inferences," that they "clearly had adequate information to make the arguments regarding Melton's possible criminal conduct," and that "even such rumors and hearsay should be sufficient basis" for them to make their arguments.  Doc. 90 at 41–42.  That whitewashing of the record compounds Habeas Counsel's dubious conduct.  Filings in federal court are not "vehicle[s] for airing rumor, suspicion, or mere hostility." *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 505 (9th Cir. 1986).

Nor does Habeas Counsel's status as "counsel in a capital case" excuse their repeated and scurrilous speculation about Melton.  Doc. 90 at 43.  They protest that they "have a professional

duty to present all 'arguably meritorious' issues in a capital client's . . . petition." *Id.* (quoting American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 1079–87 (2003)).  They insist that they had no choice but to include their arguments about Melton lest they fail to preserve those arguments for a potential future motion to amend.  *Id.* at 44.  The Court finds that Habeas Counsel's claims that Melton was involved in Graham's murder or "hir[ed] a hitman" to kill him lack any support.  If the ABA Guidelines required counsel to raise such dubious assertions (a questionable proposition about which the Court has written much, *see* doc. 74 at 38–42; doc. 86 at 4–5), counsel should have disclosed them for what they are—unsubstantiated rumors—rather than positing them as supportable fact.

In a last-ditch effort to avoid sanctions, Habeas Counsel complain that they were burdened by "the pandemic and the unprecedented challenges it brought," and insist that if only they were permitted additional discovery pertaining to Melton, they would find the evidence they need.  Doc. 90 at 44–45.  The pandemic does not excuse Habeas Counsel's factually devoid representations to this Court.  And to the extent that Habeas Counsel are obliquely taking issue with the limitations imposed by *Shinn*, the Court has already extensively addressed that issue above.  *See supra* Section III.B.5; *see also* doc. 74 at 24–26.  For counsel's repeated misrepresentations of the "evidence" against Melton, the Court finds Habeas Counsel's conduct sanctionable under Rule 11.

### 15. Misrepresentations of the record as to the Missouri State Highway Patrol's investigations

The Court has already quoted from and discussed Lewis's rumor-filled email in its discussion of point 14.  To reiterate, the email contained entirely unsubstantiated claims about Melton's possible involvement in drug trafficking and Shockley's murder.  Doc. 48-3 at 128.

The Missouri State Highway Patrol wrote a memorandum addressing the email in which it debunked Lewis's outlandish claims:  "During the course of the lengthy investigation of Sergeant Graham's murder by federal, state, and local agencies, there had never been any information obtained or substantiated that Sheriff Melton was involved in drug trafficking or that Sergeant Graham was investigating Sheriff Melton."  *Id.* at 125.

For Habeas Counsel, that memorandum was not enough.  They insisted that the memorandum failed to "include critical information" regarding potential wrongdoings by Sheriff Melton for two reasons:  "[t]here is no indication . . . of any further investigation into Sheriff Melton" after that email, "[n]or is there any reference to what [Runge] told investigators shortly after his death."  Doc. 48 at 487–88.  Those arguments lack merit.  First, the memorandum in question did not "omit critical information" by failing to substantiate the email quoted above.  As already explained in the Court's discussion of point 14, that email does not provide even an arguable basis for the specious argument advanced by Habeas Counsel.  Second, the Court has already debunked Habeas Counsel's reliance on "what [Runge] told investigators."  *See supra* Parts III.B.6, III.B.9.  Though Habeas Counsel failed to provide a citation for what Runge allegedly told investigators, their response to the show-cause order indicates that they were referring to Runge's statements about (1) her fear in the wake of Graham's murder and (2) Graham's files.  *See* doc. 90 at 45–48.  But again, as discussed above, Habeas Counsel lacked any basis to draw a causal connection between Runge's fear and the existence of Graham's files, much less the content of any file that may (or may not) have referred to Sheriff Melton.  *See supra* Part III.B.9.

Habeas Counsel hypothesize that indifferent investigators "failed to earnestly follow up" on what is no more than scandalous innuendo, and that because the record "lacks information

44

regarding any further investigation or what transpired between" the receipt of the email and the circulation of the memorandum, the memorandum must have been deficient.  Doc. 90 at 47. Such claims transgress Rule 11's insistence that "factual contentions have evidentiary support." Fed. R. Civ. P. 11(b)(3).  Accordingly, the Court finds that Habeas Counsel's conduct on this point warrants sanctions.

### 16.    Representations of the record as to the letter composed by the special prosecutor

In October 2011, a Missouri state special prosecutor issued a report regarding the possible unlawful suppression of evidence exculpatory to Shockley.  Doc. 48-3 at 249.  The report concluded that "absolutely no credible evidence exists that [anyone] ever claimed that [anyone] withheld any information from the defense attorneys representing Lance Shockley."  *Id.* at 262.  One month earlier, the same prosecutor wrote a letter to Shockley's counsel saying, "I have not completed the report but do expect to do so in the very near future. . . . I can tell you that I have found no evidence that is inconsistent with Mr. Shockley's guilt nor any that would mitigate punishment."  *Id.* at 247; *see also* doc. 48 at 480.

Habeas Counsel described the letter as reflecting that the special prosecutor "had already declared that no evidence was suppressed."  Doc. 48 at 480.  That is a false representation. Habeas Counsel explain that "there is no meaningful distinction" between the two statements on the following logic:  Shockley's counsel had not been privy to the allegedly exculpatory evidence; the special prosecutor was tasked with investigating the suppression of that evidence; if he had found evidence inconsistent with Shockley's guilt, it would have been exculpatory evidence theretofore unseen by Shockley's counsel; and because such evidence would have been new to Shockley's counsel, it must have been suppressed up to that point.  *See* doc. 90 at 49.

Regardless of counsel's circuitous logic, Rule 11 does not permit transmuting "have not completed the report" to "already declar[ing] no evidence was suppressed." *Compare* doc. 48-3 at 247 *with* doc. 48 at 480.  Nor does it permit transforming a conditional statement of "I have found no evidence inconsistent with Mr. Shockley's guilt nor any that would mitigate punishment," into an absolute declaration that "no evidence was suppressed." *Id.*  The Court finds that Habeas Counsel's conduct on this point warrants sanctions.

### 17.    Misrepresentations of *State ex rel. Johnson v. Blair* and change of position on exhaustion of claims

On June 9, 2022, Shockley moved for a stay under *Rhines v. Weber*, 544 U.S. 269 (2005).  Doc. 64.  That is, Shockley argued that the Court should stay this case to allow him time to present new claims in state court—claims he had included in his federal habeas petition but had not submitted for direct-appellate review or postconviction review in Missouri.  *Id.*  To receive a *Rhines* stay, a habeas petitioner must establish several elements, the first of which requires that some of the petitioner's claims remain unexhausted.  *Rhines*, 544 U.S. at 277.  In the habeas context, a claim is unexhausted when (1) the petitioner has some procedure available in state court under which the petitioner can present that claim and (2) that procedure belongs to the state's standard review process.  *See Welch v. Lund*, 616 F.3d 756, 758 (8th Cir. 2010) (citations omitted).

When a petitioner's claim remains unexhausted, a federal court typically cannot provide relief on that claim.  *See Wade v. Mayo*, 334 U.S. 672, 679 (1948).  And, when a petitioner has unexhausted claims, he may be able receive a stay for his federal case and pursue state litigation.  *Rhines*, 544 U.S. at 274.  *Rhines* allows for this kind of stay to serve the interests of comity and federalism.  *Id.*

After *Shinn*, Shockley could not present new evidence to support his supposedly unexhausted claims unless he returned to state court to present the evidence there.  See doc. 74 at 24–26.  So Shockley moved for a *Rhines* stay, arguing that a federal ruling on his supposedly unexhausted claims would undermine "federal-state comity."  Doc. 64 at 1.  That argument involved a significant departure from Habeas Counsel's past representations to the Court.  Before the Supreme Court decided *Shinn*, they argued that Shockley's claims were exhausted and ripe for this Court's review; after *Shinn*, they insisted that his claims were unexhausted, requiring a *Rhines* stay.  *See* docs. 48, 64; *see also* doc. 95 at 3.  That about-face regarding the availability and appropriateness of federal review came only after Habeas Counsel learned that Shockley might benefit from a return to state court—nearly three years after first filing his petition for federal review.

Again, to satisfy *Rhines*'s first element, Shockley would need to show that he has unexhausted claims by demonstrating that (1) some available state remedy exists and (2) that remedy is part of Missouri's standard review process.  *Welch*, 616 F.3d at 758.  Shockley's treatment of the first element amounts to no more than a shaky façade, and he made no attempt to address the second requirement at all.  To show that he could still have a remedy in state court, Shockley cited *State ex rel. Johnson v. Blair*, 628 S.W.3d 375, 381 (Mo. 2021) (en banc).  *See* doc. 64 at 1.  According to Habeas Counsel's show-cause response, they "cited [*Blair*] for the proposition that there is no absolute procedural bar in Missouri in Rule 91."  Doc. 90 at 50.  (Missouri Supreme Court Rule 91 governs state-habeas relief.)  Here, they referred to *Blair*'s analysis of a successive habeas claim.

Habeas Counsel fails to note that in *Blair*, the Missouri Supreme Court also addressed a claim that—like Shockley's supposedly unexhausted claims—the petitioner did not present for

postconviction review in Missouri.  The court found that claim procedurally barred.  628 S.W.3d at 387–88.  Thus, far from demonstrating that Rule 91 provides an available avenue for review, *Blair* shows that Shockley cannot obtain review under Rule 91.  Accordingly, Rule 91 cannot preserve Shockley's claims from exhaustion and open the door for a *Rhines* stay.  *See Shinn*, 596 U.S. at 378 (explaining that claims barred under state procedural law are therefore exhausted). Habeas counsel provide no substantive analysis of *Blair* and no reference to the law regarding whether Rule 91 belongs to Missouri's standard review process—which it does not.  *See* doc. 74 at 11–13 (explaining that Rule 91 provides "only an extraordinary remedy" and citing *State ex rel. Laughlin v. Bowersox*, 318 S.W.3d 695, 701 (Mo. 2010) (en banc), for the proposition that Missouri Supreme Court Rule 29.15 provides the "single unitary, post-conviction remedy" constituting Missouri's standard review process).  Any meaningful discussion of the relevant law would immediately demonstrate the frivolity of Shockley's argument.  In its show-cause order, the Court noted that "[t]ogether, counsel's failure to present these directly adverse legal authorities, the dubiousness of their argument, and the suspicious timing of Shockley's counsel's changing course on this topic indicate that they knowingly misstated the law."  Doc. 76 at 10.

Habeas Counsel no meaningful response.  Rather, they presents the following arguments: (1) *Blair* states that "there is no absolute procedural bar in Missouri in Rule 91," (2) the Court should allow him to return to state court and present new evidence even if Missouri law procedurally bars his claims, (3) the Court should not "engage in speculation" about whether Missouri Courts would find his claims procedurally barred, and (4) the Court provided Shockley only 10 pages to address to *Shinn*—the Supreme Court case that prompted Shockley to seek a *Rhines* stay—and he could have more adequately addressed the exhaustion issue with further briefing.  *See* doc. 90 at 50–54.

These arguments do not address the Court's concerns.  First, *Blair*'s comment regarding the absoluteness of Missouri's procedural bar does not answer the more pertinent question: whether Missouri law bars Shockley's claims.  *Blair* and related caselaw show that Missouri law does, in fact, bar his claims.  *See* doc. 74 at 15–17 (presenting the Court's analysis of the relevant Missouri caselaw).  Second, Shockley's interest in returning to state court does not change the fact that he has exhausted all his claims.  The Court cannot grant a *Rhines* stay for exhausted claims, as *Rhines* makes plain.  *See* 544 U.S. at 277.  Third, the Court has no need to "engage in speculation" on whether Missouri law bars Shockley's claims, doc. 90 at 51, because the rules stated by the Missouri Supreme Court make the issue clear, *see* doc. 74 at 15–17 (discussing the relevant caselaw).  Indeed, *Blair* confirms that Shockley cannot receive Rule 91 review.  Fourth, the Court's 10-page limit applied to Shockley's brief on the change in law resulting from *Shinn*, and did not anticipate or contemplate *Rhines* briefing.  Doc. 61.  To the contrary, Habeas Counsel unilaterally chose to combine their *Shinn* briefing with a request for a *Rhines* stay.  *See* doc. 64.

Habeas Counsel's response demonstrates that *Shinn*, and counsel's unwillingness to accept its holding, drove their 180-degree turn on exhaustion.  Shockley's *Rhines* motion has no basis in law and certainly no basis in *Blair*.  Instead of attempting to distinguish or arguing against cases that undermine Shockley's motion, counsel have ignored the relevant caselaw and turned *Blair*'s holding on its head.  Habeas Counsel's insistence that the Court should grant a *Rhines* stay "even if Shockley's *Martinez* claim[s] would be barred under Missouri law," doc. 90 at 50, flies in the face of *Rhines* and demonstrates the pretextual nature of counsel's reasoning.  Accordingly, Habeas Counsel have violated Rule 11's requirement that their arguments be "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing

49

existing law or for establishing new law," Fed. R. Civ. P. Rule 11(b)(2), thus warranting sanctions.

### 18.        Representations of the record as to Carly Carter's testimony

In the relevant testimony, Carter was asked, "When you had contact with Cathy Runge[,] did she ever make any statements to you along the lines that Sergeant Graham was investigating or looking into another officer?"  Doc. 20-24 at 430.  Carter replied:  "We had numerous conversations when we worked together in the park.  We were in the vehicle together for hours at a time and she had made statements of some of the cases, things that he was investigating."  *Id.* She later added, "We talked about life and all kinds of things."  *Id.* at 431.

Habeas Counsel described Carter's testimony as follows:  "According to Carter, she and Runge had 'numerous conversations' about investigations Graham was involved in."  Doc. 48 at 473 (quoting doc. 20-24 at 430).  The Court's show-cause order questioned the accuracy of that description.  Doc. 76 at 11.  In response, Habeas Counsel insist that Carter's testimony demonstrates that she and Runge discussed Graham's investigations multiple times.  Doc. 90 at 55.  "[Her] testimony," they write, "appears to support Habeas Counsel's statement that Ms. Carter testified she and Runge had numerous conversations about Graham's investigations, including at least one conversation she specifically recalled."  *Id.*  The Court disagrees.  Even as the Court gives Habeas Counsel the benefit of the doubt that some testimony "appears to support" their statement, the most natural reading of Carter's testimony remains that her "numerous conversations" comment referred to the frequency of her general conversations with Runge, not the frequency of conversation on the topic of Graham's investigations.  That reading is reinforced by Carter's later comment that she and Runge discussed "life and all kinds of

things"—the sort of description one might expect of "numerous conversations . . . in the park." Doc. 20-24 at 430.

Nevertheless, a reading of the testimony maximally generous to Habeas Counsel might see her "numerous conversations" comment in the immediate wake of a question about Graham's investigations and conclude that Carter meant the comment to directly address that question. When that exchange is considered in a vacuum, there is some conceivable ambiguity in Carter's response that would admit of Habeas Counsel's reading. Of course, that Habeas Counsel would spin such ambiguity into a definitive statement in open tension with the most natural reading of Carter's testimony hardly epitomizes candor. But mindful of the high bar appropriately attached to a Rule 11 analysis, the Court acknowledges that such ambiguity may allow for Habeas Counsel's reading, and for that reason, discharges the show-cause order on this point.

### 19.   Misrepresentations of the record as to trial counsel's testimony

Habeas Counsel misrepresented the record regarding Shockley's trial counsel, claiming that trial counsel incorrectly and unreasonably thought that the trial judge had ordered him not to talk to or subpoena jurors for purposes of post-trial proceedings. Doc. 48 at 111 ("[Trial] counsel blamed the judge for ordering them not to talk to or subpoena jurors . . . . [His] alleged 'strategy' was based upon a false belief that the judge would not allow him to question jurors."). But trial counsel never testified that the trial judge barred him from subpoenaing jurors. Instead, when asked whether he or anyone on Shockley's defense team "contact[ed] or subpoena[ed] any juror," he replied, "[w]e were not allowed to contact the jurors." Doc. 20-52 at 31. Immediately thereafter, when asked specifically whether he had considered subpoenaing any juror, he said,

"[n]o, because . . . that person would have had at that point now two or three or four weeks to have figured out some way to answer the questions had we subpoenaed him." *Id.* at 31–32.

This testimony does not reflect a belief on the part of trial counsel that he was barred by the trial judge from subpoenaing jurors. Habeas Counsel resist this conclusion, arguing that "trial counsel's testimony on this matter was somewhat conflicting" and explaining away trial counsel's rationale for not subpoenaing jurors as a "post-hoc rationalization[]." Doc. 90 at 56–57 (citations omitted). But trial counsel's testimony was not conflicting. The questions prompting his responses clearly distinguished between "contact" and "subpoena," and his answers, taken as a whole, clearly make the same distinction. Doc. 20-52 at 31–32. Further, Habeas Counsel offer no more than speculation that trial counsel's rationale for declining to subpoena jurors was a post-hoc rationalization (making Habeas Counsel's post-hoc-rationalization theory itself a post-hoc rationalization). Trial counsel stated reason for not subpoenaing any juror was not that the trial judge prohibited him from doing so, but that in his judgment and as a matter of litigation strategy, he saw little benefit in doing so given that jurors would have had sufficient time to figure out answers to questions he might ask. *Id.* at 32. Habeas counsel cannot simply ignore half of trial counsel's relevant testimony to reach the conclusion that trial counsel thought they were barred by the trial judge from contacting *or subpoenaing* any juror. Thus, Habeas Counsel misrepresent trial counsel's testimony to argue that trial counsel unreasonably based his decision on an incorrect view of the trial judge's order.

Because habeas counsel plainly misrepresented trial counsel's testimony, the Court finds that their assertion that trial counsel "blamed the judge for ordering them not to talk to or subpoena jurors" does not have "evidentiary support." Therefore, such misrepresentations violate Rule 11(b)(3) and warrant sanctions.

### 20.    Misrepresentations of the record as to the motion for remand

At one point during the state-court proceedings, Shockley's counsel moved the Supreme

Court of Missouri to remand the case to the circuit court for further proceedings.  Doc. 48-3

at 233–43.  In so doing, postconviction counsel quoted from and described testimony from Krista

Kingree:

> During her interview Krista Kingree told the special prosecutor's investigator that
> Kathy Runge is her aunt and that they always have had a "very close"
> relationship. . . . She said that Ms Runge had told her that Sgt. Graham had kept
> files in his home "due to some things that had been going on."  Ms Kingree told the
> investigator:  "It was about other officers . . . I do know it was about other officers."
> And:  "I just remember . . . it wasn't a good thing."  She recalled that Ms Runge
> had been "very scared" about her own safety after Sgt. Graham was murdered, until
> she learned that "they were[] positive" that Mr. Shockley had committed the crime.

Doc. 48-3 at 239 (citations omitted) (alterations in original).  Habeas Counsel described the

motion—excerpted in relevant part above—as "point[ing] out that the prosecutor's investigation

proved that [Runge] . . . reported her fear was based on an investigation 'about other officers."

Doc. 48 at 482 (quoting doc. 48-3 at 239).  When the Court questioned the veracity of that

description, Habeas Counsel responded in significant part explaining why they believe their

causal inference between Runge's fear and Graham's files was appropriate.  Doc. 90 at 58–60.

The Court has already addressed the flaws in that inference and need not repeat its

explanations here.  *See supra* Sections III.B.6, III.B.9.  But two further problems remain.  First,

by relying on postconviction counsel's motion for remand to make their point, Habeas Counsel

attempt to present to this Court, as evidence here, statements made by postconviction counsel in

that motion.  To be sure, Rule 11 does require "evidentiary support" for factual assertions, but it

is axiomatic that "statements of counsel are not evidence."  *Exeter Bancorporation, Inc. v.*

*Kemper Secs. Grp., Inc.*, 58 F.3d 1306, 1312 n.5, 1316 n.10 (8th Cir. 1995) (citation omitted).

Habeas Counsel cannot support their claim that Runge's fear stemmed from the existence or

contents of Graham's files by simply pointing to prior arguments made by previous counsel. Such "evidence" is no evidence at all, and Habeas Counsel's assertion remains lacking in evidentiary support.

Second, and more importantly, neither in the excerpt above nor anywhere else does Shockley's state-court motion for remand claim that Runge's fear stemmed from the existence or contents of Graham's files.  *See* doc. 48-3 at 233–43.  Further, even if Habeas Counsel were right to make a causal inference between Runge's fear and Graham's files, they would hardly be justified in imputing that inference to the motion for remand quoted above, which never discussed—much less "proved"—that a causal connection existed.  Finally, Krista Kingree would later testify that she did not recall any statements by Runge insinuating that Graham had been conducting investigations into officers or that Graham kept files of any such investigations. *See* doc. 20-24 at 436–45.  Although Habeas Counsel rightly argue that her diminished recollection does not necessarily constitute a disavowal of the testimony quoted in Shockley's motion for remand, doc. 90 at 60–62, none of her testimony at any point in the litigation of Graham's murder supports the inference that Runge's fear stemmed from the existence or content of Graham's files.

In short:  the motion for remand does not "prove[] that [Runge] . . . reported her fear was based on an investigation 'about other officers.'"  Doc. 48 at 482.  Habeas Counsel's candor-free assertions to the contrary rise to the level of sanctionable conduct.

### 21.    Misrepresentations of the record as to Roger Hart's testimony

Habeas Counsel took issue with Shockley's trial counsel's choice of questioning for Roger Hart—namely, trial counsel's failure, in Habeas Counsel's view, to more assertively impeach the testimony of Hart's wife.  Doc. 48 at 280–81.  (As an aside, the Court notes that its

show-cause order incorrectly cites to doc. 48 at 275 rather than to 280–81.)  Regarding the

identification of the car Shockley drove to and from the scene of Graham's murder, Habeas

Counsel complained, "[t]he only detail Shockley's trial team inquired about was his observations

about the license plate. . . . They chose not to ask Roger Hart about any other detail of the

car . . . even though such an inquiry would have directly impeached Lisa Hart's identification at

trial."  *Id.* (citation omitted).  But as the Court's show-cause order noted—and as Habeas

Counsel now concede—that description of Roger Hart's questioning falls flat on its face.  *See*

doc. 76 at 12; doc. 90 at 62; doc. 20-5 at 85–89.

In fact, the state-court record demonstrates that Shockley's trial counsel questioned Roger

Hart about the time he saw the car, any distinguishing marks he noticed on the car, what parts of

the car he saw, the license plate, whether he noticed a yellow sticker on the car, and the make

and model of the car.  Doc. 20-5 at 85–89.  Habeas Counsel put up no argument to the contrary,

but insist that they misspoke.  Doc. 90 at 62–64.  "Habeas Counsel was trying to emphasize,"

they claim, "trial counsel's inadequate direct examination of Mr. Hart [in which trial counsel]

missed the opportunity to draw distinctions between Ms. Hart's recollections and Mr. Hart's

recollections of the red car."  *Id.* at 62–63 (citation omitted).  They write:

> The sentence should have read, "[t]he only detail Shockley's trial team inquired
> about during direct examination was his observation of the license plate . . . They
> chose not to ask Roger Hart about any other detail of the car or even his wife's
> evolving description of the vehicle ***during trial counsel's direct examination.***"

Doc. 90 at 62 (alterations in original) (quoting doc. 76 at 12).

To start, Habeas Counsel have not correctly cited and quoted the Court's show-cause

order:  the show-cause order's opening sentence does not contain the words "during direct

examination."  *See* doc. 76 at 12.  Accordingly, in mounting their own defense, counsel have

once again misrepresented the record.  But in any event, their attempted excuse—i.e., that they

meant to take issue only with trial counsel's strategy on direct examination—runs headlong into three problems.  First, Habeas Counsel's now-amended statement is not what they represented to the Court, and the difference between those statements can hardly be chalked up to an innocent drafting error.  Second, the excuse is simply not credible:  Roger Hart's questioning on the witness stand focused on the car and its identification, so whether questions and answers on that topic appeared on direct or redirect examination, his testimony could have called into question the testimony of any other witness, including that of his wife.  Third—and most importantly— Habeas Counsel's amended assertion is hardly truer than the original.  The record reflects that even on direct examination, Shockley's trial counsel questioned Roger Hart about the time he saw the car, any distinguishing marks he noticed on the car, what parts of the car he saw, and the license plate.  *See* doc. 20-5 at 85–86.

Habeas Counsel characterize their misstatements as "a minor and immaterial error," doc. 90 at 63–64, but they fail to appreciate the Court's point.  "[T]he main point remains," Habeas Counsel insist, that "trial counsel did not seek testimony from Mr. Hart, either on direct or re-direct, that would impeach or undermine Ms. Hart's description of the red car." *Id.* at 63. That misses the mark.  The main point is that Habeas Counsel may not misrepresent the record in their effort to make any argument or claim, but they did so.  Were that Habeas Counsel's only transgression, their argument that it is not sanctionable might get more traction.  But Habeas Counsel engaged in troubling and repeated lack of candor, and the Court finds sanctions to be appropriate.

### 22.      Representations of the record as to Scott Sayler threatening his supervisor

In their discussion of Scott Sayler,[4] Habeas Counsel wrote, "Other reports indicate

that . . . [Sayler] threatened his supervisor at his employment after his termination."  Doc. 48 at

495 (citing doc. 48-3 at 123–24).  The Court questioned whether Habeas Counsel were

insinuating that Sayler actually did threaten his supervisor.  Doc. 76 at 12.  Having considered

the record and Habeas Counsel's response, the Court now discharges this point of its show-cause

order.  Habeas Counsel admit to mistakenly citing to the wrong page of the record—their citation

missed by no more than one page—and the appropriate page would have adequately supported

the claim that a report reflected Sayler's threats.  Doc. 48-3 at 122.  There, a police department

form indicates that Officer Vaughn had instructions to "Contact Springfield P.D. in ref Saylor

[sic] threatening his boss."  *Id.*

### 23.      Notification to the Court of *Mark v. Ault*

In their motion for discovery, Habeas Counsel argued that *Bracy v. Gramley*, 520 U.S.

899 (1997), entitled Shockley to discovery on Claim 27 pursuant to Habeas Rule 6(a),

notwithstanding § 2254(e)(2).  *See* doc. 57.  The Court, citing the Missouri Rules of Professional

conduct, questioned why Habeas Counsel had failed to alert the Court to *Mark v. Ault*, 498 F.3d

775 (8th Cir. 2007), a case adverse to Shockley addressing a nearly identical question and

holding that a petitioner seeking to expand the record under Habeas Rule 7 must nevertheless

satisfy the requirements of § 2254(e)(2).  Doc. 76 at 13; *Ault*, 498 F.3d at 788.

Habeas Counsel argue at length that the *Ault* case is distinguishable and that they were

therefore under no obligation to raise the case to the Court.  Doc. 90 at 65–69.  But there are, it

---

[4] The record contains two spellings—"Saylor" and "Sayler"—of this name.  Because the latter appears more prevalent, the Court adopts that spelling and uses it throughout this order (except where quoting).

turns out, at least two more fruitful responses.  First, the State helpfully directs the Court to its supplemental briefing on the discovery issue, where it did, in fact, cite and discuss the *Ault* case. Doc. 65 at 3–4.  Again, this raises the same ambiguity discussed in the Court's discussion of point 11 above: the Missouri rule requiring disclosure of adverse authority is not clear as to when the duty to raise adverse authority attaches.  *See* Mo. Sup. Ct. R. 4-3.3(a).  Because the State eventually raised the case, the Court finds sanctions on the basis of this rule inappropriate.

Second, Habeas Counsel, in their reply, themselves raised *Ault*, citing it for the correct proposition that "[t]o expand the record, a petitioner must show 'that his claim relies upon a new, retroactive law, or due diligence that could not have previously developed the facts.'"  Doc. 59 at 46 (quoting *Ault*, 498 F.3d at 788).  Although Habeas Counsel waited until they filed their reply to cite this case, once again, the Missouri rule is sufficiently ambiguous for this Court to sanction them for failure to raise the case in their opening brief.

Because both Habeas Counsel and the State eventually cited to *Ault*, and because the Court declines, in this context, to insist upon a reading of the Missouri rule that would require Habeas Counsel to have raised the case in their opening brief, the Court discharges this point of its show-cause order.

## IV.   Conclusion and admonition

As discussed above, the Court finds that Habeas Counsel's misrepresentations and misstatements warrant sanctions on 11 distinct counts.  The Court has considered whether its findings would have a chilling effect on zealous advocacy in death-penalty cases, and concludes that they would not.  Nothing in this order should be used to chill advocacy in this or any other case.  The Court simply finds it necessary to hold Habeas Counsel accountable for their

transgressions in this case, and to remind them and others that Rule 11 and the rules of professional conduct impose appropriate limits on their advocacy.

After ascertaining the sanctionable behavior, courts enjoy broad discretion to tailor a sanction to the circumstances. *Vallejo*, 903 F.3d at 747 (citation omitted). Among the appropriate sanctions is the issuance of a written admonition. *See* Fed. R. Civ. P. 11(c) advisory committee's note to 1993 amendment. The Court finds that such an admonition is the appropriate sanction to impose in this case.

Accordingly, for all of the reasons set forth in this order, the Court admonishes Jeremy Weis, Justin Thompson, and Paula Harms that their conduct violated Rule 11 and breached the trust of both this Court and the public. The Court relies on counsel to cogently and artfully represent their clients, playing an indispensable role in reaching correct rulings under the applicable law. By muddling briefing with frivolous arguments and fallacious assertions, Habeas Counsel have abdicated that responsibility. When attorneys press beyond the boundaries of Rule 11, they erode the court's trust in them and undermine their own ability to credibly advocate for their clients. Finally, Habeas Counsel's recurring lack of candor threatens to undermine the confidence of the public in the integrity of the justice system by advocating lawlessness and casting aspersions without due regard for the accuracy of their claims. The Court intends that this admonition serve as a reminder that zealous advocacy is not unbounded, and that counsel are always required to abide by the rules of conduct.

So ordered this 10th day of February 2024.

_SL R. CR_

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE